## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **REPUBLIC OF PERU** | ) | |
| Jiron Lampa 545 | ) | |
| Cercado de Lima | ) | |
| Lima 1, Perú | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| **YALE UNIVERSITY** | ) | |
| 2 Whitney Avenue, 6th Floor | ) | |
| New Haven, Connecticut  06520 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORIGINAL COMPLAINT

Plaintiff Republic of Peru, through undersigned counsel, hereby complains against Defendant Yale University as follows:

1.      Plaintiff Republic of Peru ("Peru") files this Complaint against Yale University ("Yale") seeking the return of a collection of artifacts, objects, antiquities, and related items. These artifacts belong to Peru and its people and are central to the history and heritage of the Peruvian nation.  Yale is wrongfully, improperly, and fraudulently detaining this property and has refused its return.  The property in question is composed of centuries-old Incan materials – mummies, skulls, bones and other human remains, pottery, utensils, ceramics, objects of art and other items ("artifacts") – which were excavated from Cuzco, Machu Picchu, and the surrounding areas by agents of the University.  Thereafter, the artifacts were exported to New Haven, Connecticut, where they have remained, despite demand by Peru that the artifacts be returned.

2.     Yale has retained this property in violation of the laws of Peru and the United States, in breach of Yale's promise to return the property to Peru, and in breach of numerous fiduciary duties owed to Peru.   Further, Yale's conduct violates numerous multinational conventions and treaties concerning the protection of cultural property, such as the 1970 UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export, and Transfer of Ownership of Cultural Property and the 1972 UNESCO Convention Concerning the Protection of the World Cultural and Natural Heritage – to which both Peru and the United States are parties -- as well as the UNIDROIT Convention on Stolen or Illegally Exported Cultural Objects.  Negotiations between the parties have broken down, following Yale's refusal to return Peru's artifacts.

3.     Peru, as the rightful owner of this property, seeks to defend its legal property rights concerning its cultural heritage.  Peru seeks this Court's recognition of Peru's legal rights as well as this Court's declaration the property in question belongs lawfully to Peru and should be returned.  Peru seeks the immediate return of all such property as well as damages that it has suffered on account of Yale's persistent breach of its obligations and profit at the expense of the people of Peru.

**JURISDICTION AND VENUE**

4.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332, diversity of citizenship, because Peru is a foreign state and Yale is a citizen of Connecticut and because the amount in controversy exceeds $75,000.

5.     Venue in this judicial district is proper under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

2

## PARTIES AND RELATIONSHIPS

6.      Peru is a foreign state.  The Republic of Peru, in appearing before this U.S. Court, retains its status as a sovereign State and the privileges and immunities that, as a consequence of its status as a sovereign State, belong to Peru in accordance with international law.

7.      On information and belief, Yale is a corporation organized under the laws of Connecticut and with its principal place of business in New Haven, Connecticut.  On information and belief, Yale is a private institution of higher education that accepts federal funding.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

8.      In 1893, Peru decreed that, absent special permission from the government, the exploration or excavation of archeological objects was forbidden due to the "absolute disregard for national rights" and the "dishonor of [Peru's] national civilization and culture" that Peru had suffered on account of unbridled excavation of its territory.  *Decreto Supremo*, April 27, 1893, attached as Exhibit A; *see infra* ¶ 23.

9.      In 1911, Hiram Bingham ("Bingham") of Yale conducted an expedition to Peru. On July 24, 1911, the expedition arrived at the ancient Incan ruins of Machu Picchu, which had been previously discovered.

10.      Upon information and belief, Yale, entirely or in substantial part, funded the 1911 expedition.

11.      Upon information and belief, at least by 1911, if not also before, Bingham may have improperly extracted artifacts.

12.      On February 23, 1912, Bingham wrote to Gilbert H. Grosvenor ("Grosvenor") of the National Geographic Society ("NGS") that he was

> planning to go to Peru in the near future to attempt to secure a
> concession which would enable us to [conduct] archeologjcal and

> geological exploration and excavation and also to secure
> permission to bring specimens out of the country . . . I shall have to
> do my best to persuade the politicians in Lima that this is an
> enterprise of a purely scientific character and not intended to
> exploit commercially any of Peru's wonderful archeological
> possessions. A letter from [NGS officials] stating your interest in
> the work and approval of our plans would be very helpful . . . The
> stronger the credentials which you can give me, the better able I
> shall be to persuade any who stand in the way of exploration and
> excavation that our object is scientific and not commercial.

Bingham Correspondence dated February 23, 1912, attached at Exhibit B.  NGS's support was thus critical to Yale's efforts.

13.     In May 1912, Grosvenor and Bingham, on behalf of NGS and Yale respectively, entered into a Memorandum of Agreement signed by Grosvenor, the President and the Secretary of NGS, Bingham, and President Hadley of Yale.  In the Agreement, NGS agreed, among other things, to assist in funding a second expedition to Peru.  Memorandum of Agreement between NGS and Yale, attached at Exhibit C.  Again, NGS's involvement was critical to Yale's efforts.

14.     In May 1912, recognizing that he needed permission from the Government of Peru before mounting a second expedition, Bingham, representing NGS and Yale, drafted a memorandum of a working agreement which sought permission to further explore the Incan ruins at Machu Picchu and the surrounding areas.   Draft Working Agreement for 1912 Expedition, attached at Exhibit D.  Peru, in response, enacted a law that permitted the expedition to go forward, but only with certain restrictions and limitations on the expedition's scope and conduct.  *See infra* ¶¶ 24-25.

15.     In 1914, Yale and NGS organized a third expedition to Peru.  On March 9, 1914, Bingham informed Grosvenor that Yale had approved plans for the third expedition and asked Grosvenor to "send a formal application to the Peruvian Minister, requesting him to secure the

approval of his government to this project . . . on the usual terms accorded to properly accredited

scientific expeditions." Bingham Correspondence dated March 9, 1914, attached at Exhibit E.

     16.     Grosvenor submitted such an application on behalf of Yale and NGS to the

Government of Peru which approved the request.   Suggested Form of Letter to the Peruvian

Minister, attached at Exhibit F.

     17.     Yale was required to conduct the expedition under the terms of the recently

enacted decree. *See infra* ¶¶ 29-32.

     18.     In March 1914, NGS and Yale entered into a "Memorandum of Agreement for the

Peruvian Expedition of 1914-15 under the Auspices of Yale University and the National

Geographic Society" in which NGS agreed to support and co-sponsor Bingham's third

expedition.  Grosvenor signed the Agreement for NGS.  Bingham and President Hadley signed

for Yale.  Memorandum of Agreement for 1914-1915 Expedition, attached at Exhibit G.

     19.     On each of the three expeditions – 1911, 1912, 1914-1916 – Bingham acted as an

agent for Yale.

     20.     On each of the three expeditions, Bingham and members of his expeditions

excavated and harvested artifacts from the architectural core of the Incan ruins at Machu Picchu

as well as from Cuzco and the surrounding areas.  On May 19, 1915, for example, Bingham

wrote to Grosvenor from Yanquihuasi, Ollantaytambo, and told him that the expedition had

located "mummies, quite a number of skulls and several boxes of sherds from various localities."

Bingham Correspondence dated May 19, 1915, attached at Exhibit H.

     21.     During the 1915 expedition, Bingham's expedition encountered resistance from

some Peruvians to the expedition's activities and planned use of the excavated artifacts.  On

January 31, 1916, Bingham sent Grosvenor a copy of "Peruvian Expeditions.  Summary of Work

of 1915," and a copy of the Peruvian English language newspaper, *The West Coast Leader*, dated August 19, 1915. Both set forth accounts of this controversy. The newspaper article states, "The bones and pottery which the Expedition collected will only be taken out of the country with the permission of the Peruvian Government and even in that event Professor Bingham has offered to return the collections after they have been studied." Summary of Work and Newspaper Article, attached at Exhibit I.

22.     Upon information and belief, Bingham and members of his expedition in 1911 removed artifacts from Cuzco, Machu Picchu, and the surrounding areas and had them transported to Yale in New Haven, Connecticut.

23.     On several occasions, Bingham and members of the expeditions in 1912 and 1914-1916 removed artifacts from Cuzco, Machu Picchu, and the surrounding areas and had them transported to Yale in New Haven, Connecticut. In fact, by the time that the 1914-1916 expedition was completed, Bingham and the members of his expeditions had completely stripped Machu Picchu, and the surrounding areas of their archeological objects, leaving nothing behind.

**Peruvian Law at the Time of Hiram Bingham's Expeditions**

The First Decree

24.     According to a Peruvian Decree dated April 27, 1893, ("the First Decree"), in effect as Bingham commenced his first expedition to Peru, archeological exploration or excavation without government permission was explicitly prohibited. The Decree stated: "Without special permission (from the Conservation Commission of National Antiquities] . . . it is forbidden to explore or excavate in search of archaeological objects in mounds, old fortresses, temples, or other places, whether situated on public or in vacant lands." *Decreto Supremo*, April 27, 1893, Ex. A, at 1-4 (translation).

6

The Second Decree

25.     On August 19, 1911, less than one month after Bingham arrived at Machu Picchu, the Peruvian authorities enacted a new decree ("the Second Decree") which modified several aspects of the First Decree.  The new Decree stated that, "All articles found belong to the Government. . . ."  The Decree also prohibited the exportation of artifacts of historical and archaeological importance:  "Until Congress shall enact a law regarding the preservation of antiquities, their exportation is absolutely forbidden, whatever may be their class or condition . . ." *Decreto Supremo,* August 19, 1911, attached at Exhibit J, at 4-5 (translation).

26.     The Peruvian Government established a regime to monitor compliance with the Second Decree and ordered the appointment of a Peruvian Inspector to "carefully supervise" the discoveries of approved expeditions.  Ex. J at 4.  Discovered objects were to be sent to the national history Museum in Lima, and exportation was "absolutely forbidden." Ex. J at 4-5.

27.     Artifacts and any other objects found and/or excavated by Bingham and other members of his expedition to Peru in 1991, if not also before, were and are the property of Peru.

28.     Upon information and belief, artifacts exported by Bingham and/or other members of his 1911 expedition to Peru are currently in the custody of Yale.

The Third Decree

29.     In 1912, Bingham, Yale, and NGS sought permission from the Peruvian Government to explore the Cuzco region, including Machu Picchu and the surrounding areas, and to excavate archaeological artifacts from these areas and export them to the United States. Exs. B, D.

30.     In response to the request, the Peruvian Government issued an executive order dated October 31, 1912 ("the Third Decree").  The Third Decree observed that "explorations and

7

excavations practiced to date by Dr. Hiram Bingham" had not been in strict compliance with the applicable law. *Decreto Supremo No. 1592,* October 31, 1912, attached at Exhibit K.  The Third Decree noted the explicit "ban on the export of artifacts of archeological value" contained in the Second Decree of August 19, 1911.  But, in light of the goal of "the requesting institutions" to "perform scientific research which shall benefit the history of Peru," the Third Decree granted an exception "for this time only."  The exception applied only to Bingham, Yale and NGS, and the Decree imposed specific conditions.   Among those conditions were the following: (1) Permission was granted for a limited time only, and the Government prohibited all exploration and/or excavation after expiration of the permission; (2) The expedition's activities would be supervised by a Peruvian official; and (3) The decree applied to "all artifacts extracted by virtue of this authorization *or extracted before this date."* Ex. K (emphasis added).

31.     Most important, the Third Decree explicitly reserved Peru's right to demand that Yale and NGS return artifacts "that might be extracted and have been extracted . . ." Ex. K. at 2 (translation).

32.     Artifacts exported pursuant to the Third Decree are currently in the custody of Yale.  Under the terms of this Decree, all artifacts excavated by Bingham and the members of his expedition *prior to and after* issuance of the Decree on October 31, 1912, were and are the property of Peru and subject to the conditions imposed by the Decree.

33.     The Third Decree also required Yale and NGS to return, upon Peru's demand, "all copies of all research papers and reports regarding the explorations."  The Decree reserved Peru's right to declare all such papers and reports to be official documents of Peru.  Ex. K at 2 (translation).

8

34.     Research papers and reports referenced in the Third Decree are currently in the custody of Yale.  Despite Peru's demand, Yale has never provided copies of these documents to Peru as required under the terms of the Decree.

The Fourth Decree

35.     On January 27, 1916, Peru issued a fourth executive decree in response to a from Elwood C. Erdis and Hiram Bingham -- on behalf of the 1914-1916 expedition -- to export to Yale and the NGS "74 boxes of archaeological artifacts extracted from the Department of Cuzco between 1914 and 1915."  Executive Order of January 27, 1916, attached at Exhibit L ("the Fourth Decree").

36.     The Fourth Decree again made an exception to the prohibitions in the Second Decree of August 19, 1911, and allowed the requested exportation of the 74 boxes to proceed, but only on condition that Yale and NGS "pledge to return, in the term of eighteen months from today, the artifacts whose export has been authorized." Ex. L (translation).

37.     Artifacts exported pursuant to the Fourth Decree are currently in the custody of, *inter alia*, Yale.  The artifacts were not returned within eighteen months as required by the Fourth Decree.  Upon information and belief, many if not most of these artifacts have never been returned.

38.     According to the Fourth Decree, in shipping the requested 74 boxes, Yale and NGS further pledged to send to Peru "all studies performed on [the shipped artifacts] and the photographs taken in regard to the investigations carried out on such artifacts." Ex. L.

39.     The studies and photographs referenced in the Fourth Decree are currently in the custody of, *inter alia*, Yale and have not been provided to Peru as required under the terms of the Decree.

**Yale Had Knowledge of Its Obligations**

40.     On information and belief, Hiram Bingham and Gilbert H. Grosvenor were fully aware of all their legal obligations under Peruvian law.  They knew that the First Decree of April 27, 1893, prohibited all exploration and excavation without special permission from the Peruvian Government.   They knew that the Second Decree of August 18, 1911, asserted Peruvian title to and ownership of all artifacts taken by Bingham's expeditions, and that this Decree prohibited the exportation of such artifacts.   They knew that the Third Decree of October 31, 1912, granted Yale and NGS permission to explore and excavate in the Cuzco region, including Machu Picchu, but also reserved to Peru the right to demand the return of all artifacts that had been extracted both before and after the date the Decree was issued.   They knew that the Fourth Decree of January 27, 1916, allowed Bingham's expedition to export 74 boxes from Peru to the United States, provided that all the archaeological materials would be returned within eighteen months of the date of the Fourth Decree.

41.     As evidenced by the draft May 1912 Memorandum of Working Agreement between Peru and Bingham, acting on behalf of NGS and Yale, Yale recognized Peru's ownership of the artifacts, Peru's right to protect its cultural heritage, and the immense value that the archeological objects and sites at Cuzco, Machu Picchu, and the surrounding areas held for the Peruvian people.  For example, as conditions for Peru allowing the 1912 expedition and the temporary exportation of artifacts to the United States, Yale agreed, among other things:

> "[T]o bring to Peru a property equipped scientific expedition," which included suitable "competent" personnel;
>
> "[T]o exercise all due care in excavating to see to it that the ancient monuments are in no way destroyed or injured in the course of the work, and . . . to use all due diligence to leave the ancient monuments in as good condition as they were found"; and

10

> "[T]o place at the disposal of the Consul General of Peru in New
> York within two years of the date of their arrival from Peru
> examples of all kinds of archeological or geological specimens that
> have been exported from Peru and . . . to place at his disposition
> all articles of gold that may be found whether duplicates or not."

Ex. D at 1.  Further, as an additional concession for the "privilege of bringing to New Haven,

Connecticut" the artifacts that had been excavated, Yale agreed that

> after these have been properly studied and reports on them
> prepared, or after a period of not more than two years after the date
> of their arrival in New Haven, Connecticut, good specimens of all
> the kinds of articles found are to be delivered in good order to the
> General Consul of Peru . . . .

*Id.* at 2.

42.     Six months later and based on the assurances that Yale provided Peru, as

expressed in the draft Memorandum of Working Agreement, Peru issued the Second Decree,

thus allowing Yale to conduct the 1912 expedition.  Ex. J.

43.     In March 1914, Bingham sought permission to conduct another expedition in Peru

"on the usual terms accorded to properly accredited scientific expeditions."  Ex. E.  In so doing,

he was subject to the terms of the Third Decree – enacted to allow him to conduct the 1912

expedition two years earlier – which were still in force.  These terms included, *inter alia*, the

requirement that a "detailed inventory of all artifacts" be provided to Peru, that the artifacts be

exported only through customs at Mollendo and only to Yale University, and that Yale return the

artifacts when Peru demanded their return.  Ex. J.

44.     Upon information and belief, Yale acknowledged and was aware at all times of

Peru's right to demand return of its archeological objects and that, under Peruvian law, Yale was

obligated to return them.  Yale was also bound by its own promises to Peru, by which Yale

secured the permission of the Peruvian Government to conduct the expeditions.

11

45.    With respect to the Fourth Decree of January 27, 1916, in a letter dated February 21, 1916, Bingham wrote to Grosvenor, reporting that "A decree has been issued by the President of Peru permitting the seventy-four (74) cases containing bones, potsherds, pots, etc. to be shipped to this country on the conditions in the decree, a copy of which, with the translation, I am enclosing for your benefit." Bingham told Grosvenor that, if either Yale or NGS had reservations about these conditions or did not want to accept these conditions, it would still be possible to withhold shipment. "The collections have not actually left Lima," Bingham wrote, "It will be possible to stop them if we do not care to accept the responsibilities and obligations thrust upon us by the decree.  Perhaps it would be well to have your research committee consider carefully, as soon as possible, these obligations . . .  I understand that the material will not leave Lima before the first of March, so there is time to stop it by cable if we desire to do so." Bingham Correspondence dated February 21, 1916, attached at Exhibit M.

46.    Neither Yale nor NGS raised any objection to the conditions set forth in the Fourth Decree of January 27, 1916.  Accordingly, the parties arranged for the shipments from Peru with the clear understanding that the materials would be returned within eighteen months of the date of the Fourth Decree.

47.    The parties also understood that all artifacts taken from Cuzco, Machu Picchu, and the surrounding area belonged to the Government of Peru.  In a November 28, 1916 letter to Grosvenor, Bingham wrote:

> You will remember that we eventually succeeded in bringing back from Peru on the last expedition, some seventy-four boxes of potsherds, bones and a few archaeological objects of interest to science . . . The more valuable part of the collection is made up of skeletal remains, which I offered to the National Museum for study.  They cannot accept them, however, unless they are to become their property. ***Now they do not belong to us, but to the Peruvian government, who allowed us to take them out of the***

12

> ***country on condition that they be returned in eighteen***
> ***months*** . . .

Bingham Correspondence dated November 28, 1916, attached at Exhibit N at 1 (emphasis added).

48.     Both Yale and NGS recognized that the materials in question belonged to and should be returned to Peru within eighteen months of the date of the Fourth Decree. In his November 28, 1916 letter to Grosvenor, Bingham suggested that, because work had not been completed on the artifacts,

> a written application [should] be presented to the Peruvian government through our State Department applying for an extension of the term allowed . . . I am almost tempted to let the Peruvians "whistle for it," but I suppose that would not be fair to any future work the National Geographic Society might try to do in Peru . . . My suggestion is that the collection of skulls be turned over to the best anthropologist in this vicinity that is willing to handle it, ***on the condition that it is to go back to Peru in the near future***. Are you willing?

Ex. N at 1-2 (emphasis added).

49.     The following day – November 29, 1916 – Grosvenor wrote to Bingham and stated, "I feel that we ought to abide by the letter of our agreement with the Peruvian Government and return all the material that we contracted to return, and I am glad that you share this view with me." Grosvenor Correspondence dated November 29, 1916, attached at Exhibit O (emphasis added).

50.     On December 1, 1916, Bingham wrote to Grosvenor: "I have seen President Hadley and made arrangements with him whereby the skeletal material will be studied in time to allow of its return to Peru in accordance with the letter of our agreement with the Peruvian Government." Bingham Correspondence dated December 1, 1916, attached at Exhibit P.

13

51.     Peru has never relinquished title to or ownership of the artifacts.  In fact, on November 22, 1918, the Minister of Peru, Manuel de Freyre, in a letter to Grosvenor at NGS, formally demanded, pursuant to the Fourth Decree, the return of the 74 boxes of artifacts in Yale's custody taken from Peru in 1916.  Peru Correspondence dated November 22, 1918, attached at Exhibit Q.

52.     In a November 23, 1918 letter to the Minister of Peru, Manuel de Freyre, Grosvenor attributes the delay in returning the 74 boxes to Bingham's extended service in World War I.  Grosvenor assured the Minister that Bingham would return soon and resume his study of the material and that "any promises that may have been made may be fulfilled."  Grosvenor Correspondence dated November 23, 1918, attached at Exhibit R.

53.     On October 26, 1920, the Peruvian Consul General to the United States – Eduardo Higginson – informed George Day, Treasurer of Yale, and Gilbert Grosvenor of NGS by letter that Higginson had "this day received a cablegram from [the Government of Peru] asking me to request from you the return of the original and duplicate objects taken from Peru by the [Bingham Expedition].  They also ask me to request you to send with these objects copies of the studies and information obtained relative to the investigations instigated in Peru during this investigation." Higginson went on to cite Article Four of the October 31, 1912 Decree - "of which you undoubtedly have a copy" - and asked for "your prompt reply as to when you will be able to ship these objects to Peru."  Higginson Correspondence dated October 26, 1920, attached at Exhibit S.

54.     On November 1, 1920, Bingham wrote to Grosvenor suggesting that Grosvenor tell the Peruvian Consul General that the war had interfered with his study of the material and that more time was needed before the artifacts were returned to Peru.  Bingham's letter noted that

George Day, Treasurer of Yale, had received a similar letter from Peru demanding return of the artifacts. Bingham Correspondence dated November 1, 1920, attached at Exhibit T.

55.     On November 3, 1920, George Day, Treasurer of Yale wrote to the Peruvian Consul Higginson that "Dr. Bingham is too ill to give to this matter his personal attention and that pending conferences with him it will be impossible to take action in this matter." Day asked Higginson if Yale could retain the artifacts until January 1, 1922, for completion of the studies. Day Correspondence dated November 3, 1920, attached at Exhibit U.

56.     On December 30, 1920, the Peruvian Consul General reported to Gilbert Grosvenor that "I have this day received [a] communication from [the Peruvian government stating that] permission is granted for the extension of time to January 1, 1922" for the return of the artifacts. The Peruvian Government issued a decree formally extending the time period for return of the artifacts.  Correspondence from Peru dated December 30, 1920, attached at Exhibit V; Decree No. 2169, attached at Exhibit W.

57.     Upon information and belief, in October 1921, Yale returned to Peru some of the artifacts that had been taken from Cuzco, Machu Picchu, and/or the surrounding areas.  The most valuable and archeologically significant artifacts – including but not limited to mummies, skeletons, skulls, bones, and other Incan remains – were never returned to Peru and remain in the custody of, *inter alia*, Yale.

58.     Yale's wrongful, improper, and fraudulent retention of these artifacts has caused and continues to cause damage to Peru.

**The Role of the NGS**

59.     During 1911-1916, Grosvenor was Editor-in-Chief and a director of NGS.  He began a lasting friendship with Bingham in 1908 and, over the next twenty years, the two

15

frequently corresponded about various issues relating to Bingham's Peruvian expeditions. Because of Grosvenor's personal support for the project, NGS provided substantial financial support for and played a pivotal role in the expeditions in 1912 and 1914-1915.

60.     Because of its good relationship with Peru, NGS served as the primary go-between for Bingham and Yale on one side and Peru on the other. In 1912 and 1914, for example, NGS filed applications with the Government of Peru seeking permission for the expedition to explore and excavate in Peru.

61.     NGS was party to two agreements with Yale setting forth the terms and conditions of their joint sponsorship of Bingham's 1912 and 1914-1916 expeditions to Peru. *See supra* ¶¶ 12, 17.

62.     NGS also participated in negotiations with the Peruvian Government that led to the Third and Fourth Decrees governing the conduct of the 1912 and 1914-1916 expeditions, *see supra* ¶¶ 11, 14, and a working agreement with the Peruvian Government related to the 1912 expedition, *see supra* ¶ 13.

63.     NGS provided significant funding for the 1912 expedition and for the 1914-1915 expedition. It also published through its official journal, *National Geographic Magazine,* four separate articles: "Explorations in Peru," April 1912; "In the Wonderland of Peru: The Work Accomplished by the Peruvian Expedition of 1912, under the Auspices of Yale University and the National Geographic Society," April 1913; "The Story of Machu Picchu: The National Geographic Society - Yale University Explorations in Peru," February 1915; and "Further Explorations in the Land of the Incas - The Peruvian Expedition of 1915 of the National Geographic Society and Yale University," May 1916. These articles contain hundreds of photographs and all have the byline of Hiram Bingham, referring to him as Director of

16

Expedition. At its expense, NGS later published in 1930 with Bingham, by then a United States Senator from Connecticut, a special edition book in cooperation with Yale University Press about the Peruvian Expeditions.

64.     In September 2001, representatives of Peru met with representatives of NGS to discuss how best to achieve the return of the artifacts from Cuzco, Machu Picchu, and the surrounding areas. The representatives of NGS agreed to cooperate with Peru to achieve a solution to the problem that would be agreeable to both Peru and Yale.

65.     NGS believes that the artifacts belong to Peru and should be returned, a position supported unanimously by NGS's Board of Trustees. NGS's position is based on the expressed agreement of NGS, Yale, and Hiram Bingham at the time of the expeditions and on NGS's understanding of the law and facts today. NGS has informed Yale of NGS's position. On November 30, 2001, NGS Executive Vice President for Mission Programs, Terry D. Garcia, sent a proposal - along with a legal analysis - to representatives of Yale. The analysis concluded that Peru was the rightful owner of the artifacts, and the proposal, if accepted, required Yale to confirm this fact. Declaration of Terry D. Garcia, attached at Exhibit X.

66.     On December 20, 2001, Yale notified NGS that it would not consider the proposed resolution until Yale's counsel had reviewed the documents that were the basis for NGS's analysis. NGS immediately agreed to provide Yale with these documents.

67.     On January 16, 2002, counsel for NGS sent to counsel for Yale copies of all documents referred to in NGS's November 30, 2001 proposal.

68.     Yale did not respond to the NGS initiative.

69.     On September 19, 2005, John M. Fahey, Jr., President and CEO of NGS, sent a letter to Yale's President Levin, expressing hope for a mutually agreeable solution regarding the

17

artifacts, and offering the assistance of NGS toward that end.  The letter attached a summary of correspondence between Bingham and Grosvenor in which both clearly state that the artifacts exported from Peru are the property of the Peruvian Government and must be returned.  Fahey Correspondence dated September 19, 2005, attached at Exhibit Y.

**The Artifacts Today**

70.     The Historic Sanctuary at Machu Picchu has dramatic importance to the nation of Peru, the Peruvian people, and their heritage.

71.     In light of the profound importance of Machu Picchu to the Peruvian people and its central place in the history of the Peruvian nation, the site has been inscribed on the United Nation's World Heritage List and was recently recognized as one of the Ten "New" Wonders of the World.  It is one of the most well-known and recognizable archaeological sites in the world.

72.     The mummies, skulls, bones and other human remains, pottery, utensils, art and other artifacts and objects taken from Cuzco, Machu Picchu, and the surrounding areas and currently in the custody of, *inter alia*, Yale have intrinsic and important cultural significance to the nation of Peru, the Peruvian people, and their heritage.

73.     At no time has Peru relinquished ownership of any artifact or object excavated and/or exported by Bingham and other members of the Bingham expeditions.

74.     Upon information and belief, Yale retains custody of all, or substantially all, artifacts excavated and exported by Bingham and members of the Bingham expeditions.  Yale also possesses research papers, studies, and reports about the artifacts, as well as illustrations and photographs made of the artifacts.

75.    In January 2003, Yale's Peabody Museum of Natural History inaugurated a major exhibition of artifacts from Peru.  Although this exhibition is formally housed in New Haven at the Peabody Museum, it has been taken on tour throughout the United States.

76.    The collection of artifacts from Cuzco, Machu Picchu, and the surrounding areas held by Yale constitutes one of the most important collections of its kind in the world.

77.    Upon information and belief, Yale's collection is composed of artifacts found, excavated, and exported from Peru to Yale by Bingham and the members of his expeditions.

78.    In May 2003, Yale's exhibit of artifacts from Machu Picchu was taken on a tour of the United States.  Upon information and belief, this touring exhibit generated millions of dollars of revenue for Yale.  In September 2005, it returned to New Haven.  Upon information and belief, Yale intends to make the exhibit part of the Peabody Museum's permanent collection.

79.    The Peabody Museum website has stated that Bingham "excavated hundreds of objects that tell the story of everyday life at Machu Picchu and, by agreement with the Peruvian government, these materials became part of the Peabody Museum's collections." Peabody Website, attached at Exhibit Z.

80.    There is not, and has never been, any such agreement between Yale and the Peruvian Government.

## FIRST CAUSE OF ACTION (Violation of Peruvian Law)

81.    The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

82.    Yale has violated multiple decrees that Peru enacted to ensure the retention and protection of the property composing Peru's rich cultural heritage.

19

83.     Yale has violated the First Decree by, in 1911, if not also before, exploring and excavating Peru's national monuments in search of archeological objects without first obtaining special permission from the Peruvian Government.

84.     Yale has violated the Second Decree by, in the 1912 expedition, exporting from Peru artifacts over which Peru possesses title and ownership.

85.     Yale has violated the Third Decree by refusing to return to Peru artifacts excavated by Yale both before and after the date of the Third Decree's enactment as well as research papers and reports, despite Peru's demand for their return.

86.     Yale has violated the Fourth Decree by failing to return the 74 boxes of archeological objects exported out of Peru and to the United States following the 1914-1916 expedition, despite Yale's promises to return the objects.

## SECOND CAUSE OF ACTION (Replevin)

87.     The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

88.     Yale has wrongfully exercised custody of artifacts exported from Peru by Bingham and other members of Bingham's expeditions, as well as reports, studies, and photographs related to those artifacts ("related materials"). Despite Peru's demand for return of these artifacts and related materials, Yale has refused.

89.     Peru is the owner of all such artifacts and related materials.

90.     Peru had and has a right to immediate possession of all such artifacts and related materials.

91.     Peru seeks an order of this Court replevying all such artifacts and related materials which Yale continues to detain wrongfully.

### THIRD CAUSE OF ACTION (Damages for Wrongful Retention)

92.     The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

93.     Yale wrongfully has and continues to exercise custody of artifacts belonging to Peru, and related materials to include photographs, studies and reports.

94.     Peru is the owner of all such artifacts and related materials.

95.     Peru had and has an absolute right to immediate possession of all such artifacts and related materials.

96.     Yale's wrongful retention of the artifacts and related materials has proximately caused Peru to suffer damages far in excess of $75,000.

97.     Peru seeks such damages for Yale's wrongful retention of the artifacts and related materials.

### FOURTH CAUSE OF ACTION (Conversion)

98.     The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

99.     Yale was specifically given access to the artifacts and the right to export them temporarily to the United States based on Yale's assurance that it would conduct scientific research and examination of the artifacts and would return them and the related materials when Peru demanded.  Yale has refused Peru's demand that the artifacts and related materials be returned.  Additionally, Yale failed to conduct research and studies to the extent agreed upon between Yale and Peru.  In fact, until recently, much of the collection was still in the original packaging in which it had been shipped to the United States, with numerous boxes never having been opened nearly 100 years after their shipment to the United States.

21

100.    In refusing to relinquish custody of the artifacts and related materials belonging to Peru, Yale has willfully exercised dominion and custody of such property to Peru's detriment and has, therefore, converted the same to Yale's own use.

101.    As a direct and proximate result of Yale's wrongful conduct, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

102.    Peru seeks an order of this Court replevying all such artifacts and related materials which Yale has wrongfully converted.

## FIFTH CAUSE OF ACTION (Breach of Contract)

103.    The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

104.    Peru allowed Yale to conduct the Bingham expeditions and to export artifacts from Peru on the condition that the artifacts and related materials be returned to Peru when Peru demanded.  Yale agreed to these terms.

105.    Peru is the owner of all such artifacts and is the proper party to sue for Yale's breach of contract.

106.    Yale has breached its agreement with Peru by failing to return the artifacts and related materials, despite Yale's demand for their return.

107.    As a direct and proximate result of Yale's breach, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

108.    Peru seeks such damages for Yale's breach of contract due to its failure to return the artifacts and related materials.

**SIXTH CAUSE OF ACTION (Breach of Fiduciary Duty)**

109.     The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

110.     Yale assured Peru that, if Yale were permitted to excavate and export the artifacts temporarily to the United States, Yale would conduct scientific research and studies of the artifacts and would return the artifacts and related materials to Peru when Peru demanded. Based on Yale's promises, Peru gave permission to Yale to excavate and export the artifacts temporarily to the United States.

111.     In allowing Yale to conduct the Bingham expeditions and to export priceless artifacts from Peru to the United States – artifacts that are central to the history and cultural heritage of Peru – Peru placed a high degree of trust and confidence in Yale, thus creating a special relationship between Peru and Yale.

112.     Because of this special relationship, Yale was a fiduciary of Peru and accordingly owed Peru numerous duties. Among these duties were the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, the duty to act with integrity of the strictest kind, the duty of fair and honest dealing, and the duty of full disclosure.

113.     Yale has wholly betrayed Peru's trust and confidence. Not only did Yale fail to return the artifacts when Peru demanded, but it also failed to conduct scientific research and studies of the artifacts as Yale had agreed. In fact, until recently, much of the collection was still in the original packaging in which it had been sent to the United States nearly 100 years before, with numerous boxes having never been opened.

114.     Based on Yale's conduct described herein, Yale has breached its fiduciary duty to Peru.

115.    As a direct and proximate result of Yale's breach of fiduciary duty, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.  Furthermore, as a direct and proximate result of its breach, Yale has benefited from the breach of the fiduciary duty that it owed to Peru.

116.    Peru seeks such damages for Yale's breach of fiduciary duty.

## SEVENTH CAUSE OF ACTION (Fraud)

117.    The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

118.    As a condition of Peru granting permission to Yale to excavate and export the artifacts temporarily to the United States, Yale promised Peru that it would conduct scientific research and examinations of the artifacts and that it would return the artifacts and related materials to Peru when Peru demanded.  Yale breached its promises on both counts.  Not only has Yale refused to return the artifacts to Peru, despite Peru's demand, but it also failed to conduct research and studies of the artifacts as it had agreed.  In fact, until recently, much of the collection was still in the original packaging in which it had been sent to the United States nearly 100 years before, with numerous boxes having never been opened.

119.    At the time that it agreed to the conditions that Peru imposed on the Bingham expeditions, Yale falsely represented to Peru that it would comply with those conditions.

120.    Yale's representation was material.

121.    Yale knew this representation was false at the time that it made this representation.

122.   Yale intended to deceive Peru, and Peru reasonably relied on Yale's representation, as evidenced by Peru allowing the Bingham expeditions and temporary exportation of artifacts to the United States.

123.   Peru reasonably relied on Yale's representation to its detriment.

124.   As a direct and proximate result of Yale's fraud, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

125.   Peru seeks such damages for Yale's fraud.

**EIGHTH CAUSE OF ACTION (Fraudulent Misrepresentation)**

126.   The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

127.   At the time that it agreed to the conditions that Peru imposed on the Bingham expeditions, Yale falsely represented to Peru that it would return the artifacts and related materials to Peru.

128.   Yale knew that this representation was false at the time that it made the representation.

129.   Yale intended to induce Peru's reliance on Yale's representation.

130.   In reliance on Yale's representation, Peru allowed Yale to conduct the Bingham expeditions and to export artifacts temporarily to the United States.

131.   As a direct and proximate result of Yale's fraudulent misrepresentation, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

132.   Peru seeks such damages for Yale's fraudulent misrepresentation.

**NINTH CAUSE OF ACTION (Civil Conspiracy—Wrongful Retention)**

133.    The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

134.    Yale and Bingham unlawfully and wrongfully conspired between themselves that that Yale would wrongfully retain the artifacts and related materials.

135.    Yale and Bingham agreed that Yale would wrongfully retain the artifacts and related materials.

136.    Yale's wrongful retention of the artifacts and related materials has caused harm to Peru.

137.    Yale's wrongful retention of the artifacts and related materials was done pursuant to and in furtherance of Yale's common scheme with Hiram Bingham.

138.    As a direct and proximate result of Yale's civil conspiracy to wrongfully retain Peru's property, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

139.    Peru seeks such damages for Yale's civil conspiracy with Hiram Bingham.

**TENTH CAUSE OF ACTION (Civil Conspiracy—Conversion)**

140.    The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

141.    Yale and Bingham unlawfully and wrongfully conspired between themselves that that Yale would convert the artifacts and related materials.

142.    Yale and Hiram Bingham agreed that Yale would convert the artifacts and the related materials.

143.    Yale's conversion has caused harm to Peru.

144.   Yale's conversion was done pursuant to and in furtherance of Yale's common scheme with Hiram Bingham.

145.   As a direct and proximate result of Yale's civil conspiracy to convert Peru's property, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

146.   Peru seeks such damages for Yale's civil conspiracy with Hiram Bingham.

### ELEVENTH CAUSE OF ACTION (Civil Conspiracy—Fraud)

147.   The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

148.   Yale and Hiram Bingham conspired to commit fraud concerning Yale's intention to return the artifacts and related materials to Peru.

149.   Yale and Hiram Bingham agreed that Yale would retain the artifacts and related materials but that Yale would represent to Peru that Yale would return the artifacts and related materials to Peru when Peru demanded.

150.   Yale's fraud has caused harm to Peru.

151.   Yale committed fraud pursuant to and in furtherance of the common scheme with Hiram Bingham.

152.   As a direct and proximate result of Yale's civil conspiracy to commit fraud, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

153.   Peru seeks such damages for Yale's civil conspiracy with Hiram Bingham.

### TWELFTH CAUSE OF ACTION (Civil Conspiracy—Fraudulent Misrepresentation)

154.   The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

155.    Yale and Bingham unlawfully and wrongfully conspired between themselves that that Yale would fraudulently misrepresent Yale's assurance to return the artifacts and related materials to Peru when Peru demanded.

156.    Yale and Hiram Bingham agreed that Yale would fraudulently misrepresent its assurance to return the artifacts and related materials to Peru when Peru demanded.

157.    Yale's fraudulent misrepresentations have caused harm to Peru.

158.    Yale fraudulently misrepresented its intention to return the artifacts and related materials to Peru pursuant to and in furtherance of Yale's common scheme with Hiram Bingham.

159.    As a direct and proximate result of Yale's civil conspiracy with Hiram Bingham, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

160.    Peru seeks such damages for Yale's civil conspiracy with Hiram Bingham.

## THIRTEENTH CAUSE OF ACTION (Unjust Enrichment)

161.    The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

162.    Peru conferred a benefit on Yale by allowing Yale to export Peru's artifacts to the United States temporarily for the purpose of conducting scientific research and study, with the condition that the artifacts and related materials be returned when Peru demanded.

163.    Yale possesses knowledge of this benefit conferred on it by Peru.

164.    Yale accepted and retained the benefit under inequitable circumstances by its refusal to return the artifacts and related materials, despite Peru's demand for their return.

165.    Yale has been unjustly enriched as a direct and proximate result of its actions, and Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

166.    Peru seeks damages for Yale's unjust enrichment.

**FOURTEENTH CAUSE OF ACTION (Request for Declaratory Judgment)**

167.    The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

168.    An actual controversy exists between the parties with respect to whether legal title to and ownership of the artifacts and related materials belongs to Peru.  Peru seeks this Court's recognition of Peru's legal rights concerning the property in question as well as this Court's declaration the property belongs lawfully to Peru.

169.    The controversy between Peru and Yale is of sufficient immediacy to justify the issuance of a declaratory judgment.

170.    A declaration is necessary and proper at this time so that Peru may protect its rights.

171.    Peru seeks a judicial determination of the parties' respective rights and duties and this Court's recognition and a declaration of the rights that lawfully belong to Peru concerning the artifacts and related materials, including a declaration that Peru has legal title to and ownership of the artifacts exported from Peru to the United States through the Bingham expeditions as well as the related materials, all of which Yale is wrongfully detaining.  Peru further seeks an Order from this Court directing Yale to return the artifacts and related materials in their entirety to Peru.

WHEREFORE, Peru prays for judgment as follows:

a.    For compensatory damages in an amount to be determined at trial and for interest thereon at the highest lawful rate;

b.    For punitive damages in an amount to be determined at trial and for interest thereon at the highest lawful rate;

c.      For a writ of replevin and order compelling Yale to turn over the following: all objects in its custody which were exported from Peru by Hiram Bingham and/or other members of the Bingham expeditions, including but not limited to, all mummies, skulls, bones and other human remains, pottery, utensils, objects of art and all other items; copies of all research papers and reports referenced in the Third Decree and currently in the custody of Yale; and all studies and photographs referenced in the Fourth Decree and currently in the custody of Yale;

d.      For injunctive relief enjoining Yale from transferring, depositing, or otherwise moving the artifacts and related materials until further order of this Court;

e.      For a declaration that Peru has legal title to and ownership of the artifacts exported from Peru to the United States through the Bingham expeditions as well as the related materials, all of which Yale is wrongfully detaining;

f.      For an accounting from Yale of the location of all artifacts taken from Peru by Bingham, specifying whether those artifacts are currently in Yale's custody or in the custody of any third party known to Yale, including the Bingham family, any individual, NGS, or any museum, University, or other institution;

g.      For an accounting and disgorgement of profits by which Yale has been unjustly enriched on account of its exhibition and retention of property belonging to Peru;

h.      For attorneys fees and costs of suit incurred herein;

i.      For pre- and post-judgment interest at the highest lawful rate;

j.      For any relief applicable under the above-referenced international conventions and treaties; and

k.     For such other and further relief as this Court deems just and proper.

Respectfully submitted,

William P. Cook
District of Columbia Bar No.: 465006
Edward S. Scheideman III
District of Columbia Bar No.: 475128
Cristina E. Antelo
District of Columbia Bar No.: 500124

DLA PIPER LLP (US)
500 Eighth Street, NW.
Washington, D.C. 20004
Tel: (202) 799-4000
Fax: (202) 799-5000

Ileana M. Blanco
Christina E. Ponig

DLA PIPER LLP (US)
600 Travis Avenue
Suite 1700
Houston, Texas 77002
Tel: (713) 425-8400
Fax: (713) 425-8401

Attorneys for the Republic of Peru

December 5, 2008

31