**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **REPUBLIC OF PERU** | ) | |
| Jiron Lampa 545 | ) | |
| Cercado de Lima | ) | |
| Lima 1, Perú | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08-cv-2109 |
| | ) | Judge Henry H. Kennedy |
| **YALE UNIVERSITY** | ) | |
| 2 Whitney Avenue, 6th Floor | ) | |
| New Haven, Connecticut 06520 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff Republic of Peru, through undersigned counsel, hereby complains against Defendant Yale University as follows:

1.       Plaintiff Republic of Peru ("Peru") files this First Amended Complaint against Yale University ("Yale") seeking the return of a collection of artifacts, objects, antiquities, and related items (collectively the "Artifacts"). These Artifacts belong to Peru and its people and are central to the history and heritage of the Peruvian nation. Yale is wrongfully and improperly detaining these Artifacts and has refused their return. On information and belief, the Artifacts are composed of centuries-old Incan materials – bronze, gold, and other metal objects, mummies, skulls, bones and other human remains, pottery, utensils, ceramics, objects of art and other items – which were excavated from Machu Picchu and the surrounding areas by Hiram Bingham and Yale. Thereafter, the Artifacts were exported to Yale University in New Haven, Connecticut, where they have remained, despite demand by Peru that the Artifacts be returned.

2.     Yale has retained this property in violation of the laws of Peru and the United States, in breach of Yale's promise to return the property to Peru, and in breach of numerous fiduciary duties owed to Peru.  Upon information and belief, Yale has also wrongfully profited both commercially and financially from the Artifacts, including, *inter alia*, through its exhibit, "Machu Picchu: Unveiling the Mystery of the Incas," an exhibit organized by Yale's Peabody Museum, which traveled to major cities throughout the United States from 2003 to 2005.

3.     Further, Yale's conduct violates the spirit of numerous multinational conventions and treaties concerning the protection of cultural property, such as the 1970 UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export, and Transfer of Ownership of Cultural Property ("1970 UNESCO Convention") and the 1972 UNESCO Convention Concerning the Protection of the World Cultural and Natural Heritage ("1972 UNESCO Convention") – to which both Peru and the United States are parties – as well as the UNIDROIT Convention on Stolen or Illegally Exported Cultural Objects ("UNIDROIT Convention"), to which Peru is a party.  The 1970 UNESCO Convention, in fact, expressly urges that "**cultural institutions, museums, libraries and archives should ensure that their collections are built up in accordance with universally recognized moral principles**." (emphasis added) Further, UNESCO's World Heritage Committee has placed the Historic Sanctuary of Machu Picchu on its World Heritage List, a distinction reserved only for those sites holding "outstanding universal value" for the global community.

4.     Finally, the UNIDROIT Convention incorporates numerous aspects of the 1970 UNESCO Convention.  Indeed, each of these Conventions recognize and are derived from universally recognized, long-standing principles within the international community concerning the protection and preservation of cultural patrimony – principles that existed long before these

2

Conventions' entries into force.  Yale has entirely disregarded the spirit of these international instruments and the universally recognized moral principles they embody, as evidenced by Yale's wrongful and improper retention of Peru's Artifacts.

5.      Negotiations between the parties have broken down, following Yale's recent refusal to return Peru's artifacts.  Despite repeated recognition of Peru's ownership of the Artifacts and assurances that the Artifacts would be returned to Peru, Yale has only now made clear that it has no intention of returning the Artifacts that rightfully belong to Peru.  Indeed,  in December 2005, Yale claimed for the first time that it holds title to the Artifacts.

6.      Peru, as the rightful owner of this property, seeks to defend its legal property rights concerning its cultural heritage.  Peru seeks this Court's recognition of Peru's legal rights as well as this Court's declaration that the property in question belongs lawfully to Peru and should be returned.  Peru seeks the immediate return of all such property as well as damages that it has suffered on account of Yale's breach of its obligations and its profit at the expense of the people of Peru.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332, diversity of citizenship, because Peru is a foreign State and Yale is a citizen of Connecticut and because the amount in controversy exceeds $75,000.  This Court has personal jurisdiction over Yale generally because Yale transacts and solicits business regularly and purposefully and has systematic and continuous contacts with the District of Columbia.  Personal jurisdiction is also proper in this specific instance because Yale transacted business in the District of Columbia and the claims asserted herein arise and relate to Yale's transacting business in the District of Columbia.

8.      Venue in this judicial district is proper under 28 U.S.C. § 1391(a)(2) because a substantial and significant part of the events or omissions giving rise to the claim occurred in this judicial district.

## PARTIES AND RELATIONSHIPS

9.      Peru is a foreign State.  The Republic of Peru, in appearing before this U.S. Court, retains its status as a sovereign State and the privileges and immunities that, as a consequence of its status as a sovereign State, belong to Peru in accordance with international law.

10.      Upon information and belief, Yale is a corporation organized under the laws of Connecticut and with its principal place of business in New Haven, Connecticut.   Upon information and belief, Yale is a private institution of higher education that has in the past and continues currently to seek out, lobby for, and accept federal funding, which requires Yale officials to make numerous trips to Washington, D.C..  Upon information and belief, Yale also regularly conducts events, programs, and activities in Washington, D.C., including the University's widely advertised annual "Yale in Washington, D.C." program, which it promotes to its students, faculty, alumni and the general public through its website.

11.      As detailed herein, Yale's negotiations with Peru for permission to conduct expeditions to Peru occurred largely through the Peruvian Ambassador in Washington, D.C.. Further, the assistance and collaboration of the National Geographic Society ("NGS") located in Washington, D.C., as well as numerous interactions with elements of the United States Government, to include, *inter alia*, the intercession of then President of the United States, William H. Taft and the U.S. Department of State on behalf of Yale, as well as support given the Yale expeditions by the United States Departments of Agriculture and War, as well as the

Smithsonian Institution (all of which said activities took place in part, if not in total, in Washington, D.C.),[1] were critical to either Yale's obtaining permission from the Peruvian Government for its numerous Bingham-led expeditions, or later for Yale's exploitation of the benefits it received from having conducted and sponsored said expeditions.  In fact, but for the support from NGS and the United States Government, as well as the intercession of United States Government on behalf of Yale for the expeditions, the Bingham-led expeditions would not have occurred.   Thus, Yale's numerous contacts with Washington, D.C., regarding the expeditions directly give rise to the claims asserted in this lawsuit.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

**A.**    **The 1908 Expedition**

12.      In February 1908, Bingham's travels throughout South America brought him to Cuzco, and from there, to the newly re-discovered city of Choqquerquirau in Peru.

13.      On June 24, 1909, Gilbert H. Grosvenor ("Grosvenor"), the Director of NGS, wrote Bingham:

> Dr. Thomas Barbour of Harvard University, who has written several articles for our magazine, has written me that you have some most interesting material on your South American trip which you ought to send to our Geographic Magazine.

Grosvenor requested an article from Bingham "describing the least known section which you traversed with as large a selection of photographs as possible."

14.      Bingham offered to send NGS an article and photographs from his journey from Cuzco to Choqquerquirau.   NGS was pleased with the article and planned to publish it in

---

[1] The U.S. War Department provided instruments for the expeditions, the U.S. Department of Agriculture furnished and paid the salaries of the two botanists for the 1914-1915 expedition, and the U.S. National Museum housed animal specimens that were exported from Peru following

December 1909 or January 1910.  Bingham later withdrew the article, as he believed that it was too technical for the NGS Magazine readers.

15.     Upon information and belief, Bingham may have improperly extracted artifacts from Peru during the 1908 expedition.

**B.     The 1911 Expedition**

16.     On February 28, 1911, Bingham wrote the Peruvian Ambassador in Washington, D.C., explaining his "proposed scientific expedition to Peru" and asking for any help that the Ambassador could provide "to further the success of this project."  As a postscript to his letter, Bingham noted: "I have just received a letter from [the President of Peru] approving my plan."

17.     On May 16, 1911, Grosvenor invited Bingham to speak to NGS.  Bingham's secretary replied, noting that Bingham would be leaving soon for Peru as the Director of the Yale Scientific Expedition to Peru and would not return until late December.  The secretary added that Bingham would be happy to lecture the following February or March about the Peruvian expedition.

18.     In July 1911, the expedition arrived at the ancient Incan ruins of Machu Picchu, which had been previously discovered.  Upon information and belief, Yale, entirely or in substantial part, funded the 1911 expedition.

19.     Approximately eighteen years earlier, in April 1893, Peru had decreed that, absent special permission from the Peruvian Government, the exploration or excavation of archeological objects was forbidden due to the "absolute disregard for national rights" and the "dishonor of [Peru's] national civilization and culture" that Peru had suffered on account of prior

---

the expeditions.    Thus, the involvement of the United States Government in Bingham's expeditions was hardly casual.

unbridled excavations of its territory.  *Decreto Supremo*, April 27, 1893, attached as Exhibit A; *see infra* ¶ 92.

20.      On August 19, 1911 – less than one month after Bingham arrived at Machu Picchu – the Peruvian authorities enacted a new decree ("the Second Decree") which modified the 1893 Decree in part by allowing excavation only if permission was granted by the Government.  Like the 1893 Decree, however, exportation of artifacts was expressly banned.  Further, under the express language of the Second Decree, all artifacts found belonged to the Peruvian Government.  *Decreto Supremo,* August 19, 1911, attached as Exhibit B (translation); *see infra* ¶¶93-94.

21.      Under the Second Decree, the Peruvian Government also established a regime to monitor compliance with the Second Decree and ordered the appointment of a Peruvian Inspector to "carefully supervise" the discoveries of approved expeditions.   Exh. B at 4.  Discovered objects were to be sent to the national history Museum in Lima, since exportation was prohibited.  *Id.* at 4-5.

22.      Upon information and belief, at least by 1911, if not also before, Bingham may have improperly extracted artifacts.

23.      Bingham returned from Peru in late December 1911.  On January 5, 1912, he agreed to lecture before NGS the following month, on February 9, 1912.

C.      **The 1912 Expedition**

24.      On January 18, 1912, Grosvenor invited Bingham to Washington, D.C., to meet with the NGS Research Committee, the entity responsible for allocating NGS funds to support geographic exploration.  Grosvenor added, "Our organization is doing considerable exploration

work now, and I think it will be mutually profitable for them to know you and you to know them."

25.     On February 9, 1912, Bingham spoke to NGS in Washington, D.C., about his upcoming 1912 expedition to Peru.

26.     On February 13, 1912, Bingham wrote Grosvenor, thanking him for his hospitality during Bingham's visit to Washington, D.C., as well as for his "expressed willingness to see what you could do in helping forward another expedition to Peru."  Bingham also relayed that he was not sure when his next expedition would be but that he would be in contact with Grosvenor "as soon as [he was] ready to lead another expedition to the land of the Incas."

27.     In reality, Bingham was already planning another expedition, and NGS was not the only entity offering assistance to make the expedition possible.  Bingham, in fact, had help at the highest levels of the United States Government.  On February 12, 1912, at President Taft's request, Bingham wrote President Taft, explaining his proposal for an expedition to Peru and how the U.S. Government could assist him in securing a concession from Peru that would allow excavation as well as exportation of artifacts from Peru in his next expedition.  Bingham sought a fifteen (15) to twenty-year (20) concession.  However, Bingham recognized that:

> [t]he Peruvian government, in order to protect its ancient
> monuments for [sic] devastation chiefly by local treasure hunters,
> has passed a law decreeing that all ruins and ancient cities are the
> property of the Peruvian government, and must not be excavated
> by private persons.  ***A law has also been passed forbidding the
> exportation from the country of Peruvian antiquities.*** (emphasis
> added)

28.     On February 15, 1912, the Secretary to President Taft wrote then-Acting Secretary of State, Huntington Wilson, and relayed that the President wanted to make an informal request to the Government of Peru that it allow Bingham's expedition.

29.     President Taft himself later wrote H. Clay Howard, the American Ambassador in Lima, Peru, to request that he "render all proper support to Doctor Bingham and the other representatives of Yale University in their undertaking . . ."  Bingham would later observe that President Taft's "official help" was "of a most important nature."

30.     On February 23, 1912, Bingham wrote to Grosvenor that he was –

> planning to go to Peru in the near future to attempt to secure a concession which would enable us to [conduct] archeological and geological exploration and excavation, and ***also to secure permission to bring specimens out of the country***. . .  I shall have to do my best to persuade the politicians in Lima that this is an enterprise of a purely scientific character and not intended to exploit commercially any of Peru's wonderful archeological possessions.  A letter from [NGS officials] addressed to me and stating your interest in the work and approval of our plans would be very helpful. . .  The stronger the credentials which you can give me, the better able I shall be to persuade any who stand in the way of exploration and excavation that our object is scientific and not commercial (emphasis added).

Bingham Correspondence dated February 23, 1912, attached as Exhibit C.  As detailed below, NGS's support, assistance, and collaboration would be dispositive to Yale's ability to organize, staff, fund, conduct, and ultimately to get permission from Peru to mount the expedition.

31.     On March 1, 1912, Bingham wrote Grosvenor about the limited prospects that he could obtain a long-term concession from the Peruvian government to export artifacts from Peru.  He also asked that the possibility of the expedition itself be kept under wraps until the intention of the Peruvian government could be ascertained.  Specifically, Bingham stated:

> If you choose to make as a condition of your cooperation that I secure permission to excavate and bring some archeological material out of the country it will not seriously hamper my plans for I have no doubt that I shall be able to secure this permission at least for one year from the Peruvian government.  Of course the adoption of these plans implies permission to excavate.  It does not, however, necessarily imply permission to bring things out of the country and I should prefer not to have my hands tied in that

> regard. . . .  There is no doubt whatever in my own mind that we
> can secure permission for this expedition to do its work, however
> difficult it may be to secure a concession for ten years.  However in
> order to make the latter as feasible as possible I should like to keep
> the plans for this expedition quiet until it becomes certain how the
> Peruvian government is going to take the proposal for a ten or
> twenty years' concession. . . .

Bingham Correspondence dated March 1, 1912, attached as Exhibit D.

32.     On March 12, 1912, Bingham again wrote Grosvenor about NGS's financial

support for the expedition, Bingham's possible need to go to Peru to secure the concession to

bring artifacts to the United States, and information about the expedition team, which included a

Yale geology professor, a topographer, a history professor, and an assistant who "thoroughly

understands the details of cooking and packing, and handling Spaniards."

33.     On March 15, 1912, Bingham received a setback.  Grosvenor informed him that

NGS would not be able to support the expedition, as "there is considerable feeling that the work

is archeologic and not sufficiently geographic and I am afraid we shall have to give up our plans

for the present."

34.     On March 18, 1912, Bingham wrote Grosvenor, expressing his disappointment

with Grosvenor's recent letter but offering to modify his plans substantially to satisfy NGS's

requirements for supporting the expedition.

35.     On March 27, 1912, Grosvenor telegraphed Bingham that it was important that

Bingham come to Washington, D.C., "this Sunday or next Sunday" to meet with NGS.  Bingham

made immediate plans to travel to Washington, D.C., stating "[i]t is good news that you feel

hopeful about being able to cooperate with us in the next Peruvian Expedition.  ***I shall plan to

stay in Washington as long as you need me*** . . . ."  Bingham Correspondence dated March 29,

1912, attached as Exhibit E (emphasis added).

36.     On March 30, 1912, Grosvenor, writing from Washington, D.C., advised Bingham that NGS would likely support the expedition.

37.     On April 8, 1912, Bingham sent Grosvenor an outline of the upcoming expedition.  Bingham also inquired about the issue of copyright privileges for the general report resulting from the expedition and stated that Yale was open to whatever proposal NGS wanted to make.  In addition, despite Bingham's earlier assurances that the sole purpose of the expedition would be scientific and not commercial, Bingham stated that, whatever terms resulted for copyright privileges for the general report, ***"[they] would not, of course, affect the right of any individual member of the expedition to bring out his own book***, after your magazine had printed the first story of the expedition."  (emphasis added)  Upon information and belief, Bingham later published three books about his expeditions to Peru, personally keeping all the profits therefrom.

38.     By April 8, 1912, Bingham had still not heard from the State Department about its negotiations with Peru on the concession to bring artifacts to the United States following the expedition.  He wrote to Grosvenor, stating:  "I have heard nothing from the State Department since I saw you last.  I hope they will get some news from Peru presently."

39.     On April 11, 1912, Bingham wrote Grosvenor about NGS funding for the expedition, asking NGS to deposit $5,000 with the Yale University Treasurer on May 1st and $1,000 on the first of September, October, November, December, and January.  Bingham also discussed details about the expedition team as well as relayed information from the State Department that "the Minister to Peru reports favorably on the concession business."

40.     On April 12, 1912, Grosvenor acknowledged receipt of the draft NGS-Yale memorandum of agreement from Bingham.  He indicated that he would be making a few

changes to the draft.  He also stated that the dates of deposit requested by Bingham were "perfectly satisfactory."

41.     On April 15, 1912, in a letter to Grosvenor, Bingham confirmed receipt of a letter from the State Department, "saying that the President of Peru would cordially welcome another expedition on the lines of the last, so we are now in position to get ready to publish our formal announcement."  Bingham also inquired whether Grosvenor had "any influence with the Bureau of Forestry" to secure a forestry assistant for the team.

42.     On May 1, 1912, Bingham telegraphed Grosvenor to ascertain the status of the agreement and whether NGS had secured a topographer for the expedition.

43.     On May 10, 1912, Bingham expressed his regret that he had not been able to see Grosvenor more during a recent trip to Washington, D.C., "but had so much to do that I had to leave out everything that wasn't absolutely necessary."  Bingham also asked Grosvenor to send the Yale University Treasurer "the $5,000 due June 1st as soon as possible," noting the original plan had been for it to be paid on May 1st.

44.     In May 1912, NGS and Yale entered into a Memorandum of Agreement signed in Washington, D.C., by Grosvenor on behalf of NGS, as the President and the Secretary of NGS, Bingham on behalf of Yale, and President Hadley of Yale.  In the Agreement, NGS agreed, among other things, to assist in funding a second expedition to Peru as well as in supplying the instruments for the expedition.[2]  In correspondence to Bingham, Grosvenor expressed his "***hope that you will be able to excavate and bring back a shipload of antiquities for your museum at Yale***."  Grosvenor Correspondence dated May 2, 1912, attached as Exhibit F (emphasis added).

---

[2] The U.S. War Department furnished instruments for the 1912 expedition as well.

45.     On May 3, 1912, Bingham thanked Grosvenor for the signed agreement, his help in finding a topographer for the expedition, and his contribution to the expedition.  Bingham also relayed that he would be in Washington, D.C., on May 7, 1912, "to see at that time the Acting Secretary of State and President Woodward of the Carnegie Institution, in addition to my new partners in Peruvian exploration."

46.     In May 1912, recognizing that he needed to memorialize Peru's grant of permission to mount a third expedition, Bingham, on behalf of NGS and Yale, drafted a memorandum of a working agreement which sought permission to explore further the Incan ruins at Machu Picchu and the surrounding areas as well as export artifacts for a limited time for study in the United States.

47.     On July 11, 1912, Bingham reported to NGS from Cuzco about the expedition's progress, including the discovery of "bones and sherds [sic] . . . in the Cuzco Valley together with several undescribed ruins of considerable importance."   Later that month, he asked Grosvenor to send several people in Lima complimentary copies of the NGS Magazine.  Among Bingham's list of requested recipients were the President of Peru and Bingham's contact for W.R. Grace & Co. in Lima, Peru.

48.     Upon information and belief, on October 31, 1912, in response to a request by the United States Government – which acted at the prompting of Yale – the Peruvian Government issued an executive order ("the Third Decree").  *Decreto Supremo No. 1592,* October 31, 1912 and translation, attached as Exhibit G; *see infra* ¶¶ 98-102.  The Third Decree observed that Bingham had not complied with Peruvian law in his previous explorations and excavations.  The Decree also noted the ban on the exportation of artifacts contained in the Second Decree of August 19, 1911.  Still, the Peruvian Government created an exception "for

this time only" for Bingham to excavate and export artifacts from Peru for the purpose of scientific research. The Third Decree applied only to Bingham, Yale and NGS and imposed specific conditions, which were: (1) Permission was granted for a limited time only, after which time exploration and excavation would again be prohibited; (2) The expedition's activities would be supervised by a Peruvian official; and (3) The decree allowed that the artifacts could be exported from Peru until such time as Peru shall require their return, and that this exception applied to "**all artifacts extracted by virtue of this authorization *or extracted before this date*.**" *Id.* (emphasis added). Thus, Peru's right to demand return of the Artifacts – and Bingham's and Yale's obligation to return them – applied to all artifacts – regardless of whether they had been exported in the 1908 and 1911 expeditions or exported during the 1912 expedition. Importantly, the 1912 Decree imposed no time limitation, giving Peru the right to request the return of all artifacts covered by the decree at any time in the future. Finally, as with the First and Second Decrees, the Third Decree made clear that notwithstanding any permission granted Bingham, Yale or NGS to export any or all of the Artifacts, Peru's ownership rights over those objects was never surrendered to Bingham, Yale nor NGS, and that Peru retained ownership rights to its artifacts at all times, even after they left Peru.

49.     On information and belief, Bingham discovered, excavated and exported artifacts from Peru pursuant to the 1912 Decree.

50.     Following his return from the 1912 expedition, Bingham set about the work of preparing articles for the NGS Magazine about the expedition, speaking on the expedition, arranging albums of the 3,000 photographs of the expedition, reconciling finances, and completing reports that summarized his findings. Bingham and members of his team also planned to publish books on their work.

51.     Bingham's reports and speeches covered only what he had officially sent through customs at Mollendo.  Upon information and belief, in the 1912 expedition, if not also before, Bingham reportedly shipped the most valuable artifacts excavated during the expedition – including ceramic as well as bronze, gold, and metal pieces – through Bolivia instead of Mollendo allegedly to avoid detection, registration, and the likely refusal of permission to export the artifacts by Peruvian authorities, or – in the unlikely event that he was allowed to export artifacts – the obligation to return them upon subsequent Peruvian request or at some time certain, as required by Peruvian authorities.  Bingham's conduct in sending those objects through Bolivia was illegal, and violated the very special law that Peru had enacted as a courtesy to the United States and NGS to permit Bingham's and Yale's excavation work and exportation of thousands of Peruvian artifacts to the United States.

52.     Bingham's report on the expedition would feature prominently in the NGS Magazine.  Not only would NGS devote an entire issue to the 1912 expedition, but it planned to make that issue much larger than normal to accommodate additional photographs.  Grosvenor planned to refer to the 1911 and 1912 expeditions in the issue.  Grosvenor estimated that at least 1,000,000 people would read the NGS issue on Bingham's work.  Bingham later asked Grosvenor if he had sent leather-bound copies of the article to the President of Peru, as "*[i]t might lubricate the wheels for our next expedition, especially if it were stamped in gold letters that it was presented to him by the National Geographic Society and Yale University.*" Bingham Correspondence dated November 29, 1913, attached as Exhibit H (emphasis added).

53.     So thrilled with Bingham's work was Grosvenor, in fact, that he advised Bingham, "If you have any plans which you personally expect to take charge of, say in 1914, or after your present reports are completed, I wish you would advise me at your early convenience.

***I do not think the Society could make wiser appropriations of its research money than backing your expeditions***." Grosvenor Correspondence, attached as Exhibit I (emphasis added). Bingham later stated that he did not plan to conduct another expedition until he had completed the reports from the 1912 expedition, which he estimated would take approximately two more years. Bingham stated that he intended to return in 1915.

**D.    The 1914-1915 Expedition**

54.    Bingham's plans to delay a subsequent expedition changed, when he learned of two earthquakes that had occurred in the area explored in both his 1911 and 1912 expeditions. Bingham wanted to study the area following the earthquakes and wrote Grosvenor for help in securing NGS's financial support as well as help in securing permission from the Peruvian Government to conduct yet another expedition.

55.    On January 12, 1914, Grosvenor again invited Bingham to Washington, D.C., to meet with the NGS Research Committee "so that we may talk over plans for continuing your work."  Since the NGS Research Committee controlled expedition funding, Bingham was required to meet with them in Washington, D.C., before the Committee would agree to fund any of his expeditions.

56.    On January 14, 1914, Bingham again wrote Grosvenor about NGS's support for the expedition.  Bingham also advised that he was coming to Washington, D.C., would be a guest at the house of the Peruvian Ambassador that weekend, and would attend a dinner that the Ambassador was giving for the Vice-President of the United States.  Bingham intended to discuss with them plans for a 1915 expedition.

57.    On January 16, 1914, Grosvenor wrote Bingham that he was "very anxious for you to continue your work in South America.  You had such splendid results last year that you

must certainly resume it.  You are, beyond comparison, the best man in the country to carry on these investigations."

58.     On January 19, 1914, Bingham received a formal invitation from the Bolivian Government to excavate and explore the area of Lake Titicaca.  In addition, if Bingham gave Bolivia the material excavated, Bolivia would allow Bingham to keep all duplicates.  Bingham saw the offer as a suitable alternative to the Peruvian expedition, should the Peruvian expedition fail to materialize.

59.     On February 20, 1914, Bingham traveled to Washington, D.C., to lecture, meet with the NGS Research Committee, and meet with the Peruvian Ambassador.  These presentations and meetings concerned Bingham's proposals for upcoming work in Peru.

60.     On February 26, 1914, Grosvenor advised Bingham that an article about the 1912 expedition had been published without giving proper credit to NGS.  He reminded Bingham of NGS's extensive financial support and asked that Bingham ensure that the oversight not happen again.

61.     On March 6, 1914, Bingham relayed to Grosvenor that "[w]e are going rapidly ahead securing the outfit for the new expedition.  The chief block at present is in regard to the topographers, and we want very much to find out about some Washington men . . . ."  The process of finding a suitable topographer proved to be a difficult one, with Grosvenor lending immense assistance to Bingham, including calling on his contacts at the Coast Artillery. Bingham eventually hired a young civil engineer to serve as assistant topographer to the chief topographer.

62.     On March 9, 1914, Bingham advised Grosvenor that Yale had approved the plans for the 1914-1915 expedition.  He also requested that NGS and Yale send a formal application to

the Peruvian Ambassador, "requesting him to secure the approval of his government to this project." Bingham further asked Grosvenor to make a personal visit to the Ambassador and ask him to telegraph Lima directly "that [NGS] and Yale University would like to send an exploring expedition to Peru this year, and would like to be assured that it will be received on the usual terms accorded to properly accredited scientific expeditions."

63.     Bingham wrote Grosvenor again on March 9, 1914, asking if NGS could request use of a detached service chest from the U.S. War Department in Washington, D.C.  The War Department had loaned a similar chest to Bingham's expedition in 1911 and 1912.  Bingham had previously made the request through President Taft but thought that it would be better if the request came through Grosvenor as Director of NGS.  Bingham routinely prevailed upon NGS to intercede with Governmental entities to obtain concessions he would have been unable to arrange absent NGS's institutional support.

64.     On March 10, 1914, Grosvenor confirmed that he had made the request with the Peruvian Ambassador about the 1914-1915 expedition and that "everything is all right."  Peru had approved the request.  Peru would later grant Yale and NGS a concession of limited duration to remove artifacts excavated during the 1914-1915 expedition from Peru, mandating that such artifacts had to be returned to Peru within eighteen (18) months.  This provision was a significant change in law from the Second Decree enacted in 1912, which had not restricted the duration in which artifacts could be removed from Peru and had only mandated that Yale return those artifacts when Peru demanded their return.

65.     In March 1914, NGS and Yale entered into a "Memorandum of Agreement for the Peruvian Expedition of 1914-15 under the Auspices of Yale University and the National Geographic Society" in which NGS agreed to support and co-sponsor Bingham's third

expedition.  Grosvenor again signed the Agreement for NGS in Washington, D.C., and sent the signed agreement to Yale for its signature.  Bingham and President Hadley signed for Yale.

66.      On March 17, 1914, Bingham asked Grosvenor to make the President of the Lima Geographical Society a life member of NGS, as he "is a person of importance in Peru" and "it would be a help to us."

67.      On March 23, 1914, Grosvenor received the fully executed agreement from Yale University and wrote Yale President Arthur T. Hadley, relaying that "it is with great pleasure that our Society co-operates again with Yale University in Dr. Bingham's work."

68.      As with the 1912 expedition, NGS gave immense assistance to Bingham and Yale for the 1914-1915 expedition.  This included, *inter alia,* giving financial support, loaning equipment, consulting with Bingham about his team members as well as the scope of the expedition, and even helping Bingham secure staff for the expedition, including a staff member from the U.S. War Department.

69.      On April 14, 1914, Bingham advised Grosvenor that Ellwood C. Erdis, the Chief Engineer of the Expedition, was going to Washington, D.C., to meet with the curator of animals at the United States National Museum[3] "to learn how they want the things packed and sent home."  Erdis planned to spend nearly a year and a half in the field on the expedition, and had arranged to house animals collected in Peru at National Museum facilities.

70.      Not everyone in Peru supported Bingham's 1914-1915 expedition and Bingham approached that disapproval by having an alternate plan in place.  As such, on April 7, 1914, Bingham advised Grosvenor:

---

[3] The United States National Museum is now known as The Smithsonian Institute.

> If Erdis finds, on getting to Lima, that Peru really does not want us
> – although I think this is a remote possibility – we can go on and do
> just as interesting work in Bolivia. . . .

However, the Peruvians gave Bingham and Yale what they requested in terms of being able to export any artifacts found, as per the conditions set forth above, and the expedition proceeded as planned.

71.     On October 8, 1914, Bingham offered to travel to Washington, D.C., to help Grosvenor arrange an NGS exhibit of Bingham's photographs from the Peruvian Expedition. Bingham also thanked Grosvenor for the check in the amount of $5,000 for the Peruvian Expedition, which Grosvenor had confirmed NGS would send.

72.     On December 16, 1914, Grosvenor inquired whether Bingham would need more than $10,000 for the portion of the expedition planned for 1914-1915.

73.     Upon information and belief, on or about December 30, 1914, Bingham met with the NGS Research Committee.  Grosvenor asked Bingham to stay on after that meeting for a few days in Washington, D.C., to attend the NGS exhibit of Bingham's photographs from the Peruvian Expedition.  Upon information and belief, NGS paid Bingham's travel expenses for this trip.

74.     On January 8, 1915, Bingham submitted to Grosvenor his "Plans for Future Work of Exploration in Peru," for which the object was "to make a map of ancient Peru, showing the location of the early tribes, the growth of the Inca influence, the extent of the Inca Empire, and the steps by which this extent was reached."  Bingham noted that "it is believed that a great deal of evidence still remains to be collected."  He also noted that "it would be advisable to carry on a certain amount of excavation and study at the great ruins of Tiahuanaco on the southern end

of Lake Titicaca.  The opportunity of doing this has been recently offered to me by the Bolivian government."

75.    In securing staff for the expedition, Grosvenor was involved as before with the earlier expeditions, including by helping to find a naturalist and botanist for the expedition. Regarding the naturalist whom he secured, Grosvenor noted, "[w]e have to pay him a fat salary of $250 a month, but he is the very best man for the work.  He will arrive in Washington on January 20."  Grosvenor also suggested that

> We ought to have a meeting of the Research Committee in January when you come down.  I would suggest that you draw up a list of the recommendations that you have to make, so that I can send your report to each member of the Research Committee before the meeting.  I have no doubt that everything will be satisfactorily arranged from this end.

76.    On January 9, 1915, Grosvenor advised Bingham that the U.S. Department of Agriculture would be granting leave to two staff members to serve as botanists on the expedition. The Department of Agriculture would also pay the salaries of the two men.

77.    On January 19, 1915, Bingham remarked that their funds were low and asked Grosvenor for "another $5,000 on account of the regular subscription to the Expedition."  In the same letter, Bingham summarized the work for the 1915 portion of the 1914-1915 Expedition. Bingham also added:

> ***We should be very glad if you would procure for us special recommendations of the U.S. Government to the Peruvian Government***.  The size and representative character of the National Geographic Society and the character of our former work ought to justify them in taking all . . . steps to see that our work receives every aid which the government can give it.  It might be well to take this up directly with [the Peruvian Ambassador]. (emphasis added)

78.     On January 21, 1915, Grosvenor confirmed that the NGS Treasurer would send Bingham a check for $5,000.  In addition, he advised that the NGS biologists "wish[ed] to keep in Washington, probably in the National Museum, any specimens secured by [the botanists]." Bingham agreed.

79.     On January 21, 1915, Grosvenor forwarded the memorandum of contract from the Department of Agriculture and stated that "[o]f course, nothing will be done until we can have a conference here on this matter."

80.     In March 1915, Bingham returned to Machu Picchu for the 1915 portion of the expedition; Erdis had led the expedition up to that point.

81.     NGS continued its support of and assistance to Bingham, and Bingham and NGS collaborated as they had for the 1912 expedition and the first half of the 1914-1915 expedition.

82.     On each of the three expeditions, Bingham and members of his expeditions excavated and harvested artifacts from the architectural core of the Incan ruins at Machu Picchu as well as from Cuzco and the surrounding areas.  Upon information and belief, Bingham and his team excavated mummies, skulls, pottery shards, Incan jewelry, tools, ceramic artifacts as well as bronze, gold, and other metal objects.

83.     During the 1915 expedition, Bingham encountered resistance from Peruvians to the expedition's activities and planned use of the excavated artifacts.  On January 31, 1916, Bingham sent Grosvenor a copy of "Peruvian Expeditions.  Summary of the Work of 1915," and a copy of the Peruvian English language newspaper, *The West Coast Leader*, dated August 19, 1915.  Both set forth accounts of this controversy.  The newspaper article states, "The bones and pottery which the Expedition collected ***will only be taken out of the country with the permission of the Peruvian Government and even in that event Professor Bingham has offered to return***

22

***the collections after they have been studied***." Summary of Work and Newspaper Article, attached as Exhibit J. (emphasis added).

84.     Bingham returned from Peru in late August/early September 1915.  In his first letter to Grosvenor after returning from Peru, Bingham wrote:  "***Personally, I had so much unpleasantness in Peru over the silly opposition of the young gentlemen composing the Instituto Historico of Cuzco*** that I was ill in bed for several days, and felt eventually quite used up. . . . " (emphasis added)

85.     Such resistance, however, did not foil Yale's efforts to extract and export significant quantities of Peru's heritage for shipment to the United States, no matter how sincere and well-founded the opposition; Bingham and Yale just would not be denied in their efforts to bring home the treasures of Machu Picchu.  On November 1, 1915, Bingham wrote Grosvenor:

> Erdis is still at Cuzco waiting for the chance to bring out the results of our excavations.  W.R. Grace & Company, in Lima, have [sic] notified me that the president has consented to their exportation.  I am sure you will rejoice with me at this good news.  ***The seeds of our diplomatic scheming and the expedition plans are beginning to bear fruit.***

Bingham Correspondence dated November 1, 1915, attached as Exhibit K (emphasis added).

86.     Soon thereafter, on January 27, 1916, Peru issued a fourth executive decree in response to a request from Yale (in the person of Erdis and Bingham) – on behalf of the 1914-1915 expedition – to export to Yale and NGS "74 boxes of archaeological artifacts extracted from the Department of Cuzco between 1914 and 1915."  Executive Order of January 27, 1916, attached at Exhibit L ("the Fourth Decree"); *see infra* ¶¶104-105.

87.     The Fourth Decree again made an exception to the prohibition against exportation in the Second Decree of August 19, 1911, and allowed the requested exportation of the 74 boxes to proceed, but only on condition that Yale and NGS "pledge to return, in the term

of eighteen (18) months from today, the artifacts whose export has been authorized." Exh. L (translation). Yale and NGS also pledged to send to Peru the studies performed on the exported artifacts as well as photographs taken during those studies. *Id.*

88.     Upon information and belief, Bingham and members of his expedition in 1908 and the Yale expedition in 1911 removed artifacts from Cuzco, Machu Picchu, and their surrounding areas, as well as those originating from other areas of Peru, and had them transported to both Yale in New Haven, Connecticut, and elsewhere in the United States. Upon information and belief, the artifacts removed from Peru during the 1908 and 1911 expeditions are in the custody of or under the control of, *inter alia*, Yale.

89.     On several occasions, Bingham and members of the expeditions in 1912 and 1914-1915 removed artifacts from Cuzco, Machu Picchu, and the surrounding areas and had them transported to Yale in New Haven, Connecticut. In fact, by the time that the 1914-1915 expedition was completed, Bingham and the members of his expeditions had removed from Machu Picchu and surrounding areas Peru's most valuable archeological objects.    Upon information and belief, artifacts removed from Peru during the 1912 and 1914-1915 expeditions are in the custody or under the control of, *inter alia*, Yale.

90.     On each of the three expeditions – 1911, 1912, and 1914-1915 – Bingham and the members of his expeditions acted as agents for Yale.

E.     **Yale Had Knowledge of Its Obligations**

91.     As discussed above (*supra* ¶¶19-21, 48, 86), various laws were in force in Peru concerning exploration and exportation of Peruvian artifacts at the time of the Bingham-led expeditions. Upon information and belief, Bingham and Yale were fully aware of their legal obligations under each of these laws, and freely and willing accepted those limitations as the

"price" of being able to remove the Artifacts from Peru.  They knew that the First Decree of April 27, 1893, prohibited all exploration and excavation without special permission from the Peruvian Government.  They knew that the Second Decree of August 18, 1911, asserted Peruvian title to and ownership of all artifacts excavated by Bingham's expeditions and that this Decree prohibited the exportation of such artifacts.  They knew that the Third Decree of October 31, 1912, granted Bingham, Yale, and NGS permission to excavate in the Cuzco region, including Machu Picchu, and to export artifacts, but they also knew that the Third Decree expressly reserved Peru's right to demand – at any time in the future – the return of all artifacts that had been extracted both before and after the date the Decree was issued.  Thus, the Third Decree recognized Peru's ownership rights, as well as reinforced those rights as expressed by the First and Second Decrees.  Finally, Bingham and Yale knew that the Fourth Decree of January 27, 1916, allowed Yale to export 74 boxes from Peru to the United States, provided that all the archaeological materials would be returned within eighteen (18) months of the date of the Fourth Decree.  Despite Yale's recognition of these laws and acceptance of benefits under them, Yale has refused to perform as required under Peruvian law and Yale's agreed upon commitments to Peru.

### 1.   The First Decree

92.    According to a Peruvian Decree dated April 27, 1893, ("the First Decree"), in effect as Bingham commenced his first expedition to Peru in 1908, archeological exploration or excavation without government permission was explicitly prohibited.  The Decree stated: "Without special permission (from the Conservation Commission of National Antiquities] . . . it is forbidden to explore or excavate in search of archaeological objects in mounds, old fortresses,

temples, or other places, whether situated on public or in vacant lands." *Decreto Supremo*, , Exh. A, at 1-4 (translation).

### 2.     The Second Decree

93.     On August 19, 1911, again less than one month after Bingham arrived at Machu Picchu for Yale's 1911 expedition, the Peruvian authorities enacted a new decree ("the Second Decree") which modified several aspects of the First Decree.  The new Decree stated that, "All articles found belong to the Government. . . ."  The Decree also prohibited the exportation of artifacts of historical and archaeological importance:  "Until Congress shall enact a law regarding the preservation of antiquities, their exportation is absolutely forbidden, whatever may be their class or condition. . . . "  *Decreto Supremo,* Exh. B at 4-5 (translation).

94.     The Peruvian Government established a regime to monitor compliance with the Second Decree and ordered the appointment of a Peruvian Inspector to "carefully supervise" the discoveries of approved expeditions.  Exh. B at 4.  Discovered objects were to be sent to the National History Museum in Lima, and exportation was "absolutely forbidden."  Exh. B at 4-5.

95.     Artifacts and any other objects found and/or excavated by Bingham and other members of his expedition to Peru in 1908 through 1911, were and remain the property of Peru.

96.     Upon information and belief, artifacts exported by Bingham and/or other members of his 1908 through 1911 expeditions to Peru have never been returned to Peru or accounted for by Yale and are currently in the custody or under the control of Yale.

### 3.     The Third Decree

97.     As the draft May 1912 Memorandum of Working Agreement between Peru, NGS, and Yale shows, Yale recognized Peru's ownership of the artifacts, Peru's right to protect its cultural heritage, and the immense value that the archeological objects and sites at Machu

Picchu, and the surrounding areas held for the Peruvian people.  For example, as conditions of Peru allowing the 1912 expedition and the temporary exportation of artifacts to the United States, Yale agreed, *inter alia*:

> "[T]o bring to Peru a properly equipped scientific expedition," which included "suitable" and "competent" personnel;

> "[T]o exercise all due care in excavating to see to it that the ancient monuments are in no way destroyed or injured in the course of the work, and . . . to use all due diligence to leave the ancient monuments in as good condition as they were found"; and

> "[T]o place at the disposal of the Consul General of Peru in New York within two years of the date of their arrival from Peru examples of all kinds of archeological or geological specimens that have been exported from Peru and . . . to place at his disposition all articles of gold that may be found whether duplicates or not. . . ."

Further, as an additional concession for the "privilege of bringing to New Haven, Connecticut" the artifacts that had been excavated, Yale agreed that

> after these have been properly studied and reports on them prepared, or after a period of not more than two years after the date of their arrival in New Haven, Connecticut, good specimens of all the kinds of articles found are to be delivered in good order to the General Consul of Peru . . . "

Draft Memorandum of Working Agreement of 1912, attached as Exhibit M.

98.    Based on these assurances and in response to a request by the United States Government – acting at the request of Yale – the Peruvian Government issued an executive order dated October 31, 1912 ("the Third Decree"), which allowed Yale to conduct the 1912 expedition.

99.    As discussed above (*supra* ¶48), the Third Decree observed that "explorations and excavations practiced to date by Dr. Hiram Bingham" had not been in strict compliance with the applicable law.  Exh. G at 1 (translation).  The Third Decree noted the explicit "ban[] [on] the

export of artifacts of archeological value" contained in the Second Decree of August 19, 1911. But, in light of the goal of "the requesting institutions" to "perform scientific research which shall benefit the history of Peru," the Third Decree granted an exception "for this time only." The exception applied only to Bingham, Yale and NGS, and the Decree imposed specific conditions.   Among those conditions were the following:  (1) Permission was granted for a limited time only, and the Government prohibited all exploration and/or excavation after expiration of the permission; (2) The expedition's activities would be supervised by a Peruvian official; and (3) The decree applied to "all artifacts extracted . . . by virtue of this authorization, *or extracted before this date*. . . ." Exh. G (emphasis added).

100.    Most important, the Third Decree explicitly reserved Peru's right at any time to demand that Yale and NGS return artifacts "***that might be extracted and have been extracted*** . . . ." Exh. G at 2 (translation) (emphasis added).

101.    Artifacts exported pursuant to the Third Decree are currently in the custody or control of Yale.  Under the terms of this Decree, **all artifacts** excavated by Bingham (regardless of whether they were obtained during the expeditions of 1908, 1911 or 1912) and the members of his expedition *prior to and after* issuance of the Decree on October 31, 1912, were and are the property of Peru and subject to the conditions imposed by the Decree, including their return at any time Peru demanded such.

102.    The Third Decree also required Yale and NGS to return, upon Peru's demand, "all copies of all research papers and reports regarding the explorations. . . ."  The Decree reserved Peru's right to declare all such papers and reports to be official documents of Peru. Exh. G at 2 (translation).  Upon information and belief, research papers and reports referenced in

the Third Decree are currently in the custody or control of Yale.  Despite Peru's demand, Yale has never provided copies of these documents to Peru as required under the terms of the Decree.

> **4.      The Fourth Decree**

103.      On March 9, 1914, Yale sought permission to conduct another expedition in Peru "on the usual terms accorded to properly accredited scientific expeditions."  Thus, Yale knew that Peru would impose conditions upon Yale that were similar to those that Peru had imposed for the earlier expeditions.

104.      On January 27, 1916, Peru issued the Fourth Decree in response to a request from Yale (in the person of Erdis and Bingham) – on behalf of the 1914-1915 Expedition – to export to Yale and the NGS "74 boxes of archaeological artifacts extracted from the Department of Cuzco between 1914 and 1915." Exh. L.

105.      The Fourth Decree again made an exception to the ban on exportation as expressed in the Second Decree of August 19, 1911, and allowed the requested exportation of the 74 boxes to proceed, but only on condition that Yale and NGS "pledge to return, in the term of eighteen (18) months from today, the artifacts whose export has been authorized."  Exh. L (translation).

106.      With respect to the Fourth Decree, in a letter dated February 21, 1916, Bingham wrote Grosvenor and reported:  "A decree has been issued by the President of Peru permitting the seventy-four (74) cases containing bones, potsherds, pots, etc. to be shipped to this country on the conditions in the decree, a copy of which, with the translation, I am enclosing for your benefit."  Bingham told Grosvenor that, if either Yale or NGS had reservations about these conditions or did not want to accept these conditions, it would still be possible to withhold shipment.  "The collections have not actually left Lima," Bingham wrote, "***It will be possible to***

***stop them if we do not care to accept the responsibilities and obligations thrust upon us by the decree***.  Perhaps it would be well to have your research committee consider carefully, as soon as possible, these obligations . . .  I understand that the material will not leave Lima before the first of March, ***so there is time to stop it by cable if we desire to do so***."  Bingham Correspondence dated February 21, 1916, attached as Exhibit N. (emphasis added).

107.     Neither Yale nor NGS raised any objection to the conditions set forth in the Fourth Decree of January 27, 1916.  Accordingly, the parties arranged for the shipments from Peru with the clear understanding that the materials would be returned within eighteen months of the date of the Fourth Decree.

108.     The parties also understood that all artifacts taken from Cuzco, Machu Picchu, and the surrounding area belonged to the Government of Peru.  In a letter to Grosvenor dated November 28, 1916, Bingham wrote:

> You will remember that we eventually succeeded in bringing back from Peru on the last expedition, some seventy-four boxes of potsherds, bones and a few archaeological objects of interest to science . . .  The more valuable part of the collection is made up of the skeletal remains, which I offered to the National Museum for study.  They cannot accept them, however, unless they are to become their property.  ***Now they do not belong to us, but to the Peruvian Government, who allowed us to take them out of the country on condition that they be returned in eighteen months . . .***

Bingham Correspondence dated November 28, 1916, attached at Exhibit O at 1 (emphasis added).

109.     Both Yale and NGS recognized that the materials in question belonged to and should be returned to Peru within eighteen (18) months of the date of the Fourth Decree.  Yet in his November 28, 1916 letter to Grosvenor, Bingham cynically suggested for the moment that

Yale and NGS could consider just simply walking away from their commitment to the Peruvian people if they could not get more time to retain the artifacts, stating:

> a written application [should] be presented to the Peruvian Government through our State Department, applying for an extension of the term allowed . . . ***I am almost tempted to let the Peruvians "whistle for it," but I suppose that would not be fair to any future work that the National Geographic Society might try to do in Peru*** . . . <u>My suggestion is that the collection of skulls be turned over to the best anthropologist in this vicinity that is willing to handle it, on the condition that it is to go back to Peru in the near future.</u>  Are you willing?

*Id.* at 1-2 (emphasis added).  Fortunately, in the end Bingham recognized that all of the artifacts belonged to the people of Peru and neither Yale nor NGS.

110.    The following day – November 29, 1916 – Grosvenor wrote to Bingham and stated, "I feel that we ought to abide by the letter of our agreement with the Peruvian Government and return all the material that we contracted to return, and I am glad that you share this view with me."

111.    On December 1, 1916, Bingham wrote to Grosvenor:  "I have seen President Hadley and made arrangements with him whereby the skeletal material will be studied in time to allow of its return to Peru in accordance with the letter of our agreement with the Peruvian Government."

112.    Thus, upon information and belief, Yale acknowledged and was aware at all times of its obligations to Peru to return the artifacts.

113.    Peru has never relinquished title to or ownership of the artifacts and Yale knows this, notwithstanding its remarkable recent claims to ownership of any or all of the Artifacts.

**F.**   **Peru's Demand for the Return of the Artifacts by Yale**

114.    On November 22, 1918, the Ambassador of Peru, Manuel de Freyre, in a letter to Grosvenor at NGS, formally demanded, pursuant to the Fourth Decree, the return of the seventy-four (74) boxes of artifacts in Yale's custody taken from Peru in 1916.

115.    Grosvenor responded on November 23, 1918 the Ambassador of Peru attributing the delay in returning the seventy-four (74) boxes to Bingham's extended service in World War I.  Grosvenor assured the Ambassador that Bingham would return soon and resume his study of the material and that "any promises that have been made may be fulfilled."

116.    On October 26, 1920, the Peruvian Consul General to the United States – Eduardo Higginson – informed Gilbert Grosvenor of NGS by letter that he had "this day received a cablegram from [the Government of Peru] asking me to request from you the return of the original and duplicate objects taken from Peru by the [Yale Expedition].  They also ask me to request you to send with these objects copies of the studies and information obtained relative to the investigations instigated in Peru during this investigation."   Higginson proceeded to cite Article Four of the October 31, 1912 Decree [the "Third Decree"] – "of which you undoubtedly have a copy"- and asked for "your prompt advice as to when you will be able to ship these objects to Peru."

117.    On November 1, 1920, Bingham wrote to Grosvenor suggesting that Grosvenor tell the Peruvian Consul General that the war had interfered with his study of the material that had been exported to the U.S. from the 1914-1915 expedition and that more time was needed before the artifacts were returned to Peru.  Bingham's letter noted that George Day, Treasurer of Yale, had received a similar letter from Peru demanding return of the artifacts.

118.     On November 3, 1920, Day responded to Higginson that "Dr. Bingham is too ill to give to this matter his personal attention and that pending conferences with him it will be impossible to take action in this matter."  Day asked Higginson if Yale could retain the artifacts until January 1, 1922, for completion of the studies.

119.     On December 30, 1920, the Peruvian Consul General reported to Grosvenor that the Peruvian Government had granted the extension of time to January 1, 1922.

120.     In or about October 1921 Yale purportedly returned to Peru the entire collection of artifacts exported from Peru during the various Bingham expeditions, which artifacts had been taken from Cuzco, Machu Picchu, and/or the surrounding areas or elsewhere in Peru, as permitted under the Third and/or Fourth Decrees.  In fact, artifacts from the 1908-1915 expeditions have not been returned or otherwise accounted for by Yale, and remain in Yale's custody or control.

121.     Further, upon information and belief, the most valuable and archeologically significant artifacts from the 1914-1915 expedition – including but not limited to bronze and metal objects, mummies, skeletons, skulls, bones, and other Incan remains – were never returned to Peru and remain in the custody or control of, *inter alia*, Yale.

122.     Upon information and belief, at various times between October 1921 and the present, Yale has maintained custody and/or control of a collection of artifacts taken from Peru during the various Bingham expeditions between 1908 and 1915.  On or about 2002-2003, as a result of, *inter alia*, a listing of an inventory posted on the Peabody Museum's website, and Yale's undertaking of the Yale Peabody Museum traveling exhibit of artifacts from Machu Picchu, Peru entered into discussions with Yale in order to ascertain and determine what artifacts Yale actually possessed, as well as the specific means by which Yale obtained those Peruvian

33

artifacts it then and today continues to maintain custody or control of, particularly in light of Yale's purported return of the Artifacts in October 1921.  Said discussions with Yale were undertaken by Peru in order to ascertain whether artifacts remained in Yale's custody or control in violation of either or both the Third or Fourth Decrees.

123.     Discussions between Yale and the Government of Peru continued thereafter for a period of approximately five (5) years, during which time Yale: (i) consistently maintained that it had returned to Peru **all** of the artifacts from the expedition of 1914-1915; (ii) consistently disclosed that it had, in fact, retained the artifacts from the expedition of 1912, notwithstanding the request for their return in 1920 and Yale's purported compliance with such in 1921; (iii) never at any time during those discussions made any claim of ownership of the artifacts in question; and (iv) claimed that it had custody of a third group of artifacts that it maintained Bingham "legally" purchased and exported on behalf of Yale from Peru during his 1908 and 1911 expeditions.

124.     Negotiations for the return of the artifacts from the 1912 expedition continued without agreement until October, 2005 when then Ambassador Eduardo Ferrero of Peru made a formal demand for the return of all the artifacts from the 1912 expedition.  In December 2005, Barbara Shailor writing on behalf of Yale stated **for the first time** Yale's newfound position that the artifacts from the 1912 expedition were the property of Yale.  Peru thereupon filed suit in the U.S. District Court for the District of Columbia in December 2008.

125.     As set forth more fully below, in October 2007, Yale permitted Peru a very limited, informal viewing of some of the artifacts from the 1912 expedition, but up until March 2008, Yale did not permit Peru to formally inventory what Yale claimed was the complete set of artifacts it said it possessed from the 1912 expedition.  Once that formal inventory was

completed in March 2008, Peru had for the first time the full scope of that which Yale claimed it had custody from the expedition of 1912, was able to confirm that many of the most important pieces it expected to find were not provided for its review, and learned that the number of pieces retained by Yale were much greater than what Yale had previously stated it held.

126.     Upon information and belief, none of the 1912 expedition artifacts have ever been returned to Peru.  Despite what Yale presented to Peru as the "full collection" of artifacts from the expedition of 1912 in March 2008, not all of the artifacts from the 1912 expedition have ever properly been accounted for by Yale, and the entirety of the collection of 1912 artifacts otherwise remain in Yale's custody or control.  Further, upon information and belief, the most valuable and archeologically significant artifacts from the 1912 expedition – including but not limited to bronze and metal objects, mummies, skeletons, skulls, bones, and other Incan remains – remain in the custody or control of, *inter alia*, Yale.

127.     Under the Third and Fourth Decrees, Yale further pledged to send to Peru "all studies performed on [the shipped artifacts] and the photographs taken in regard to the investigations carried out on such artifacts."  Exh. L.

128.     The studies and photographs referenced in the Third and Fourth Decrees are currently in the custody of, *inter alia*, Yale and have not been provided to Peru as required under the terms of those Decrees.

**G.     The Role and the View of NGS Regarding the Return of the Artifacts to Peru**

129.     During 1911-1916, Gilbert Grosvenor was Editor-in-Chief and a director of NGS.  He began a lasting friendship with Bingham in 1908 and, over the next several decades, the two frequently corresponded about various issues relating to Bingham's Peruvian

expeditions.  Because of Grosvenor's personal support for the project, NGS provided substantial financial support for and played a pivotal role in the expeditions in 1912 and 1914-1915.

130.    Because of its strong relationship with Peru, NGS in Washington, D.C., served as an essential conduit for Bingham and Yale on one side and Peru on the other to obtain permission for the exportation of artifacts as well as for the expeditions themselves.  In 1912 and 1914, for example, NGS filed applications with the Government of Peru seeking permission for the expedition to explore and excavate in Peru.

131.    NGS was party to two agreements with Yale setting forth the terms and conditions of their joint sponsorship of Bingham's 1912 and 1914-1915 expeditions to Peru.  *See supra* ¶¶ 44, 65.

132.    NGS also participated in negotiations with the Peruvian Government that led to the Third and Fourth Decrees governing the conduct of the 1912 and 1914-1915 expeditions, *see supra* ¶¶ 30, 62, 64 and a working agreement with the Peruvian Government related to the 1912 expedition, *see supra* ¶ 46.

133.    NGS provided significant funding for the 1912 expedition and for the 1914-1915 expedition.  It also published through its official journal, *National Geographic Magazine,* four separate articles:  "Explorations in Peru," April 1912; "In the Wonderland of Peru:  The Work Accomplished by the Peruvian Expedition of 1912, under the Auspices of Yale University and the National Geographic Society," April 1913; "The Story of Machu Picchu:  The National Geographic Society - Yale University Explorations in Peru," February 1915; and "Further Explorations in the Land of the Incas - The Peruvian Expedition of 1915 of the National Geographic Society and Yale University," May 1916.  These articles contain hundreds of photographs and all have the byline of Hiram Bingham, referring to him as Director of

Expedition. At its expense, NGS later published in 1930 with Bingham, by then a United States Senator from Connecticut, a special edition book in cooperation with Yale University Press about the Peruvian Expeditions.

134. In September 2001, representatives of Peru met with representatives of NGS to discuss how best to achieve the return of the artifacts from Machu Picchu and the surrounding areas. The representatives of NGS agreed to cooperate with Peru to achieve a solution to the problem that would be agreeable to both Peru and Yale.

135. NGS believed then and continues to believe that all of the Artifacts belong to Peru and should be returned, a position supported unanimously by NGS's Board of Trustees. NGS's position is based on the expressed agreement of NGS, Yale, and Hiram Bingham at the time of the expeditions and on NGS's understanding of the applicable Peruvian and U.S. law, and the facts of the case, as they, like Yale, were participants in events that took place almost 100 years ago. NGS has informed Yale of NGS's position. On November 30, 2001, NGS Executive Vice President for Mission Programs, Terry D. Garcia, sent a proposal - along with a legal analysis - to representatives of Yale. The analysis concluded that Peru was the rightful owner of the artifacts, and the proposal, if accepted, required Yale to confirm this fact. Declaration of Terry D. Garcia, attached as Exhibit P.

136. On December 20, 2001, Yale notified NGS that it would not consider the proposed resolution until Yale's counsel had reviewed the documents that were the basis for NGS's analysis. NGS immediately agreed to provide Yale with these documents.

137. On January 16, 2002, counsel for NGS sent to counsel for Yale copies of all documents referred to in NGS's November 30, 2001 proposal.

138. Yale did not respond to the NGS initiative.

139.    On September 19, 2005, John M. Fahey, Jr., President and CEO of NGS, sent a letter to Yale's President Levin, expressing hope for a mutually agreeable solution regarding the artifacts, and offering the assistance of NGS toward that end.  The letter attached a summary of correspondence between Bingham and Grosvenor in which both clearly state that the artifacts exported from Peru are the property of the Peruvian Government and must be returned.  Upon information and belief, Yale never responded.

**H.    The Machu Picchu Artifacts – Peru's Heritage, What Does Yale Still Possess & Why?**

140.    The artifacts of Machu Picchu have dramatic importance to the nation of Peru, the Peruvian people, and their heritage.

141.    In light of the profound importance of Machu Picchu to the Peruvian people and its central place in the history of the Peruvian nation, the site has been inscribed on the United Nation's World Heritage List and was recently recognized as one of the Ten "New" Wonders of the World.  It is one of the most well-known and recognizable archaeological sites in the world.

142.    The bronze, gold, silver, mummies, skulls, bones and other human remains, pottery, utensils, art and other artifacts and objects taken from Cuzco, Machu Picchu, and the surrounding areas and currently in the custody or control of, *inter alia*, Yale have intrinsic and important cultural significance to the nation of Peru, the Peruvian people, and their heritage.

143.    At no time has Peru relinquished ownership of any artifact or object excavated and/or exported by Bingham and other members of the Bingham expeditions.

144.    Upon information and belief, Yale retains custody or control of all, or substantially all, of the Artifacts excavated and exported by Bingham and members of the expeditions.  Yale also holds research papers, studies, and reports about the artifacts, as well as illustrations and photographs made of the Artifacts.

145.    In January 2003, Yale's Peabody Museum of Natural History inaugurated a major exhibition of Artifacts.  Although this exhibition is formally housed in New Haven at the Peabody Museum, it has also been taken on tour throughout the United States.

146.    The collection of artifacts from Machu Picchu and the surrounding areas held by Yale constitutes one of the most important collections of its kind in the world.

147.    Upon information and belief, Yale's collection is composed of artifacts found, excavated, and exported from Peru to Yale by Bingham and the members of his expeditions.

148.    In May 2003, Yale's exhibit of artifacts from Machu Picchu was taken on a tour of the United States.  Upon information and belief, this touring exhibit generated millions of dollars of revenue for Yale, of which Yale has never made a proper accounting to Peru.  In September 2005, the exhibit returned to New Haven.  Upon information and belief, Yale intends to make the exhibit part of the Peabody Museum's permanent collection and has indicated its intent to promote the collection through additional domestic and international traveling exhibits for which it expects to generate additional future revenue for the benefit of Yale.

149.    The Peabody Museum website has stated that Bingham "excavated hundreds of objects that tell the story of everyday life at Machu Picchu and, by agreement with the Peruvian government, these materials became part of the Peabody Museum's collections."

150.    There is not, and has never been, any such agreement between Yale and the Peruvian Government, a fact known to Yale, and the aforesaid public statement by Yale to the contrary was and remains intentionally false and misleading.

151.    In or about March 2008, representatives from Peru visited the Peabody Museum to inspect the artifacts in Yale's custody.  The representatives had also visited the Museum in October 2007 and had returned in March 2008 to inspect the same pieces that they had examined

during the earlier visit.   For both visits, Yale controlled which pieces the Peruvian representatives saw.   In October 2007 and March 2008, Yale represented to the Peruvian representatives that the only pieces in its custody – and thus the only pieces that the Peruvian representatives were examining – were those from the 1912 expedition.  Yale further represented that all of the pieces from the 1914-1915 expedition had been returned in the 1920s.

152.    On the first day of the visit in March 2008, the Peruvian representatives were shown pieces that they had not seen during the October 2007 visit.   They were, of course, surprised.   The following day, when one of the representatives asked about the pieces, she learned that those pieces had disappeared from the room where Peru had been allowed to conduct its inspection.  Yale informed the representative that those pieces were not part of the negotiations between Yale and Peru at the time – negotiations which have since obviously broken down.

153.    The never-before-seen pieces came from one of the expeditions – 1908, 1911, 1912, or 1914-1915 – but it is unknown which one(s).  Yale has refused to provide an inventory of what it held prior to the 1912 expedition, after the 1912 expedition, and after the 1914-1915 expedition.  Yale has also refused to provide an inventory of what it has returned to Peru.  Upon information and belief, Yale's refusal to provide an inventory has allowed it to move pieces between the collections from each expedition with little risk of its malfeasance being discovered.

154.    Upon information and belief, Yale has purposefully concealed its malfeasance, deceived Peru, and has misrepresented what pieces it holds, their origin, and what it has purportedly returned to Peru.   Yale's wrongful and improper retention of these artifacts has caused and continues to cause damage to Peru.

## FIRST CAUSE OF ACTION (Violation of Peruvian Law)

155.    Peru repeats the allegations in the preceding paragraphs of this Complaint.

156.    Yale has violated multiple decrees that Peru enacted to ensure the retention and protection of the property composing Peru's rich cultural heritage.

157.    Yale violated the First Decree and Second Decree in the 1911 expedition by exporting artifacts without the special permission of the Peruvian Government.

158.    Yale has violated the Third Decree by refusing to return to Peru the Artifacts exported from Peru in 1908, 1911, and 1912, despite Peru's demand for their return, as well as by failing to provide Peru research papers and reports regarding such Artifacts.

159.    Yale has violated the Fourth Decree by failing to return the entire contents of the 74 boxes of archeological objects exported out of Peru and to the United States following the 1914-1915 expedition, despite Yale's assurances that it has returned all the artifacts from that expedition.

160.    Pursuant to Peruvian law, Peru seeks an immediate return of all Artifacts and related materials.

## SECOND CAUSE OF ACTION (Replevin)

161.    Peru repeats the allegations in the preceding paragraphs of this Complaint.

162.    Yale has wrongfully exercised custody or control of artifacts exported from Peru by Bingham and other members of Bingham's expeditions, as well as reports, studies, and photographs related to those artifacts ("related materials").   Under the Third Decree enacted in October 1912, Yale was required – upon Peru's demand – to return all artifacts that were exported from Peru either before or after the enactment of the Third Decree.  While Yale in 1921 purportedly returned artifacts from the 1912 and 1914-1915 expeditions, it in fact only returned

some of the artifacts from the 1914-1915 expedition, and has refused to return the artifacts and related materials from the 1908, 1911, and 1912 expeditions, despite Peru's demand for their return.  Further, upon information and belief, it has also failed and refused to return all artifacts exported from Peru following the 1914-15 expedition, which Peru allowed to be exported under the Fourth Decree.

163.     Peru is the owner of all Artifacts and related materials.

164.     Peru had and has a right to immediate possession of all Artifacts and related materials.

165.     Peru seeks an order of this Court replevying all Artifacts and related materials which Yale continues to detain wrongfully.

### THIRD CAUSE OF ACTION (Damages for Wrongful Retention)

166.     Peru repeats the allegations in the preceding paragraphs of this Complaint.

167.     Yale has wrongfully exercised custody or control of artifacts exported from Peru by Bingham and other members of Bingham's expeditions, as well as reports, studies, and photographs related to those artifacts ("related materials").  Under the Third Decree enacted in October 1912, Yale was required – upon Peru's demand – to return all artifacts that were exported from Peru either before or after the enactment of the Third Decree.  While Yale in 1921 purportedly returned artifacts from the 1912 and 1914-1915 expeditions, it in fact only returned some of the artifacts from the 1914-1915 expedition, and it has refused to return the artifacts and related materials from the 1908, 1911, and 1912 expeditions, despite Peru's demand for their return.  Further, upon information and belief, it has also failed and refused to return all artifacts exported from Peru following the 1914-15 expedition, which Peru allowed to be exported under the Fourth Decree.

168.     Peru is the owner of all Artifacts and related materials.

169.     Peru had and has an absolute right to immediate possession of all Artifacts and related materials.

170.     Yale's wrongful retention of the Artifacts and related materials has proximately caused Peru to suffer damages far in excess of $75,000.

171.     Peru seeks such damages for Yale's wrongful retention of the artifacts and related materials.

**FOURTH CAUSE OF ACTION (Conversion)**

172.     Peru repeats the allegations in the preceding paragraphs of this Complaint.

173.     Under the Third Decree enacted in October 1912, Yale was required – upon Peru's demand – to return all artifacts that were exported from Peru either before or after the enactment of the Third Decree.  While Yale in 1921 purportedly returned artifacts from the 1912 and 1914-1915 expeditions, it in fact only returned some of the artifacts from the 1914-1915 expedition, and it has refused to return the artifacts and related materials in its custody from the 1908, 1911, and 1912 expeditions, despite Peru's demand for their return.  Upon information and belief, it has also failed and refused to return all artifacts exported the 1914-1915 expedition that Peru allowed to be exported under the Fourth Decree.

174.     In refusing to relinquish custody of the Artifacts and related materials belonging to Peru, Yale has willfully exercised dominion and control of such property to Peru's detriment and has, therefore, converted the same to Yale's own use.

175.     As a direct and proximate result of Yale's wrongful conduct, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

176.     Peru seeks an order of this Court replevying all such artifacts and related materials which Yale has wrongfully converted.

## FIFTH CAUSE OF ACTION (Breach of Contract)

177.     Peru repeats the allegations in the preceding paragraphs of this Complaint.

178.     Peru allowed Yale to conduct the Bingham expeditions and to export artifacts from Peru on the condition that the artifacts and related materials be returned to Peru when Peru demanded.  Yale agreed to these terms, and a contract between Yale and Peru existed concerning the artifacts and related materials.  Peru fully performed its contractual obligations to Yale.

179.     Peru is the owner of all such artifacts and is the proper party to sue for Yale's breach of contract.

180.     Yale has breached its agreement with Peru by failing to return the artifacts and related materials, despite Yale's demand for their return.

181.     As a direct and proximate result of Yale's breach, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

182.     Peru seeks such damages for Yale's breach of contract due to its failure to return the artifacts and related materials.

## SIXTH CAUSE OF ACTION (Breach of Bailment Contract)

183.     Peru repeats the allegations in the preceding paragraphs of this Complaint.

184.     Peru allowed Yale to conduct the 1911, 1912, and 1914-1915 expeditions under certain conditions.  For the 1912 expedition, Peru allowed Yale to excavate and export artifacts on the express condition that, upon Peru's demand, Yale would return all artifacts exported from Peru during the 1912 expedition as well as during the 1908 and 1911 expeditions.  Yale agreed to these conditions.  Yale also agreed to return all related materials to Peru, which under Peruvian

law belonged to Peru, but following demand for such return from Peru, Yale has refused to return any of the artifacts from the 1908, 1911 or 1912 expeditions.

185.    For the 1914-1915 expedition, Peru allowed Yale to remove from the country 74 boxes of artifacts on the condition that Yale would return the artifacts within eighteen months. Yale agreed to this condition.  Yale also agreed that it would send Peru all materials relating to the study of the artifacts, which under Peruvian law belonged to Peru.  While Yale returned some artifacts in 1921, upon information and belief, it has failed to return all artifacts exported from Peru following the 1914-1915 expedition.

186.    Peru delivered property to Yale, which Yale accepted.  Peru's delivery of property and Yale's acceptance thereof created a bailment.  Yale and Peru mutually agreed to the terms of the bailment contract.

187.    Peru has demanded return of all Artifacts and related materials.  Yale has refused their return.

188.    Based on Yale's conduct described herein, Yale has breached its contract of bailment with Peru.

189.    As a direct and proximate result of Yale's breach, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

190.    Peru seeks such damages for Yale's breach of contract of bailment.

### SEVENTH CAUSE OF ACTION (Breach of Fiduciary Duty)

191.    The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

192.    In 1912 and again in 1914, Yale assured Peru that, if Yale were permitted to excavate and export the Artifacts temporarily to the United States, Yale would conduct scientific

research and studies of the artifacts and would return the Artifacts and related materials to Peru when Peru demanded.  Based on Yale's promises, Peru gave permission to Yale to excavate and export the artifacts temporarily to the United States.

193.    In allowing Yale to conduct the Bingham expeditions and to export priceless Artifacts from Peru to the United States – artifacts that are central to the history and cultural heritage of Peru – Peru placed a high degree of trust and confidence in Yale, thus creating a special relationship between Peru and Yale.

194.    Because of this special relationship, Yale was a fiduciary of Peru and accordingly owed Peru numerous duties.  Among these duties were the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, the duty to act with integrity of the strictest kind, the duty of fair and honest dealing, and the duty of full disclosure.

195.    Yale has wholly betrayed Peru's trust and confidence.  Not only did Yale fail to return the Artifacts when Peru demanded, but it also failed to conduct scientific research and studies of the artifacts as Yale had agreed.  In fact, until recently, much of the collection was still in the original packaging in which it had been shipped to the United States and remained in the basement of Yale's Peabody Museum and other proximate locations, with numerous boxes never having been opened nearly 100 years after their original shipment to the United States.

196.    Yale has put its own interests ahead of the interests of Peru.  Yale has exploited its holding of the Machu Picchu collection for commercial and financial gain at the expense of the interests of the Peruvian people and in violation of the fiduciary obligations that Yale owes Peru.

197.    In addition, as became apparent during the March 2008 visit by Peruvian representatives to the Peabody Museum, Yale has fraudulently concealed which Artifacts it holds

and which Artifacts were returned, in violation of the special trust and confidence reposed in Yale by Peru.  Further, Yale has refused to give Peru an accounting of what it holds and what it contends was exported from Peru in each Bingham-led expedition.

198.     Based on Yale's conduct described herein, Yale has breached its fiduciary duty to Peru.

199.     As a direct and proximate result of Yale's breach of fiduciary duty, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.  Furthermore, as a direct and proximate result of its breach, Yale has benefited from the breach of the fiduciary duty that it owed to Peru.

200.     Peru seeks such damages for Yale's breach of fiduciary duty.

## EIGHTH CAUSE OF ACTION (Fraud)

201.     The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

202.     As a condition of Peru granting permission to Yale to excavate and export the artifacts temporarily to the United States, Yale promised Peru that it would conduct scientific research and examinations of the artifacts and that it would return the artifacts and related materials to Peru when Peru demanded.  Yale breached its promises on both counts.  Not only has Yale refused to return the artifacts to Peru, despite Peru's demand, but it also failed to conduct research and studies of the artifacts as it had agreed.  In fact, until recently, much of the collection was still in the original packaging in which it had been shipped to the United States and remained in the basement of Yale's Peabody Museum and other proximate locations, with numerous boxes never having been opened nearly 100 years after their original shipment to the United States.

203.     At the time that it agreed to the conditions that Peru imposed on the Bingham expeditions, Yale falsely represented to Peru that it would comply with those conditions.

204.     Yale's representation was in reference to a material fact.

205.     Yale knew this representation was false at the time that it made this representation.

206.     Yale intended to deceive Peru, and Peru reasonably relied on Yale's representation, as evidenced by Peru allowing the Bingham expeditions and temporary exportation of artifacts to the United States.

207.     Peru reasonably relied on Yale's representation to its detriment.

208.     As a direct and proximate result of Yale's fraud, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

209.     Peru seeks such damages for Yale's fraud.

### NINTH CAUSE OF ACTION (Fraudulent Misrepresentation)

210.     The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

211.     As a condition of Peru granting permission to Yale to excavate and export the artifacts temporarily to the United States, Yale promised Peru that it would conduct scientific research and examinations of the artifacts and that it would return the artifacts and related materials to Peru when Peru demanded.  Yale breached its promises on both counts.  Not only has Yale refused to return the artifacts to Peru, despite Peru's demand, but it also failed to conduct research and studies of the artifacts as it had agreed.  In fact, until recently, much of the collection was still in the original packaging in which it had been shipped to the United States and remained in the basement of Yale's Peabody Museum and other proximate locations, with

numerous boxes never having been opened nearly 100 years after their original shipment to the United States.

212.     At the time that it agreed to the conditions that Peru imposed on the Bingham expeditions, Yale falsely represented to Peru that it would comply with those conditions.

213.     Yale's representation was in reference to a material fact.

214.     Yale knew this representation was false at the time that it made this representation.

215.     Yale intended to deceive Peru.  Peru believed Yale's representation to be true and reasonably relied on Yale's representation, as evidenced by Peru allowing the Bingham expeditions and temporary exportation of artifacts to the United States.

216.     Peru reasonably relied on Yale's fraudulent representation to its detriment.

217.     As a direct and proximate result of Yale's fraud, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

218.     Peru seeks such damages for Yale's fraudulent misrepresentation.

## TENTH CAUSE OF ACTION (Unjust Enrichment)

219.     The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

220.     Peru conferred a benefit on Yale by allowing Yale to export Peru's artifacts to the United States temporarily for the purpose of conducting scientific research and study, with the condition that the artifacts and related materials be returned when Peru demanded.

221.     Yale possesses knowledge of this benefit conferred on it by Peru.

222.     Yale accepted and retained the benefit under inequitable circumstances by its refusal to return the artifacts and related materials, despite Peru's demand for their return.

223.    It would be unjust for Yale not to pay Peru the value of the benefit conferred upon Yale.

224.    Yale has been unjustly enriched as a direct and proximate result of its actions, and Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

225.    Peru seeks damages for Yale's unjust enrichment.

**ELEVENTH CAUSE OF ACTION (Civil Conspiracy—Wrongful Retention)**

226.    The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

227.    Yale and Bingham agreed that they would conspire between themselves that Yale would retain the artifacts and related materials wrongfully and unlawfully.

228.    Yale and Bingham agreed that Yale would retain the artifacts and related materials wrongfully and unlawfully.

229.    Yale's wrongful and unlawful retention of the artifacts and related materials has caused harm to Peru.

230.    Yale's wrongful and unlawful retention of the artifacts and related materials was done pursuant to and in furtherance of Yale's common scheme with Hiram Bingham.

231.    As a direct and proximate result of Yale's civil conspiracy to wrongfully retain Peru's property, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

232.    Peru seeks such damages for Yale's civil conspiracy with Hiram Bingham.

**TWELFTH CAUSE OF ACTION (Civil Conspiracy—Conversion)**

233.    The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

234.     Yale and Bingham agreed that they would conspire between themselves that Yale would convert the artifacts and related materials.

235.     Yale and Hiram Bingham agreed that Yale would convert the artifacts and the related materials.

236.     Yale's conversion has caused harm to Peru.

237.     Yale's conversion was done pursuant to and in furtherance of Yale's common scheme with Hiram Bingham.

238.     As a direct and proximate result of Yale's civil conspiracy to convert Peru's property, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

239.     Peru seeks such damages for Yale's civil conspiracy with Hiram Bingham.

**THIRTEENTH CAUSE OF ACTION (Civil Conspiracy—Fraud)**

240.     The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

241.     Yale and Hiram Bingham agreed to conspire between themselves to defraud Peru concerning Yale's intention to return the artifacts and related materials to Peru.

242.     Yale and Hiram Bingham agreed that Yale would retain the artifacts and related materials but that Yale would represent to Peru that Yale would return the artifacts and related materials to Peru when Peru demanded.

243.     Yale's fraud has caused harm to Peru.

244.     Yale committed fraud pursuant to and in furtherance of the common scheme with Hiram Bingham.

245.     As a direct and proximate result of Yale's civil conspiracy to commit fraud, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

246.     Peru seeks such damages for Yale's civil conspiracy with Hiram Bingham.

**FOURTEENTH CAUSE OF ACTION (Civil Conspiracy—Fraudulent Misrepresentation)**

247.     The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

248.     Yale and Bingham agreed and unlawfully and wrongfully conspired between themselves that that Yale would fraudulently represent Yale's assurance to return the artifacts and related materials to Peru when Peru demanded.

249.     Yale's fraudulent misrepresentations have caused harm to Peru.

250.     Yale fraudulently represented its intention to return the artifacts and related materials to Peru pursuant to and in furtherance of Yale's common scheme with Hiram Bingham.

251.     As a direct and proximate result of Yale's civil conspiracy with Hiram Bingham, Peru has been damaged in an amount to be proven at trial, but which far exceeds $75,000.

252.     Peru seeks such damages for Yale's civil conspiracy with Hiram Bingham.

**FIFTEENTH CAUSE OF ACTION (Request for Declaratory Judgment)**

253.     The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

254.     An actual controversy exists between the parties with respect to whether legal title to and ownership of the artifacts and related materials belongs to Peru.  Peru seeks this Court's recognition of Peru's legal rights concerning the property in question as well as this Court's declaration the property belongs lawfully to Peru.

255.   The controversy between Peru and Yale is of sufficient immediacy to justify the issuance of a declaratory judgment.

256.   A declaration is necessary and proper at this time so that Peru may protect its rights.

257.   Peru seeks a judicial determination of the parties' respective rights and duties and this Court's recognition and a declaration of the rights that lawfully belong to Peru concerning the artifacts and related materials, including a declaration that Peru has legal title to and ownership of the artifacts exported from Peru to the United States through the Bingham expeditions as well as the related materials, all of which Yale is wrongfully detaining.  Peru further seeks an Order from this Court directing Yale to return the artifacts and related materials in their entirety to Peru.

## SIXTEENTH CAUSE OF ACTION (Accounting—Artifacts)

258.   The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

259.   The interests of Peru have been directly and negatively impacted by Yale's conduct, including, *inter alia*, Yale's refusal to give an inventory of what it holds and what it contends was exported from each expedition.  Yale has breached its numerous contractual, common-law, and fiduciary obligations to Peru.  Further, it has violated Peruvian law in refusing to return the Artifacts.

260.   Peru has no means of ascertaining what artifacts Yale holds and what it contends was obtained from each expedition.  Upon information and belief, Yale has wrongfully obtained and retained Artifacts, all of which belong to the Peruvian people.

261.   Peru has requested from Yale an inventory of what it holds from the 1908, 1911, 1912, and 1914-1915 expeditions and what it contends was obtained from each expedition, as well as an inventory of any other Peruvian artifacts Yale currently hold or has control over. However, thus far, Yale has ignored or refused Peru's request for an accounting.

262.   An accounting of the Artifacts in Yale's custody will reveal – fully and finally – what Artifacts Yale holds.

263.   Peru, therefore, seeks an Order from this Court, directing the accounting of what artifacts Yale holds, from which expedition or other source Yale contends each artifact was obtained, the location of all artifacts taken from Peru by Bingham or anyone else operating on Yale's behalf, specifying whether those artifacts are currently in Yale's custody or in the custody of any third party known to Yale, including the Bingham family, any individual, NGS, or any museum, University, or other institution;

### SEVENTEENTH CAUSE OF ACTION (Accounting—Funds Received)

264.   The Plaintiff here repeats the allegations in the preceding paragraphs of this Complaint.

265.   The interests of Peru have been directly and negatively impacted by Yale's conduct, including Yale's exploiting the Machu Picchu collection for commercial and financial gain, including, *inter alia*, the exhibition that traveled the United States from 2003 to 2005.

266.   Peru seeks an accounting of all funds that Yale has received on account of the Machu Picchu exhibit.

267.   An accounting of monies received by Yale on account of the Machu Picchu collection will reveal – fully and finally – Yale's unjust profit at the expense of the people of Peru.

268.    Peru, therefore, seeks an Order from this Court, directing the accounting of funds received by Yale on account of the Machu Picchu collection.

WHEREFORE, Peru prays for judgment as follows:

a.          For compensatory damages in an amount to be determined at trial and for interest thereon at the highest lawful rate;

b.          For punitive damages in an amount to be determined at trial and for interest thereon at the highest lawful rate;

c.          For a writ of replevin and order compelling Yale to turn over the following:  all objects in its custody which were exported from Peru by Hiram Bingham and/or other members of the Bingham expeditions, including but not limited to, all mummies, skulls, bones and other human remains, pottery, utensils, objects of art and all other items; copies of all research papers and reports referenced in the Third Decree and currently in the custody of Yale; and all studies and photographs referenced in the Fourth Decree and currently in the custody of Yale;

d.          For injunctive relief enjoining Yale from transferring, depositing, or otherwise moving the artifacts and related materials until further order of this Court;

e.          For a declaration that Peru has legal title to and ownership of the artifacts exported from Peru to the United States through the Bingham expeditions as well as the related materials, all of which Yale is wrongfully detaining;

f.          For an accounting from Yale of the location of all artifacts taken from Peru by Bingham, specifying whether those artifacts are currently in Yale's custody or in the custody of any third party known to Yale, including the Bingham family, any individual, NGS, or any museum, University, or other institution;

g.          For an accounting and disgorgement of profits by which Yale has been unjustly enriched on account of its exhibition and retention of property belonging to Peru;

h.          For attorneys fees and costs of suit incurred herein;

i.          For pre- and post-judgment interest at the highest lawful rate;

j.          For any relief applicable under the above-referenced international conventions and treaties; and

k.          For such other and further relief as this Court deems just and proper.

                                   Respectfully submitted,


                                   _____/s/_____
                                   William P. Cook
                                   District of Columbia Bar No.: 465006
                                   Edward S. Scheideman III
                                   District of Columbia Bar No.:  475128
                                   Cristina E. Antelo
                                   District of Columbia Bar No.: 500124

                                   DLA PIPER LLP (US)
                                   500 Eighth Street, NW.
                                   Washington, D.C. 20004
                                   Tel:  (202) 799-4000
                                   Fax: (202) 799-5000

                                   Ileana M. Blanco
                                   Christina E. Ponig

                                   DLA PIPER LLP (US)
                                   600 Travis Avenue
                                   Suite 1700
                                   Houston, Texas 77002
                                   Tel: (713) 425-8400
                                   Fax: (713) 425-8401

                                   Attorneys for the Republic of Peru

April 20, 2009

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of April, 2009, the First Amended Complaint of

Plaintiff The Republic of Peru was served via electronic mail to the following:

>Jeffrey R. Babbin, Esq.
>Wiggin and Dana LLP
>One Century Tower
>P.O. Box 1832
>New Haven, Connecticut 06508-1832
>
>Attorneys for Yale University


_____/s/_____

Edward S. Scheideman