**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| REPUBLIC OF PERU, | : | |
| | : | Case No.: 3:09-cv-01332 (AWT) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY, | : | |
| | : | |
| Defendant. | : | October 16, 2009 |

**YALE UNIVERSITY'S MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS PERU'S AMENDED COMPLAINT**
<u>**FOR FAILURE TO STATE A CLAIM**</u>

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................................. ii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 3

ARGUMENT ............................................................................................................................. 7

I.      All of Peru's claims are time-barred ............................................................................. 7

        A.      Connecticut supplies the applicable statute of limitations principles .................... 8

        B.      Conversion, replevin, wrongful retention, and related conspiracy claims............ 10

                1.      Assertion of Dominion by Barbara Shailor Letter of December 2005 ...... 13

                2.      Assertion of Dominion Admitted by Peru in Statements to its Own
                        Congress in November 2005................................................................... 14

                3.      Assertions of Dominion on the Peabody Museum Website and in the
                        Yale Bulletin from 2002 to 2005 ............................................................ 17

                4.      Other Assertions of Dominion and Control in 2003 and 2004 ................. 21

                5.      Assertion of Dominion and Control by Yale University Press Book in
                        1930........................................................................................................ 23

                6.      Assertion of Dominion through Alleged Refusal  of Demand in 1921 ..... 24

        C.      Fraud, fraudulent misrepresentation, and related conspiracy claims.................... 27

        D.      Contract, unjust enrichment and accounting claims ............................................. 28

        E.      Breach of fiduciary duty ...................................................................................... 33

        F.      Declaratory judgment........................................................................................... 34

II.     All claims except conversion and replevin are statutorily barred ................................. 35

III.    The "conspiracy" claims violate the intra-corporate conspiracy doctrine ..................... 36

IV.     The fraud and fraudulent misrepresentation claims violate Fed. R. Civ. P. 9 ................ 38

CONCLUSION......................................................................................................................... 39

# TABLE OF AUTHORITIES

## CASES

*Ahern v. Kappalumakkel*, 97 Conn. App. 189 (2006) ...................................................................33

*Angrave v. Oates*, No. CV040352012, 2004 WL 2595855 (Conn. Super. Ct. Oct. 15, 2004) ........................................................................................................................................36

*AroChem International, Inc. v. Buirkle*, 968 F.2d 266 (2d Cir. 1992) .............................................8

*Ashcroft v. Iqbal*, --, U.S. --, 129 S. Ct. 1937 (2009) .................................................................39

*Estate of Axelrod v. Flannery*, 476 F. Supp. 2d 188 (D. Conn. 2007)...........................................33

*Baena Brothers, Inc. v. Welge*, 207 A.2d 749 (Conn. Cir. A.D. 1964) .........................................24

*Baron v. Rabinovici*, No. CV-05-0110 (TCP)(ETB), 2006 WL 1318426 (E.D.N.Y. May 12, 2006) ..................................................................................................................................17

*Bartone v. Robert L. Day Co.*, 232 Conn. 527 (1995) ...............................................................31

*Baxter v. Sturm, Ruger and Co., Inc.*, 230 Conn. 335 (1994)........................................................8

*Baxter v. Sturm, Ruger & Co.*, 13 F.3d 40 (2d Cir. 1993) .............................................................8

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) ................................................................14, 17, 39

*Burgos v. National Automobile Broker*, 5 Conn. L. Rptr. 63, No. CV91-284583S, 1991 WL 204356 (Conn. Super. Ct. Sept. 30, 1991)..................................................................36

*Cambridge Literary Properties, Ltd. v. Goebel Porzellenfabrik G.m.b.H.*, 510 F.3d 77 (1st Cir. 2007) .....................................................................................................................32

*Caminis v. Troy*, 112 Conn. App. 546 (2009) ......................................................................32, 34

*Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704 (2d Cir. 2002)......................................................8

*Certain Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383 (2008) ......10, 11, 31, 34

*Choquette v. Sanfilippo*, No. 3:99CV562(CFD), 2001 WL 1266305 (D. Conn. Sept. 28, 2001) ..................................................................................................................................9, 14

*Consolidated Motor Lines, Inc. v. M & M Transport Co.*, 128 Conn. 107 (1941)..........................9

*Converse v. General Motors Corp.*, 893 F.2d 513 (2d Cir. 1990)............................................9, 14

ii

*Cornelio v. Stamford Hospital*, 246 Conn. 45 (1998) .................................................................35

*Day v. General Electric Credit Corp.*, 15 Conn. App. 677, *cert. denied*, 209 Conn. 819 (1988) ..........................................................................................................................................27

*Dowling v. Finley Associates, Inc.*, 49 Conn. App. 330 (1998), *rev'd on other grounds*, 248 Conn. 364 (1999) .................................................................................................................31

*Edwards v. Metro-North Commuter Railroad*, No. 3:04cv1430 (JBA), 2006 WL 2790402 (D. Conn. Sept. 27, 2006) ......................................................................................................37

*Farbstein v. Hicksville Public Library*, No. 06 Civ. 0907, 254 Fed. Appx. 50 (2d Cir. Nov. 15, 2007) ........................................................................................................................37

*Fichera v. Mine Hill Corp.*, 207 Conn. 204 (1988) .................................................10, 11, 25, 28

*Flaherty v. Schettino*, 136 Conn. 222 (1949) .........................................................................38

*Gibbons v. NER Holdings, Inc.*, 983 F. Supp. 310 (D. Conn. 1997) ......................................28

*Harp v. King*, 266 Conn. 747 (2003) .......................................................................................37

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996) ................................................................39

*Hartline v. Gallo*, 546 F.3d 95 (2d Cir. 2008) ........................................................................36

*Higgins v. Emmons*, 5 Conn. 76 (1823) ..................................................................................24

*Johnson & Johnson v. American National Red Cross*, 528 F. Supp. 2d 462 (S.D.N.Y. 2008) ..........................................................................................................................................7

*Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487 (1941) ...............................8

*Krondes v. Norwalk Savings Society*, 53 Conn. App. 102 (1999) ..........................................27

*Label Systems Corp. v. Aghamohammadi*, 270 Conn. 291 (2004) .........................................11

*Levy v. Pyramid Co. of Ithaca*, 871 F.2d 9 (2d Cir. 1989), *affirming Levy v. Pyramid Co. of Ithaca*, 687 F. Supp. 48, 52 (N.D.N.Y. 1988) .................................................................9

*Litchfield Asset Management Corp. v. Howell*, 70 Conn. App. 133 (2002) ...........................10

*Luciani v. Stop & Shop Cos.*, 15 Conn. App. 407, *cert. denied*, 209 Conn. 809 (1988) .........12, 24

*Macomber v. Travelers Property & Casualty Corp.*, 261 Conn. 620 (2002) ..........................32

*Maroun v. Tarro*, 35 Conn. App. 391, *cert. denied*, 231 Conn. 926 (1994)....................................12

*Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397 (S.D.N.Y. 2002)............................................14

*Mead v. Johnson*, 54 Conn. 317 (1886) .........................................................................................10

*In re Merrill Lynch & Co. Research Reports Sec. Litigation*, 289 F. Supp. 2d 416
    (S.D.N.Y. 2003)..........................................................................................................................15

*Modis, Inc. v. Bardelli*, 531 F. Supp. 2d 314 (D. Conn. 2008).......................................................11

*In re Moody's Corp. Securities Litigation*, 599 F. Supp. 2d 493 (S.D.N.Y. 2009) ........................7

*Mountaindale Condominium Association, Inc. v. Zappone*, 59 Conn. App. 311 (2000)...............31

*Muller-Paisner v. TIAA*, 289 Fed. Appx. 461 (2d Cir. 2008) ...................................................7, 18

*Nelson v. Sotheby's, Inc.*, 115 F. Supp. 2d 925 (N.D. Ill. 2000)....................................................24

*Neuhaus v. DeCholnoky*, 280 Conn. 190 (2006) ......................................................................1, 11

*Nickerson v. Martin*, 34 Conn. Supp. 22 (Conn. Super. Ct. 1976) ...............................................10

*O'Connor v. O'Connor*, 201 Conn. 632 (1986)..............................................................................26

*Olsen v. Pratt & Whitney Aircraft, Division of United Technologies Corp.*, 136 F.3d 273
    (2d Cir. 1998)..............................................................................................................................39

*PJM and Associates, LC v. City of Bridgeport*, 292 Conn. 125 (2009).........................................35

*Piteo v. Gottier*, 112 Conn. App. 441, 446 (2009)........................................................................11

*Plikus v. Plikus*, 26 Conn. App. 174 (1991)...................................................................................11

*Priceline.com, Inc. v. Mayes*, No. CV-030196820, 2005 WL 896261 (Conn. Super. Ct.
    Mar 16, 2005).............................................................................................................................32

*QuesTech Financial, LLC v. Benni's, LLC*, 105 Conn. App. 749 (2008)......................................10

*Rapuano v. Rapuano*, No. CV010278120, 2001 WL 1332431 (Conn. Super. Ct. Oct. 12,
    2001) ..........................................................................................................................................36

*Rosenfield v. David Marder & Associates, LLC*, 110 Conn. App. 679 (2008).............................30

*Rosenfield v. Rogin, Nassau, Caplan, Lassman, & Hirtle, LLC*, 69 Conn. App. 151
    (2002)...................................................................................................................................10, 27

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ..................................................................3, 14

*Santos v. Praxair Surface Techs. Inc.*, No. 3:04 CV 350 (CFD), 2005 WL 756528 (D. Conn. Mar. 31, 2005) ............................................................................................................37

*Schaeffer v. Village of Ossining*, 58 F.3d 48 (2d Cir. 1995) ....................................................9

*Simko Law Firm, LLC v. Yale New Haven Health Services Corp.*, No. CV075006228S, 2008 WL 1734689 (Conn. Super. Ct. Mar. 24, 2008) ...............................................32

*Slekis v. National Railroad Passenger Corp.*, 56 F. Supp. 2d 202 (D. Conn. 1999)......................8

*Snow v. Howard Motors, Inc.*, 3 Conn. Cir. Ct. 702, *cert. dismissed*, 154 Conn. 721 (1966) ...............................................................................................................................38

*Staehr v. Hartford Finance Services Group, Inc.*, 547 F.3d 406 (2d Cir. 2008) .................3, 6, 15

*Stuart & Sons, L.P. v. Curtis Public Co., Inc.*, 456 F. Supp. 2d 336 (D. Conn. 2006) ...........................................................................................................12, 21, 25, 34

*Suarez-Negrete v. Trotta*, 47 Conn. App. 517 (1998)..............................................................12

*T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*, 33 F. Supp. 2d 122 (D. Conn. 1998)....................27

*Tobert v. Connecticut General Life Insurance Co.*, 257 Conn. 118 (2001) .........................29, 31

*Town of Orangetown v. Gorsuch*, 718 F.2d 29 (2d Cir. 1983) .......................................................34

*United States v. Brown*, 688 F.2d 1112 (7th Cir. 1982)...............................................................18

*United States v. GAF Corp.*, 928 F.2d 1253 (2d Cir. 1991) .........................................................17

*Walker v. Armco Steel Corp.*, 446 U.S. 740 (1980)......................................................................8

*Wasmer v. Fabricating & Production Machinery Inc.*, No. CV 91 28 10 76, 1991 WL 83999 (Conn. Super. Ct. Apr. 19, 1991) .........................................................................36

*Wedig v. Brinster*, 1 Conn. App. 123 (1983), *cert. denied*, 192 Conn. 803 (1984) .......................10

*Wilson v. Kelley*, 224 Conn. 110 (1992) .....................................................................................34

*Yeomans v. Wallace*, 291 F. Supp. 2d 70 (D. Conn. 2003)...........................................................12

## STATUTES AND RULES

28 U.S.C. § 1406(a) .....................................................................................................................9

Conn. Gen. Stat. § 1-2z..................................................................................35

Conn. Gen. Stat. § 404..................................................................................32

Conn. Gen. Stat. § 52-515..........................................................................10, 35

Conn. Gen. Stat. § 52-522..........................................................................35, 36

Conn. Gen. Stat. § 52-530................................................................................10

Conn. Gen. Stat. § 52-576................................................................................29

Conn. Gen. Stat. § 52-577........................................................10, 11, 25, 27, 28, 33

Fed. R. Evid. 201...........................................................................................7

Fed. R. Civ. P. 4............................................................................................7

Fed. R. Civ. P. 9.......................................................................................38, 39

Fed. R. Civ. P. 11..........................................................................................18

Fed. R. Civ. P. 12...........................................................................................3

Fed. R. Civ. P. 44.1.........................................................................................5

## INTRODUCTION

Nearly a century ago, Hiram Bingham ("Bingham"), a professor at Defendant Yale University ("Yale"), led scientific expeditions to Incan ruins in Peru, including those at Machu Picchu in the province of Cuzco.  During his expeditions, Bingham collected samples of old Incan materials, primarily fragments of ceramic, metal and bone, and with Peru's permission sent them to Yale University in New Haven, Connecticut.

Plaintiff Republic of Peru ("Peru") brings more than a dozen claims, but they all boil down to the assertion that the materials were on loan and that Yale wrongfully refused to return them.  Peru admits that Yale shipped back boxes full of the material in 1921, and for eight decades Peru did not complain about the shipment.  Now, with all witnesses long since dead, Peru claims that Yale should have sent more boxes back to Peru.  Yale rejects Peru's allegations; it is fully prepared to prove at trial that it has acted honorably throughout the long decades and that it is the lawful owner of the Incan materials kept at its Peabody Museum.  But that factual dispute need not be joined.

Yale has repeatedly published its continuing possession of the artifacts and, consistent with its ownership of them, it has regularly asserted dominion and control over the artifacts. Decade after decade, Peru was content to let Yale hold itself out to the world as the owner of the objects.  It disregarded the reasonable time limits imposed by law for bringing its claims.  Those limits "prevent the unexpected enforcement of stale and fraudulent claims by allowing persons after the lapse of a reasonable time, to plan their affairs with a reasonable degree of certainty, free from the disruptive burden of protracted and unknown potential liability[.]" *Neuhaus v. DeCholnoky*, 280 Conn. 190, 207 (2006).  Statutes of limitation recognize that a court's "search for truth . . . may be impaired by the loss of evidence, whether by death or disappearance of

witnesses, fading memories, disappearance of documents or otherwise." *Id.* By waiting for decades to bring its suit, Peru has forfeited any right to seek this court's assistance.

Yale's first assertion of dominion over the artifacts triggered the statute of limitations. Peru alleges that it demanded in 1920 that Yale return all of the materials, but that Yale returned only some of them. If that allegation were taken at face value, as it must be on this motion, then Yale's refusal to return the materials constituted an assertion of dominion over them, starting the limitations clock. That was only the first assertion of dominion. Between 1923 and 1928, several Yale publications discussed the remaining Incan materials, describing them as part of the permanent Peabody collection. In 1930, Yale published a book by Bingham on the objects, stating that the Incan materials were (still) at the Peabody, displaying photographs of many of the objects, and explaining how Yale had recreated some objects from fragments.

Peru made no response to these acts of dominion – except to invite Bingham back to Peru as a hero and to name a major highway near Machu Picchu after him. Its failure to object in that first decade is fatal to its claims. It tries now to ignore the first eighty years, focusing its attention on recent years, when new political interests have found it convenient to manufacture this dispute out of a peaceful historical record.

Peru cannot ignore those first decades, but even if confined to recent years, analysis of the pleaded facts compels dismissal of the claims as time-barred. In a vain attempt to delay the inevitable, Peru omits the dates of several recent Yale assertions, transforming the Amended Complaint into a textbook example of sharp pleading. It omits the date of the Yale letter that, on Peru's (counterfactual) theory, represented Yale's first assertion of dominion and control in December 2005. It omits the date of a Yale Peabody website that for many years has asserted dominion and control over the artifacts – and which Peru itself cites as proof of Yale's supposed

wrongdoing. And it ignores not just the date, but the entirety of a public hearing of its Congressional Foreign Affairs Committee during which the Director of Peru's National Institute of Culture testified that Yale regarded the artifacts as its own. Even without Yale's assertions of dominion in the early part of the twentieth century, any of these twenty-first century assertions would alone compel the dismissal of this suit on the basis of the statute of limitations.

Nearly all of Peru's claims suffer from further fatal flaws, both statutory and at common law. Those flaws are detailed below, but need not be considered, as none of the claims survive the statute of limitations. "Dismissal . . . is appropriate when a defendant raises . . . a statutory bar as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (brackets, quotation and emphasis omitted). This lawsuit lacks any legitimate basis in law and must be dismissed.

## STATEMENT OF FACTS

As required on a motion to dismiss, the following facts are drawn from the Amended Complaint, the documents attached to it as exhibits or incorporated by reference, and records of which the Court may take judicial notice. *See Staehr*, 547 F.3d at 425 ("[I]n ruling on a Rule 12(b) motion to dismiss, we have acknowledged that the court may also consider matters of which judicial notice may be taken") (quotation marks omitted); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered" on a motion to dismiss).

In 1908, 1911, 1912 and 1915, Hiram Bingham, a professor at Yale University, led expeditions to the Cuzco region of Peru, an area with Incan ruins including those at Machu Picchu. Amended Complaint ("AC") ¶¶ 12, 18, 47, 80. During the expeditions, Bingham

discovered and sent to Yale for further study a variety of archeological remains. AC ¶¶ 15, 22,

49, 86. In letters quoted by Peru, Bingham described those remains as "potsherds, bones and a

few archeological objects of interest to science . . . [t]he more valuable part of [which] is made

up of the skeletal remains[.]" *Id.* ¶ 108; *accord* ¶ 106.

Peru avers that it authorized Bingham to export the objects to Yale through two executive

orders, one dated October 31, 1912 ("the 1912 Decree") and the other dated January 27, 1916

("1916 Decree"). AC ¶ 91. Peru claims that the 1912 Decree encompassed all Bingham's

findings in Peru before and after the passage of the Decree, and gave Peru the right to demand

those objects back at any time, along with copies of any related research papers or reports. AC

¶¶ 48, 99-102; *cf.* AC Exh. G (translation) at 3. By its plain text, the 1912 Decree required a

senior Peruvian official to make "a detailed inventory of all artifacts" before permitting them to

be exported. AC Exh. G (translation) at 2-3. The 1916 Decree was narrower, addressing only

the export of a specific "74 boxes containing archeological artifacts extracted from the

Department of Cuzco between 1914 and 1915." AC Exh. L (translation) at 1. On its face, it

required Yale to return those objects within eighteen months, along with "all studies performed

on them." *Id.*; *see also* AC ¶¶ 86-87.

Peru alleges that it called in its loan under the 1916 Decree on November 22, 1918. AC ¶

114. It also claims that, two years later, on October 26, 1920, it made a separate demand for the

materials exported under the 1912 Decree. AC ¶ 116. According to Peru, both demands were

supposed to be satisfied by January 1, 1922. AC ¶ 119.

On March 19, 1921, Peru passed another decree, by which it gave Yale title to all

"duplicate" objects excavated by Bingham and subject to return by January 1, 1922, demanding

only that unique objects be returned by that date.[1]  Peru admits that in October 1921, Yale

shipped dozens of boxes of artifacts back to Peru.  AC ¶ 120.  But it contends that the shipment

did not contain all of the materials encompassed by its demands.  AC ¶¶ 120-22.

Although Peru claims that Yale "purported[]" to have returned "the entire collection of

artifacts," AC ¶ 120, it admits that nine years later Yale published "a special edition book [by

Bingham] . . . about the Peruvian Expeditions."  AC ¶ 133.  That book, which the Amended

Complaint incorporates by reference, states plainly that "[t]he collection of Machu Picchu

material is now in the Peabody Museum of Natural History at Yale University."  Hiram

Bingham, *Machu Picchu:  A Citadel of the Incas* (Yale University Press, 1930) at vi

(incorporated by reference at AC ¶ 133) (copy of title page and referenced pages attached as

Exh. B-18).  Several other Yale publications from the 1920s – of which the Court may take

judicial notice – similarly described the Peabody Museum as the owner of a collection of Incan

objects excavated by Bingham at Machu Picchu.  *See* Exhs. B-20, B-21, B-22, B-23 and

discussion *infra* Pt. I.B.6.  That pattern continued in Yale publications from the 1980s and 1990s.

*See* Exhs. B-15, B-16, B-30, B-31 and discussion *infra* Pt. I.B.3, n.13.

According to the Amended Complaint, Yale's assertions of ownership over the artifacts

have been just as pronounced in this century.  In 2001, Peru avers that Yale rebuffed a proposal

for returning the objects which "concluded that Peru was the rightful owner of the artifacts . . .

---

[1] *See* Exh. B-19 ("It is Resolved:  1st – To cede to the University of Yale only the duplicates of
the antiquities of all kinds which it took for purposes of study and which are to be returned on or
before January 1922.  Unique specimens shall be returned without exception whatever to the
Museum of Natural History.") (translation of "Se resuelve:  1o. – Ceder a la Universidad de
Yale, simplemente los duplicados de las antigüedades de toda clase que llevó para estudio y que
debe devolver antes o en enero de 1922.  Los ejemplares únicos serán devueltos sin excepción
alguna al Museo de Historia Nacional.").  Consideration of the 1921 executive order on this
motion to dismiss is permissible because it is law, not fact.  *See* Fed. R. Civ. P. 44.1.  But in any
event, this Court need not rely on it, for the reasons given *infra* Pt. I.B.

[and,] if accepted, required Yale to confirm this fact." AC ¶ 135; *see* AC ¶¶ 135-38.  Beginning

in 2003, Peru alleges that Yale "consistently disclosed that it had, in fact, retained the artifacts

from the expedition of 1912," and also "maintained [that] Bingham 'legally' purchased and

exported on behalf of Yale" artifacts from the 1908-1911 expeditions.  AC ¶ 123.   That same

year, Yale took the Machu Picchu objects on a tour of the United States.  AC ¶ 148.

By September 2005, Yale's Peabody website publicly "stated that Bingham 'excavated

hundreds of objects that tell the story of everyday life at Machu Picchu and, by agreement with

the Peruvian government, these materials became part of the Peabody Museum's collections.'"

AC ¶ 149.[2]  On October 20, 2005, Peru attached a copy of the Peabody webpage containing that

statement to a draft complaint which it threatened to file unless Yale "acknowledge[s] Peru's

rightful ownership."  *See* Exh. B-6.  One month later, on November 28, 2005, Luis Guillermo

Lumbreras, then the Director of the relevant branch of Peru's government, the National Institute

of Culture, told the Peruvian Congress that "Yale University argues that having had the

collection in their possession for over 50 or 60 years, it belongs to them."  *See* Official Transcript

of November 28, 2005, Hearing Before the Foreign Affairs Committee of the Peruvian Congress

at 13 (translation of "[[L]a Universidad de Yale asumió la tesis de que teniendo más de 50 ó 60

años la colección en su poder, pertenecía a la Universidad.") (copy attached as Exh. B-2).[3]

---

[2] While Peru's Amended Complaint omits the dates on which Yale published this statement, the
Court may take judicial notice of the date of its repeated publication before, during, and shortly
after September 2005.  *See* Exhs. B-5,-6,-24,-25,-26,-27,-28,-29 and discussion *infra* Pt. I.B.3 &
nn.10-11.  Because "matters judicially noticed by the District Court are not considered matters
outside the pleadings," consideration of these dates does not require converting this motion to
dismiss into a motion for summary judgment.  *Staehr*, 547 F.3d at 425-26.  That is true for all
facts subject to judicial notice described in this brief.

[3] Lumbreras' testimony is quoted in the December 2005 Barbara Shailor letter incorporated by
reference at paragraph 124 of the Amended Complaint; a copy of the Shailor letter is attached as
Exh. B-1.  Moreover, this Court may take judicial notice of the fact that a senior Peruvian
executive branch official made these statements on the record in a hearing of the Foreign Affairs

On December 8, 2005, ten days after Lumbreras explained Yale's position to the

Peruvian legislature, Peru alleges that "Barbara Shailor writing on behalf of Yale stated **for the**

**first time** Yale's newfound position that the artifacts from the 1912 expedition were the property

of Yale." AC ¶ 124 (emphasis in original); *see also* Exh. B-1 (Shailor letter).  On January 16,

2009 – three years and thirty-nine days after the date of the Shailor letter, seventy-nine years

after the Bingham book, and eighty-eight years after the date on which Yale allegedly did not

return the objects it was allegedly obliged to return – Peru finally served Yale with its

complaint.[4]

## ARGUMENT

**I.      All of Peru's claims are time-barred.**

Connecticut law, which governs the limitations issues in this diversity action, applies a

three-year statute of limitations to Peru's tort and related claims, and a six-year statute of

limitations to Peru's contract and related claims.  Because Yale was served on January 16, 2009,

---

Committee of the Peruvian Congress.  *See Muller-Paisner v. TIAA*, 289 Fed. Appx. 461, 466 n.5
(2d Cir. 2008) ("congressional testimony is an appropriate subject for judicial notice as a public
record for the fact that the statements were made"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp.
2d 493, 504 (S.D.N.Y. 2009) ("transcripts of Congressional hearing testimony . . . are public
records, which courts in this District have found to be subject to judicial notice."); *Johnson &
Johnson v. Am. Nat'l Red Cross*, 528 F. Supp. 2d 462, 463 n.1 (S.D.N.Y. 2008) (noting that
congressional hearing testimony is a public record subject to judicial notice).

[4] Peru has not filed a return of service with the Court.  *But cf.* Fed. R. Civ. P. 4(l) (requiring
plaintiff to file proof of service when service is not waived).  If Peru had filed the required proof
of service, it would show service on Yale on January 16, 2009.  *See* Exh. A (Decl. of Harold
Rose).  Indeed, Peru did not even give the summons to a process server until January 13, 2009 or
later.  *See* Exh. A-1 (cover letter by Peru's counsel to Yale, dated January 13, 2009, stating that it
enclosed summons and complaint, to be delivered "Via private process server").  This Court can
take judicial notice of the date of that letter, as it is a fact "not subject to reasonable dispute in
that it is . . . capable of accurate and ready determination by resort to sources whose accuracy
cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Moreover, this very case file contains
emails from Peru's counsel to Yale on January 9, 2009 discussing the possibility of forthcoming
service on Yale; Peru itself put those emails on the record.  *See* Decl. of William P. Cook
attached as Exhibit C to Peru's Opposition to Yale's Motion to Dismiss [doc. # 20-12].

Peru's tort claims are time-barred if the tortious acts allegedly took place before January 16, 2006, and the contract claims are time-barred if the contractual breaches allegedly took place before January 16, 2003. Peru's own averments in its Amended Complaint, along with facts of which this Court may readily take judicial notice, make plain that the alleged wrongs – if wrong at all – took place well before those dates.

### A.   Connecticut supplies the applicable statute of limitations principles.

A federal court sitting in diversity applies the choice-of-law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941); *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 269-70 (2d Cir. 1992). Connecticut choice-of-law rules require the application of Connecticut statute of limitations. *See Baxter v. Sturm, Ruger & Co., Inc.*, 230 Conn. 335, 347 (1994) (Connecticut statute of limitations apply in diversity action for all claims that existed at common law, including claims governed by the substantive law of another jurisdiction), *on certification from Baxter v. Sturm, Ruger & Co.*, 13 F.3d 40 (2d Cir. 1993); *see also Slekis v. Nat'l R.R. Passenger Corp.*, 56 F. Supp. 2d 202, 204-05 (D. Conn. 1999). The applicable local statute of limitations rules include those that set the beginning of the limitations period and those that set the end of the limitations period, when an action is deemed "commenced." *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 709 (2d Cir. 2002) ("[I]n diversity cases state law governs not only the limitations period but also the commencement of the limitations period"); *Walker v. Armco Steel Corp.*, 446 U.S. 740, 751-52 & n.12 (1980) (holding that a state statute that stops the statute of limitations by service on the defendant – not filing – represents "an integral part of the several [state] policies served by the statute of limitations" and that "the service rule must be considered part and parcel of the statute of limitations.").

Connecticut law (not D.C. law) governs here because Connecticut is the transferee forum and the case was transferred here because of a lack of personal jurisdiction in the original forum. *Levy v. Pyramid Co. of Ithaca*, 871 F.2d 9, 10 (2d Cir. 1989) (per curiam) (holding that after transfer of "a case based on diversity of citizenship from one federal trial court to another so as to cure a defect of personal jurisdiction over the defendant, the state law of the transferee forum governs the action for the purposes of the statute of limitations"), *affirming Levy v. Pyramid Co. of Ithaca*, 687 F. Supp. 48, 52 (N.D.N.Y. 1988) (when "the determination is made that venue and jurisdiction is not proper in the transferor court, the law of the transferee court will then apply"); *Choquette v. Sanfilippo*, No. 3:99CV562(CFD), 2001 WL 1266305, at *3-*5 (D. Conn. Sept. 28, 2001) (where transfer is made because of lack of personal jurisdiction or venue, district court applies the statute of limitations rules of the transferee court, including its service rules); *see also Schaeffer v. Vill. of Ossining*, 58 F.3d 48, 50 (2d Cir. 1995) (following transfer under 28 U.S.C. § 1406(a), district court should apply the service rules it would have applied if the action had been properly commenced there).

Connecticut deems an action commenced when the defendant is actually served, not when the suit is filed. *See Converse v. Gen. Motors Corp.*, 893 F.2d 513, 515 (2d Cir. 1990) (holding that Connecticut statute of limitations had expired on serious injury claim filed by plaintiff two weeks before end of statute of limitations period because defendant was not actually served until five days after the end of the limitations period); *Consolidated Motor Lines, Inc. v. M & M Transp. Co.*, 128 Conn. 107, 109 (1941) ("From a very early date in this state the time when the action is regarded as having been brought is the date of service of the writ upon the defendant."); *Choquette*, 2001 WL 1266305, at *5 ("It is well established that Connecticut

follows the 'actual service rule' under which an action is commenced upon actual service on the defendant rather than upon filing with the Clerk").

**B.      Conversion, replevin, wrongful retention, and related conspiracy claims**

A claim for conversion must be brought within three years of the act of conversion.  *See Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212 (1988) ("[O]ur general tort statute of limitations, General Statutes § 52-577 . . . allows an action to be brought within three years 'from the date of the act or omission complained of'"); *Certain Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383, 408 (2008) ("[T]he statute of limitations for claims of conversion . . . is the three year period applicable to torts, set forth in General Statutes § 52-577").[5]

The date on which a plaintiff learns of the alleged wrong has no bearing on the timeliness analysis because "Section 52-577 is a statute of repose in that it sets a fixed limit after which the tortfeasor will not be held liable and in some cases will serve to bar an action before it accrues." *Rosenfield v. Rogin, Nassau, Caplan, Lassman, & Hirtle, LLC*, 69 Conn. App. 151, 159 (2002) (quotation marks omitted).  The purpose of a statute of limitation or of repose is "[to] prevent the

---

[5] The replevin claim is based on the same allegations as the conversion claim and is subject to the same three-year statute of limitations.  *Compare* AC ¶ 173 (conversion) *with* AC ¶ 162 (replevin); *see Nickerson v. Martin*, 34 Conn. Supp. 22, 30 (Conn. Super. Ct. 1976) ("As the early case of *Mead v. Johnson*, 54 Conn. 317, 319 [1886], makes evident, [t]he action of replevin is founded in tort"); *QuesTech Fin., LLC v. Benni's, LLC*, 105 Conn. App. 749, 753 (2008) (holding that replevin is not an equitable claim).  Peru's third claim, "Damages for Wrongful Retention," does not state a separate cause of action.  Damages for wrongful detention of a chattel can be sought via the common-law tort of conversion or the replevin statute, *see* Conn. Gen. Stat. §§ 52-515, 52-530, both of which are time-barred for the reasons set forth in text.  The conspiracy claims based on conversion, "wrongful retention" and replevin are likewise time-barred, and for the same reasons.  *See Wedig v. Brinster*, 1 Conn. App. 123, 136 (1983), *cert. denied*, 192 Conn. 803 (1984) ("The complaint alleged a conspiracy to cheat and defraud the plaintiff.  It sounded in tort.  The applicable statute . . . limits the bringing of such an action to three years.") (quotation marks and citations omitted); *cf. Litchfield Asset Mgmt. Corp. v. Howell*, 70 Conn. App. 133, 144 (2002), *cert. denied*, 261 Conn. 911 (2002) ("[A] civil conspiracy action is in essence an action for damages caused by acts committed pursuant to a formed conspiracy, not an action based on the conspiracy itself.").

unexpected enforcement of stale and fraudulent claims by allowing persons after the lapse of a

reasonable time, to plan their affairs with a reasonable degree of certainty, free from the

disruptive burden of protracted and unknown potential liability, and . . . to aid in the search for

truth that may be impaired by the loss of evidence, whether by death or disappearance of

witnesses, fading memories, disappearance of documents or otherwise." *Neuhaus v.*

*DeCholnoky*, 280 Conn. 190, 206-07 (2006) (quotation marks omitted).  Accordingly, the

Connecticut Supreme Court has insisted that "'[i]n construing our general tort statute of

limitations . . . we have concluded that the history of that legislative choice of language

precludes any construction thereof delaying the start of the limitation period until the cause of

action has accrued or the injury has occurred.'"  *Certain Underwriters*, 289 Conn. at 408

(quoting *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212 (1988)).  Thus, "[t]he relevant date of

the act or omission complained of, as that phrase is used in § 52-577, is the date when the . . .

conduct of the defendant occurs and not the date when the plaintiffs first sustain damage," and

"[i]gnorance of his rights on the part of the person against whom the statute has begun to run,

will not suspend its operation.").  *Piteo v. Gottier*, 112 Conn. App. 441, 446 (2009) (citations and

quotation marks omitted).

Conversion occurs when a defendant does "some unauthorized act which deprives

another of his property permanently or for an indefinite time. . . .  The essence of the wrong is

that the property rights of the plaintiff have been dealt with in a manner adverse to him,

inconsistent with his right of dominion and to his harm."  *Label Sys. Corp. v. Aghamohammadi*,

270 Conn. 291, 329 (2004) (quotation marks and citations omitted); *accord Modis, Inc. v.*

*Bardelli*, 531 F. Supp. 2d 314, 321 (D. Conn. 2008).  A defendant can believe that it owns the

property in question but still commit conversion.  *See Plikus v. Plikus*, 26 Conn. App. 174, 180

(1991) (holding that conversion occurs when one exercises dominion "over property belonging to another, without authorization and to the exclusion of the owner's rights . . . even if one reasonably believes that the item is one's own") (quotation marks and citations omitted); *see also Luciani v. Stop & Shop Cos.*, 15 Conn. App. 407, 409-12, *cert. denied*, 209 Conn. 809 (1988) (defendant's mistaken belief that fixtures were its own property did not prevent finding that conversion occurred); *Yeomans v. Wallace*, 291 F. Supp. 2d 70, 76-77 (D. Conn. 2003) (citing *Suarez-Negrete v. Trotta*, 47 Conn. App. 517, 521 (1998)).

Conversion can occur when possession begins wrongfully. It can also occur "when the possession is originally rightful, but becomes wrongful as a result of: (1) a wrongful detention; (2) a wrongful use of the property; or (3) the exercise of unauthorized dominion over the property." *Stuart & Sons, L.P. v. Curtis Publ'g Co., Inc.*, 456 F. Supp. 2d 336, 344 (D. Conn. 2006) (citation omitted); *see also Maroun v. Tarro*, 35 Conn. App. 391, 396, *cert. denied*, 231 Conn. 926 (1994). A wrongful detention – *i.e.*, a retention of the property following demand and refusal – is only one of the ways that an originally rightful possession can turn wrongful. Possession can also turn wrongful through unauthorized use or assertion of dominion over the property, such as through public assertions of ownership. When that happens, a later demand is legally meaningless: "Proof of the wrongful taking establishes the conversion; thus there is no need for a demand and a refusal for return of the property to establish the tort. The statute of limitations begins to run on the date the property was wrongfully taken." *Stuart & Sons, L.P.*, 456 F. Supp. 2d at 344 (citation omitted). "Connecticut law does not require demand and refusal for a conversion to occur when a possessor exercises a right of ownership to the exclusion of the [alleged] rightful owner. . . ." *Id.* at 347; *see also Luciani*, 15 Conn. App. at 410-11 ("wrongful use or dominion . . . change the character of the possession itself. Therefore, these actions, when

taken by a possessor, constitute sufficient demarcation of a substantial change in the status of the relationship of the parties to each other, and to the property in question. Accordingly, the requirement of demand is unnecessary.").

The Amended Complaint alleges that Yale converted the objects long before January 16, 2006. Yale maintains – and is prepared to prove at trial – that it has acted honorably and lawfully with regard to the objects for more than a century. Because it owns the objects, its assertions of dominion and control over them for more than nine decades have been perfectly proper. But Peru has failed to shoulder the burden necessary to move this case forward into the arena of factual dispute. Viewed in the light most favorable to Peru, Peru's allegations describe acts of conversion occurring more than three years – and as many as ninety years – before Peru served its complaint.

Any one of the following, standing alone, would require the conclusion that the claim is time-barred.

### 1. Assertion of Dominion by Barbara Shailor Letter of December 2005

Peru alleges that "[i]n December 2005, Barbara Shailor writing on behalf of Yale stated **for the first time** Yale's newfound position that the artifacts from the 1912 expedition were the property of Yale." AC ¶ 124 (emphasis in original). As the following sections show, that allegation conflicts with half a dozen other allegations in the Amended Complaint, and with dozens of sources of which this Court could take judicial notice, all of which make plain that Yale has asserted dominion and control over the artifacts for decades. But even when taken on Peru's terms, the allegation that Yale did not assert ownership over the artifacts until December 2005 cannot save Peru's claims from the statute of limitations.

The Shailor letter upon which the Amended Complaint relies is dated December 8, 2005. *See* Exh. B-1.  Peru omitted the date of the letter from the Amended Complaint, but because the letter is incorporated by reference, Peru's artifice cannot prolong this case.[6]  If, as Peru alleges, Yale asserted dominion and control over the artifacts on December 8, 2005, then Peru had until December 8, 2008 to serve Yale with a summons and complaint raising conversion and related claims.  Because it did not serve Yale until January 16, 2009, the claims are time-barred. *See Converse*, 893 F.2d at 515; *Choquette*, 2001 WL 1266305, at *5.

### 2.    Assertion of Dominion Admitted by Peru in Statements to its Own Congress in November 2005

In November 2005, Luis Guillermo Lumbreras, then the Director of Peru's National Institute of Culture, testified before the Peruvian Congress, unequivocally stating that Yale claimed ownership of the artifacts.  On behalf of Peru's executive branch, Lumbreras told the Peruvian Congress on November 28, 2005 that "Yale University argues that having had the collection in their possession for over 50 or 60 years, it belongs to them."  Exh. B-2 at 13 (translation of "[L]a Universidad de Yale asumió la tesis de que teniendo más de 50 ó 60 años la colección en su poder, pertenecía a la Universidad").[7]  Yale "had registered the collection as

---

[6] *Bell Atl. v. Twombly*, 550 U.S. 544, 568 n.13 (2007) (noting that "[t]he complaint quoted a reported statement of Qwest's CEO . . . that it 'might be a good way to turn a quick dollar.' . . . This was only part of what he reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn."); *Roth*, 489 F.3d at 509 ("Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered" on a motion to dismiss); *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) ("a court may consider documents attached to the complaint as exhibits, or incorporated by reference, as well as any documents that are integral to, or explicitly referenced in, the pleading.  If a plaintiff's allegations are contradicted by such a document, those allegations are insufficient to defeat a motion to dismiss.") (citations omitted).

[7] The December 2005 Shailor letter, incorporated into the Amended Complaint, directly addresses Lumbreras' testimony and thus incorporates it. *See* Exh. B-1 (Shailor letter); Exh. B-2 (Lumbreras transcript).  Moreover, this Court may take judicial notice of the fact that a senior

theirs, as belonging to Yale University," he informed Peru's Congress.  *Id.* (translation of "[E]llos tenían inscrita la colección como propia, de la Universidad de Yale").  Remarkably, Peru omits this colloquy from the face of its Amended Complaint.  But it cannot hide the colloquy from this Court.

Lumbreras followed his official testimony to Peru's Congress with a press tour, repeating on behalf of Peru – in November 2005 – that Yale thought it owned the objects.  On November 30, 2005, Lumbreras told the Associated Press that "Yale considers the collection university property."  Fox News, *Peru to Sue Over Artifacts* (Nov. 30, 2005), *available at* http://www.foxnews.com/story/0,2933,177194,00.html (copy attached as Exh. B-3).[8]  Peru determined that the dispute could not be amicably resolved, and Lumbreras told the AP that Peru was "preparing a lawsuit against Yale University."  *Id.*  "Peru's Foreign Ministry was preparing the legal case and would likely present it in Connecticut state court, Lumbreras said.  He said it was not clear when the lawsuit would be filed."  *Id.*  CBS News filed a story the same day reporting that "Peru is preparing a lawsuit against Yale University to retrieve artifacts taken nearly a century ago," citing Lumbreras as the source.  CBS News, *Peru Poised to Sue Yale for Relics* (Nov. 30, 2005), *available at* http://www.cbsnews.com/stories/2005/11/30/world/main1087897.shtml?source=search_story (copy attached as Exh. B-4).  Lumbreras stated that "Yale considers the collection university

---

Peruvian executive branch official made these statements on the record in a hearing of the Foreign Affairs Committee of the Peruvian Congress.  *See supra* n.3.

[8] This Court can take judicial notice of the date of press reports, the fact of their publication, and the effect of the publications on the commencement of the statute of limitations.  *Staehr*, 547 F.3d at 425; *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d. 416, 425 n.15 (S.D.N.Y. 2003) ("The Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion [to dismiss] into one for summary judgment.").

property," that "[t]his is something we do not recognize," and that "it will be necessary to air this in the courts and no longer simply on the level of diplomatic conversations." *Id.* at 1.[9]

As the official Congressional testimony and the on-the-record press blitz show, Peru recognized by November 28, 2005 that Yale had asserted dominion and control over the artifacts. Even if that were the first time that Yale had asserted dominion and control over the artifacts – and it was not – Peru would have needed to serve Yale with a summons and complaint raising conversion and related claims by November 28, 2008.  It did not.

---

[9] Lumbreras had to explain to Congress why Peru waited almost a century to conclude that Yale's dominion over the objects was wrongful.  He conceded that "there was a document in the United States which declared that they had returned, I believe, 47 boxes of archeological materials from Machu Picchu and that they had consequently complied with the requirement of returning the materials to Peru."  Exh. B-2 at 13 (translation of "existía en los Estados Unidos un documento donde se indicaba que se habían devuelto 47, creo, cajas con material arqueológico de Machu Picchu y, consecuentemente, ya se había cumplido con devolver al Perú los materiales de Machu Picchu").  He claimed that "studies we [the National Institute of Culture] conducted show that is not what was found in Machu Picchu."  *Id.* at 14 (translation of "Los estudios que se tuvieron que hacer como parte de esto, es que eso no es lo que se encontró en Machu Picchu").  But he could not explain why Peru did not conduct its alleged "studies" until 2005.  To the contrary, he acknowledged that "the documentation about what was really found in Machu Picchu is mostly or entirely published."  *Id.* (translation of "la documentación sobre lo que se halló en Machu Picchu está todo o mayormente publicada").  In fact, he explained, there had been "fifteen publications in scientific journals regarding everything found in Machu Picchu," including a 1916 study "of all the metal objects found in Machu Picchu, piece by piece" and "a very detailed catalog" published in 1930 about the Machu Picchu "ceramic collections, including the fragments that were taken from there."  *Id.* (translation of: "hay unas 15 publicaciones hechas en revistas científicas, en diversas publicaciones sobre lo que se encuentra en Machu Picchu;" "un estudio . . . en al año 1916 que es un análisis de todos los objetos de metal que se encontraron en Machu Picchu, pieza por pieza;" and "[e]n 1930, se publicó un catálogo con mucho detalle de las colecciones de cerámica, incluido los fragmentos que se llevaron allá").  In sum, in the early part of the twentieth century – and unquestionably by November 2005 – there was "concrete factual information about what Yale University has."  *Id.* (translation of "la información factual concreta de lo que hay en la Universidad de Yale").  *See also* AC ¶ 122 (alleging that "[o]n or about 2002-2003" Yale published "an inventory posted on the Peabody Museum's website").

### 3.   Assertions of Dominion on the Peabody Museum Website and in the Yale Bulletin from 2002 to 2005

The Amended Complaint expressly alleges that Yale has asserted dominion and control over the Machu Picchu artifacts via the Yale Peabody Museum website.  According to Peru, "[t]he Peabody Museum website has stated that Bingham 'excavated hundreds of objects that tell the story of everyday life at Machu Picchu and, **by agreement with the Peruvian government, these materials became part of the Peabody Museum's collections**.'"  AC ¶ 149 (emphasis added).  In what may have been an attempt to avoid the statute of limitations, the Amended Complaint omits the date of the assertion of dominion and control on the Yale Peabody webpage.  In any event, the assertion was published to the World Wide Web long before January 16, 2006.[10]

The top half of the webpage contains the following words:

> Exhibitions
>
> Machu Picchu:
> Unveiling the Mystery of the Incas
>
> A major new exhibition returning to
> the Yale Peabody Museum on September 10, 2005

---

[10] Because Peru incorporated the webpage by reference into the Amended Complaint, this Court may properly consider its date.  *See Twombly*, 550 U.S. at 568 n.13 ("District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn.").  Peru also attached a copy of the web page to the original complaint that it filed in the District of Columbia.  *See* Exhibit Z to Peru's original complaint, No. 1:08-cv-02109-HHK [doc. # 1-27] (copy attached as Exh. B-5).  *See generally United States v. GAF Corp.*, 928 F.2d 1253, 1259 (2d Cir. 1991) ("[T]he law is quite clear that superseded pleadings in civil cases may constitute admissions of party opponents, admissible in the case in which they were originally filed . . .  A party thus cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories.") (quotation marks and citation omitted); *Baron v. Rabinovici*, No. CV-05-0110 (TCP)(ETB), 2006 WL 1318426, at *3 (E.D.N.Y. May 12, 2006) (dismissing amended complaint based in part on inconsistency of allegations with the original complaint).

Exh. B-5 at 1.  Based on that text it is plain that the statement of dominion and control quoted by

Peru in paragraph 149 was made on the web before September 10, 2005.  Peru (or its attorneys)

printed the webpage in October of that year, as shown by the printout date on the bottom right

corner of the document.[11]

This Court can also take judicial notice of archival copies of the webpage containing the

same language of dominion and control and dated September 9, 2005, October 18, 2005 and

December 12, 2005 (archival copies attached as Exhs. B-24, B-25, B-26).  *See Muller-Paisner*,

289 Fed. Appx. at 466 n.5 ("Judicial notice may be taken of the defendants' website for the fact

of its publication.").  Similarly, the Court may take judicial notice that the language of dominion

and control alleged in paragraph 149 of the Amended Complaint appeared on the Peabody

Museum website even before September 2005.  Archival copies of the Yale Peabody website

reveal that by October 10, 2002, Yale had published a webpage advertising "Machu Picchu:

Unveiling the Mystery of the Incas," a "major new exhibition opening Sunday, January 26,

through Sunday, May 4, 2003."  Like the webpage cited by Peru, the 2002 publication asserted

that Bingham "excavated hundreds of objects that tell the story of everyday life at Machu Picchu

---

[11] The printout date of the copy attached to the original complaint becomes illegible after the
month.  That should not matter, though, as the text of the webpage assertion compels the
conclusion that the assertion itself occurred on or before 2005.  In any event, the second page of
a copy of the webpage that Peru's (prior) counsel at Williams & Connolly attached to a
threatened complaint sent to Yale on October 20, 2005, unequivocally contains the printout date
of "10/13/2005."  *See* Exh. B-6 at internal Exh. CC thereto (print-out of webpage attached to
draft complaint which accompanied October 20, 2005 letter from Peru to Yale) (blank space in
original).  Having provided the print-out to Yale, Peru cannot now contest its authenticity.  *Cf.*
*United States v. Brown*, 688 F.2d 1112, 1116 (7th Cir. 1982) ("[Defendant] cannot have it both
ways.  Once he voluntarily produced the documents and implicitly represented them to be
Cataract's records, he cannot be heard to contend that they are not Cataract's records.").
Moreover, Peru's current counsel will no doubt be mindful of its responsibility under Fed. R.
Civ. P. 11(b) to ensure that any assertion about the date of the print-out that Peru may make in
response to this motion is not belied by the webpage printout bearing the date "10/15/2005"
which was attached to the Williams & Connolly complaint; current counsel should have a copy
of that printout in the case files provided by prior counsel.

and, by agreement with the Peruvian government, these materials became part of the Peabody

Museum's collections." *Compare* AC ¶ 149 *with* Internet Archive copy of Yale Peabody

webpage as of October 21, 2002, *available at*

http://web.archive.org/web/20021021085740/www.peabody.yale.edu/exhibits/inca/ (a copy of

the latter is attached as Exh. B-27; additional copies from December 19, 2002 and February 10,

2003 are attached as Exhs. B-28, B-29).

   The very same assertion of dominion and control was picked up and broadcast by several

news organizations in early 2003.  The Associated Press reported:

> Hundreds of the ceramics and human bones dug up by expeditions led by Hiram
> Bingham between 1911 and 1915 went on display at the university's Peabody
> Museum in late January.  "The government appreciates the exhibit as a way of
> projecting Peruvian culture and we are seeking an accord that will permit the
> return of these cultural assets to Peru," Deputy Foreign Minister Manuel
> Rodriguez said Wednesday.  **The Peabody Museum's web site says the
> artifacts became part of its collection "by agreement with the Peruvian
> government."**

Associated Press, *Peru wants Yale University to give back Machu Picchu relics* (Mar. 6, 2003),

(copy attached as Exh. B-7); *see also* California State University, *National Exhibition Includes*

*Machu Picchu Virtual Tour Create by Cal State Hayward Team* at 2 (Nov. 14, 2003) ("Through

an agreement with the Peruvian government, the[] [Machu Picchu] materials became part of the

Peabody Museum's collections.")  (copy attached as Exh. B-8)

   Earlier in 2003, Yale had issued a press release similarly announcing that "'Machu

Picchu:  Unveiling the Mystery of the Inca', the largest exhibition on the Incas ever assembled in

the United States, will open at the Peabody Museum January 26," and then go on "a two-year

tour of five major venues **before returning to the Peabody for permanent installation**."  Yale

Office of Public Affairs, *Major Exhibition on Machu Picchu Opens January 26 at Yale Peabody*

*Museum* at 1-2 (Jan. 14, 2003), *available at* http://opa.yale.edu/news/article_print.aspx?id=4491

(last visited Oct. 16, 2009) (copy attached as Exh. B-9).  In the same month, almost identical

assertions that the Machu Picchu objects would return from tour to their permanent home at the

Peabody were likewise published in the Yale Bulletin & Calendar, Yale Environmental News,

and The Yale Herald.[12]

 Going back still further before the limitations period, Yale publicly asserted ownership of

the artifacts in the April 12, 2002 volume of the Yale Bulletin & Calendar, reporting that the

"Machu Picchu:  Unveiling the Mystery of the Incas" exhibit was "[s]lated for a January 2003

opening" at the Peabody and would "provide the museum with a permanent venue to display **its**

**extensive Machu Picchu collections**, excavated in 1912 by Yale archaeologist Hiram

Bingham." *Peabody receives grant for Machu Picchu exhibit*, 30 Yale Bulletin & Calendar 25, 8

(Apr. 12, 2002) (emphasis added) (copy attached as Exh. B-13).  In addition to its paper

publication of the *Bulletin*, Yale posted the article on the internet, where an electronic copy may

still be found at http://www.yale.edu/opa/arc-ybc/v30.n25/story9 (last visited Oct. 16, 2009).

Identical language appears in the Spring 2002 edition of Yale Environmental News.  *See*

*Peabody Receives CHC Grant to Fund Audio Visual Components of Machu Picchu Exhibit*, 7

Yale Environmental News 3, 5 (Spring 2002) (copy attached as Exh. B-14).[13]

---

[12] *See Peabody exhibition sheds light on mysteries of Machu Picchu* 31 Yale Bulletin & Calendar 15 (Jan. 17, 2003), *available at* http://www.yale.edu/opa/arc-ybc/v31.n15/story3.html (copy attached as Exh. B-10); *Major Exhibition on Machu Picchu Opens January 26 at Yale Peabody Museum*, 8 Yale Environmental News 1, 27 (Winter 2003) (copy attached as Exh. B-11); *Largest-ever Incas exhibit at the Peabody*, XXXV The Yale Herald 3 (Jan. 31, 2003) (copy attached as Exh. B-12).

[13] The Peabody Museum website and other Yale publications asserted Yale's ownership of the Machu Picchu artifacts even earlier.  A 1987 edition of the Peabody Museum's *Discovery* magazine described a display "celebrat[ing] the 75th anniversary of Bingham's initial excavations at Machu Picchu, which were made in 1912," and said that "[t]he Machu Picchu collection **of the Peabody Museum** is one of the largest collections of Inca pottery in the world." *Peabody Museum Notebook*, 20 Discovery 2, 31 (1987) (emphasis added) (copy attached as Exh. B-15).  Five years later, the same Peabody publication announced that "**our**

In short, Yale asserted ownership of the objects between 2002 and 2005, in the *Bulletin* and repeatedly via the Peabody website.  Peru therefore had until no later than 2005 to serve Yale, but did not serve Yale until January 16, 2009.  *See Stuart & Sons*, 456 F. Supp. 2d at 346 ("the statute of limitations began to run on the date that Stuart, Sr. first publicly asserted his ownership of the Paintings," in a book on Norman Rockwell where "Stuart, Sr. is listed as the owner of 'Saying Grace' and 'Walking to Church.'").

### 4.   Other Assertions of Dominion and Control in 2003 and 2004

Peru alleges that beginning in 2003 Yale "consistently disclosed that it had in fact retained the artifacts from the expedition of 1912, notwithstanding the request for their return in 1920 and Yale's purported compliance with such in 1921[.]"  AC ¶ 123.[14]  On Peru's theory, in 1921 Yale "purported" to comply with Peru's 1920 demand that the pieces be returned, but actually refused the demand by improperly keeping the pieces.  Peru apparently means to imply that the 1921 refusal was confusing, because Yale returned some of the pieces.  (Never mind that, as Lumbreras admits, inventories of the artifacts had long ago been published, *see supra* Pt.

---

collections enable us to focus on one of the remarkable civilizations . . . the vast Incan empire of the Andes," and that, within the next decade, the museum would launch "**a permanent exhibition** of enormous scholarly and historical significance . . . The City At the Top of the World:  Machu Picchu in the Modern Imagination, **a new permanent installation**."  *What's the Big Idea?  Exhibitions at the Peabody Museum*, 23 Discovery 1, 36 (1992) (emphasis added) (copy attached as Exh. B-16).  Then, in 1997, a webpage describing the "Permanent Exhibits" advertised "the museum's extensive Meso-American and South American archeological collections" and explicitly stated that "[f]uture **permanent** exhibits now in development will feature the museum's collections from Machu Picchu . . . ."  Internet Archive copy of Yale Peabody webpage as of April 17, 1997, *available at* http://web.archive.org/web/19970417035124/http://www.peabody.yale.edu/exhibits (emphasis added) (last visited Oct. 16, 2009) (copy attached as Exh. B-30).  The same language appeared in 1999.  *See* Internet Archive copy of Yale Peabody webpage as of February 19, 1999, *available at* http://web.archive.org/web/19990219182901/http://www.peabody.yale.edu/exhibits (last visited Oct. 16, 2009) (copy attached as Exh. B-31).

[14] Yale is prepared to prove that it returned some of the pieces and kept those that it was entitled to keep, but that factual dispute need not be resolved on this motion.

I.B.2, n.9, meaning that many decades ago Peru could have compared the contents of the returned boxes to the published inventories.).

As discussed below, Peru's insinuation of ignorance is both implausible in light of other allegations in the Amended Complaint, and legally irrelevant under Connecticut's occurrence-based accrual rules. *See infra* Pt. I.B.6, n.18. But Peru's case is not advanced even if the court credits the implication that Peru was ignorant in 1921 as to the fact that Yale had not returned all of the pieces that the Bingham expeditions brought back to Connecticut. The Amended Complaint makes clear that Peru knew of Yale's supposed failure to return all the objects no later than 2003 when, according to Peru, Yale "consistently disclosed that it had in fact retained the artifacts from the expedition of 1912, notwithstanding the request for their return in 1920 and Yale's purported compliance with such in 1921." AC ¶ 123. Accordingly, Peru would have had to serve Yale with the conversion claim by 2006, but it did not.

Likewise, the Amended Complaint asserts that beginning in 2003 Yale "maintained [that] Bingham 'legally' purchased and exported on behalf of Yale" artifacts from the 1908-1911 expeditions. AC ¶ 123. Peru's admission that Yale claimed ownership in 2003 of all items exported by the 1908-1911 expeditions means that Peru needed to serve Yale with a conversion claim by 2006; again, it did not.

While the statements made in Paragraph 123 of the Amended Complaint bar only Peru's claims to the 1908-1911 objects and the 1912 objects, other statements in the Amended Complaint allege that Yale also asserted dominion and control in 2003 over all of the objects, including those from the 1914-1915 expedition. Peru asserts that "[i]n May 2003, Yale's exhibit of artifacts from Machu Picchu was taken on a tour of the United States . . . generat[ing] millions of dollars of revenue for Yale, of which Yale has never made a proper accounting to Peru." AC

¶ 148.  If, as Peru asserts, it owned the objects and had demanded their return decades earlier, then Yale's exhibition of the objects on a nationwide tour and its alleged generation of millions of dollars in revenue would have been unauthorized assertions of dominion and control.  Any conversion claim regarding the objects would have become time-barred in May 2006.

Like Peru's allegations regarding the Barbara Shailor letter, like Lumbreras' testimony, and like Peru's allegations regarding the Peabody website, the Amended Complaint's statements regarding Yale's alleged assertions of dominion and control in 2003 mandate the dismissal of the conversion claim.

### 5.    Assertion of Dominion and Control by Yale University Press Book in 1930

The Amended Complaint alleges that in 1930 Yale published "a special edition book [by Bingham] . . . about the Peruvian Expeditions."  AC ¶ 133.  That book, which the Amended Complaint incorporates by reference, states plainly that "[t]he collection of Machu Picchu material is now in the Peabody Museum of Natural History at Yale University."  Exh. B-18 at vi (incorporated by reference at AC ¶ 133).  If, as Peru avers, Yale had in 1921 purported to comply with a 1920 demand for the return of all of the objects, *see* AC ¶¶ 114, 116, 119-20, 123, then this publication nine years later constituted an assertion of dominion and control over the unreturned objects.  The limitations clock therefore started running in 1930 and stopped in 1933.[15]

The book also stated plainly that Yale had taken the fragments exported from Peru and assembled them into whole objects.  *See id.* Exh. B-18 at 121, 124, 126, 134, 157.   If Peru owned the fragments, as it asserts, then Yale's construction of whole objects from the fragments

---

[15] Yale's publication of the book was consistent with what it knew to be the truth: that it had returned to Peru what needed to be returned and had kept what it properly owned.  But Peru's version of the facts must be presumed true here.

would have represented another unauthorized exercise of dominion, and the statute of limitations on any conversion or related claim would have run three years after Yale assembled them. *See Luciani*, 15 Conn. App. at 410-14 (upholding finding of conversion where defendant who had leased building with permission to use fixtures, destroyed fixtures); *Baena Bros., Inc. v. Welge*, 207 A.2d 749 (Conn. Cir. A.D. 1964) (finding that plaintiff had stated claim for conversion by alleging that bailee deviated from instructions by altering furniture).

### 6.    Assertion of Dominion through Alleged Refusal of Demand in 1921

Peru alleges that by 1920 it had formally demanded that Yale return all of the objects on or before January 1, 1922, but that Yale failed to comply with its request, returning only a portion of the objects in 1921. *See* AC ¶¶ 114, 116, 120-23; *see also* AC Exh. L (Jan. 27, 1916 executive order). Peru remarkably fails to mention that its own law – an executive order dated 2/19/1921 – gave Yale title to all of the "duplicate" objects.[16] *See* Exh. B-19. Yale is prepared to prove at trial that its 1921 shipment of forty-seven boxes of objects to Peru fully complied with Peru's demands. But there is no need for a jury to evaluate that factual dispute. Even if presumed true, the allegation that Yale ignored a demand to return some of the objects on or before January 1, 1922 would compel the conclusion that Yale converted those objects almost 90 years before Peru brought this lawsuit.[17]

---

[16] The relevant text of the order is reproduced *supra* n.1.

[17] *See Higgins v. Emmons*, 5 Conn. 76, 79 (1823) (where bailment contract required delivery "upon demand," defendants' "silence was equivalent to a refusal of the delivery of the goods"); *accord Nelson v. Sotheby's, Inc.*, 115 F. Supp. 2d 925, 929-30 (N.D. Ill. 2000) (dismissing as time-barred a conversion claim filed in 2000 because, even assuming a discovery rule applied to conversion actions under Illinois law, "a companion rule to the discovery rule places a burden on plaintiffs to investigate should they get a whiff that wrongdoing exists . . . [and plaintiff] alleges that as soon as Sotheby's informed him [in early 1989 that] it was holding the painting, he immediately complained and demanded its return as the rightful owner.").

Peru implies that Yale's alleged failure to return the demanded objects in 1922 cannot constitute conversion because Peru did not know that Yale had not returned all of the objects. That profession of ignorance is at odds with several more specific assertions made in the Amended Complaint.[18]  But even if it were not, the professed ignorance is legally irrelevant. "Connecticut does not adhere to the discovery rule to determine when the statute of limitations begins to run," *Stuart & Sons*, 456 F. Supp. 2d at 346.  Put simply, "[w]hether the rightful owner had actual knowledge of the conversion is of no consequence for purposes of the statute of limitations." *Id.* at 344.  Connecticut law is clear that the statute of limitations begins to run on "the date of the act or omission complained of." *Fichera*, 207 Conn. at 212 (applying Conn. Gen. Stat. § 52-577).  The Amended Complaint alleges that Yale exercised unauthorized dominion over the property on January 1, 1922, when it failed to return the objects that Peru demanded.  The claim thus became barred in 1925.

Even if the Amended Complaint had not alleged that Yale exercised unauthorized dominion over the property by failing to return it on January 1, 1922, this Court could take

---

[18]  First, Peru freely admits that the 1912 Decree required Peruvian authorities to prepare an inventory of the objects before they could be exported.  *See* AC ¶ 48 & Exh. G.  Peru thus had the ability to check the returned objects against the list of exported objects, and complain promptly about any discrepancy.  Second, Peru acknowledges that in 1930 Yale published a book declaring that "[t]he collection of Machu Picchu material is now in the Peabody Museum of Natural History at Yale University." *See* Exh. B-18 at vi (incorporated by reference at AC ¶ 133); *see also supra* Pt. I.B.2, n.9 (acknowledgment by Peru in Peruvian Congress that inventories of the objects had been published and available for decades).  So it was plainly on notice that not all objects had been returned.  Third, Peru asserts that in 2001, it entered into discussions with the National Geographic Society about how to persuade Yale to return objects that it thought should have been returned, AC ¶ 134, thus alleging that it knew by 2001 that Yale had converted the objects by refusing to return them.  Fourth, Peru asserts that in 2002 Yale posted an inventory of the objects on its website, AC ¶ 122, again putting it on notice that objects had not been returned by the final deadline of 1922.  Even if the date when Peru discovered that some objects had not been returned was relevant – and it is not under Connecticut's occurrence-based accrual rules – Peru's own allegations make plain that it had ample opportunity to cure its alleged ignorance beginning in 1922.

judicial notice of similar assertions of dominion from as early as 1923 – the year immediately

following the shipment of artifacts back to Peru.  In September 1923, Yale published a volume of

the *Yale Bulletin* containing the 1922-1923 report of the director of the Peabody Museum,

Richard Swann Lull.  In it, Lull asserted that "**the collections gathered by the Yale-Peruvian**

**Expeditions in charge of Director Hiram Bingham**" had "**all been donated by Professor**

**Bingham and allocated to the Department of Anthropology.**"  *See* Exh. B-20 at 359

(emphasis added).  That 1923 assertion of ownership means that Peru's conversion claims were

time-barred by 1926.[19]

In short, the Amended Complaint's own averments – not to mention the facts of which

this Court can take judicial notice – compel the conclusion that Peru's conversion and related

claims expired well before Yale was served with the complaint on January 16, 2009.[20]

---

[19] Between 1923 and 1928, several other Yale publications similarly broadcast Bingham's gift of the Machu Picchu objects to the Peabody. *See Yale University News Statement* at 3 (Dec. 27, 1925) ("[T]he Museum was a beneficiary of the Peruvian expeditions . . . during the years 1910, 1911, 1912 and 1915. Senator Bingham has given Yale his entire Peruvian collection, reserving only the right to carry on research.") (copy attached as Exh. B-21); Richard S. Lull, *The Collections*, VII Museum Work 5 (1925), *reprinted in* The New Peabody Museum at 139-40 ("Among the more notable collections added . . . should be mentioned . . . [8] The archeological collections gathered by the various Yale-Peruvian Expedition[s] under the direction of Professor Hiram Bingham") (copies of title page and relevant pages attached as Exh. B-22); *The Peabody Museum Collections*, XXXIII The Yale Alumni Weekly 15, 402 (Dec. 28, 1928) (same) (copy of title page and relevant page attached as Exh. B-23).

[20] Peru also asserts that Yale violated several Peruvian executive orders, AC ¶¶ 156-59, and "seeks an immediate return of all Artifacts and related materials" in accordance with what it states is Peruvian law. *Id.* ¶ 160.  While the Amended Complaint describes it as a cause of action, denominated "Violation of Peruvian Law," AC at 41, this demand for a return of the objects is just another way of stating a conversion or replevin claim.  The invocation of Peruvian law is a choice-of-law argument, not a separate cause of action.  Peruvian law does not apply to the replevin or conversion claims, as Connecticut is both the alleged *lex loci delicti* and the jurisdiction with the most significant relationship to the alleged conversion. *See generally O'Connor v. O'Connor*, 201 Conn. 632 (1986).  But it would not matter even if Peruvian law provided the substantive rules for the claims, since the Connecticut statute of limitations would still apply. *See supra* Pt. I.A.

### C.     Fraud, fraudulent misrepresentation, and related conspiracy claims

Peru bases its fraud claims on allegations that Yale and its agent Bingham "falsely represented to Peru that [Yale] would comply with" certain conditions set forth in executive orders of the Peruvian government issued in 1912 and 1916, in particular with alleged promises to "conduct scientific research" and to "return the artifacts and related materials to Peru when Peru demanded."  AC ¶¶ 203, 212, 211, 202.

The alleged misrepresentations took place over ninety years ago.  *Id.*; *see also e.g., id.* ¶ 192 ("**In 1912 and again in 1914**, Yale assured Peru that, if Yale were permitted to excavate and export the Artifacts temporarily to the United States, Yale would conduct scientific research and studies of the artifacts and would return the Artifacts and related materials to Peru when Peru demanded.") (emphasis added).  Like conversion claims, claims of fraud and fraudulent misrepresentation must be brought within the three-year limitation period set forth in Conn. Gen. Stat. § 52-577.  *See Krondes v. Norwalk Sav. Soc'y*, 53 Conn. App. 102, 113 (1999); *Day v. Gen. Elec. Credit Corp.*, 15 Conn. App. 677, 683, *cert. denied*, 209 Conn. 819 (1988) (holding that "[c]laims based upon fraudulent misrepresentation are governed by the three year statute of limitations of General Statutes § 52-577.").  Peru did not bring them within three years.

It makes no difference whether Peru could have, should have, or did recognize the representations as (allegedly) fraudulent when made because, as noted above, "Section 52-577 is a statute of repose in that it sets a fixed limit after which the tortfeasor will not be held liable and in some cases will serve to bar an action before it accrues."  *Rosenfield*, 69 Conn. App. at 159 (quotation marks omitted); *accord Fichera*, 207 Conn. at 212; *T.F.T.F. Capital Corp. v. Marcus Dairy, In*c., 33 F. Supp. 2d 122, 126 (D. Conn. 1998).   It follows that the three-year clock may not be tolled, even for claims of fraud, by allegations that the plaintiff did not immediately

discover the fraudulent nature of the representations.  *See Gibbons v. NER Holdings, Inc.*, 983 F.

Supp. 310, 315 (D. Conn. 1997) (rejecting plaintiff's claim that that the equitable principle of

"inquiry notice" ought to toll the application of the Section 52-577 limitation period to his fraud

and misrepresentation claims, because "[i]n Connecticut, the statute of limitations for tort claims

will not be extended until such time as the cause of action has accrued or the injury has occurred

. . . [D]elay[ing] the start of the limitations period until the time at which [plaintiff] knew a cause

of action had accrued . . . is contrary to the holding in *Fichera* and subsequent related cases.").[21]

Accordingly, the three-year clock began to run on the date of the alleged

misrepresentations – ninety years ago – and the claims of fraud, fraudulent misrepresentation and

derivative claims of conspiracy to defraud are time-barred and must be dismissed.

### D.     Contract, unjust enrichment and accounting claims

The First Amended Complaint asserts two contract claims, one styled "breach of

contract" and one styled "breach of bailment contract."  The "breach of contract" claim alleges

that Peru "allowed Yale to conduct the Bingham expeditions and to export artifacts from Peru on

the condition that the artifacts and related materials be returned to Peru when Peru demanded"

and that "Yale agreed to these terms."  AC ¶ 178.  The "breach of bailment contract" claim

asserts that "Peru allowed Yale to conduct the [Bingham] expeditions under certain conditions,"

including the "condition that, upon Peru's demand, Yale would return all artifacts exported from

Peru" and that "Yale agreed to these conditions."  AC ¶ 184; *see also id.* ¶ 185.

It is not clear what Peru means by its contract claims, as it does not attach a signed

contract to the Amended Complaint (despite its numerous exhibits) or even allege a written

---

[21] Even if the date when Peru first discovered the alleged fraud were relevant – and it is not – the Amended Complaint leaves no doubt that Peru has known since at least December 2005 (and more plausibly since 1921) that Yale did not believe it was obliged to, and had no intention of, returning all of the artifacts and related materials.  *See supra* Pt. I.B.

contract.[22]  Nor does it allege that an oral contract was formed (perhaps because anyone who could testify on such a theory would have died long ago).  Perhaps Peru means to argue that its own unilateral executive orders somehow created bilateral contracts.  *See* AC ¶¶ 97-98 & Exh. G (executive order of October 31, 1912); AC ¶¶ 104-05 & Exh. L (ministerial resolution of January 27, 1916).

Whatever Peru's contract theory, its central story is the same:  Peru let Yale excavate and export the objects between 1912 and 1916 because Yale promised it would return the artifacts when Peru asked for them.  AC ¶¶ 178, 184.  Yale later "breached its agreement . . . by failing to return the artifacts . . . despite [Peru's] demand for their return."  AC ¶ 180 (breach of contract); *accord id.* ¶¶ 187-88 (breach of bailment contract).  Under Connecticut law, the statute of limitations for contract actions is six years from the accrual of the contract claim.  *See* Conn. Gen. Stat. § 52-576(a) ("No action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of the action accrues[.]"); *Tobert v. Conn. Gen. Life Ins. Co.*, 257 Conn. 118, 124  (2001) ("the cause of action for a breach of contract claim is complete . . . at the time the breach of contract occurs, that is, when the injury has been inflicted.").  The plaintiff need not be aware of the injury caused by the alleged breach:  "[T]he occurrence of an act or omission – whether it is a breach of contract or of duty – that causes a direct injury, however slight, may start the statute of limitations running . . . even if the plaintiff is not aware of the injury . . . [I]t is unimportant that the actual or substantial damage is not discovered or does not occur until later.  The fact that the extent of the damages

---

[22] There is no signed contract between Yale and Peru for the 1912 expedition, the 1915 expedition, or any other period or expedition.  Peru does attach an exhibit entitled "draft May 1912 Memorandum of Working Agreement between Peru, NGS and Yale," AC ¶ 97 & Exh. M, but the document bears no signatures or other indicia of execution, *id.*, and Peru does not aver that the parties executed it.

cannot be determined at the time of the wrongful act does not postpone the running of the statute of limitations." *Rosenfield v. David Marder & Assocs., LLC*, 110 Conn. App. 679, 686 (2008) (quotation marks omitted).

Peru's own pleadings make it clear that the alleged breaches occurred over eighty years ago. Peru avers that "**[i]n 1912 and again in 1914** Yale assured Peru that, if Yale were permitted to excavate and export the Artifacts temporarily to the United States, Yale would conduct scientific research and studies of the artifacts and would return the Artifacts and related materials to Peru when Peru demanded."). AC ¶ 192 (emphasis added). In 1916, Yale allegedly "pledged to return, in the term of eighteen months from today [January 27, 1916], the artifacts . . . [and] to send to the Ministry of Instruction all studies performed on them." AC Exh. L; *accord id.* ¶ 127 ("Under the Third and Fourth Decrees, Yale further pledged to send to Peru 'all studies performed on [the shipped artifacts]"). And in 1920, Yale allegedly promised "completion of the studies" and to return all of the objects by January 1, 1922. AC ¶ 118.

According to the Amended Complaint, Yale breached all of these promises in 1921, when it "purportedly returned to Peru the entire collection of artifacts," AC ¶ 120, while actually retaining "the most valuable and archeologically significant artifacts," *id.* ¶ 121, and leaving "much of the collection" unwrapped – and unstudied – in boxes in the basement of the Peabody Museum, *id.* ¶ 195. Peru's contractual claims are meritless,[23] but even if they had merit, the

---

[23] Contrary to Peru's claim, substantial research has been conducted on the artifacts. Peru's own Director of the National Institute of Culture quoted several such studies from the early part of the twentieth century in his November 2005 testimony to the Peruvian Congress, *supra* n.9, and there are many other examples in the public domain. *See, e.g.*, Hiram Bingham, *Types of Machu Picchu Pottery*, 17 Am. Anthropologist 2, 257-271 (1916); G.F. Eaton, *The collection of osteological material from Machu Picchu* (Tuttle, Morehouse & Taylor Co. 1916); C.H. Mathewson, *A metallographic description of some ancient Peruvian bronzes from Machu Picchu*, XI Am. J. Sci. 525-602 (1915); R.B. Gordon & J.W. Rutledge, *Bismuth Bronze from Machu-Picchu, Peru*, 223 Science 4636, 585-86 (1984); R.B. Gordon, *Laboratory Evidence of*

causes of action accrued at the moment Yale allegedly failed to make good on its promise to

return the artifacts along with reports detailing the studies completed on them – i.e., in 1921.

Peru therefore had until 1927 to serve Yale with its complaint.  It did not, and the claims are

therefore time-barred.[24]

The same is true of the unjust enrichment and accounting claims.  *See Certain*

*Underwriters*, 289 Conn. at 407, 411 (affirming trial court holding that "because the plaintiffs'

equitable claims of unjust enrichment and for an accounting . . . were based on the same factual

allegations as the plaintiffs claims of conversion and statutory theft, the equitable claims also

were time barred" and stating that "the trial court properly determined that, because these legal

claims are barred, the plaintiffs' equitable claims based on the same facts are also time barred");

*see also Dowling v. Finley Assocs., Inc.,* 49 Conn. App. 330, 335 (1998), *rev'd on other grounds,*

248 Conn. 364 (1999) ("Where a party seeks equitable relief pursuant to a cause of action that

---

the Use of Metal Tools at Machu-Picchu (Peru) and Environs, 12 J. Archeological Sci. 311-327
(1985); J.W. Rutledge and R.B. Gordon, *The Work of Metallurgical Artificers at Machu-Picchu,
Peru*, 52 Am. Antiquity 3, 578-94 (1987).  But this dispute need not be addressed for the reasons
stated in the text.

[24] Peru implies that it was not aware of the breach at the time it occurred, *see supra* Pt. I.B.6 &
n.18, but its professed ignorance is no more relevant to its contract claims than to its tort claims.
*See Tobert*, 257 Conn. at 124-25 ("Although the application of this rule may result in occasional
hardship, it is well established that *ignorance of the fact that damage has been done does not
prevent the running of the statute*") (court's emphasis).  *Tobert* recognizes an exception for
breaches of contract involving "something tantamount to a fraudulent concealment of a cause of
action," *id.* at 125, but Peru cannot claim the protection of that doctrine.  Fraudulent concealment
requires (1) the concealer's "actual awareness, rather than imputed knowledge, of the facts
necessary to establish the plaintiffs' cause of action"; (2) the concealer's "intentional
concealment of these facts" from the party with the cause of action; and (3) that the concealer's
"concealment of the facts [was] for the purpose of obtaining delay on the plaintiffs' part in filing
a complaint on their cause of action."  *Bartone v. Robert L. Day Co.*, 232 Conn. 527, 533 (1995).
In addition, a claimant that could have discovered the alleged fraud with due diligence cannot
toll the statute of limitations.  *See Mountaindale Condo. Ass'n, Inc. v. Zappone*, 59 Conn. App.
311, 323-24 (2000).  The Amended Complain pleads none of those – and could not plead them
without violating Rule 11.  To the contrary, far from "concealing" its purported breaches, Yale
has repeatedly and publicly asserted its legally proper ownership and possession of the objects.
*See supra* Pt. I.B.

would allow the party to seek legal relief, concurrent legal and equitable jurisdiction exists, and the statute of limitations that would be applicable to bar the legal claim also applies to bar the equitable claim"); *cf. Cambridge Literary Props., Ltd. v. Goebel Porzellenfabrik G.m.b.H.*, 510 F.3d 77, 81 (1st Cir. 2007) (accounting claims "necessarily rest upon plaintiff having met the antecedent showing that it has ownership rights . . . [which] in turn requires that [plaintiff] have asserted its ownership claims within th[e] statute's limitations period") (involving claim to accounting for profits from sale of Hummel figurines and concluding that statutory limitations period could not be "undercut by [plaintiff's] subterfuge" in pleading).  *See generally Caminis v. Troy*, 112 Conn. App. 546, 557-58 (2009) ("Whether the staleness of the claim and the prolonged sleep of the plaintiffs be called laches or something else is not of controlling importance when equitable principles are within the court's discretion to consider, even if laches . . . is not strictly applicable.") (internal quotation marks omitted).[25]

---

[25] The accounting claims fail to state a claim for other reasons as well.  Connecticut statutes permit accounting claims in certain defined circumstances.  *E.g.*, Conn. Gen. Stat. § 52-404(a) (establishing action for accounting in probate context by residuary legatees); Conn. Gen. Stat. § 52-404(b) (establishing action for accounting in real estate context by "joint tenants, tenants in common or coparceners").  Peru's claims do not fall within those categories.  Claims for an accounting outside those categories are merely requests for a discovery tool or a provisional remedy sought to advance a plaintiff's ultimate goal of securing final remedies for the underlying alleged torts and contractual breaches.  They thus fail to state a claim. *See Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 623 n.3 (2002) (holding that a request for an accounting is a remedy, not a substantive cause of action upon which a complaint may be predicated: "rather than being substantive causes of action upon which the complaint is predicated, these counts [for accounting and constructive trust] request remedies, the appropriateness of which would be left to the discretion of the trial court if the plaintiffs, or either of them, were to prevail at trial."); *Simko Law Firm, LLC v. Yale New Haven Health Servs. Corp.*, No. CV075006228S, 2008 WL 1734689, at *2 (Conn. Super. Ct. Mar. 24, 2008) ("accounting is a tool of discovery and should not be pled as a stand alone count in a complaint."); *Priceline.com, Inc. v. Mayes*, No. CV-030196820, 2005 WL 896261, at *5 (Conn. Super. Ct. Mar. 16, 2005) (striking accounting claim because it is not a separate cause of action; accounting instead must be sought in prayer for relief associated with appropriate cause of action).

### E.       Breach of fiduciary duty

Peru claims that by "allowing Yale to conduct the Bingham expeditions and to export priceless Artifacts," "Peru placed a high degree of trust and confidence in Yale," and Yale therefore became Peru's fiduciary.  AC ¶¶ 193-94.  On this theory, when Yale allegedly failed to return the objects on demand, it breached not only contract but also fiduciary duties.  *Id.* ¶ 195-98.  Even if true – and it is not – the claim would be time-barred.

As with other torts, a fiduciary duty claim expires after three years.  *See, e.g., Ahern v. Kappalumakkel*, 97 Conn. App. 189, 191 n.3 (2006) ("Breach of fiduciary duty is a tort action governed by the three year statute of limitations contained within General Statutes § 52-577."); *Estate of Axelrod v. Flannery*, 476 F.Supp.2d 188, 203 (D. Conn. 2007) ("In Connecticut, all common law tort claims, including claims for fraud, negligent misrepresentation, and breach of fiduciary duty, are subject to the three-year statute of limitations as set forth in Section 52-577 of the Connecticut General Statutes.") (citations and punctuation omitted).

According to Peru, Yale breached fiduciary duties by "fail[ing] to return the [a]rtifacts when Peru demanded . . . fail[ing] to conduct scientific research and studies of the artifacts . . . [and] exploit[ing] its holding of the Machu Picchu collection for commercial and financial gain."  AC ¶¶ 195-96.  Even if true – and even if those facts stated a claim for fiduciary breach – those allegations state fiduciary breaches occurring much more than three years before Peru served Yale with its complaint.  *See* AC ¶ 120 (alleging that in 1921 Yale failed to comply with Peru's demand for return of all the objects); AC ¶ 87 & Exh. L (alleging that Yale pledged to conduct studies on and return objects from the 1914-15 expeditions within eighteen months of export); AC ¶ 148 (alleging that Yale profited from a touring exhibit of the objects in 2003).  Accordingly, the fiduciary duty claim is time-barred and must be dismissed.

**F.     Declaratory judgment**

Peru also seeks a "declaration that [it] has legal title to and ownership of the artifacts exported from Peru to the United States through the Bingham expeditions" and "an Order from this Court directing Yale to return the artifacts." AC ¶ 257.   These claims are identical to the conversion and replevin claims and, like those claims, are barred by the statute of limitations. Peru cannot avoid that bar by "opportunistically pleading" legal claims as claims for equitable relief: to hold otherwise would be to permit litigants to make "a mockery of the statute of limitations through creative labeling in cases where, as here, legal and equitable claims co-exist." *Stuart & Sons*, 456 F. Supp. 2d at 343 (denying declaratory judgment of title to painting where the "applicable statute of limitations bars the concurrent legal remedy [of conversion]," and holding that "although the Defendants' counterclaim is labeled as one seeking declaratory relief, in substance it is a claim for conversion"); *see also Certain Underwriters*, 289 Conn. at 407, 411 (where equitable claims are "based on the same factual allegations as the plaintiffs claims of conversion and statutory theft, the equitable claims also were time barred"; "because these legal claims are barred, the plaintiffs' equitable claims based on the same facts are also time barred"); *Caminis*, 112 Conn. App. at 559 (2009) (quoting *Wilson v. Kelley*, 224 Conn. 110, 114-16 (1992)) ("In analyzing whether a declaratory judgment action is barred by a particular statutory period of limitations, our Supreme Court relie[s] on the same principle of examining 'the underlying claim or right on which the declaratory action is based' because '[d]eclaratory relief is a mere procedural device by which various types of substantive claims may be vindicated'"); *Town of Orangetown v. Gorsuch*, 718 F.2d 29, 41-42 (2d Cir. 1983) (noting that if a claim for declaratory relief can be resolved through another form of action that has a specific limitations period, the specific period will govern).

II.     **All claims except conversion and replevin are statutorily barred.**

In its complaint, Peru brings seventeen separate causes of action, all premised on its allegations that Yale has wrongfully appropriated the artifacts, and that these artifacts should be returned to Peru.  Peru's claims thus sound in conversion and replevin, and Peru explicitly brings these claims.  Under Connecticut law, Peru's claim for replevin is governed by statute, *see generally* Conn. Gen. Stat. § 52-515 *et seq.*; *Cornelio v. Stamford Hosp.*, 246 Conn. 45, 49 (1998), and Connecticut law is clear that a plaintiff who chooses to bring a replevin action cannot append to the action any claims other than conversion.  "In an action for replevin, no cause of action, except of replevin or for a conversion of the goods described in the writ of replevin may be stated."  Conn. Gen. Stat. § 52-522.

The language of Conn. Gen. Stat. § 52-522 is plain and unambiguous, representing a direct legislative choice on the election of remedies in this context.  *See* Conn. Gen. Stat. § 1-2z ("The meaning of a [Connecticut] statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes.  If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."); *see also see PJM and Assocs., LC v. City of Bridgeport*, 292 Conn. 125, 133-36 (2009) (finding statutory language plain and unambiguous where statute not "susceptible to more than one reasonable interpretation").  Courts have repeatedly applied the plain meaning of Conn. Gen. Stat. § 52-522, throwing out claims other than conversion that plaintiffs impermissibly tack

onto replevin claims.[26]  If Peru's replevin and conversion claims were not dismissed, then all other claims would have to be dismissed.

### III.    The "conspiracy" claims violate the intra-corporate conspiracy doctrine.

Peru's "civil conspiracy" claims allege a conspiracy between Yale and its agent, Bingham.[27]  Because the law does not view coordination between a corporation and its agent as conspiracy, Peru's civil conspiracy claims fail at the outset.

Hiram Bingham served as a member of the Yale faculty throughout the relevant period. As the Complaint straightforwardly states: "On each of the three expeditions . . . Bingham and the members of his expeditions acted as agents for Yale." AC ¶ 90.  *See also* AC Exh. F (1912 letter identifying Bingham as "Prof. Hiram Bingham, Yale University"); AC Exh. G (Peruvian ministerial resolution identifying Hiram Bingham as "Commissioner of the University of Yale"); *id.* ¶ 17 (describing Bingham as "the Director of the Yale Scientific Expedition to Peru.").

There thus could be no conspiracy between Yale and Bingham.  As the Second Circuit unequivocally stated last year, "under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Hartline v.*

---

[26] *See Angrave v. Oates*, No. CV040352012, 2004 WL 2595855, at *2 & n.4 (Conn. Super. Ct. Oct. 15, 2004) (precluding contract claim); *Rapuano v. Rapuano*, No. CV010278120, 2001 WL 1332431, at *1 (Conn. Super. Ct. Oct. 12, 2001) ("Since General Statutes §§ 52-522 and 52-524 forbid the commingling of an action of replevin with any other cause of action except conversion of the goods described in the writ, the parties may not pursue other causes of action in this matter except those sounding in replevin or conversion. To proceed otherwise would thwart the provisions of General Statutes §§ 52-522 and 52-524 merely because the parties chose not to use the word replevin in their pleadings.") (internal footnotes omitted) (precluding contract, quantum meruit, and unfair trade practices claims); *Burgos v. Nat'l Auto Broker*, 5 Conn. L. Rptr. 63, No. CV91-284583S, 1991 WL 204356, at *1 (Conn. Super. Ct. Sept. 30, 1991) (§ 52-522 precluded combining a breach of warranty claim with a cause of action "in the nature of a writ of replevin"); *Wasmer v. Fabricating & Prod. Mach. Inc.*, No. CV 91 28 10 76, 1991 WL 83999, at *1 (Conn. Super. Ct. Apr. 19, 1991) (under (§ 52-522, "plaintiff's complaint [went] beyond the scope of an action of replevin" where he "alleged five causes of action.").

[27] The Eleventh, Twelfth, Thirteenth and Fourteenth Causes of Action allege "civil conspiracy" to commit wrongful retention, conversion, fraud, and fraudulent misrepresentation.

*Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (affirming district court dismissal of conspiracy claim) (quotation marks omitted).[28]  The Connecticut Supreme Court has stated that principle just as clearly: "employees of the same corporate entity cannot conspire with one another or with the corporate entity as long as their alleged acts are within the scope of their employment." *Harp v. King*, 266 Conn. 747, 751 n. 5 & 776-81 (2003).

Peru does not allege that Bingham's expeditions to Peru were some frolic or detour, outside the scope of his employment.  To the contrary, Peru repeatedly avers involvement by those at Yale's highest levels in Bingham's work.  *See* AC ¶ 44 (alleging that President Hadley of Yale signed a contract with the National Geographic Society (NGS) regarding funding and supplies for Bingham's 1912 expedition); *id.* ¶ 65 (alleging that President Hadley of Yale signed a contract with NGS regarding Bingham's 1914-15 expedition); *id.* ¶ 66 (alleging correspondence between senior officials of NGS and Yale regarding Bingham's 1914-15 expedition); *id.* ¶ 48 (alleging that Yale prompted the U.S. Government to request Peru to issue an executive order concerning Bingham's 1912 expedition); *id.* ¶ 111 (alleging that Bingham wrote to a senior NGS official that he had met with President Hadley and discussed arrangements for the study and return of certain skeletal material); *id.* ¶ 117 (alleging that Bingham wrote that "George Day, Treasurer of Yale" had received letter from Peru demanding return of artifacts in 1920); *id.* ¶ 118 (alleging letter from Day to Peruvian Consul General

---

[28] *See also Farbstein v. Hicksville Pub. Library*, No. 06 Civ. 0907, 254 Fed. Appx. 50, 51 (2d Cir. Nov. 15, 2007) (affirming dismissal of conspiracy claim "at the first step of analysis" because of the "legal impossibility of pleading conspiracy by exclusive reference to actions of employees of a single corporation"); *Edwards v. Metro-North Commuter R.R.*, No. 3:04cv1430 (JBA), 2006 WL 2790402, at *13 (D. Conn. Sept. 27, 2006) (ruling that "plaintiff's conspiracy claim must fail because . . . the alleged co-conspirators[] were both employees of Metro-North and acting within the scope of their employment[.]"); *Santos v. Praxair Surface Techs. Inc.*, No. 3:04 CV 350 (CFD), 2005 WL 756528, at *2 (D. Conn. Mar. 31, 2005) (granting motion to dismiss claim of conspiracy under Connecticut statute because "[w]hen the allegations involve only one corporate entity acting through its employees, no conspiracy claim can stand.").

regarding the artifacts).

In short, the Complaint alleges coordination between a corporation and its agent, activity that legally cannot be characterized as conspiracy.

**IV.     The fraud and fraudulent misrepresentation claims violate Fed. R. Civ. P. 9.**

In its eighth and ninth causes of action, Peru brings identically worded claims for "Fraud" and "Fraudulent Misrepresentation." Both claims are premised on the allegation that Yale made promises to Peru about the artifacts, and that Peru relied on these promises in allowing Yale to excavate and export the artifacts. AC ¶¶ 202, 211. But Peru alleges no facts that could support the claim. It merely recites the elements of fraud: Yale allegedly "falsely represented that it would comply with . . . conditions" imposed by Peru; AC ¶¶ 203, 212; the representation was "in reference to a material fact"; AC ¶¶ 204, 213; Yale "knew this representation was false at the time that it made this representation"; AC ¶¶ 205, 214; Yale "intended to deceive Peru," and Peru "believed Yale's representation to be true and reasonably relied on Yale's representation" to "its detriment." AC ¶¶ 206-207, 215-216; and Peru was "damaged" as "a direct and proximate result of Yale's fraud." AC ¶¶ 208, 217.

Connecticut recognizes a cause of action for fraud based on "a present intent not to fulfill" a promise to do something later. *See Flaherty v. Schettino*, 136 Conn. 222, 226 (1949). But "[t]he intention of the promisor not to perform cannot be established by proof of nonperformance only, nor does his failure to perform an agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into." *Id.* at 226-27; *see also Snow v. Howard Motors, Inc.,* 3 Conn. Cir. Ct. 702, 709, *cert. dismissed*, 154 Conn. 721 (1966) ("The intention not to perform cannot be presumed or

found except upon proof affirmatively establishing it, either directly or by a fair and reasonable inference from the facts and circumstances surrounding the situation.").

By making fraud claims, Peru set for itself the task of meeting the stringent "heightened pleading" standards of Rule 9(b).  An assertion of fraud must be made with "particularity":  it "must (1) detail the statements . . . that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements . . . were made, and (4) explain why the statements . . . are fraudulent."  *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996).  A complaint that merely asserts the "gist" of an alleged fraud "falls far short of the requirements of Fed. R. Civ. P. 9(b), and must be dismissed."  *Olsen v. Pratt & Whitney Aircraft, Div. of United Techs. Corp.*, 136 F.3d 273, 275-76 (2d Cir. 1998).  Peru says nothing about the who, when, where and why of the alleged frauds, and its fraud claims thus must be dismissed.[29]

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss Peru's Amended Complaint should be GRANTED.

---

[29] Peru's fraud claims would have to be dismissed even without the heightened pleading standard.  "Threadbare recitals of the elements of the cause of action" do not suffice.  *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555); *cf.* AC ¶¶ 205, 214 (conclusorily alleging that "Yale knew this representation was false at the time that it made this representation").

**DEFENDANT YALE UNIVERSITY**

By: ___/s/ Jonathan M. Freiman_____
      Jonathan M. Freiman (ct24248)
      Tahlia Townsend (ct27687)
      Amos E. Friedland (ct27989)
      WIGGIN AND DANA LLP
      One Century Tower
      P.O. Box 1832
      New Haven, CT 06508-1832
      (203) 498-4400
      (203) 782-2889 fax
      jfreiman@wiggin.com
      ttownsend@wiggin.com
      afriedland@wiggin.com

      R. Scott Greathead (*pro hac vice*)
      WIGGIN AND DANA LLP
      450 Lexington Avenue, Suite 3800
      New York, NY 10017
      (212) 490-1700
      (212) 490-0536 fax
      sgreathead@wiggin.com

      *Attorneys for Yale University*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2009, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF system.


/s/ Jonathan M. Freiman
Jonathan M. Freiman