Picchu en cuanto a propiedad; y otra, en cuanto al rescate de los bienes culturales extraídos por Hiram Bingham.

Para que se fotocopie, por favor el informe y se pase a los señores congresistas.

Antes de dar uso de la palabra a los señores parlamentarios, me cuenta la doctora Barreda Molina, asesora del congresista Máximo Mena Melgarejo, que dé cuenta lo que ya hizo esta mañana el congresista Humberto Requena. Que el Parlamento Latinoamericano se ha respaldado la solicitud de extradición de Alberto Fujimori ante el gobierno Chileno, inclusive, han firmado congresistas chilenos y con la abstención del congresistas parlamentarios latinoamericanos de Ecuador y Aruba; habiendo manifestado de esta abstención y la protesta respectiva.

El Parlamento Latinoamericano, entonces, se suma al año pasado de mi pedido que extraditaran desde Japón y ahora Máximo Mena, secretario de nuestra Comisión, pide que se haga desde Chile y esto ha sido aprobado por el Parlamento Latinoamericano, que tramitará seguramente el pedido.

Los señores parlamentarios que deseen hacer uso de la palabra, respecto al tema que nos ocupa en el Orden del Día, pueden hacerlo.

El congresista Mario Ochoa, cede la palabra a la congresista Elvira de la Puente Haya.

**La señora DE LA PUENTE HAYA (PAP).—** Gracias, señor Presidente; gracias, congresista Ochoa.

Yo no tengo muy claro y entiendo que la Cancillería pasado el periodo en el cual debieran haber hecho la devolución, es la encargada ahora de realizar todos los trámites requeridos con el apoyo técnico del Instituto Nacional de Cultura, para lograr la repatriación de los bienes.

Entiendo también por lo que nos ha expuesto el doctor Lumbreras, que se ha iniciado este trámite recién luego de la asunción del mando de nuestro Presidente de la República, el doctor Toledo.

Pero no he entendido con claridad qué inconvenientes se han encontrado desde el inicio de las gestiones y en qué estado está ese proceso de repatriación de los bienes arqueológicos que han sido hallados en el Santuario de Machu Picchu, que fueron llevados a la Universidad de Yale para su estudio, habiendo permanecido irregularmente por tantos años en Estados Unidos.

También cuáles son las causas para que esto que es tan claro, porque existen documentos de permisos para el trabajo primero, licencias que fueron extendidas por seis meses más. Y existen los documentos para que no podamos hacer una gestión directa que nos permita, quizá incluso, solicitando el apoyo de la propia National Geographic Society para lograr ese traslado de los bienes a nuestro país.

Quería saber en qué estado se encuentra actualmente.

Muchas gracias, al doctor Lumbreras y a María Elena Córdova.

**El señor PRESIDENTE.—** Doctor Lumbreras.

**El señor DIRECTOR DEL INSTITUTO NACIONAL DE CULTURA, don Luis Guillermo Lumbreras Salcedo.—** Si bien no existen documentos directos, escritos, firmados; en términos generales, lo que ocurre es que la Universidad de Yale asumió la tesis de que teniendo más de 50 ó 60 años la colección en su poder, pertenecía a la Universidad.

Ellos hasta donde tenemos conocimiento, no estaban ya a lo largo de los años, al tanto de los procesos de todo lo que había ocurrido y ellos tenían inscrita la colección como propia, de la Universidad de Yale.

En los Estados Unidos, los términos de propiedad sobre esto son términos muy precisos, aparentemente, a que ello les pertenecía.

Esta fue la razón porque las primeras conversaciones que se tuvo tanto el Presidente como la Primera Dama, tuvieron una primera conversación con la Vicepresidenta de la Universidad de Yale sobre este tema. Y lo que encontraron fue alguna resistencia aceptar que esto ocurría, razón por la cual se comenzó a buscar toda la información que existía, mucha de esta información tuvo que ser rescatada en los Estados Unidos, algunos documentos aquí y que se dio en muchas partes y, finalmente se logró rescatar la información.

Como parte de esa información existía en los Estados Unidos un documento donde se indicaba que se habían devuelto 47, creo, cajas con material arqueológico de Machu Picchu y, consecuentemente, ya se había cumplido con devolver al Perú los materiales de Machu Picchu.

El asunto es que hecha la averiguación porque también se vio que pudo haber ocurrido esto en la década del 30, en la época del 20; en fin, se hizo un examen de lo que efectivamente se había remitido y efectivamente, llegaron 40 y tantas cajas, todas ellas con huesos, restos óseos y no todos ellos de Machu Picchu y se suponía que se había devuelto la colección.

Los estudios que se tuvieron que hacer como parte de esto, es que eso no es lo que se encontró en Machu Picchu, por suerte, la documentación sobre lo que se halló en Machu Picchu está toda o mayormente publicada.

Existe un estudio del señor Matison, por ejemplo, en el año 1916 que es un análisis de todos los objetos de metal que se encontraron en Machu Picchu, pieza por pieza; de modo, que es casi un catálogo de las colecciones sobre metal que se recuperaron en las excavaciones de Machu Picchu.

En 1930, se publicó un catálogo con mucho detalle de las colecciones de cerámica, incluido los fragmentos que se llevaron allá y están también publicadas estas informaciones.

Todo lo que hay sobre material de pielítico, todo lo que existe sobre restos vegetales, fueron publicados por el señor Cook, por el señor Erthis e incluso los restos humanos. Porque las colecciones que devolvieron no fueron ni siquiera la de los restos humanos, sino la de los restos de animales. Y muchos que habían encontrado en inversos otros lugares que no eran precisamente Machu Picchu.

De modo, que lo del señor Erthis se publicó en el año 1931, en 1916 primero y en 1931 después.

Hay la publicación, incluso, hay una traducción al castellano del informe del señor Erthis que fue publicado por el Instituto Cultural Peruano Norteamericano, una traducción que hizo Sonia Guillén, debe ser alrededor de los 70.

En fin, hay unas 15 publicaciones hechas en revistas científicas, en diversas publicaciones sobre lo que se encuentra en Machu Picchu.

De modo, que ahí está la información factual concreta de lo que hay en la Universidad de Yale.

Pero además, la Universidad de Yale el año pasado recaudó algunos millones de dólares, de acuerdo a la información que tenemos, haciendo una suerte de gira de la colección de Machu Picchu por todos los Estados Unidos.

Como oferta de la Universidad de Yale —en ese momento ya estábamos haciendo la reclamación nosotros, esto hace un par de años— se nos decía que podría devolver una parte de esa colección para que nosotros hagamos lo mismo, recorrer la colección por el país.

Esto desde luego, ni fue aceptado de ninguna manera. Se indicó que nosotros reclamábamos el total de la colección y que nos llamaba mucho la atención, que se hiciera esta exposición itinerante que ellos hicieron y que, desde luego, estaba parada por su reclamo de que la colección les pertenecía. Esto era una colección de la Universidad de Yale.

Esto es lo que ha ido demorando las gestiones, entiendo que la Cancillería primero con la intervención del doctor García Sayán, pero luego con la del embajador doctor Manuel Rodríguez que fue bastante activa, logró reunir algunas informaciones mayores y conversaciones que se hicieron.

Sabemos que en este momento, la Cancillería tiene que tomar la decisión de cuál es el paso que se tiene que dar, que aparentemente sería el judicial. Porque ya de una propiedad internamente reconocida como privada de parte de la Universidad de Yale, éste no es un tema en el que intervenga directamente el estado norteamericano. **(6)**

**El señor PRESIDENTE.—** Solamente voy a interrumpir para indicar en la transcripción que conversarán directamente la congresista Elvira De la Puente y el doctor Lumbreras, para que no intervenga quien habla.

Congresista.

**La señora DE LA PUENTE HAYA (PAP).—** Congresista, solo quería una pequeña interrupción, doctor, porque no comprendo a raíz de qué asume la Universidad de Yale que ya pueden registrar como propios los elementos llevado de Machu Picchu.

En qué documentos se basan porque hasta en propiedad intelectual, incluso, hay 70 años en que se reconoce la propiedad intelectual y hay respeto por derechos de autor —solo estoy haciendo una comparación— en cuanto a restos arqueológicos de un país.

Entonces, no comprendo en qué momento y a raíz de qué decide la Universidad de Yale que puede registrar los elementos como propios.

Gracias.

**El señor DIRECTOR DEL INSTITUTO NACIONAL DE CULTURA, don Luis Guillermo Lumbreras Salcedo.—** Entiendo que el registro no es actual sino que ya es un registro que aparentemente tiene muchos años y ellos daban como cierto de que esto pertenecía a la Universidad de Yale en la medida en que aparentemente nadie reclamó.

Y el supuesto que conocemos no escrito pero verbalmente referido es que nadie reclamó en el estado peruano la propiedad de parte del Perú.

El argumento que nosotros presentamos a través de la Cancillería, que la Cancillería presentó es que existen los documentos en los cuales en ningún momento el estado peruano cedió derechos de propiedad, de modo que es en ese punto en el que nosotros estamos.

**El señor PRESIDENTE.—** Congresista Mario Ochoa.

Damos la bienvenida al congresista Humberto Requena, quien ya se ha reincorporado a la sesión, ha estado en la mañana en un foro.

Colega Ochoa, tiene la palabra.

**El señor OCHOA VARGAS (UPD).—** Gracias, Presidente.

Un saludo al maestro, doctor Guillermo Lumbreras, de quienes los peruanos en muchas oportunidades hemos utilizado su testimonio personal y su trabajo para poder entender y comprender no solo nuestra historia sino el desafío al futuro del Perú como maestro en la asignatura de Ciencias Histórico Sociales.

Realmente es un enorme honor estar aquí y hablar sobre estos temas que no solo es pasión sino que es el alma, es la cultura viva —creo yo— que nos tiene a todos los peruanos de pie.

Y no voy a abundar, Presidente, en aspectos que tienen que ver con Machu Picchu porque para ello está aquí el doctor Lumbreras. Me voy a abocar básicamente en tener que perfilar y de manera muy breve la razón del porqué de la presentación de este proyecto de ley junto al doctor Henry Pease, con quienes somos autores de este proyecto y tiene la adhesión del congresista Adolfo Latorre como cusqueño básicamente.

Pero esto va a más allá de lo cusqueño y de lo peruano. Se trata de reivindicar algo que nos pertenece y que yendo a la lógica, como lo precisaba bien la congresista Elvira De la Puente, sencillamente ha vencido ya en exceso los tiempos de los alcances de aquellos decretos supremos y resoluciones que posibilitara la salida por uno o año y medio o máximo dos años, de estos objetos pertenecientes al patrimonio nacional. Y ese es, creo, la esencia de este tema.

Quiero agradecer, dicho sea de paso, al INC por habernos respondido de manera rápida y oportuna a una comunicación cursada pidiendo una opinión sobre este proyecto, para ver en qué medida podría o no ayudar la posibilidad de generar una ley desde este Congreso de la República para de una vez por todas repatriar esto que nos pertenece.

Y ha sido positivo eso, ha sido transcrito a esta comisión, Presidente.

De igual manera, con opinión también favorable y positiva se muestra la Cancillería, quien también indica que ésta es una herramienta que podría ayudar en este proceso, porque ya han habido varios intentos, han habido varios esfuerzos en realidad, como consta aquí en la ayuda memoria del Instituto Nacional de Cultura para poder lograr esto.

Pero hemos ido escuchando a través de los tiempos una serie de compromisos, una serie de gestos, pero al final han pasado 88 años ya hasta hoy en el cual sencillamente no tenemos respuesta a una situación que legalmente nos pertenece.

Por consiguiente, a nuestro juicio, Presidente, es totalmente ilegal hoy la posesión de estos objetos que alcanzan casi un promedio de 5 mil por parte de la Universidad de Yale en los Estados Unidos; 4 mil 902 exactamente, creo, Presidente, y que lógicamente no puede haber de ninguna manera indiferencia por parte nuestra para poder en esta instancia y en este Congreso de la República tener que propiciar algo que verdaderamente hoy se ha convertido en una especie no solo de ícono en cuanto al turismo internacional.

Y no es únicamente un ícono ahí de la historia sino, como decimos nosotros los cusqueños, es el santuario vivo de nuestra cultura como es el santuario histórico de Machu Picchu.

De tal suerte que esta primera maravilla del mundo, como recientemente una revista inglesa acaba de señalarlo, este primer destino turístico para los chinos y así sucesivamente podríamos enumerar muchas cosas, yo creo que tiene mucho en proyecto y mucho en razón para seguirlo potenciando.

Bueno, yo no sé si existió Manco Cápac. También el doctor Lumbreras puede explicarle, mi querido Presidente.

Pero en todo caso su construcción allá por los albores en 1450, de eso estoy casi seguro, de esta ciudadela, en este nuevo siglo debemos de hacer que vuelva al país.

Yo no puedo quedarme con una deuda permanentemente toda mi vida, que tenga que arrastrar al tener que volver a mis afanes normales en la tierra.

Es por eso que en esta oportunidad, Presidente, seguro estoy también que el Instituto Nacional de Cultura tiene una visión para poder ver cómo no va a ser posible que no solo en Machu Picchu, que no solo en Aguas Calientes, en Cusco de repente puede ser Lima también en alguna oportunidad, la que tenga en algún momento que ver ahí todo esto que ha significado el inicio de un trabajo que dicho sea de paso no lo empezó eso también, estamos nosotros bastante claros, la expedición de la Universidad de Yale de los Estados Unidos y (ininteligible).

Creo que personas como Lizárraga, como Sánchez, Justo Ochoa, mi querido Presidente, ya lo dije más de una vez, estuvieron aun mucho más antes el año 1902 presentes por esos lugares. Pero en todo caso, Presidente, creo que ya es hora de darle una seña al país de lo que queremos hacer.

Muchos nos dirán pero ya existe la Ley N.° 24047, la Ley de Patrimonio; o tal vez la propia Constitución Política del Estado que protege ello. Pero estamos aquí ante un problema que ya lo ha explicado el doctor Lumbreras en el sentido que ciertamente hay cosas inaceptables y contradictorias.

Muy pronto el Perú no va a ser dueño de nada, que nuestra papa, nuestro olluco, la kiwicha, la maca y hasta nuestros monumentos históricos o santuarios históricos como Machu Picchu ya no nos van a pertenecer. Y creo que esta familia Zavaleta que hoy se irroga la propiedad de más de 22 hectáreas de terreno de este santuario milenario, entiendo yo que tampoco no puede seguir generando ningún tipo de contrasentidos a una situación natural que la reconoce el Perú y el mundo entero.

De tal manera, Presidente, con estas consideraciones así aparentemente simples pero contundentes, yo espero que el predictamen en algún momento puede estar ya de una vez por todas aquí en el debate de este pleno de la Comisión de Relaciones Exteriores y, en todo caso, agradecerle al doctor Lumbreras, porque qué mejor que en la gestión de él podamos efectivamente todos, de manera conjunta, porque este es un tema que no atañe únicamente al primer poder del Estado, este Legislativo. Este es un trabajo del INC, es un trabajo de Cancillería, es un trabajo de todos quienes podamos aportar.

Hace un instante han estado presentes aquí peruanos y paisanos nuestros en los Estados Unidos, que bien podrían generar toda una corriente favorable, obviamente en los canales civilizados y obviamente respetando las leyes de ambos países para poder tener que en algún momento hacer que el Perú y particularmente el Cusco pueda vibrar nuevamente al tener estos restos que nos pertenecen, estos restos, estos objetos que definitivamente son únicamente nuestros y no pertenecen absolutamente a nadie más que a los peruanos.

Gracias, Presidente; muchas gracias, doctor Lumbreras.

**El señor PRESIDENTE.—** Gracias, colega.

Hay un documento que voy a dar lectura, del 3 de noviembre, donde el canciller Maúrtua le contesta al doctor Mario Ochoa Vargas respecto a este pedido justamente.

Y en tres puntos el embajador José Alberto Carrión Tejada, su secretario político cultural exterior le contesta y le dice que es todo verdad y que la Cancillería y el INC están evaluando la posibilidad de recurrir a la vía judicial en los Estados Unidos para recuperar ese patrimonio; que si bien salió de territorio peruano de manera lícita, ha permanecido en ese país de manera ilegal.

Aquí se nota, colega, este es un comentario a pie de página, no le aplican la ley de extranjería a esos restos. Si se hubiera tratado de un peruano sin visa ya no estaría en Estados Unidos; en cambio, aquí no hace falta visa sino que se quedan con lo tuyo.

Y hablando, como dice el colega Mario Ochoa, nos van a dejar sin mucha propiedad, por ejemplo, aquí la Coca Cola. Permítame este comentario, yo tomo Coca Cola, sobre todo por lo de coca. O sea, los norteamericanos dicen coca no, pero Coca Cola sí, cuando se sabe que esto se hace en base a la coca, por eso es Coca Cola.

A mí me gustaría saber si ellos pueden también decirle a este imperio que es la Coca Cola que le quiten el nombre a la coca cola.

Entonces, yo saludo esta tenaz intervención siempre del colega Mario Ochoa, para comprometer a todos los miembros del Congreso para que podamos hacer juntos este reclamo.

Doctor Lumbreras, ¿algún comentario?

**El señor DIRECTOR DEL INSTITUTO NACIONAL DE CULTURA, don Luis Guillermo Lumbreras Salcedo.—** Señor Presidente, señores congresistas, yo acabo de llegar de Argentina a donde fui en misión oficial por gestiones de la Cancillería. Y debido a que no teníamos en el estado como cubrir mis gastos allá, hemos sido cubiertos con un apoyo que nos ha dado el convenio Andrés Bello para ir.

¿Cuál ha sido el objetivo de mi viaje? Examinar y hacer el peritaje de una impresionante colección de objetos arqueológicos peruanos que han sido, ellos le llaman, secuestrados, rescatados, requisados, por el gobierno argentino. Estamos hablando de varios miles de objetos peruanos. **(7)**

Esta es una colección de alrededor de 20 mil objetos que han sido recuperados por las aduanas y la policía bonaerense, y de la cual varios de estos miles de objetos, la mayoría, diría yo, son peruanos.

He tenido la oportunidad de trabajar con colegas argentinos en la identificación. Yo quiero decirle, señor Presidente, que lo que yo he visto, hay piezas de lo que yo he visto, realmente nosotros no tenemos ni idea aquí de cosas realmente fabulosas que estaban destinadas a los mercados europeos. En fin, esto fue obtenido en tiendas de antigüedades, en el tráfico de antigüedades, en Buenos Aires.

Entre los miles de objetos he podido encontrar, por ejemplo, la antigua vestimenta. Por primera vez en mi vida la he visto, y tengo 50 años investigando arqueología, una tenida de un guerrero de la civilización Chimú, con todas las corazas y todos lo que tenía un guerrero, yo no lo imaginé jamás.

Me recuerda mucho al tipo de vestidos que tenían los guerreros japoneses, los guerreros chinos, con unos atuendos, una cosa realmente maravillosa, aparte de objetos de una gran cantidad de piezas.

Todo esto fue robado del país. Este vestido todo adornado con plumas, es decir una cosa estupenda, debe ser del siglo XI, siglo XII. Pero hay objetos dentro de esta colección, de las cuales estoy hablando, objetos que tienen por lo menos unos 3 mil, 4 mil años de antigüedad, una colección de cosas, es una colección de cosas de su tierra, una cantidad notable de cerámica Vicus, de cerámica Moche, de cerámica Nazca, objetos de plata, objetos finos.

Eso parecía la cueva de Aladino, una cantidad impresionante de objetos, todos ellos robados del Perú, y el objetivo era efectivamente confirmar que eran peruanos, a qué épocas pertenecían y todo esto.

Tenemos cosas de este tipo en varios países, nunca tan grandes, de varios miles de objetos, que obviamente han salido del Perú desde hace muchos años, y sigue saliendo, porque siguen robando, sigue habiendo depredación, que están en Argentina como punto de tránsito.

Estos objetos tienen destinos a Europa, Estados Unidos y llegan a Argentina. Ahora por suerte, gracias al convenio firmado entre el Perú y Argentina, y al que se ha adherido Argentina además la protección de los bienes arqueológicos, ya hay una intervención de parte de ellos y una excelente voluntad de cooperación respecto a esto.

Pero lo que yo quisiera, aprovechando esta circunstancia, señores congresistas, es referirme al hecho de que para poder defender nosotros nuestro patrimonio no tenemos recursos.

El problema es que ni siquiera los tenemos para recuperar. Cuando nosotros recuperamos estas cosas, estamos recuperando cantidades realmente importantísimas de nuestro patrimonio.

Ya ni siquiera estoy pensando en una cantidad de soles o dólares que nosotros recuperamos, que son realmente miles. Pero estoy pensando en todo lo que estamos dejando que se lleven, que está afuera.

Yo pensaba cómo estas colecciones podrían enriquecer, por ejemplo, nuestros museos de frontera.

Nosotros debiéramos tener museos nacionales donde se presentara toda la riqueza de nuestra cultura en Tacna, en Puno, en Tumbes, en Piura, en Iquitos, en diversos puntos, para no tener que venir solamente a Lima.

Allí están, lo que yo he visto llena dos o tres museos, lo que he visto en estos días que he estado allá trabajando con la gente de Argentina.

De modo que nosotros tenemos problemas porque no tenemos, entre otras cosas, por ejemplo, para pagar a los abogados, quienes defienden los intereses peruanos.

Estábamos en reuniones con el embajador nuestro en Argentina, don Martín Belaunde, y él no tiene con qué financiar. Para yo poder hacer el peritaje hemos tenido, con ayuda de la Cancillería, conseguir fondos desde otras partes. No puede ser de esa manera, no estamos en condiciones de poder hacerlo.

No hemos podido viajar a Washington para hacer las gestiones. Por ejemplo, se hubiese aprovechado cada vez que el presidente o la Primera Dama ha viajado, o a través de nuestras gestiones de nuestros embajadores, porque no tenemos cómo.

El peritaje lo hemos tenido que pedir a peruanos que viven allí, arqueólogos que están allá. es toda una complicación, sería sumamente importante que se tome esto presente, para entender la importancia que puede tener el disponer de algunos recursos en el futuro para este tipo de trámites.

**El señor PRESIDENTE.—** Congresistas, estamos en la parte final de la exposición del doctor Lumbreras, les ruego que no se vayan porque tenemos que discutir el Tratado de Cooperación con Bolivia, y todavía no hemos terminado este punto con el doctor Lumbreras.

Doctor Lumbreras, para conocimiento del congresista Mario Ochoa, la Cancillería todavía no remite su punto de vista respecto al proyecto de ley de su iniciativa.

Vamos a instar a la Cancillería que lo haga. Hemos invitado a su secretario de Política Cultural Exterior, el señor Carrión, para que venga hoy y no ha venido.

Cancillería suele siempre excusarse o enviar a otra persona. No hemos tenido noticias en este punto, vamos a instar a que puedan venir.

En otro orden de cosas, me pregunto, congresista Ochoa, si debemos formar un Frente Parlamentario, con usted a la cabeza, para iniciar un reclamo con los parlamentarios norteamericanos, y ver de que manera nosotros también podemos pedirle a Estados Unidos que cumpla.

Si nos devuelven a los vivos también que nos devuelvan a los muertos. Si no quieren quedarse con nuestros activos, que nos devuelvan lo antiguo.

Congresista Requena, puede hacer uso de la palabra.

**El señor REQUENA OLIVA (FIM).—** Gracias, señor Presidente.

Pidiendo disculpas por haber venido un poquito tarde porque estaba atendiendo a unos chicos que han venido desde Piura, del Colegio Adventista, y le pedí al doctor Luis Solari que los saludara, y así lo hizo.

Estos chicos que están aquí paseando mañana se están yendo al Cusco, y estaban preocupados y llamaron al Cusco al Instituto Nacional de Cultura para que les permita apoyarlos en que conozcan al detalle esas linduras que tenemos por el Cusco, la ciudad que acaban de declararla patrimonio mundial.

No le han contestado, yo no sé si el doctor nos puede hacer ese servicio de conseguir que se les atiendan a estos chicos que se están yendo el día de mañana.

Aparte yo quería comentar y saludarlo al señor Luis Guillermo Lumbreras y a la doctora María Elena Córdova Burga. Los dos apellidos son del norte, uno de Chiclayo y el otro de Piura.

Es increíble lo que está diciendo, es la pura y neta verdad. Yo he visto en Argentina cosas increíbles del Perú, y he visto en Estados Unidos, en todos sitios, y en Piura, que hizo referencia el doctor Lumbreras, Domingo Seminario Urrutia, tenía una de las mejores colecciones de las huacas de Chulucanas, de Vicús, increíble, y han desaparecido del mapa, porque las trajeron acá en Lima, la tenía el Banco Popular del Perú, que hizo un canje de deuda, y resulta que han desaparecido.

El Concejo Provincial de Piura quiso rescatarlas y no han podido porque se han esfumado, y han depredado toda la parte histórica de Piura y de todo el Perú.

Aquí me permito hacerle algunas preguntas al doctor. Doctor Lumbreras, hace unos años un diplomático peruano fue atrapado con las manos en la masa, traficando objetos de arte antiguo peruano, estos bienes se quedaron en Bolivia, y Bolivia dijo que eran bolivianos, cuando en realidad eran peruanos.

¿Conoce usted el caso? ¿Qué acciones ha tomado el Instituto Nacional de Cultura? ¿Conoce de algún otro caso donde esté implicado otro funcionario de Torre Tagle?

**El señor PRESIDENTE.—** Le ruego al doctor Lumbreras que vaya acumulando las preguntas, para contestarlas en bloque, si es tan amable.

Congresista Elvira de la Puente, puede hacer uso de la palabra.

**La señora DE LA PUENTE HAYA (PAP).—** Muchas gracias, señor Presidente.

Lo que ha expuesto el doctor Lumbreras nos hace meditar muchísimo y revisar este tema que lo venimos estudiando y que nos preocupa tanto de la falta de recursos para todo lo que son actividades culturales en nuestro país, de las más diversas expresiones o diverso tipo de actividades culturales, o por la cultura.

Me hace volver a la memoria el hecho de que quizás debemos insistir por tener un Ministerio de Cultura en nuestro país, porque será una voz presente en el Consejo de Ministros, para defender también un presupuesto coherente y no una parte que siempre se siente como no indispensable, y que resulta siendo un mínimo, únicamente posible de aplicar a lo que son los recursos en cuanto a salarios y material administrativo del Instituto Nacional de Cultura, cuando el trabajo del INC, todos sabemos, es otro y podría ser otro siempre y cuando tuviera los recursos, porque el material humano está.

De modo que creo que esto es fundamental. Yo ahora acabo de enviar un oficio prácticamente en protesta, porque no ha asistido nadie al Encuentro de Bahía para defender los proyectos de cine peruanos, que prácticamente deciden el futuro del cine peruano en este año y en los próximos porque se queda afuera, sino había una persona representativa en el Encuentro de Bahía para sustentar los proyectos que envía nuestro país.

Nuestro país viene obtenido logros a nivel internacional y reconocimientos a nivel internacional en festivales importantísimos del mundo, y sin embargo en nuestro país no se encuentra la manera de destinar fondos y proporcionarle recursos para que viaje una persona a sustentar la posición del Perú, y se queda fuera de los beneficios de Ibermedia.

Todos los años tenemos que rogar para que se cumpla con los depósitos a Ibermedia, que además están adquiridos mediante un compromiso internacional, que es el Fondo Ibermedia.

Me hace volver al tema de que quizás debemos insistir en la idea planteada por el presidente el 28 de julio, y que un poco ha sido dejada de lado porque sufrieron, creo yo, algunas críticas, no creo que haya sido por otra razón, pero quizás se debería retomar por la urgencia de tener un Ministerio de Cultura en el país.

Y en cuanto específicamente a lo de Cusco y la repatriación de los objetos del Santuario de Machu Picchu, yo diría que quizás como suelen hacer también los congresistas norteamericanos, podríamos dirigir una carta firmada empezando por la Comisión de Relaciones Exteriores, mediante un acuerdo de la Comisión de Relaciones Exteriores, dirigirnos al Congreso de los Estados Unidos a plantear el caso y que esta sea firmada multipartidariamente por la mayor cantidad de congresistas para hacer gestiones en los Estados Unidos y que faciliten la repatriación de los objetos.

Quizás podría ser también otro camino al que podríamos recurrir y que es muy bien entendido y respetado allá.

Cuando son cartas presentadas por grupos de congresistas de un país, esto es tomado muy seriamente. De modo que también quería hacer esa sugerencia.

Gracias, señor Presidente.

**El señor PRESIDENTE.—** Intervención final del congresista Mario Ochoa.

**El señor OCHOA VARGAS (UPD).—** Gracias, señor Presidente.

Me hubiese gustado, en algún momento, dar cuenta de lo que actualmente ocurre en el departamento de la región Cusco, dentro de esto que significa el interés por tener, no sé si administrar, defender, proteger, Machu Picchu.

Aquí el doctor Lumbreras no puede ser, de ninguna manera, excepción en el hecho de no conocer lo que hoy ocurre con el Gobierno Regional Cusco y la situación del Instituto Nacional de Cultura; **(8)** pero yo no voy a entrar a ese tema. Yo voy a entrar a algo que siente la población y que aquí todos estamos reconociendo, efectivamente, es lo que nos interesa.

En el Perú hay muchas cosas, ciertamente, que no se pueden hacer por falta de dinero, pero también creo que hay la posibilidad de ver, y ese tema tampoco lo voy a tocar, en el sentido de lo que realmente reporta Machu Picchu. Si hablamos del año 2004 no más hemos superado, creo, los 7, casi 8 millones de dólares de captación de ingresos que se han tenido por concepto de visita nada más al Santuario y que obviamente no es mi preocupación ese monto sino el hecho de que cada vez más crece la cantidad de turistas que desean llegar ahí y que en algún momento soy partícipe, doctor Lumbreras, de lo que ha significado la presentación del Plan de Protección del Santuario de Machu Picchu presentado por el doctor David Ugarte Vegacenteno, director del INC Cusco, y que ha merecido una serie de controversias también y reparos.

Pero creo que este tipo de acciones de manera conjunta que nos puedan demandar la posibilidad de que podamos hacer esto, pensar en un museo de sitio de descongestione Machu Picchu.

En *El Peruano* de hoy ha salido la aprobación, la legalización a lo que significa una carretera Machu Picchu-Aguas Calientes, no sé qué zonitas. O sea, de a pocos hay la posibilidad de tener que gestar la ejecución de una carretera, más allá de la línea férrea que hoy, para quienes queremos proteger el Santuario, a Dios gracias es el único medio y la vía que existe, porque de lo contrario, si lo pienso con una mentalidad de empresario, de agente de turismo, lógicamente yo no solo pongo ahí una carretera asfaltada sino pongo un helipuerto y tantas cosas más.

Pero pensamos de otra forma la cultura en el país y tenemos otra concepto del manejo de nuestro patrimonio, de tal suerte de que hay elementos, hay personas que al margen de no tener una responsabilidad jurídica son peruanos, son cusqueños, que residen allá que tranquilamente podrían, en algún momento, señor Presidente, se lo comenté, tener que sufragar gastos que a veces es difícil sacarle al Gobierno Central; es difícil conseguir la publicación de una resolución que autorice un viaje. Finalmente, esto se dará, pero obviamente sin tocar el erario nacional porque hay gente que sí está comprometida con este proyecto, sí puede hacerlo. Es más, hasta de repente sacar algunos dividendos más, no económicos, sino que tengan que ver con la defensa de nuestra cultura y nuestro medio ambiente porque el Santuario de Machu Picchu no son solamente las ruinas, no son los restos, por favor. Cuántos miles de diversidades de especies, de flora y de fauna existe en ese Santuario. Machu Picchu no porque es Machu Picchu es la primera maravilla hoy, para una revista como esta londinense. No.

Pero antes de continuar me pide una interrupción la congresista Elvira de la Puente, si usted lo permite, señor Presidente.

**El señor PRESIDENTE.—** Congresista De la Puente, la palabra.

**La señora DE LA PUENTE HAYA (PAP).—** Muchas gracias, congresista Ochoa; gracias, señor Presidente.

Yo quería recordar también, estoy pensando ahora en lo de Argentina, que quizá es más simple porque no hay un problema ahí de interpretaciones legales o posesiones indebidas, y más bien hay un convenio que nos está facilitando el acceso a estos objetos y la posibilidad de su regreso al país.

En este caso, quizá se podría pensar en elaborar un proyecto que pueda ser presentado a la cooperación internacional para inversión justamente en la implementación con esos elementos de un estudio intenso sobre todos estos 20 mil objetos con que se cuenta, un proyecto de estudio y luego la implementación de museos en el país.

Yo creo que con un proyecto fuerte se podría fácilmente lograr recursos de la cooperación internacional que vienen muchas veces en millones de dólares al país y son mal utilizados. Señor Presidente, a través suyo al doctor Lumbreras, porque lo que vemos muchas veces se utilizan en proyectos administrativos, el dinero se va en pago de los sueldos de la administración, de quienes tienen a su cargo ciertas ONG y no llega al destino final, que debería ser de esos millones al verdadero fin que es al beneficio del pueblo peruano.

Entonces, quizá podría también por ese lado pensarse en la elaboración de un proyecto fuerte para lograr esa repatriación de los bienes en el caso de Argentina.

Gracias, señor Presidente.

**El señor PRESIDENTE.—** Colega Ochoa, puede continuar.

**El señor OCHOA VARGAS (UPD).—** Señor Presidente, termino saludando esta actitud del presidente del Instituto Nacional de Cultura, que nos ha relatado la realidad, aunque con esta crudeza que ya no nos extraña, de lo que significa esas ganas y deseos de proteger nuestro patrimonio.

Sobre el caso Argentina, creo que si vamos a otros sitios también vamos a encontrar que en colecciones familiares hay una serie de objetos, de restos que han sido huaqueados, depredados, y sigue haciéndose. A veces, yo le digo, doctor, con consentimiento —tal vez — de gente que inclusive pertenece a su propia institución.

Soy sicuaneño, el tema de Racchi me agradó cómo hoy por fin se está potenciando. Creo que después de Sacsayhuamán, no por decirlo menos, pero incorporado a un circuito turístico (Ininteligible) que viene generando. Y es el Santuario de Wiracocha, obviamente, que hoy con un poquito de esfuerzo que se le haya dado, con pequeños recursos, es que siempre para la cultura existirán solo migajas en el Perú, y eso es lamentable decirlo y terrible aceptarlo, pero si de migajas estamos viviendo por qué no podemos generar algunas otras migajas más para poder emprender esta lucha firme, y desde aquí porque no podemos hacer solo ello.

A la pregunta suya y la propuesta de que se pueda conformar, está en el proyecto de ley la posibilidad de tener que establecer una comisión donde yo no necesito participar de la misma. A mí lo que me interesa es que la gente especializada, la gente que directamente tenga que ver con ese tema asuma esa responsabilidad.

Soy un transmisor nada más de las inquietudes hechas porque lo que menos me gustaría es que el tema se siga politizando. Y sabe usted, doctor, a qué me refiero cuando hablo del gobierno de la región Cusco y hablo del Instituto Nacional de Cultura, de tal suerte de que yo no voy a entrar en ese terreno porque finalmente el patrimonio es de todas las banderas, de todos los colores, de todos los pelajes y de todos los intereses.

Gracias, señor Presidente.

**El señor PRESIDENTE.—** Doctor Lumbreras, la palabra.

**El señor DIRECTOR NACIONAL DEL INSTITUTO NACIONAL DE CULTURA, doctor Luis Guillermo Lumbreras Salcedo.—** Sé que ustedes tienen todavía mucho más que hacer.

Respecto al caso boliviano referido por el congresista, el caso está referido a un señor Pedro Díaz que, efectivamente, él era miembro de nuestra delegación en Bolivia. Él fue sancionado por la Cancillería en su momento.

Lo que nos preocupa a nosotros sustantivamente —eso ya pasó luego al Poder Judicial, en fin— es la recuperación de los objetos que estaban dentro de eso.

Se han recuperado 12 lienzos que han retornado a sus lugares de origen, que eran templos fundamentalmente en la región del Cusco. Estos ya están, han sido entregados, fueron rescatados con ayuda, con apoyo del gobierno boliviano fueron trasladados y entregados a sus lugares de origen. Se quedaron 5 de ellos, que era bolivianos, probadamente bolivianos, y se quedaron en Bolivia.

Hay una cantidad de más de cien lienzos que permanecen en La Paz porque no hay todavía una clara definición si son del Escuela Cusqueña, si son de la Escuela Paceña. En fin, están todavía en este momento bajo custodia compartida entre la Embajada peruana y el Viceministerio de Cultura de Bolivia.

En realidad, ni Bolivia ni el Perú han podido probar la propiedad, de modo que están en *status quo*. Y esto es lo que yo podría informarle en relación a esto.

Creo, de otro lado, que es importante saber que la participación de funcionarios nuestros, de la Cancillería, en otro tipo de casos hasta ahora no es conoce. Entonces, yo tengo que informar esto. Por lo menos hasta ahora no tenemos una información en relación a esto.

Sí tenemos casos de funcionarios de otros países que llevaron cosas del Perú y por lo menos en un caso fueron denunciados en su propio país, uno de ellos incluso fue retirado de la carrera diplomática en un país europeo. En fin, están dentro de esas condiciones.

Estoy totalmente de acuerdo con la congresista Elvira de la Puente respecto a la necesidad de caminar en torno a la habilitación de un Ministerio de Cultura. Creo que es un tema muy importante, creo que es un tema que debiera debatirse en el Congreso con mucha amplitud, creo que debiera caminarse con

precisión, creo que es una institución que requiere, en el Perú, un manejo adecuado, entre otras cosas, porque soy un convencido total de que la cultura en el Perú es matriz fundamental de gran parte de las cosas que nosotros somos capaces de hacer en este país.

Nuestra condición multicultural, pluricultural, como se le llame, es una condición muy seria, que interviene en casi todas las decisiones que nosotros tomamos respecto del futuro en el país. No es que solamente seamos un país multicultural, no es que solamente seamos un país plurilingüista, sino que somos un país en donde las condiciones de diversidad exigen un tratamiento especializado que pasa necesariamente por el campo de la cultura en todas las decisiones, desde aquellas que van por el campo de la salud, pasando por el campo de la agricultura, pasando por el campo de las reformas básicas, la educación sin asumir esta condición pluricultural efectiva y no simplemente declarativa tiene problemas muy serios.

Es muy distinto aprender a leer cuando se tiene como lengua materna al quechua o al aimara, o se tiene al pano como lengua materna, que aprenderla cuando se tiene la lengua limeña, que es distinta a la piurana y que es distinta a la arequipeña.

Creo que este tipo de condiciones pasa por cultura y por esa causa, entre otras, creo que debe tratarse muy seriamente y cuanto más pronto mejor el tema del Ministerio de Cultura.

**El señor PRESIDENTE.—** Yo tengo dos preguntas 'chiquitas'. Una, si podemos entrar tranquilos, doctor Lumbreras, porque ya la UNESCO ha aclarado el tema de que esto no está inventariado, lo de Machu Picchu, como bien privado, sino como bien nuestro. **(9)** O sea, ¿podemos estar tranquilos en el Congreso?

**El señor DIRECTOR DEL INSTITUTO NACIONAL DE CULTURA, don Luis Guillermo Lumbreras Salcedo.—** Señor congresista: Nosotros hemos conversado con la UNESCO sobre esto, entre otras cosas, porque consideramos que la UNESCO no tiene nada que ver con el reconocimiento de propiedad en el Perú, esa es una cuestión soberana nuestra. Eso deriva y depende de nuestras leyes, deriva y depende de nuestra Constitución y consecuentemente la UNESCO, que es un organismo internacional que nosotros suscribimos en el cual participamos, no está en condiciones de decirnos qué es y qué no es nuestra propiedad.

Este es una asunto que lo hemos conversado con UNESCO y ellos están totalmente de acuerdo y desde luego han negado que en algún momento ellos hayan sostenido una cosa de esto, rotundamente, tanto UNESCO París cuando UNESCO de aquí. Ellos nos han indicado que van a mandar por escrito, porque nosotros hemos considerado.

Claro, ellos no reconocían la necesidad de hacerlo por escrito porque dice, es absurdo, simplemente nosotros no estamos en condiciones de declarar, bueno, simplemente les hemos pedido que ellos digan que, efectivamente, ellos no están en condiciones de hacer una declaración de ese tipo.

Y esto se ha debido más bien a una confusión, porque lo que se hizo en el instituto fue tratar de buscar cuál era la madre del cordero, de dónde salía este tipo de declaraciones o este tipo de insinuaciones. Y es un documento que no es de UNESCO, es de una especie de ONG que tiene relaciones con UNESCO que se llama la UNEP.

Supongo que es una organización que tiene que ver con ecología en donde ellos llamaban la atención sobre la posibilidad de que en Machu Picchu hubiera una propiedad privada en los predios de Mandorpampa, Torontoi y Santa Rita de Kenti, entonces, a raíz de esto, aparentemente, quienes leyeron el documento, quienes se les comunicó como esto está en inglés, hicieron una lectura, una interpretación y seguramente les preocupó con mucha justicia ¿no es cierto? el que hubiese la posibilidad de que se estuviera sosteniendo fuera del país una propiedad que no podemos aceptar.

Esto es todo el asunto que hemos podido averiguar, de todos modos, como le digo, los funcionarios de UNESCO con quienes hemos conversado tanto los de París como los de Lima, Perú, están dispuestos simplemente a hacer una aclaración en ese sentido.

**El señor PRESIDENTE.—** Para el registro de la grabación, entonces vamos a esperar oportunamente si llega el documento de UNESCO que, por favor, nos remitan una copia para archivar el tema, es decir, bueno el tema se ha archivado, porque mientras UNESCO no firma ese documento yo entiendo su disquisición jurídica y me parece compartirla porque, claro, el catastro del patrimonio es nuestro.

Nosotros tenemos instituciones que dicen que es propiedad pública o privada, ruego por favor ese documento, uno. Y dos, el tema de Hiram Bingham está sujeto al impulso parlamentario del proyecto de ley que ha presentado el colega Mario Ochoa.

Esos son los dos temas, entonces, el proyecto de ley que a cancillería hay que pedirle que nos dé su opinión y el tema que podemos dormir tranquilos esta noche. Las tierras sagradas de Machu Picchu no son parte de la propiedad de la familia Zavaleta.

**El señor DIRECTOR DEL INSTITUTO NACIONAL DE CULTURA, don Luis Guillermo Lumbreras Salcedo.—** Además ya existe por si acaso, existe el registro lo hemos hecho llegar la copia. Está en el registro público, lo hemos hecho además con pedido de último día de fecha 24 de noviembre, o sea, hasta ese día no había inscrita ninguna otra propiedad que no sea la del Estado peruano y eso está totalmente zanjado.

**El señor PRESIDENTE.—** Muy bien, entonces, siendo así, doctora Córdova, gracias por su presencia.

Maestro Lumbreras siempre es un gusto tenerlo, parece que vamos a citarlo con más frecuencia; aunque no haya materia.

Vamos a suspender unos instantes la sesión, le ruego que no se vayan.

*—Se suspende la sesión.*

*—Se reinicia la sesión.*

**El señor PRESIDENTE.—** Vamos a iniciar a que pasen diplomáticos de la cancillería que vienen a sustentar el Tratado de Integración Perú Bolivia, mientras tanto el congresista Humberto Requena va a sustentar el documento que aprobó el Parlamento Latinoamericano en el caso Fujimori.

**El señor REQUENA OLIVA (FIM).—** Gracias, señor Presidente; colegas de la comisión.

Quiero informarles que hace tres días hemos estado en San Pablo, Brasil integrando la comisión peruana en el Parlamento Latinoamericano y en la parte del legislativo el congresista Máximo Mena que fue de la delegación propuso que se tratara el asunto de Fujimori. Lo aprobaron por unanimidad en el consejo, luego buscó el Pleno y ahí se trató el problema y una cosa muy agradable fue que la delegación chilena presentó la siguiente resolución que a la letra dice:

"Propuesta de Declaración Parlatina caso Fujimori.

El Parlamento Latinoamericano

Considerando:

1. Que deben prevalecer las relaciones de amistad y cooperación entre los Estados miembros.

2. Que el fin esencial de los Parlamentos Latinoamericanos velar por el respeto irrestricto de los derechos humanos.

3. El que el ex Presidente del Perú, Alberto Fujimori Fujimori se encuentra detenido provisionalmente en Chile en conocimiento de que el Perú ha anunciado de que requerirá su extradición.

4. El que existe un Tratado Bilateral de Extradición entre Chile y Perú que rige desde el año 1936, resuelve:

Apoyar el pedido del Perú para que los tribunales de Chile concedan la extradición del ex presidente Alberto Fujimori a fin de que éste pueda ser sometido a la justicia de los tribunales competentes con pleno respeto a los procedimientos judiciales de Chile, país en la cual rige en plenitud el estado de derecho y se acoge rigurosamente a los tratados vigentes de esta materia."

Cuando se inició el debate de esta resolución fue sorpresa para nosotros, los que asistimos ahí, que la delegación del Ecuador y de Aruba se opusieron y dijeron que ellos se iban a abstener en la votación, como en efecto se abstuvieron.

Pero en un momento que intervino Mena, intervino quien les habla y había llegado ya el doctor Xavier Barrón quien hizo una defensa magistral sinceramente, a mi juicio. En vista de eso sometieron a votación y se ganó con la abstención de estos dos países.

Inmediatamente yo me puso al habla con mi oficina el mismo día 25 y se redactó el siguiente comunicado que se ha enviado a todos los periódicos, por todos los correos electrónicos y todo, y dicen que no ha leído que *El Comercio* el día de hoy hace algún comentario de esto.

Dice así: "Parlamento Latinoamericano aprueba respaldar extradición de Fujimori. San Pablo, Brasil, noviembre 25, Parlamento Latinoamericano, organismo regional permanente unicameral, integrado por

los parlamentos nacionales de 22 países de América Latina acordó: Apoyar el pedido de extradición que pesa sobre el ex presidente peruano Alberto Fujimori Fujimori, actualmente detenido el Chile por las autoridades de ese país. Ese fue el acuerdo al que arribaron al finalizar la XXI Asamblea Ordinaria que desde el 24 de noviembre se desarrolló en San Pablo, Brasil.

Así, este organismo internacional ratificó su firme y coherente posición en la propuesta que está haciendo el continente para luchar contra la corrupción y el narcotráfico.

El jueves, el congresista peruano Máximo Mena sustentó el comisión la posición peruana respecto a este caso que está por resolverse y en el que esgrimió aspectos relacionados con los casos que ante la justicia peruana debe enfrentar el ex mandatario.

El viernes, en el Plenario, el representante chileno J. Naranjo hizo suya la propuesta de resolución presentada por Mena, quien la sustentó nuevamente siguiendo en el orden de intervenciones solicitadas.

Los congresistas Humberto Requena trató de llamar la atención de Ecuador y Aruba que estaban indecisos en su posición de respaldar la petición peruana y Xavier Barrón que centró su intervención desde el punto de vista técnico jurídico.

El Parlamento Latinoamericano se ha pronunciado así en el sentido que deben prevalecer las relaciones de amistad y cooperación entre los Estados miembros ya que es fin esencial de este organismo internacional, velar por el respeto irrestricto de los derechos humanos conforme se registra en la parte considerativa.

El Parlamento Latinoamericano luego del debate y pese a las abstenciones de Ecuador y de Aruba aprobó la resolución respaldando el pedido del Perú para que los tribunales de Chile concedan la extradición del ex presidente Fujimori a fin de que sea sometido a la justicia peruana."

Es increíble, señor Presidente, que esto se mandó con tanta preocupación del día 25 porque interesa a toda Latinoamérica y no le han dado bola, así de simple. Le ruego a la presidencia de la comisión tome carta en el asunto y que así como nos hacen polvo y cenizas porque ya de las cenizas quieren rebrotar un montón de cosas, esto que lo divulguen y esto han sido de 22 países que han asistido ahí de los cuales 20 han estado totalmente de acuerdo y los otros se han abstenido no han votado en contra, sino se han abstenido.

Gracias, señor Presidente.

**El señor PRESIDENTE.**— Muchas gracias, colega, así lo haremos.

Saludamos su posición enhiesta y firme junto al colega Máximo Mena y al colega Barrón, según usted nos ha descrito.

Vamos a invitar a tres altos funcionarios de la cancillería a que, por favor, puedan pasar a los escaños correspondientes Carlos Berninson, director general de Integración; ministro consejero Carlos Vallejo, de la Dirección de Integración; el consejero Manuel de Cossío de la Dirección de Integración.

Vamos a iniciar el debate, señores parlamentarios, de un asunto que preocupa a la cancillería a nuestro gobierno y a la Presidencia del Congreso y cómo no a nuestra comisión. Se trata del Proyecto de Ley N.° 12189/2004 que propone aprobar el Tratado General de Integración y Cooperación Económica y Social para la conformación de un Mercado Común entre la República del Perú y la República de Bolivia. **(10)**

Es un predictamen que está recaído en una resolución legislativa que propone aprobar y que tiene como sustento lo mencionado y que se basa en la Carta de Intenciones entre la República del Perú y la República de Bolivia para la complementación energética. El comunicado en conjunto de los presidentes de ambos países que se suscribió los días 3 y 4 de agosto en Ilo, Moquegua, en el marco de la visita de estado a nuestro país del presidente boliviano.

Antecedentes del predictamen:

1) Favorecer el desarrollo sostenible e integral de las partes, aspectos económico, social, políticocultural y ambiental.

2) Promover el desarrollo equilibrado y armónico para elevar los niveles de vida de sus poblaciones.

3) Armonizar gradualmente las políticas económicas y sociales.

Este tratado profundizará el vínculo histórico, social, económico y cultural de las dos naciones.

Los aspectos más relevantes son:

1) Integración comercial.

2) Asunto aduanero.

3) Medidas sanitarias y fitosanitarias.

4) Doble tributación e intercambio de información. (Entiendo la eliminación de la doble tributación).

5) Cooperación en materia de propiedad intelectual.

6) Desarrollo de la integración fronteriza.

7) Programas de cooperación en salud.

8) Luchas contra el tráfico ilícito de drogas.

9) La cooperación en materia de educación.

10) Desarrollar programas de capacitación en registro, catalogación e identificación en su patrimonio cultural.

Tiene opinión favorable de los ministerios de Producción, Salud, Energía y Minas, Transportes, Economía y Finanzas y Agricultura con las siguientes objeciones.

En la sesión de la comisión el Ministro de Agricultura expuso los alcances de este tratado.

En esa misma sesión el gerente de la Asociación Peruana de Productores de Azúcar señaló que en efecto Bolivia está interesada en implementar sanciones comerciales por el incumplimiento del Perú, que el acuerdo entre privados con Bolivia va en función a apreciar el grado de hermetismo que tiene Bolivia respecto a su mercado, y pidieron reciprocidad en el comercio bilateral.

Este tratado se basa en la fraternal y profunda vinculación que une a los pueblos de Bolivia y Perú, que comparten espacio e historia comunes.

Coadyuvará a un desarrollo económico y social más dinámico.

La agricultura y el sector manufacturero, en particular la micro y pequeña empresa, juegan un rol significativo en la generación de la ocupación de la mano de obra para la reducción de la pobreza.

Por consiguiente, iniciamos el debate para amparar el pedido a fin de aprobar el Tratado de Integración y Cooperación Económica.

Artículo Único.— Objeto.

Apruébase el Tratado General de Integración y Cooperación Económica y Social para la Conformación de un Mercado Común entre la República del Perú y la República de Bolivia, suscrito en la ciudad de Lima, 3 de agosto de 2004.

De conformidad con los artículos 56.° inciso 1) y 102.°, inciso 3), de la Constitución Política del Perú.

Los señores parlamentarios en el uso de la palabra.

Congresista Alcides Llique.

**El señor LLIQUE VENTURA (PP).—** Mi saludo, en primer lugar, a través de la Presidencia, al señor ministro y al equipo que lo acompaña para tratar este predictamen.

En verdad, señor Presidente, es necesario que podamos entre países hermanos, países andinos poder tener esta integración y creo que el documento mayormente está bien estructurado, principalmente creo que hay que analizar la buena intención que no solamente tiene que ver con la apertura a la libre circulación de la mercadería sino también al control del contrabando principalmente que es uno de los grandes problemas.

Lo que no se estructura mucho es respecto, por ejemplo, a temas como el apoyo, la ayuda mutua para la lucha contra el narcotráfico, pero no está muy bien establecido las acciones concretas que debemos hacer en esta luchar, probablemente porque todo depende del plan que implemente Estados Unidos en Colombia y que tiene que aplicarse, naturalmente, de acuerdo a los resultados al Perú y a Bolivia.

Yo quiero básicamente destacar algunas cosas principalmente cuando se refiere a la tratativa de los productos sensibles. Acá no está muy claro y yo no entiendo en el artículo 27.°, por ejemplo, cuando hablamos específicamente de la sensibilidad, aquí más bien se refiere en el contenido al origen, en todo

caso me referiría yo, para ponernos de acuerdo, al tratado en sí y no al proyecto porque el proyecto no tiene que discutirse, se aprueba y punto.

Yo quiero ver el tratado porque en el artículo 27.°, cuando nos referimos a productos agropecuarios sensibles, es el título, pero el contenido está referido al origen que es otra cosa, son cosas totalmente diferentes, o cambiamos el título o cambiamos el contenido para que sea coherente.

Creo que en el artículo 28.° de frente podríamos decir que no subvenciona la exportación de productos agrícolas y ayudas internas, que ese es un tema bastante importante.

Ojalá que si el Tratado de Libre Comercio con Estados Unidos fuera así, tuviese un artículo, encantado, entonces no habría ningún problema ni qué discutir.

Con respecto al artículo 36.°, acceso y protección a recursos genéticos, conocimientos tradicionales y manifestaciones culturales, aquí también o es que hay que arreglar el contenido del artículo, porque el título me parecería bien, acceso y protección a recursos genéticos, conocimientos tradicionales y manifestaciones culturales, me parece que encaja muy bien, pero diría yo que las partes adoptaran estrategias, medidas y acciones coordinadas para el acceso, uso y protección de los recursos genéticos, conocimientos tradicionales y manifestaciones culturales, porque solamente habla nada del título, solamente la prevención, prevenir, y el título es acceso y protección.

Ahí es cuestión, me parece, de redacción porque este mismo contenido parte de ello tiene más adelante en otro título.

No sé, para poder seguir más bien, seguramente todos queremos hacer algunas observaciones, aportes, pero esta negociación, este acuerdo, señor Presidente, yo quisiera preguntarle si puede ser modificado. Es de repente como el TLC que nos dicen, nos van a pintar, nos traen acá y se aprueba sí o sí.

¿Tenemos la prerrogativa todavía de plantear algunas modificaciones, hay esa posibilidad dentro del equipo peruano y boliviano que han trabajado este tema? No sé, me preocupa si es que prácticamente estaría ya todo esto terminado y simplemente en el Congreso para que se vote su aprobación.

Yo planteo eso como una pregunta directa, señor Presidente, a través de la mesa.

**El señor PRESIDENTE.—** Hay una pregunta del congresista Llique Ventura, señores diplomáticos, señor Ministro, respecto a cuáles son los alcances, límites, si podemos conocer cuál ha sido el equipo negociador y cuál es el margen que tenemos como Congreso para sugerir discutir o no.

**El señor REPRESENTANTE DEL MINISTERIO DE RELACIONES EXTERIORES, don Carlos Berninson.—** Muchas gracias, señor Presidente.

Antes que todo nuestra complacencia por estar acá como miembros de la Cancillería y del Servicio Diplomático Peruano, es un privilegio venir a trabajar en este importante foro que tiene una gran incidencia en la vida política nacional.

Contestando a la pregunta del congresista Alcides Llique, en primer lugar lamento que no se puede modificar, esto ya fue aprobado por Bolivia, ya está aprobado en el congreso boliviano y lo que está pendiente es la aprobación en el Congreso peruano.

Y no necesito explayarme mucho frente a los problemas que estamos teniendo con la vecina república de Chile con relación al diferendo marítimo, a la salida del gas boliviano por suelo peruano, la importancia geopolítica que tiene este instrumento que están ustedes estudiando, que por lo demás, como ya lo mencionó el presidente, cuenta ya con la aprobación de los distintos sectores de la administración pública.

Y la última pregunta sobre cómo se negoció y quiénes negociaron por la parte peruana, estuvo no solamente la Cancillería, estuvo el Ministerio de Comercio Exterior y Turismo, estuvo el Ministerio de Agricultura, estuvo el Ministerio de la Producción; o sea, todos los sectores involucrados.

Con respecto al artículo 27.° de productos sensibles la mención a las normas de origen no es casual. Bolivia es un gran productor de azúcar y de aceite de soja o de soya.

Específicamente en el caso de azúcar los productores peruanos temen una invasión masiva no de azúcar boliviana sino de azúcar brasilera triangulada a través de Bolivia, y este artículo lo que busca es evitar la triangulación del azúcar brasilera, el 27.°, a través de las normas de origen.