# EXHIBIT B
## BELAUNDE DECLARATION

TRANSLATION

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **REPUBLIC OF PERU** ) | |
| ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 3:09-cv-01332-AWT |
| ) | |
| v. ) | |
| ) | DECLARATION OF |
| **YALE UNIVERSITY** ) | DR. JAVIER DE BELAUNDE |
| ) | |
| Defendant. ) | |
| ) | |

**I, JAVIER DE BELAUNDE,** declare:

1.    I am an attorney admitted to practice in the Republic of Peru, and I submit this declaration in support of Plaintiff's Memorandum in Opposition to Defendant Yale University's Motion to Dismiss the First Amended Complaint in the above action. The present affidavit is related to the Peruvian doctrine of prescription, both in regard to the acquisition of property and to the extinction of the right of action before tribunals.

## Qualifications

2.    I have been a Professor of law at the Pontificia Universidad Católica del Perú (PUCP), in Lima, since 1972. Since 1986, I have held the position of Principal Professor. From 1980 to 1982, I was a Professor of law at the "Programa de Maestría de Autogestión con mención en Administración", a post-graduate studies program of the Centro de Estudios Superiores del Sector Social (CESIAL). In 1990, I held the position of Professor in the Peruvian Supreme Court's Magistrate Academy, a public institution in charge of appointing judges and keeping them up to date in legal matters. In 1990, I was also a Professor at the Universidad de Lima. From 2005 to 2008 I was Chairman of the PUCP Law Faculty's Curriculum Commission. In 2006 I obtained a Masters Degree in Humanities from PUCP.

3.    I have participated as arbitrator in over 40 arbitrations since 1996 either as President or as Tribunal member. I am recorded in the Arbitrator Lists of the Arbitration Center for the Lima

Chamber of Commerce, the OSCE (Public Procurement Entity), the PUCP Arbitration Center and the AmCham Conciliation and Arbitration Center.

4.      I have written over 40 legal publications, between books and articles, mainly on Civil Law, Constitutional Law and Judicial Reform.

5.      I have acted as ad hoc Judge at the Inter-American Court of Human Rights from 2002 to 2003 and from 2005 to 2006

6.      I have been actively involved in issues regarding the reform of Peru's Judicial System. For example, in 1981 I was appointed by the Peruvian Supreme Court to the Commission in charge of producing the 1982 Draft Organic Law of the Judicial Branch. Subsequently, during the 1993 Democratic Constitutional Congress, in charge of drafting a new Constitution for the Republic of Peru, I was appointed by the Supreme Court to produce the Draft Title on the Judicial Branch. From 1994 to 1995, I was a member of the Magistrate Academy's First Directive Council in representation of the Peruvian Bar.  In 2001 I was a member of the Commission to Study the Bases for Constitutional Reform, appointed by the Ministry of Justice during the Transition Government. In 2002 I was a member of the Sub-Group on Administration of Justice commissioned by the Congress Constitutional Committee, in charge of proposing changes to the 1993 Constitution. More recently, from 2003 to 2004 I was commissioned by the Civil Society to the Special Commission for Comprehensive Reform of the Administration of Justice (CERIAJUS), a Commission that presented a comprehensive reform plan for the judicial system and a proposal for constitutional reform.  From 2008, until the present time, I have been a member of the Advisory Committee of the Congressional Commission for Justice and Human Rights.

7.      I am well versed in the Peruvian Civil Code, and served as consultant and then member of Commissions in charge of reforming Peru's 1984 Civil Code between 1997 to 2001 and from 2003 to 2006.

8.      I have read the First Amended Complaint and Yale's Motion to Dismiss, and am familiar with the claims therein.  I have also reviewed Peruvian legal materials related to these claims and am familiar with them.  Documents cited herein are attached as exhibits with a translation to

2

English.  Plaintiff has requested my opinion as a matter of Peruvian law about matters regarding

title to certain Machu Picchu artifacts being held by Defendant, and specifically on the application

of prescription with respect to the claims and the artifacts.

## Summary of Opinion

9.      Plaintiff had original title to the Machu Picchu artifacts in Defendant's collection.

Defendant obtained the artifacts as a loan from Plaintiff.  The nature of Plaintiff's title and

Defendant's possession prevents Defendant from acquiring title through what is known in Peruvian

civil law as acquisitive prescription (usucaption) or by barring Plaintiff's action by extinctive

prescription.

## I.      Legal Status of the Artifacts

10.     Plaintiff, Peru, had original title under Peruvian law to the Machu Picchu artifacts now in

Defendant's collection.  Plaintiff loaned the artifacts to Defendant, Yale, without passing an interest

equivalent to title under Peruvian law.  This loan was for a specific end (scientific study), and with

the condition that the artifacts be returned.

### A.      Peru Holds Title to the Artifacts

11.     Plaintiff has had a property interest in all pre-Colombian and Inca artifacts discovered in

Peru throughout the history of the Peruvian Republic, including those held by Defendant.  Less

than a year after Peru's declaration of independence, Supreme Decree No. 89 states: "[t]he

monuments remaining from Peru's past are the property of the Nation."[1]  Recognizing the need to

protect this property, and as an implicit exercise of its proprietary rights,[2] Plaintiff issued a series of

Supreme Decrees and Supreme Resolutions to regulate the excavation, export, and possession of

such artifacts.

---

[1] Supreme Decree No. 89 (Apr. 2. 1822) (Exhibit B-1); See also Supreme Decree, Considerations (Apr. 27, 1893) (Exhibit B-5) (stating that 'thus far, exploration for such objects at huaca ceremonial sites and ruins has been carried out in a disorderly manner for no purpose other than the satisfaction of individual interests and with the most perfect disregard of the rights of our Nation").

[2] It is a principle of Peruvian law that with respect to objects the power to license implies proprietary rights because a person without property cannot license.

12.     Supreme Decrees and Supreme Resolutions are a significant source of Peruvian law,
hierarchically in line following the Constitution and enactments of the legislature and Decrees of
law. Supreme Decrees and Supreme Resolutions therefore have binding legal effect and are a
source of legal rights and obligations.[3]

13.     Beginning in 1822, Supreme Decrees determined the laws applicable to pre-Columbian
artifacts and antiquities.  The early decrees focused on preventing unauthorized excavation and
export of artifacts, but said nothing of title being transferred to anyone:

- Supreme Decree 89, dated April 2, 1822 declared it was illegal to excavate artifacts
  from ancient monuments without a specific license from the government.  In addition to
  a fine, contravention of the decree was punished by forfeiture of artifacts to the national
  museum.[4]

- Supreme Decree 433, dated June 3, 1836 specifically reiterated Supreme Decree 89.[5]

14.     The first explicit mention of title occurred in Supreme Decree dated April 27, 1893.  This
Decree expanded on the licensing requirements established in prior decrees by prohibiting
explorations and excavations seeking archeological objects in huacas, ancient fortifications,
temples, or other places on public lands or ownerless lands without a special license from the
Peruvian government.  In addition, numeral II of the decree states: "[a]ll objects thus found shall
belong to the [license] applicant; however, the applicant shall also be under a duty, as prescribed in
the relevant decree, to provide the State with a duplicate of each such object, or a photograph of

---

[3] C.f. Constitution of the Republic of Peru, art. 94 (1860) (Exhibit B-4) (Stating that among the attributes of the
President of the Republic is "to promulgate and execute the laws and other Congressional resolutions; and issue
decrees, orders, regulations, and instructions for their better fulfillment."); Organic Law of the Executive Branch, Law
29158, art. 11 (Dec. 18, 2007, published in Diario Oficial El Peruano Dec. 20, 2007) (Exhibit B-30) ("The issuance of
the following dispositions corresponds to the President : (3) Supreme Decrees are norms of a general character that
regulate norms of legal status or regulate the sectorial or multi-sectorial functional activity at a national level; (4)
Supreme Resolutions are decisions of a specific character signed by the President of the Republic and approved by one
or more Ministers to whose scope of competence they belong."); see also Marcial Rubio Correa, El Sistema Jurídico
152 (PUCP Editorial Fund 2006) (Exhibit B-27) ("we can conclude that the Supreme Decree is the form of creating
legal norms that expresses the normative will of (i) the President of the Republic and the approbatory vote of the
Council of Ministers (ii) the President of the Republic and the advisory vote of the Council of Ministers; (iii) the
President of the Republic (plus the Minister who signs in regard to the corresponding political
responsibility")(emphasis added).

[4] Supreme Decree No. 89, art. 1 - 2 (Apr. 2. 1822) (Exhibit B-1).

[5] Supreme Decree No. 433, art. 11 (June 3, 1836) (Exhibit B-2).

4

any such object for which no similar items are available, along with a detailed description that is adequate to accurately depict the relevant object."[6] Therefore, a person who discovered ancient artifacts could have title to unique objects so long as they acquired them with the requisite license from the Peruvian government.

15.     However, licensees after 1911 did not obtain title.  Supreme Decree 2612, dated August 19, 1911 specifically modified numeral II of the 1893 Supreme Decree as follows: " All objects thus found shall belong to the State; the State may provide duplicates to permit holders, provided, however, that the applicant is an official scientific institution; as to items that are unique, applicants shall only be allowed to take photographs."[7]  Because the artifacts in question were excavated after 1911, they were Plaintiff's property. The Supreme Resolution dated October 31, 1912 and Supreme Resolution no. 31 dated January 27, 1916 that granted Bingham an exception to the licensing requirement and restrictions on export did not alter the fact of Plaintiff's title.  Indeed, as shall be explained below, these Resolutions established a loan.

16.     It is also worth noting that Peruvian law continued to state that Peru had title to ancient artifacts like those now held by the Defendant:

- Supreme Decree dated  June 11, 1921 considers "the monuments, temples, burial sites, fabrics, utensils, huaco pottery artwork, mummies and, in general, all items that remain from the ancient people of Peru dating back to pre-historic and Inca times are the property of the Nation, and it is the Government's duty to protect and preserve them."[8]

- Article 822(5) of the Civil Code of 1936 specifically says that "historical monuments and archeological objects governed by special laws" are State property.  In Peru, Special Laws are the ones that regulate a specific subject and that can complement another norm, like for instance Supreme Decree No. 2612, which was specially elaborated to regulate cultural patrimony matters.

---

[6] Supreme Decree, art. 6(II) (Apr. 27, 1893) (Exhibit B-5).

[7] Supreme Decre 2612 (August 19, 1911) (Exhibit B-6).

[8] Supreme Decree (Jun. 11, 1921) (Exhibit B-10).

**B.     Yale's Possession is a Loan**

17.     As stated above, Defendant's possession of the artifacts is pursuant to Supreme Resolution

dated October 31, 1912 and Supreme Resolution no. 31 dated January 27, 1916, which allowed

Defendant to export other artifacts to the United States on certain conditions.

18.     The Supreme Resolution dated October 31, 1912 gave Hiram Bingham permission to

excavate until December 31, 1912, and to export the artifacts. However, Article 4 of the Supreme

Resolution states: "The Government of Peru hereby reserves its right to demand that the University

of Yale and the National Geographic Society of the United States of America return all unique

objects and all such duplicates as may be extracted or have been extracted."[9]

19.     Similarly, Supreme Resolution No. 763, dated January 27, 1916, authorized the export of 74

boxes containing artifacts excavated between 1914 and 1915 to Defendant. Furthermore, Article 2

states: "[w]ithin a period of eighteen months as from the date hereof, the University of Yale and

the National Geographic Society shall return the objects the export of which is hereby

authorized."[10]

20.     No title passed as to the artifacts exported by virtue of the 1912 and 1916 Resolutions. The

artifacts were granted by the Peruvian Government as a loan, for the specific purpose of scientific

study, and with the condition that they be returned.

**II.     There Has Been No Prescription**

21.     Prescription refers to certain means of gaining or losing rights through the passage of time,

for example property rights. Historically, there have been two types of prescription under Peruvian

law: (i) acquisitive prescription, also known as usucaption, and (ii) extinctive prescription, also

known as prescription of the action. Both concepts have existed in Peruvian law since before

Defendant obtained the loan of the artifacts, and at no time would have allowed Defendant to

obtain title to the artifacts.

---

[9] Supreme Resolution No. 17848 (General Directorate of Public Instruction Oct. 31, 1912) (Exhibit B-6).

[10] Supreme Resolution 31, art. 2 (Jan. 27, 1916) (Exhibit B-7).

6

## A.  **Acquisitive Prescription**

22.     The first kind of prescription in Peruvian law, *prescripción adquisitiva de dominio*, i.e. acquisitive prescription or usucapion, is one of the forms by which property can be acquired over an object. This concept can be traced to Roman law, and has been included in all Peru's Civil Codes in force both before and since the time the artifacts were excavated:

- Article 536 of the Civil Code of 1852, in force at the time Defendant took possession of the artifacts, states that "[t]o acquire property of a good through prescription the following elements are necessary: 1. possession: 2. good faith: 3. just title: 4. passage of time period specified by this Code."[11]

- Article 893 of the Civil Code of 1936 states that prescription "requires continuous possession as owner for two years if there is good faith, and four if there is none."[12]

- Article 951 of the Civil Code of 1984 states that "[t]he acquisition of a movable object through prescription requires the continuous, peaceful and public possession as owner for two years if there is good faith and four if there is none."[13]

23.     Throughout these Codes, scholars have recognized two determinative factors: (i) possession of an object as owner, and (ii) the passage of a fixed period of time.[14]  Of these, the factor that bears examining here is possession.

24.     Unlike the common law concept of adverse possession, where a possessor gains title by being hostile to the titleholder, the Peruvian law of acquisitive prescription requires that the possessor actually hold with the status of owner for himself. This was codified in Article 465 of

[11] Civ. Cod. art. 536 (1852) (Exhibit B-3);  See also id. at art. 465 (defining possession for oneself as "the having or enjoying of a thing or right with intent to keep it for oneself."); id. at art. 467 (stating that "possession is in good faith when the possessor of the thing believes she has acquired a thing properly from the person considered to be the owner or the person capable of disposing of the thing. It is in bad faith possession when such belief is lacking."); id. at art. 539 (stating that "it is just title to acquire through prescription any cause enough to transfer domain, according to the methods established in this Code."); id. at art. 543 (defining the prescriptive time period as three years of continuous possession.).

[12] Cod. Civ. art. 893 (1936) (Exhibit B-11).

[13] Cod. Civ. art. 951 (1984) (Exhibit B-16).

[14] Marcial Rubio Correa, La Extinción de Acciones y Derechos en el Código Civil 15 (Biblioteca Para Leer el Código Civil, Editorial Fund, Pontificia Universidad Católica del Perú, 1989) (Exhibit B-18) ("Acquisitive prescription is a method of acquiring property in which two determinant factors coincide: the passage of a certain period of time (which varies according to the circumstances) and the presence of a determined quality of possession over the object in question.").

7

the 1852 Civil Code, which defines possession as "the having or enjoying a thing or right with intent to keep it for oneself."[15]

25.     One part of possession is behaving as owner. Thus, the court in *Silva v. Quevedo*, stated: "one of the requirements to acquire property of an estate by prescription is to have possessed 'as owner', i.e. to have behaved as such, complying with the obligations and exercising the rights inherent to it".[16] Similarly, the seminal treatise on civil law by Georges Ripert and Jean Boulanger states: "[t]he kind of possession through which property may be acquired by adverse possession is hostile possession, which entails…the intent to act as an owner."[17]

26.     In addition, possession must be for oneself. This means that the possessor holding an object for someone else, whether by loan, as a steward or otherwise, cannot acquire the object through prescription. This principle has been recognized by successive Civil Codes as well as by scholarly writings. Article 553 of the 1852 Civil Code expressly provides that "[t]hose who administer the goods of another person according to the law, mandate or by a particular order, shall not be able to acquire those goods through prescription, except for the benefit of the person they represent".[18] Article 873 of the 1936 Civil Code lists as not acquirable through prescription "objects on deposit, withheld, leased or given in administration or mandate by those who hold them through said acts."[19]  Similarly Article 905 of the Civil Code of 1984 differentiates between direct possessor and indirect possessor, stating that "the direct possessor is the temporal possessor by virtue of a title. Indirect possession corresponds to he who granted the title." Thus, a direct possessor cannot acquire title through prescription pursuant to Article 951, because of the indirect possessor's superior title.  As explained by Max Arias Schreiber, "[p]ossession has to be owner-like to acquire

---

[15] Cod. Civ. art. 465(1852) (Exhibit B-3).

[16] Silva v. Quevedo, File No. 1889-92-Apurimac, Gaceta Jurídica No. 31, p. 7-A (August 31, 1993) (Exhibit B- 20).

[17] Georges Ripert and Jean Boulanger, 6 Tratado de Derecho Civil 345 (Buenos Aires 1965) (Exhibit B-13).

[18] Civ. Cod. art. 553 (1852) (Exhibit B-3).

[19] Civ. Cod. art. 873 (1936) (Exhibit B-11).

tle through prescription. Thus, possessors that enjoy the so called direct possession are excluded... such as tenants, usufructuaries, loanees, anticresists, keepers and depositaries."[20]

27.    These principles are clearly present, for example, in the Peruvian contractual doctrine of *comodato* – a "gratuitous loan" that implies the existence of a possessor not acting as an owner. The concept was part of Peruvian law at the time of the Supreme Resolutions relating to the artifacts now held by Defendant, and remains to this day.

28.    According to Article 1825 of the Civil Code of 1852, in force at the time of the Supreme Resolutions relating to the artifacts now held by Defendant, *comodato* is a real contract where a person gratuitously delivers a non-fungible good to another person to use for a certain time or for a certain purpose and then return it. According to Article 1828, the transfer is only for use, and title does not pass.[21]  According to Article 1728 of the Civil Code of 1984, now in force, under *comodato* the titleholder assumes an obligation to loan a non-consumable good to another person to use for a certain time or for a certain purpose and then return it.[22]Because the obligation to return the loaned good is integral to the definition of *comodato*,[23]  the possessor cannot acquire title to the loaned object through acquisitive prescription.

29.    The underlying principle in Peruvian law is that a person who possesses an object for another by virtue of a status that does not amount to a transfer of property (i.e. title) may not obtain property rights over the object in question.

30.    Here, Defendant did not possess the artifacts as owner in order to acquire property through prescription, and instead possessed the objects only as a steward. A steward or administrator does not possess for itself, and thus cannot gain title through prescription.

---

[20] Max Arias Schreiber, 5 Exégesis: Derechos Reales 17 (Gaceta Jurídica, Lima 1998) (Exhibit B-21).

[21] Civ. Cod. art. 1825 (1852) (Exhibit B-3) ("Comodato is a real contract through which a person gratuitously delivers to another a non-fungible thing for the other to use during a certain time period or for a certain end and then return it."); id at 1828 ("In comodato, only use is transferred: the comodante or lender keeps title in the lent thing.").

[22] Civ. Cod. art. 1728 (1984) (Exhibit B-16) ("Through comodato the comodator obliges himself to deliver gratuitously to the comodatoree a non-consumable good to use during a certain time period or for a certain end and then return it.").

[23] See Raymundo M. Salvat, Tratado de Derecho Civil Argentino 575, (3rd Ed. 1954) (Exhibit B-12) ("This obligation results from the very nature of the contract, in which the thing is delivered to the borrower for him to use it as agreed or as determined by the circumstances. Upon expiration of the term or fulfillment of the purpose, the thing must be logically returned to the lender...").

31.    In fact, Yale expressly recognized its status as steward between 2003 and 2007, including in the signed 2007 Memorandum of Understanding.[24]  Even before, in 2002, in a letter sent by Allison Richard, Yale's Provost, where she expressly mentions: "My colleague Richard Burger's report of his meeting with you in August, proposing a collaboration between Yale and the Government ... gave me the hope that we are close to a very positive agreement concerning the Machu Picchu collections under the stewardship of Yale University." (Emphasis added).

32.    Under Peruvian law an assertion of stewardship would be inconsistent with any claim of owner-like behavior.  The very concept of a steward, as defined in the 1992 West's Spanish-English/English-Spanish Law Dictionary, is described as "administrator."  Thus, a steward is not in a position to exclude the owner from title nor he is exercising all the rights and obligations that come with the property right.

## The Artifacts Are Not Subject to Prescription Pursuant to Special Laws on Cultural Patrimony

33.    Another reason why prescription would be inappropriate in this case is that archeological artifacts are expressly not subject to prescription under Special Laws on Cultural Patrimony since 1971.  Section 1 of Law Decree 19033, dated November 16, 1971, recognizes that "real property and personal property items that are a part of the Heritage Monuments of our Nation date back to the Pre-Inca and Inca, Colonial and Republican eras of Peru's history."[25]  Section 2 states that "[m]onuments from Pre-Inca and Inca times are the property of the State and, accordingly, they are inalienable, and not subject to prescription."[26]  Section 1 of Supreme Decree 16-85-ED, dated February 22, 1985 establishes that "[r]eal and personal property from the Pre-Hispanic era that is a part of the Cultural Heritage of our Nation shall be inalterable and inalienable, may not be subject to prescription."[27]  Section VI of Law 28296 adopted in 2004 states that "[t]he State of Peru's rights

---

[24] See Memorandum of Understanding dated Sept. 14, 2007 (Exhibit B-29) (Stating: "whereas, for more than ninety years Yale has acted as steward of the Materials, and has conserved, preserved, researched and made available to the public and International scholarly community for viewing and study this historically recognized cultural patrimony").

[25] Law Decree No. 19033 (Nov. 16, 1971, published in Diario Oficial El Peruano Nov. 17, 1971) (Exhibit B-14).

[26] Id. at art. 2; It is clear from art. 1 that the term "monuments" includes both real and personal property.

[27] Supreme Decree No. 16-85-ED (Exhibit B-17).

ver property that has been declared to be a part of the Cultural Heritage of our Nation shall not be subject to prescription."[28]

## B.   Prescription of the Action

34.   The second type of prescription in Peruvian law is *prescripcion extintiva*, i.e. extinctive prescription or prescription of the action. This is the concept whereby the right to file a claim before a Tribunal in order to protect one's rights may expire with time, and resembles common law Statute of Limitations in some ways.

35.   Through an extinctive prescription one loses the action to demand a right before a Tribunal, but not the substantive right itself, which remains with the corresponding person,[29]

36.   With the 1852 Civil Code the relevant prescription time was twenty years[30], and with the current 1984 Civil Code, the relevant prescription time is ten years.[31]

37.   Article 557 of the 1852 Civil Code provided that the prescription of an action begins to run from the date the documents, either private or public, in which the actions are based are delivered.[32] Under Article 558, when there is no document covering the obligation the prescription term will run from the moment the obligation arose. [33]   Under Article 559, for obligations that were subject to terms and conditions, the prescription term would run from the time due or the occurrence of the condition.[34] In addition, under Article 1993 of the 1984 Civil Code, "prescription begins to run from the day in which the action can be exercised ...."[35]

---

[28] Law No. 28296, art. VI  (July 21, 2004, published in Diario Oficial El Peruano July 22, 2004) (Exhibit B-24).

[29] See Civ. Cod. art. 1889 (1984) (Exhibit B-16) (providing that "prescription takes away the action but not the right itself.").

[30] See Civ. Cod. art. 560 (1852) (Exhibit B-3) (providing a term of 20 years for real actions).

[31] See Civ. Cod. art. 2001 (1984) (Exhibit B-16) (stating that personal actions, real actions, actions that arise from final judgments and from the nullity of legal acts shall prescribe after ten years).

[32] See Civ. Cod., art. 557 (1852) (Exhibit B-3).

[33] Id. at art. 558.

[34] Id. at at. 559.

[35] Civ. Cod. art. 1993 (1984) (Exhibit B-16).

Here, Defendant may assert no prescriptive period as to the artifacts, and Plaintiff's claim cannot be time barred under Peruvian law because (i) actions to recover property are not subject to prescription of the action; and (ii) Defendant tacitly renounced prescription by its actions.

### i.    Plaintiff's right to recover is not subject to prescription

39.    Peruvian law deems certain underlying rights to be unaffected by extinctive prescription. These rights escape from the harmful effect of time, or in other words, are not subject to prescription.[36] One of these is the right of a titleholder to recover ~~property from a non-titleholder~~ through the *acción reivindicatoria*, i.e. the action to recover.[37] This action flows from the very concept of title, under which, for example, according to the definition in Article 923 of the 1984 Civil Code, "property is the judicial power that permits the use, enjoyment, disposition, and recovery of a good."[38]

40.    Article 927 of the 1984 Civil Code expressly states that "the *acción reivindicatoria* is not subject to prescription. It does not proceed against someone who has acquired the object via prescription."[39]    This means that the *acción reivindicatoria* cannot expire through the passage of time, and the owner has at all times the right to protect his property. Consequently, this action protects the owner's property right "for all time, whether for 40, 50, or more years, so the owner can always recover goods that are his property in case of dispossession."(Emphasis added.)[40]

41.    The only available defense against an owner claiming this action is that the possessor demonstrate that she has acquired property over the object by means of prescription (prescripcion adquisitiva), because he behaved as an owner, for the required period of time according to law, and with just title. As discussed above, however, Defendant could not do that here because of the legal status under which the objects left Peru (as a loan). Thus, all that Defendant ever had was

---

[36] Fernando Hinestrosa, La Prescripción Extintiva 35, (Universidad Externado de Colombia 2000) (Exhibit B-22) (Stating that "there are rights and claims that are immune to prescription, i.e. that escape the noxious effect of time, that is, that are not subject to prescription."

[37] Civ. Cod. art. 927 (1984) (Exhibit B-16).

[38] Id. at art. 923.

[39] Id. at art. 927.

[40] César Godenzi Pando, Acción Reivindicatoria, 5 Código Civil Comentado 154 (Editorial Gaceta Jurídica 2007) (Exhibit B-31).

ssession without just title; at most, Defendant held the artifacts "in stewardship", which as I have already explained, is not an owner-like way of possession under Peruvian law.

42.     There are three specific conditions for an "accion reivindicatoria". First, the Claimant has to be the owner of the good, since it is an action that originates from the property right and it is intended to protect such right. Thus, "ownership has to be proven at the beginning of the 'acción reivindicatoria' and continue throughout the legal proceeding."[41]  Second, the owner cannot be in possession of the goods. It is not enough that the owner has been disturbed in the exercise of his property right, but instead an effective taking of possession has to take place.  Third, the "acción reivindicatoria" has to fall over determinable goods.[42]

43.     Therefore, because Plaintiff's claim is a valid action to recover its property under Peruvian law, it cannot be time barred and hence is not subject to extinctive prescription.

**ii.      Defendant Tacitly Renounced Extinctive Prescription**

44.     Even if Defendant could manage to obtain extinctive prescription over Plaintiff's claims, its actions during the negotiations with Plaintiff were a tacit renunciation of the prescription under Peruvian law.

45.     As already mentioned, unlike common law Statutes of Limitations, extinctive prescription under Peruvian law does not affect an underlying right; rather it only bars certain actions from being brought.  Article 1989 of the 1984 Civil Code states that, "prescription extinguishes the action but not the right itself."[43] Because the underlying right does not disappear, the possessor can renounce prescription under certain circumstances.

46.     Article 1991 of the 1984 Civil Code states that "prescription that has already been earned can be renounced expressly or tacitly. Tacit renunciation is understood to have occurred when it results from the execution of an act incompatible with the intent to be favored by prescription."[44]

---

[41] Jorge Avendaño Valdez,  La revalorización de la acción reivindicatoria en el ordenamiento jurídico peruano, 1 Jus Jurisprudencia 77 (June 2007) (Exhibit B-28).

[42] Id. ("The third and final condition implies that the acción reivindicatoria must fall on a specific object").

[43] Civ. Cod. art. 1989 (1984) (Exhibit B-16).

[44] Id. at art. 1991.

Defendant renounced any extinctive prescription it may have acquired when it negotiated with Plaintiff because it could have informed Plaintiff immediately and consistently that Plaintiff's right of action was time barred. This Defendant did not do. On October 7, 2005, the Peruvian Ambassador to the United States, Eduardo Ferrero, sent a letter stating that if Defendant did not acknowledge Plaintiff's ownership over the artifacts, Plaintiff would pursue legal and equitable remedies.[45] Instead of raising an objection based on prescription, Defendant responded on November 7, 2005 by stating that issues of title should be "set aside" and outlined a proposed settlement premised on Defendant being acknowledged as a steward of the artifacts.[46] Under Peruvian law, Defendant's statements were equivalent to a tacit renunciation of any and all extinctive prescriptions Defendant may ever have been able to assert (which, in any event, there were none).

---

[45] Letter from Peruvian Ambassador to the US to Yale (Oct. 7, 2005) (Exhibit B-25).

[46] Letter from Yale University to Williams & Connolly (Nov. 7, 2005) (Exhibit B-26).

III.  <u>**Conclusion**</u>

48.    For all these reasons, Plaintiff has title to the artifacts in issue and that this title has not been
affected by or is not subject to prescription.


**I declare under penalty of perjury that the foregoing is true and correct.  Executed on
November 27, 2009, at Lima, Peru.**

Javier de Belaúnde

15

# INDIVIDUAL ACKNOWLEDGEMENT CERTIFICATE

Republic of Peru            )
Province and City of Lima   )  ss:
Embassy of the              )
United States of America     )

I, **Charles Roe,** Consular Associate of the United States of
America at Lima, Peru, duly commissioned and qualified, do
hereby certify that on this day the individual(s) named
below appeared before me and acknowledged to me that the
attached instrument was executed freely and voluntarily:

## JAVIER DE BELAUNDE

This Embassy assumes no responsibility for the contents
of the document.

**Charles Roe**
**Consular Associate.**
**U.S. Embassy, Lima**

My commission expires:
**INDEFINITELY**

November 30, 2009
(Date)

# Belaunde Declaration
# Spanish Original



## EN LA CORTE DISTRITAL DE LOS ESTADOS UNIDOS
## PARA EL DISTRITO DE CONNECTICUT

| | |
|---|---|
| **REPÚBLICA DEL PERU** ) | |
| ) | |
| Demandante, ) | Acción Civil No. 3:09-cv-01332-AWT |
| ) | |
| c. ) | |
| ) | DECLARACIÓN DEL |
| **UNIVERSIDAD DE YALE** ) | DR. JAVIER DE BELAUNDE |
| ) | |
| Demandado. ) | |

**YO, JAVIER DE BELAUNDE,** declaro:

1.      Soy un abogado admitido a ejercer mi profesión en la República del Perú y presento esta declaración en apoyo al Memorándum de Respuesta del Demandante a la Moción para Desestimar la Primera Demanda Enmendada presentada por el Demandado, Universidad de Yale, en la presente acción.  La presente declaración está relacionada con la doctrina Peruana de prescripción, tanto respecto a la adquisición de propiedad como a la extinción del derecho de acción ante los tribunales.

### Calificaciones

2.      Soy profesor de derecho en la Pontífica Universidad Católica del Perú (PUCP), en Lima, desde 1972.  Desde 1986,  tengo la posición de profesor principal.  Desde 1980 hasta 1982 fui profesor de derecho en el "Programa de Maestría de Autogestión con mención en Administración", un programa de estudios de post-grado del Centro de Estudios Superiores del Sector Social (CESIAL). En 1990, tuve la posición de profesor en la Academia de la Magistratura de la Corte Suprema, una institución pública a cargo de seleccionar a jueces y mantenerlos actualizados en asuntos de derecho. En 1990 fui también profesor en la Universidad de Lima. Del 2005 al 2008, fui Presidente de la Comisión de Plan de Estudios de la Facultad de Derecho de la PUCP.   En el 2006 obtuve una Maestría en Humanidades de la PUCP.

3.       Desde 1996 he participado como Presidente o como miembro de Tribunales Arbitrales en 40 arbitrajes. Soy integrante de la relación de árbitros del Centro de Conciliación y Arbitraje de la Cámara de Comercio de Lima, del OSCE (Organismo Supervisor de la Compras del Estado), del Centro de Conciliación y Arbitraje de la PUCP y del Centro de Conciliación y Arbitraje de la Cámara de Comercio Americana del Perú (AmCham).

4.       He escrito más de 40 publicaciones legales, entre libros y artículos, muchos de ellos sobre temas de derecho civil, derecho constitucional y reforma judicial.

5.       He actuado como Juez Ad-hoc en la Corte Interamericana de Derechos Humanos del 2002 al 2003 y del 2005 al 2006.

6.       He participado activamente en temas relacionados con la reforma del Sistema Judicial Peruano.  Por ejemplo, en 1981 fui nombrado por la Corte Suprema del Perú para participar en la Comisión a cargo de elaborar un ante-proyecto de Ley Orgánica del Poder Judicial.   Luego, en 1993, durante el Congreso Constituyente Democrático, establecido para elaborar una nueva Constitución para la Republica del Perú, fui nombrado por la Corte Suprema para elaborar la propuesta del Título sobre el Poder Judicial.   De 1994 a 1996 fui integrante del Primer Consejo Directivo de la Academia de la Magistratura en representación de los Colegios de Abogados del país.  En el 2001 fui integrante de la Comisión de Estudio de Bases para la Reforma Constitucional designada por el Ministerio de Justicia del Gobierno de Transición. En 2002 fui miembro del Sub-Grupo de Administración de Justicia de la Comisión de Constitución del Congreso, a cargo de proponer cambios a  la Constitución de 1993. Más recientemente, de 2003 a 2004 fui Comisionado por la Sociedad Civil en la Comisión Especial para la Reforma Integral de la Administración de Justicia (CERIAJUS), una Comisión que presentó un plan integral de reforma para el sistema judicial y una propuesta de reforma constitucional.   Desde 2008 hasta el día de hoy he sido miembro del Comité Consultivo de la Comisión de Justicia y Derechos Humanos del Congreso de la República.

7.      Tengo un buen conocimiento del Código Civil Peruano, habiendo servido como consultor y

luego miembro de Comisiones a cargo de reformar el Código Civil del Perú de 1984 entre 1997 al

2001 y del 2003 al 2006 respectivamente.

8.      He leído la Primera Demanda Enmendada y la Moción para Desestimar de Yale y tengo

conocimiento de las pretensiones ahí mencionadas. También he revisado materiales legales

peruanos relacionados con estas pretensiones y tengo conocimiento de ellos.  Los documentos

citados en la presente declaración se adjuntan como anexos con una traducción al inglés. El

Demandante ha solicitado mi opinión en materia de derecho peruano con respecto a asuntos

relacionados con la propiedad sobre ciertos objetos arqueológicos de Machu Picchu que

actualmente se encuentran retenidos por el Demandado y, específicamente con relación a la

aplicación de la prescripción a las pretensiones del Demandante y a los objetos arqueológicos.

### Resumen de la Opinión

9.      El Demandante tuvo desde el comienzo la propiedad de los objetos de Machu Picchu que se

encuentran en la colección del Demandado. El Demandado obtuvo los objetos por parte del

Demandante en calidad de préstamo.  La naturaleza del título de propiedad del Demandante y la

posesión del Demandado impide que el Demandado pueda adquirir la propiedad de los objetos a

través de lo que se conoce en el derecho civil peruano como prescripción adquisitiva (usucapión) o

que el Demandante se vea impedido de ejercer su acción debido a una prescripción extintiva.

**I.      Status Legal de los Objetos**

10.     De acuerdo a la ley peruana, desde el comienzo, el Perú, El Demandante, ha tenido la

propiedad de los objetos de Machu Picchu los cuales se encuentran actualmente en la colección del

Demandado.   El Demandante le prestó los objetos al Demandado, Yale, sin transferir ningún

derecho equivalente a la propiedad, de acuerdo al derecho peruano. Este préstamo fue para un fin

específico (estudios científicos) y con la condición de que los objetos sean devueltos.

**A.      El Perú Tiene la Propiedad de los Objetos**

11.     El Demandante ha tenido un interés de propietario sobre todos los objetos Incas y Pre-

Colombinos descubiertos en el Perú a lo largo de la historia de la Republica del Perú, incluyendo

los objetos que actualmente tiene el Demandado. Menos de un año después de la Declaración de la Independencia del Perú, el Decreto Supremo No. 89 estableció: "[l]os monumentos que quedan de la antigüedad del Perú son una propiedad de la nación (...)."[1] Reconociendo la necesidad de proteger esta propiedad, y como un ejercicio implícito de sus derechos reales,[2] el Demandante adoptó una serie de Decretos Supremos y Resoluciones Supremas para regular la excavación, exportación y posesión de tales artefactos.

12.      Los Decretos Supremos y Resoluciones Supremas son una fuente significativa de derecho peruano y, siguen jerárquicamente a la Constitución, que es la norma de mayor jerarquía legal, y a las leyes del Congreso y los Decretos Ley. Los Decretos Supremos y las Resoluciones Supremas cuentan con un efecto legal vinculante y pueden ser fuente de derechos y obligaciones legales.[3]

13.      A comienzos de 1822, ciertos Decretos Supremos determinaron las leyes aplicables a objetos y antigüedades de la era Pre-Colombina. Estos primeros decretos se enfocaron en impedir la excavación y la exportación no autorizada de objetos, pero no hacían mención a la transferencia de propiedad a favor de alguien.

- El Decreto Supremo 89 de fecha 2 de abril de 1822 establecía que era ilegal excavar objetos de monumentos antiguos sin contar con una licencia expresa y especial del gobierno. Además de la imposición de una multa, al que contravenía este decreto se le decomisarían los objetos, los cuales pasarían al Museo Nacional.[4]

---

[1] Decreto Supremo No. 89 (Abr. 2, 1822) (Anexo B-1); Ver también Decreto Supremo de fecha 27 de abril de 1893, Considerando (Anexo B-5) (estableciendo que "hasta ahora las exploraciones de estos objetos en huacas y ruinas se han llevado a cabo sin orden y sin otro objeto que satisfacer el interés individual, con prescindencia absoluta de los derechos de la Nación."

[2] Es un principio del Derecho peruano que con relación a objetos el poder de dar una licencia implica derechos reales porque una persona sin propiedad no puede otorgar licencia.

[3] C.f. Constitución de la Republica del Perú, Art. 94 (1860) (Anexo B-4) (Estableciendo que entre las atribuciones del Presidente de la República esta "promulgar y hacer ejecutar las leyes y demás resoluciones del Congreso; y dar decretos, órdenes, reglamentos e instrucciones para su mejor cumplimiento."); Ley 29158 – Ley Orgánica del Poder Ejecutivo, Art. 11 (Dec. 18, 2007) (Anexo B-30), publicada en el Diario Oficial El Peruano el 20 de diciembre de 2007 ("Corresponde al Presidente de la República dictar los siguientes dispositivos: (…) 3. Decretos Supremos.- Son normas de carácter general que reglamentan normas con rango de ley o regulan la actividad sectorial funcional o multisectorial funcional a nivel nacional (…) 4. Resoluciones Supremas.- Son decisiones de carácter específico rubricadas por el Presidente de la República y refrendadas por uno o mas Ministros a cuyo ámbito de competencia correspondan."). Ver también Marcial Rubio Correa, El Sistema Jurídico 152 (PUCP Editorial Fund 2006) (Anexo B-27) ("[P]odemos concluir que el Decreto Supremo es la forma de crear normas jurídicas en las que se expresa la voluntad de normativa de – El Presidente de la República y el voto aprobatorio del Consejo de Ministros – El Presidente de la República y el voto consultivo del Consejo de Ministros – El Presidente de la Republica (mas el ministro que firma a efectos de la responsabilidad política correspondiente) (Énfasis añadido).

[4] Decreto Supremo No. 89, Art. 1 y 2 (2 de abril de 1822) (Anexo B-1).

- El Decreto Supremo 433 de fecha 3 de junio de 1836 específicamente reiteró lo dispuesto en el Decreto Supremo 89.[5]

14.    La primera mención expresa sobre propiedad ocurrió con el Decreto Supremo de fecha 27 de abril de 1893. Este Decreto extendió los requerimientos de licencia establecidos en decretos anteriores al prohibir excavaciones y exploraciones en busca de objetos arqueológicos en huacas, antiguas fortalezas, templos u otros lugares situados en terrenos públicos o de nadie sin una licencia especial por parte del gobierno peruano. Asimismo, el numeral II del decreto establece: "Todos los objetos que se encontraren pertenecerán al que solicitó la licencia, pero tendrá éste también la obligación, que se expresará en el Decreto respectivo, de entregar al Estado un duplicado de cada uno de los objetos que se descubran, ó copia fotográfica de los que no tuvieren similares, acompañada de la descripción detallada que baste para dar idea exacta del objeto a que se refiere"[6] En consecuencia, una persona que descubriera objetos arqueológicos sólo podría tener propiedad sobre los originales si éstos fuesen adquiridos con la licencia respectiva otorgada por el gobierno peruano.

15.    Sin embargo, luego de 1911 los licenciatarios no obtenían la propiedad. El Decreto Supremo 2612, de fecha 19 de agosto de 1911, específicamente modificó el numeral II del Decreto Supremo de 1893 de la manera siguiente: "Todos los objetos que se encuentren pertenecen al Estado, quien puede conceder los duplicados a los que soliciten la licencia, siempre que se trate de corporaciones científicas de carácter oficial, de los objetos únicos, los solicitantes solo pueden tomar fotografías"[7] Debido a que los objetos bajo disputa fueron excavados después de 1911, éstos eran de propiedad del Demandante. Asimismo, la Resolución Suprema de fecha 31 de octubre de 1912 y la Resolución Suprema No. 31 de fecha 27 de enero de 1916, que le otorgaban a Bingham una excepción al requisito de la licencia y a las restricciones para exportación, no alteraron el hecho de que el Demandante era el propietario. Es más, tal como será explicado a continuación, estas dos resoluciones otorgaban un préstamo.

---

[5]  Decreto Supremo No. 433, Art. 11 (3 de junio de 1836) (Anexo B-2).
[6]  Decreto Supremo de fecha 27 de abril de 1893, Art. 6(II) (Anexo B-5).
[7] Decreto Supremo 2612 (19 de Agosto de 1911) (Anexo B-6).

16.     Resulta necesario mencionar también que la ley peruana continuó afirmando que el Perú tenía la propiedad sobre los objetos arqueológicos, como los que actualmente retiene el Demandado:

- El Decreto Supremo de fecha 11 de junio de 1921 menciona que "los monumentos, fortalezas, templos, cementerios, tejidos, objetos de uso, instrumentos, huacos, momias y, en general todos los restos que perduran de los antiguos pobladores del Perú, de las épocas prehistóricas e incaicas, son de propiedad de la Nación y al Estado incumbe protegerlos y conservarlos."[8]

- El Artículo 822(5) del Código Civil de 1936 señala expresamente que "los monumentos históricos y los objetos arqueológicos que están regidos por su ley especial" son propiedad del Estado.  En el Perú, son leyes especiales las que regulan una materia específica que puede complementar otra norma, como el Decreto Supremo No 2612 que fue elaborado especialmente para regular asuntos de patrimonio cultural.

**B.      La Posesión de Yale es en Calidad de Préstamo**

17.     Tal como he mencionado anteriormente, la posesión del Demandado sobre los objetos proviene de la Resolución Suprema de fecha 31 de octubre de 1912 y de la Resolución Suprema No. 31 de fecha 27 de enero de 1916, las cuales permitieron al Demandado poder exportar los objetos a los Estados Unidos sujeto a ciertas condiciones.

18.     La Resolución Suprema de fecha 31 de octubre de 1912 otorgó a Bingham permiso para excavar hasta el 31 de diciembre  de 1912, y poder exportar los objetos. Sin embargo, el Artículo 4 de la Resolución Suprema dispone: "El Gobierno del Perú se reserva el derecho de exigir de la Universidad de Yale y de la Sociedad Geográfica Nacional de los Estados Unidos de Norte America la devolución de los objetos únicos y la de los duplicados que se extraigan y hayan extraído (…)."[9]

19.     De manera similar, la Resolución Suprema No. 763 de fecha 27 de enero de 1916 autorizó al Demandado la exportación de 74 cajas conteniendo objetos que fueron excavados entre 1914 y

---

[8] Decreto Supremo de fecha 11 de junio de 1921, Considerando (Anexo B-10).
[9] Resolución Suprema No. 17848, Dirección General de Instrucción Pública (Oct. 31, 1912) (Anexo B-6).

1915. Asimismo, el Artículo 2 señala: "La Universidad de Yale y la National Geographic Society quedan obligados a devolver en el plazo de diez y ocho meses contados desde la fecha, los objetos cuya exportación se permite (…)".[10]

20.     Ningún derecho de propiedad fue transferido sobre los objetos exportados en virtud de las Resoluciones de 1912 y 1916. Los objetos fueron otorgados por el gobierno peruano como un préstamo, con el propósito específico de estudios científicos, y con la condición de que sean devueltos.

## II.     No Ha Existido Prescripción

21.     La prescripción se refiere a ciertas maneras de poder ganar o perder derechos por el transcurso del tiempo, como por ejemplo, el derecho de propiedad. Históricamente, han habido dos clases de prescripción bajo el derecho peruano: (i) la prescripción adquisitiva, también conocida como usucapión, y (ii) la prescripción extintiva, también conocida como prescripción de la acción. Ambos conceptos han existido bajo el derecho peruano desde antes que el Demandado obtuvo el préstamo de los objetos y, en ningún momento han permitido al Demandado el poder obtener la propiedad sobre los objetos.

### A.     Prescripción Adquisitiva

22.     La primera clase de prescripción bajo ley peruana, la *prescripción adquisitiva de dominio* o usucapión, es una de las formas por las que la propiedad sobre un objeto puede ser adquirida. Este concepto proviene del Derecho Romano y ha sido incluido en todos los Códigos Civiles del Perú vigentes tanto antes como después de la época en que los objetos fueron excavados:

- El artículo 536 del Código Civil de 1852, vigente al momento en que el Demandado tomó posesión de los objetos, señala que "[p]ara adquirir por prescripción el dominio de una cosa, es necesario que concurran: 1. Posesión: 2. Justo título: 3. Buena fe: 4. Transcurso del tiempo señalado por este código."[11]

---

[10] Resolución Suprema No. 31 (Ene. 27, 1916) (Anexo B-7).
[11] Cod. Civ. Art. 536 (1852) (Anexo B-3). Ver también *id.* en Art. 465 (definiendo la posesión para uno mismo como "la tenencia o goce de una cosa o de un derecho, con el animo de conservarlo para si."); *id.* en Art. 467 (señalando que existe posesión de buena fe "cuando el poseedor de la cosa cree tenerla bien adquirida, de aquel a quien consideraba ser su dueño o estar facultado para disponer. Es de mala fe cuando falta esa creencia."); *id.* en Art. 539 (señalando que "es

- El Artículo 893 del Código Civil de 1936 señala que "la prescripción de los bienes muebles requiere la posesión continua a título de dueño por dos años, si hay buena fe, y por cuatro, si no la hay".[12]

- El Artículo 951 del Código Civil de 1984 señala que "la adquisición por prescripción de un bien mueble requiere la posesión continua, pacífica y pública como propietario durante dos años si hay buena fe y por cuatro si no la hay."[13]

23.    A lo largo de estos Códigos, la doctrina ha reconocido dos factores determinantes: (i) posesión como propietario de un objeto y (ii) el paso de un periodo determinado de tiempo.[14] De estos, el factor que debe ser estudiado aquí es la posesión.

24.    A diferencia del concepto de *adverse possession* del common law, en donde un poseedor obtiene la propiedad siendo hostil con el titular de la propiedad, el régimen peruano de prescripción adquisitiva requiere que el poseedor en efecto posea como propietario para sí mismo. Esto fue codificado en el Artículo 465 del Código Civil de 1852, que define la posesión como "la tenencia o goce de una cosa o de un derecho, con el animo de conservarlo para si"[15]

25.    Una parte de la posesión es comportarse como propietario. Así, la corte en el caso *Silva c. Quevedo* señaló que "uno de los requisitos para adquirir la propiedad de un inmueble por prescripción es haber poseído 'como propietario', es decir haberse comportado por tal, cumpliendo las obligaciones y ejerciendo los derechos inherentes a ella."[16]. De forma similar, el Tratado de Derecho Civil de Georges Ripert y Jean Boulanger señala: "La posesión susceptible de conducir a

---

justo título para adquirir por prescripción, toda causa bastante para transferir el dominio, según los modos establecidos en este código."); *id.* en Art. 543 (definiendo el plazo prescriptorio como de tres años de posesión continua).

[12] Cod. Civ. Art. 893 (1936) (Anexo B-11).

[13] Cod. Civ. Art. 951 (1984) (Anexo B-16).

[14] Marcial Rubio Correa, La Extinción de Acciones y Derechos en el Código Civil 15 (Biblioteca Para Leer el Código Civil, Fondo Editorial, Pontificia Universidad Católica del Perú, 1989) (Anexo B-18) ("La prescripción adquisitiva es un modo de adquisición de la propiedad en el que confluyen dos factores determinantes: el transcurso de un cierto lapso (que varía según las circunstancias) y la existencia de una determinada calidad de posesión sobre el bien materia del caso.").

[15] Cod. Civ. art. 465(1852) (Anexo B-3).

[16] Silva v. Quevedo, Exp No. 1889-92-Apurimac, Gaceta Jurídica No. 31, p. 7-A (31 de Agosto de 1993) (Anexo B-20).

la adquisición de la propiedad es la posesión verdadera, la que implica (…) la intención de comportarse como propietario." [17]

26.    Adicionalmente, la posesión debe ser para uno mismo. Esto significa que el poseedor que posee un objeto para otro, sea por medio de un préstamo, como administrador, o de cualquier otra forma, no puede adquirir el objeto por prescripción. Este principio ha sido reconocido tanto por los subsiguientes Códigos Civiles como por los escritos de la doctrina.  El Artículo 553 del Código Civil de 1852 expresamente establece que "Los que administren bienes de otro por ministerio de la ley ó por encargo particular, no podrán adquirirlos por prescripción, sino a favor de la persona a quien representan." [18]. El Artículo 873 del Código Civil de 1936 establece que "no son adquiribles por prescripción…los bienes depositados, retenidos, arrendados o dados en administración o mandato, por quienes los detienen por esos actos." [19] De forma similar, el Artículo 905 del Código Civil de 1984 diferencia entre poseedor inmediato y poseedor mediato, señalando que "Es poseedor inmediato el poseedor temporal en virtud de un título. Corresponde la posesión mediata a quien confirió el título". Por lo tanto, un poseedor inmediato no puede adquirir propiedad por prescripción en virtud al Artículo 951, debido a que el poseedor mediato tiene un título superior. Como explica Max Arias Schreiber, "La posesión tiene que ser a título de propietario. Quedan por consiguiente excluidos aquellos poseedores que gocen de la llamada posesión inmediata (…) como son los arrendatarios, usufructuarios, comodatarios, anticresistas, retenedores y depositarios" [20]

27.    Estos principios están claramente presentes, por ejemplo, en la figura contractual peruana del *Comodato* – "préstamo gratuito", que implica la existencia de un poseedor que no actúa como propietario. El concepto era parte del Derecho peruano al momento de adoptarse las Resoluciones Supremas relacionadas con los objetos hoy retenidos por el Demandado y continúa siéndolo hasta el día de hoy.

---

[17] Georges Ripert y Jean Boulanger, 6 Tratado de Derecho Civil 345  (Buenos Aires 1965) (Anexo B-13).

[18] Cod. Civ. Art. 553 (1852) (Anexo B-3).

[19] Cod. Civ. Art. 873 (1936) (Anexo B-11).

[20] Max Arias Schreiber, 5 Exégesis: Derechos Reales 17 (Gaceta Jurídica, Lima 1998) (Anexo B-21).

28.     De acuerdo con el Artículo 1825 del Código Civil de 1852, vigente al momento de las Resoluciones Supremas, un *comodato* es un contrato real por el que una persona entrega a otra gratuitamente alguna cosa no fungible para que se sirva de ella por cierto tiempo o para cierto fin y después lo devuelva. De acuerdo con el Artículo 1828, la transferencia es únicamente para el uso, y la propiedad no es transferida.[21] De acuerdo con el Artículo 1728 del Código Civil de 1984 vigente, por el *comodato*, el comodante asume una obligación de prestar un bien no consumible a otra persona para que lo use por cierto tiempo o para cierto fin y luego lo devuelva.[22] Debido a que la obligación de devolver el objeto prestado es esencial en la definición del *comodato*[23], el poseedor no puede adquirir la propiedad del objeto prestado a través de la prescripción adquisitiva.

29.     El principio rector en el Derecho peruano es que una persona que posee un objeto para otro en virtud a un status que no equivale a una transferencia de propiedad (esto es, un título), no puede obtener propiedad sobre el objeto en cuestión.

30.     Aquí, el Demandado no poseyó los objetos como un propietario para adquirir propiedad por prescripción y, en cambio, poseyó los objetos sólo como un administrador. Un administrador o *steward* no posee para sí, y por lo tanto no puede obtener la propiedad mediante la prescripción.

31.     De hecho, Yale expresamente reconoció su status de administrador entre 2003 y 2007, incluso en el Memorándum de Entendimiento firmado en 2007.[24] Inclusive antes, en 2002, en una carta enviada por Allison Richard, Provost de Yale, donde ella expresamente menciona: "El reporte de mi colega Richard Burger de su reunión con usted en agosto, proponiendo una colaboración entre Yale y el Gobierno (…) me dio esperanzas de que estamos cerca de un acuerdo muy positivo

---

[21] Cod. Civ. Art. 1825 (1852) (Anexo B-3) ("El comodato es un contrato real por el que una persona entrega a otra gratuitamente alguna cosa no fungible para que se sirva de ella por cierto tiempo o para cierto fin y después lo devuelva."); *id.* en 1828 ("En el comodato no se transfiere más que el uso: el comodante o prestador conserva la propiedad de la cosa que presta.").

[22] Civ. Cod. art. 1728 (1984) (Anexo B-16) ("Por el comodato, el comodante se obliga a entregar gratuitamente al comodatario un bien no consumible para que lo use por cierto tiempo o para cierto fin y luego lo devuelva.").

[23] Ver Raymundo M. Salvat, Tratado de Derecho Civil Argentino 575, (3rd Ed. 1954) (Anexo B-12) ("Esta obligación es la consecuencia de la naturaleza misma del contrato, en el cual la cosa se entrega al comodatario únicamente para que pueda hacer de ella el uso convenido o el que las circunstancias indiquen. Vencido el término o terminado el servicio la cosa debe ser lógicamente restituida al comodante....").

[24] Ver Memorándum de Entendimiento de 2007 de fecha 14 de setiembre de 2007 (Anexo B-29) (Señalando: "Que, por más de noventa años, Yale ha actuado como *steward* de los Materiales, y ha conservado, preservado, investigado y ofrecido al público y la comunidad académica internacional para su apreciación y estudio este patrimonio cultural históricamente reconocido"). Traducción al español.

con respecto a la colección Machu Picchu, bajo la administración de la Universidad de Yale".

(Traducido al español) (Énfasis añadido).

32.     Bajo el Derecho peruano, un alegato de administración sería inconsistente con cualquier

reclamo de comportamiento como propietario. El mismo concepto de *steward*, tal como es definido

en el 1992 West's Spanish-English/English-Spanish Law Dictionary, es descrito como

"administrador". Por lo tanto, un administrador no está en una posición de excluir al propietario del

título ni está ejercitando todos los derechos y obligaciones que vienen con el derecho de propiedad.

### Los Objetos No Están Sujetos a Prescripción Conforme a Leyes Especiales sobre Patrimonio Cultural

33.     Otro motivo por el que la prescripción no sería apropiada en este caso es que los objetos

arqueológicos son expresamente imprescriptibles bajo Leyes Especiales sobre Patrimonio Cultural

desde 1971. El Artículo 1 del Decreto Ley 19033, de 16 de noviembre de 1971, reconoce que "los

bienes inmuebles y muebles del Patrimonio Monumental de la Nación corresponden a las Épocas

Pre-Incaica e Incaica, Colonial y Republicana de la Nación.".[25] El Artículo 2 señala que "los

Monumentos de las épocas Pre-Incaica e Incaica son propiedad del Estado y por tanto inalienables

e imprescriptibles."[26] El Artículo 1 del Decreto Supremo 16-85-ED, de 22 de febrero de 1985,

establece que "son intangibles, inalienables e imprescriptibles los bienes muebles e inmuebles de la

época prehispánica perteneciente al Patrimonio Cultural de la Nación."[27] El Artículo VI de la Ley

28296, adoptada en 2004, señala que "los derechos de la Nación sobre los bienes declarados

Patrimonio Cultural de la Nación, son imprescriptibles."[28]

---

[25] Decreto Ley No. 19033 (Nov. 16, 1971, publicado en el Diario Oficial El Peruano el 17 de noviembre de 1971) (Anexo B-14).

[26] *Id.* en art. 2. Queda claro del Art. 1 que el término "monumentos" incluye bienes inmuebles y muebles: ("Los bienes inmuebles y muebles del Patrimonio Monumental de la Nación corresponden a las Epocas Pre-Incaica e Incaica).

[27] Decreto Supremo No. 16-85-ED (Feb. 22, 1985, publicado en el Diario Oficial El Peruano el 27 de febrero de 1985) (Anexo B-17).

[28] Ley No. 28296, Art. VI (Jul. 21, 2004, publicado en el Diario Oficial El Peruano el 22 de julio de 2004) (Anexo B-24).

### B. Prescripción de la Acción

34.    La segunda clase de prescripción bajo ley peruana es la prescripción extintiva o prescripción de la acción. Este es el concepto por el cual el derecho a presentar una demanda ante un Tribunal para proteger los derechos de uno puede expirar con el tiempo y es similar en cierta forma al *Statute of Limitations* del common law.

35.    Mediante la prescripción extintiva uno pierde la acción para demandar ante un Tribunal, pero no el derecho sustantivo mismo, que permanece con la persona correspondiente. [29]

36.    En el Código de 1852, el plazo de prescripción relevante era de veinte años[30], y en el actual Código Civil de 1984, el plazo de prescripción relevante es de diez años. [31]

37.    El Artículo 557 del Código Civil de 1852 establece que la prescripción de una acción comienza a correr desde la fecha en que son otorgados los documentos, sean públicos o privados, en los que se basa la acción.[32] Según el Artículo 558, cuando no se extiendan documentos para la obligación, el plazo de prescripción correrá desde el momento en que la obligación se contrae. [33] Según el Artículo 559, para las obligaciones que fueron sometidas a plazos y condiciones, el plazo prescriptorio corre desde el momento en que el plazo se cumple o se verifica la condición.[34] El Artículo 1993 del Código Civil de 1984 establece que "la prescripción comienza a correr desde el día que pueda ejercitarse la acción…"[35]

38.    Aquí, el Demandado no puede afirmar periodo prescriptorio alguno con relación a los artefactos y el reclamo del demandante no puede haber prescrito bajo ley peruana porque (i) las

---

[29] Ver Cod. Civ. Art. 1989 (1984) (Anexo B-16) (señalando que "la prescripción extingue la acción pero no el derecho mismo".)

[30] Ver Cod. Civ. Art. 560 (1852) (Anexo B-3) (estableciendo un plazo de 20 años para acciones reales).

[31] Ver Cod. Civ. en Art. 2001 (1984) (Anexo B-16) ("[P]rescriben, salvo disposición diversa de la ley: 1. A los diez años, la acción personal, la acción real, la que nace de una ejecutoria y la de nulidad del acto jurídico.").

[32] Ver Cod. Civ. en Art. 557 (1852) (Anexo B-3) ("Empieza a correr el termino para la prescripción de acciones, desde la fecha en que se otorgaron los documentos en que se fundan, sean públicos o privados.").

[33] *Id.* en Art. 558 ("Cuando no se extendió documento de la obligación, corre el termino desde que fue contraída").

[34] *Id.* en Art. 559 ("En las obligaciones a plazo y en las condicionales, se cuenta el termino para la prescripción desde que el plazo se cumple o la condición se verifica.").

[35] Cod. Civ. Art. 1993 (1984) (Anexo B-16).

acciones reivindicatorias no están sujetas a prescripción de la acción; (ii) por sus acciones, el Demandado renunció tácitamente a la prescripción.

### i. El Derecho del Demandante de Recuperar los Objetos No Esta Sujeto a Prescripción

39.     El Derecho peruano considera que ciertos derechos básicos no están afectados por la prescripción extintiva. Estos derechos escapan de los efectos dañinos del tiempo o, en otras palabras, son imprescriptibles.[36] Uno de éstos es el derecho del propietario de reivindicar su propiedad de un no propietario mediante la acción reivindicatoria.[37] Esta acción fluye del mismo concepto de propiedad, bajo el cual, por ejemplo, de acuerdo con la definición del Artículo 923 del Código Civil de 1984, "la propiedad es el poder jurídico que permite usar, disfrutar, disponer y reivindicar un bien".[38]

40.     El Artículo 927 del Código Civil de 1984 señala expresamente que "la acción reivindicatoria es imprescriptible. No procede contra aquel que adquirió el bien por prescripción."[39] Esto significa que la acción reivindicatoria no puede expirar con el paso del tiempo, y que el propietario tiene, en todo momento, el derecho a proteger su propiedad. Consecuentemente, esta acción protege el derecho de propiedad del propietario "durante todo el tiempo, sean 40, 50 o más años, de modo que el propietario siempre podrá reivindicar el bien de su propiedad en caso de desposesión" (Énfasis añadido.)[40]

41.     La única defensa disponible contra un propietario que alega esta acción es que el poseedor demuestre que ha adquirido la propiedad sobre el objeto por medio de prescripción (prescripción adquisitiva), porque se comportó como propietario, por el periodo requerido de acuerdo a ley, y con

---

[36] Fernando Hinestrosa, La Prescripción Extintiva, p. 35, Universidad Externado de Colombia (2000) (Anexo B-22) ("hay derechos y pretensiones inmunes a la prescripción, es decir, que escapan al efecto nocivo del tiempo, o dicho sin mas, que son imprescriptibles (…).")

[37] Cod. Civ. Art, 927 (1984) (Anexo B-16) ("La acción reivindicatoria es imprescriptible. No procede contra aquel que adquirió el bien por prescripción.").

[38] *Id.* en Art. 923.

[39] *Id.* en Art. 927.

[40] César Godenzi Pando, Acción Reivindicatoria, V Código Civil Comentado 154 (2007) (Anexo B-31).

13

justo título. Como ha sido mencionado anteriormente, el Demandado no podría alegar eso aquí debido al status legal bajo el cual los objetos salieron del Perú (como un préstamo). Por lo tanto, todo lo que el Demandado ha podido tener es una posesión sin justo título; en el mejor de los casos, el Demandado retuvo los objetos "en administración", que, como ya he explicado antes, no es una forma de posesión como propietario en el Derecho peruano.

42.    Hay tres condiciones específicas para una acción reivindicatoria. Primero, el Demandante tiene que ser el propietario del bien, puesto que es una acción que se origina del derecho de propiedad y tiene por fin proteger este derecho. Por lo tanto, "la propiedad debe demostrarse al inicio de la acción reivindicatoria y debe mantenerse a lo largo de todo el proceso".[41] Segundo, el propietario no puede estar en posesión de los bienes. No es suficiente que el propietario haya sido molestado en el ejercicio de su derecho de propiedad, sino que en cambio se haya llevado a cabo una toma de posesión efectiva. Tercero, la acción reivindicatoria tiene que recaer sobre bienes determinados.[42]

43.    Por lo tanto, como el reclamo del Demandante es una acción de reivindicación de su propiedad válida bajo el Derecho peruano, no puede estar impedida por el paso del tiempo y por ende no está sujeta a prescripción extintiva.

### ii.    El Demandado Renunció de Manera Tácita a la Prescripción Extintiva

44.    Aun cuando el Demandado pudiera encontrar la manera de obtener una prescripción extintiva contra los reclamos del Demandante, sus acciones durante las negociaciones con el Demandante constituyeron una renuncia tácita a la prescripción bajo ley peruana.

45.    Tal como ya se ha mencionado, a diferencia del *Statutes of Limitations* del common law, bajo el Derecho peruano la prescripción extintiva no afecta un derecho subyacente; en cambio, sólo impide la interposición de ciertas acciones. El Artículo 1989 del Código Civil de 1984 establece que "la prescripción extingue la acción pero no el derecho mismo".[43] Dado que el derecho

---

[41] Jorge Avendaño Valdez, La revalorización de la acción reivindicatoria en el ordenamiento jurídico peruana, 1 Jus Jurisprudencia 77 (June 2007) (Anexo B-28).

[42] Id. ("La tercera y última condición implica que la acción reivindicatoria debe recaer sobre un bien particular.").

[43] Cod. Civ. art. 1989 (1984) (Anexo B-16).

14

subyacente no desaparece, un poseedor puede renunciar a la prescripción en determinadas

circunstancias.

46.     El Artículo 1991 del Código Civil de 1984 establece que "puede renunciarse expresa o

tácitamente a la prescripción ya ganada. Se entiende que hay renuncia tácita cuando resulta de la

ejecución de un acto incompatible con la voluntad de favorecerse con la prescripción". [44]

47.     El Demandado renunció a cualquier prescripción extintiva que pueda haber adquirido

cuando negoció con el Demandante porque pudo haber informado al Demandante inmediata y

consistentemente que el derecho de acción del Demandante había prescrito. El Demandado no hizo

esto. El 7 de octubre de 2005, el Embajador Peruano en los Estados Unidos, Eduardo Ferrero, envió

una carta señalando que si el Demandado no reconocía la propiedad del Demandante sobre los

objetos, el Demandante iniciaría acciones legales y equitativas. [45] En lugar de interponer una

objeción basada en la prescripción, el Demandado respondió, el 7 de noviembre de 2005, que el

tema de la propiedad debería "ponerse a un lado" y ofreció una propuesta de acuerdo basada en que

el Demandado sea reconocido como administrador de los objetos. [46]  Bajo ley peruana, las

declaraciones del Demandado fueron equivalentes a una renuncia tácita de cualquier y todas las

prescripciones extintivas que el Demandado pueda alguna vez haber sido capaz de alegar (que, en

cualquier caso, no hubo ninguna).

---

[44] _Id_. en art. 1991.

[45] Carta del Embajador del Perú en los Estados Unidos a Yale (Oct. 7, 2005) (Anexo B-25).

[46] Carta de la Universidad de Yale a Williams & Connolly (Nov. 7, 2005) (Anexo B-26).

## III.   Conclusión

48.    Por todas estas razones, el Demandante tiene la propiedad de los objetos en disputa y este título no ha sido afectado ni está sujeto a prescripción.


**Declaro bajo pena de perjurio que lo antes dicho es verdadero y correcto. Firmado el 27 de Noviembre de 2009, en Lima, Perú.**


Javier de Belaunde

## INDIVIDUAL ACKNOWLEDGEMENT CERTIFICATE

```
Republic of Peru            )
Province and City of Lima   )   ss:
Embassy of the              )
United States of America    )
```

I, **Charles Roe,** Consular Associate of the United States of
America at Lima, Peru, duly commissioned and qualified, do
hereby certify that on this day the individual(s) named
below appeared before me and acknowledged to me that the
attached instrument was executed freely and voluntarily:

### JAVIER DE BELAUNDE

This Embassy assumes no responsibility for the contents
of the document.

**Charles Roe**
**Consular Associate**
**U.S. Embassy, Lima**

My commission expires:
**INDEFINITELY**

November 30, 2009
(Date)