# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| REPUBLIC OF PERU, | : | |
| | : | Case No.: 3:09-cv-01332 (AWT) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY, | : | |
| | : | |
| Defendant. | : | June 1, 2010 |

## YALE UNIVERSITY'S RESPONSE TO PERU'S SUR-REPLY
## IN FURTHER SUPPORT OF YALE'S MOTION TO DISMISS

**ORAL ARGUMENT REQUESTED**

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

ARGUMENT .............................................................................................................................. 2

I.      Connecticut statutes of limitation apply ........................................................................ 2

        A.      Connecticut law is the lex loci ......................................................................... 3

        B.      Replevin existed at common law ...................................................................... 4

        C.      Peru admits that its limitations principles are not substantive ....................... 5

II.     The claims would be barred by Peruvian prescription rules ......................................... 6

        A.      Extinctive prescription would bar Peru's claims ............................................ 6

                1.      The 1852 Code—not the 1984 Code—would set the applicable limitations period under Peruvian law ................................................................ 7

                2.      The 1852 Code provided for a maximum 20-year limitations period ........ 9

                3.      Peru's claims would have accrued in 1942 under Peruvian law ............... 10

                4.      Yale did not renounce its limitations defense under Peruvian law ........... 13

        B.      Acquisitive prescription would bar Peru's claims ........................................ 15

III.    Yale has title under the 1852 Code, the Water Code, and the 1921 Decree ..................... 17

        A.      The 1852 Civil Code and the 1902 Water Code ............................................ 18

        B.      The 1921 Decree ............................................................................................ 19

IV.     Peru's interpretation of Peruvian law would not be entitled to substantial deference ....... 21

CONCLUSION ...................................................................................................................... 23

## TABLE OF AUTHORITIES

### U.S. CASES

*Baxter v. Sturm, Ruger & Co*, 230 Conn. 335 (1994) ..................................................2, 3, 4, 5, 17

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) .............22

*In re Enterprise Mortgage Acceptance Co., LLC*, 391 F.3d 401 (2d Cir. 2004) ............................8

*Government of Peru v. Johnson*, 720 F. Supp. 810 (C.D. Cal. 1989)...........................................22

*Karaha Bodas Co., LLC v. Perusahan Pertambangan Minyak Dan Gas Bumi Negara*,
     313 F.3d 70 (2d Cir. 2002)...............................................................................................22

*Middleton v. City of Chicago*, 578 F.3d 655 (7th Cir. 2009) ...........................................................7

*In re Oil Spill by the Amoco Cadiz Off the Coast of France On March 16, 1978*, 954 F.2d
     1279 (7th Cir. 1992)........................................................................................................22

*Thomas Iron Co. v. Ensign-Bickford Co.*, 131 Conn. 665 (1945) ...................................................5

### PERUVIAN LEGAL AUTHORITIES

1867 Peruvian Constitution, Article 59 ..........................................................................................21

1852 Civil Code, Articles 461, 462, 522, 528, 536, 543, 545, 559, 560, 568 ...................... *passim*

1936 Civil Code, Article 1833 .........................................................................................................8

1984 Civil Code, Articles 927, 1666, 1734, 1989, 2091, 2122 ............................................ *passim*

1902 Water Code, Articles 56, 282...........................................................................................18, 19

CAS N° 2581-98 AREQUIPA, EL PERUANO 01-12-2000, P.6541 ...........................................15

IV *Exegis del Codigo Civil Peruano de 1984* at 228 ....................................................................10

V *Código Civil Comentado* 241-42 ...............................................................................................16

Fernando Hinestrosa, *La Prescripción Extintiva* (Universidad Externado de Columbia
     2000) .........................................................................................................................11, 12, 13

Toribio Pacheco, II *Tratado de Derecho Civil* 287 ......................................................................18

Max Arias-Schreiber Pezet, V *Exegis del Código Civil Peruano de 1984* at 16...........................16

Delia Revoredo, V *Exposicin de Motivos del Cdigo Civil* 175......................................................10

Georges Ripert & Jean Boulanger, VI *Tratado de Derecho Civil* 355 ....................................10, 15

Aníbal Torres Vásquez, *Introducción al Derecho* 755 ..................................................................10

## INTRODUCTION

Yale's previous briefs on this motion have made clear that Connecticut choice of law principles apply to Peru's claims, that Connecticut choice of law principles require application of Connecticut statutes of limitations to Peru's claims, and that under Connecticut law the limitations periods ran long ago. Those issues have been fully briefed, and they are the dispositive ones.

In a last-ditch effort, Peru has filed a sur-reply arguing that its claims—involving objects in Connecticut for more than ninety years—are governed by Peruvian statutes of limitation and that Peruvian statutes of limitation have not expired even after more than ninety years. Yale is confident that Connecticut statutes of limitation apply and briefly reiterates here why they bar Peru's claims. Yet Peru has chosen to file many pages on Peruvian law: two declarations by a Peruvian academic, as well as the better part of its sur-reply, amounting to almost 40 pages on Peruvian law. That is a flood of argument on a body of law almost certainly not applicable to this dispute. Yale is reticent to add to that irrelevant flood, both because it does not wish to burden this Court, but also because the growing volume of submitted material on Peruvian law can create the perception that the body of law *must* matter if the parties spend so many pages on it. (Peru's precise strategy in submitting a sur-reply and a second academic declaration may be to leave the erroneous impression that these, the last-briefed issues, are the ones that matter.) In short, Yale wants to avoid contributing to the illusion that the tail wags the dog.

Nonetheless, Peru's mischaracterization of even Peruvian law should not go unaddressed. Though Peruvian limitations law should play no part in Peru's claims in a Connecticut court regarding objects in Connecticut, Yale here rebuts Peru's mischaracterization of Peruvian law to

foreclose the remote possibility that the stale and meritless claims Peru has brought could persist beyond this motion to dismiss.

## ARGUMENT

### I. Connecticut statutes of limitation apply.

Peru does not contest that Connecticut conflicts principles determine the applicable limitations law for this action. *See* Opp. 11-13. It concedes that Connecticut choice of law principles ordinarily require the application of Connecticut statutes of limitation to claims brought in a court in Connecticut. *Id.* 11. And it recognizes that *Baxter v. Sturm, Ruger & Co.,* 230 Conn. 335 (1994) determines whether a Connecticut statute of limitation applies. *Id.* If Connecticut's limitations rules apply, Connecticut's three-year tort limitations period forecloses Peru's claims.[1]  Statutes of limitation bar the claims whether the alleged wrongs date to 1922 (when Peru alleges Yale failed to return objects demanded by Peru) or December 2005 (when Peru alleges Yale first asserted title). *See* Mem. [doc. # 44] 9-34; Reply [doc. # 67] 3-11.[2]

Recognizing that Connecticut limitations law bar its century-old claims, Peru argues that its claims fit within an exception recognized in *Baxter* that allows foreign limitations law to govern claims brought in Connecticut under certain narrow circumstances. *Baxter* describes the rule and its exception: "A limitation period is ... characterized as substantive, only when it applies to a new right created by statute. ... Thus, for the limitation period of the lex loci to

---

[1] Peru has abandoned most of its claims since Yale filed the motion to dismiss. It voluntarily withdrew six claims: fraud, fraudulent misrepresentation, and four civil conspiracy counts. *See* Order [doc. # 77] (dismissing counts 8, 9, 11, 12, 13, and 14). And during briefing on this motion, it abandoned claims for breach of fiduciary duty, breach of contract, and unjust enrichment. *See* Opp. 3 n.2 (declining to brief merits of nine causes of action); *id.* 23 n.13 (stating that merits of Peru's fiduciary duty and contract claims "are not here at issue nor urged," despite citing Mem. 28-33, where those claims were expressly challenged). The extant counts are "violation of Peruvian law," replevin, "wrongful detention," conversion, declaratory judgment, and accounting.

[2] This brief uses the same naming conventions as Yale's previous briefs on this motion.

apply, the underlying right upon which the lawsuit is based must not have existed at common law. Otherwise, the limitation period established by the lex fori governs." 230 Conn. at 340.

Peru's claims cannot fall within the exception—and be governed by Peruvian limitations principles—unless Peru establishes three things. It can establish none of them.

### A.    Connecticut law is the lex loci.

First, Peru must show that Peruvian substantive law, not Connecticut substantive law, would be applicable to its claims. That is, it must show that the "lex loci" would be Peruvian law. Peru has not even *attempted* to meet its burden of showing how Peruvian law could apply to the substance of the conversion, replevin and related claims brought in a Connecticut court, over objects possessed by a Connecticut university, in Connecticut, for more than ninety years. *Contra* Reply 14 n.17 (arguing that Connecticut substantive law applies to the claims). That is not surprising, as Connecticut substantive law applies to the conversion, replevin and related declaratory and accounting claims for objects openly held in Connecticut by a Connecticut university for nearly a century. Peru fares no better with its claim for "violation of Peruvian law," which is not a cause of action, but an attempt to foist a choice-of-law conclusion on this Court through an artifice of pleading. *See* Mem. 26 n.20; Reply 14 n.17. Peru's conversion, replevin and related claims are governed by the law that is applicable under Connecticut's choice of law principles—not by the law that a plaintiff chooses to insert into its description of a cause of action. Because the applicable substantive law—the lex loci—is Connecticut law, the lex loci and the lex fori are the same, and this Court does not need to address whether a Peruvian cause of action would fall within the *Baxter* exception.

**B.     Replevin existed at common law.**

Second, even if Peruvian law were the lex loci, Peru would have to prove that the

relevant Peruvian substantive law is a "new right created by statute," one that "must not have

existed at common law." *Baxter*, 230 Conn. at 340.  It cannot prove that here.  Peru points to

Article 927 of the 1984 (Peruvian) Civil Code, which provides that a cause of action called

"acción reivindicatoria" is not subject to "extinctive prescription."[3]  *See id.*[4]  Peru does not

dispute that "acción reivindicatoria" is essentially just replevin: an action in rem by a professed

title-holder to recover property that has allegedly been wrongfully detained.  *See* First

Declaration of Dr. Belaunde ["Belaunde I"] ¶ 39 (defining "acción reivindicatoria" as "the right

of a titleholder to recover property from a non-titleholder through … the action to recover").[5]

And Peru does not claim that Peruvian law first allowed replevin claims in 1984.  Nor could it.

Peruvians believing that someone else held their property have long been able to bring claims

demanding that the property be given back.  *Cf.* Second Declaration of Dr. Belaunde ["Belaunde

II"] ¶ 13.  In short, the "acción reivindicatoria" is not "new" and it most certainly "existed at

---

[3]  Peru describes two sorts of limitations principles under Peruvian law, "extinctive prescription" and "acquisitive prescription."  It claims that Art. 927 of the 1984 Civil Code prevents a possessor from defending against an "acción reivindicatoria" on the basis of *extinctive* prescription, but does not (and cannot) argue that Art. 927 prevents a possessor from defending against an "acción reivindicatoria" on the basis of *acquisitive* prescription.

[4]  A declaration of Yale's expert on Peruvian law, Dr. Ramos Núñez, is attached as Exhibit A. An appendix of the foreign authorities cited in this brief and that declaration is attached as Exhibit B, and an affidavit of counsel attesting to the accuracy of the copies of those authorities is attached as Exhibit C.

[5]  Even if Peruvian substantive law applied, and even if an "acción reivindicatoria" fell within the *Baxter* exception, Peruvian limitations law would apply only to the replevin action (i.e., the "acción reivindicatoria").  Peru does not argue that Peruvian law governing its other causes of action (all *in personam* claims) are subject to Art. 927 of the 1984 Civil Code.  Even if the Court otherwise disagreed with Yale's analyses of *Baxter* and of Peruvian law, every one of Peru's claims except replevin would still be subject to Connecticut limitations principles and would have to be dismissed.

common law"—in the form of the ancient writ of replevin.  It does not matter that Peru calls the

action one thing and Connecticut calls it another.  The law of the forum applies so long as some

version of the foreign statute's right of action could have been brought at common law.  *See*

Reply 12-13; *Baxter*, 230 Conn. at 340-41 (recognizing that modern statutory schemes had

dramatically reshaped common law products liability but nonetheless holding that Oregon's

limitations period for statutory product liability claims was procedural not substantive because

some form of such claims could have been brought at common law); *Thomas Iron Co. v. Ensign-*

*Bickford Co.*, 131 Conn. 665, 670 (1945) (applying Connecticut limitations law to right of action

under New Jersey workers' compensation statute because the claims would have been actionable

as negligence under common law).

### C.  Peru admits that its limitations principles are not substantive.

Third and finally, Peru cannot possibly argue that Article 927 of the 1984 Civil Code falls

under the *Baxter* exception as "substantive," for its own expert admits that under Peruvian law

"extinctive prescription does not affect the underlying right."  Belaunde II; *accord* Belaunde I ¶

45 ("Article 1989 of the 1984 Civil Code states that '[extinctive] prescription extinguishes the

action but not the right itself'").  When "the limitation merely qualifies the remedy rather than

the right, it is characterized as procedural, and the lex fori applies."  *Baxter*, 230 Conn. at 340.

Peru's own choice of law rules confirm that Peru does not regard its limitations rules as

inextricably bound up with the substantive right.  The 1984 Civil Code expressly provides that

extinctive prescription of actions involving moveable property should be determined by the law

of the place in which the objects were located when the prescription period completed, even if

that place is not Peru.  *See* 1984 Civil Code art. 2091 ("The time-bar of actions involving chattels

that change location during the limitation period shall be governed by the law of the place in

which the chattel is located when the limitation period is completed, as provided under the law of that place is completed").[6]  While Peru urges this Court to apply Peruvian law to its claims, Peru's own courts would be bound by Article 2091 to apply Connecticut's statute of limitations.

Accordingly, Article 927 is not substantive, Connecticut's three-year limitations period governs, and Peru's claims are time-barred.

## II.     The claims would be barred by Peruvian prescription rules.

For all of the reasons above, no choice of law analysis could lead to the application of Peruvian limitations law.  But even if Peruvian limitations law applied, that law would itself require dismissal of Peru's claims.  As Peru notes, there are two doctrines of limitation under Peruvian law: extinctive prescription and acquisitive prescription.  Both apply here and bar the claims.

### A.      Extinctive prescription would bar Peru's claims.

Yale has previously explained that Peru's replevin claim would have been extinguished after 20 years under Article 560 of Peru's 1852 Civil Code. *See* Reply 19; 1852 Code art. 560.4. Peru counters that Article 927 of the 1984 Civil Code specifically exempts "acciones reivindicatorias" from the limitations period otherwise applicable to property actions.  As a preliminary matter, even if effective, this argument would only save Peru's replevin claim from dismissal:  Article 927 does not apply to the conversion claim or any of Peru's other claims, and Peru does not argue that it does.  Nor can Article 927 save Peru's replevin claim, because under Peruvian law Yale's statute of limitations defense would be governed by the 1852 Civil Code,

---

[6] Translation of "[l]a prescripción de acciones relativas a bienes corporales que cambien de lugar durante el plazo de prescripción, se rige por la ley del lugar en que se complete el tiempo necesario para prescribir, conforme a la ley de dicho lugar."

not the 1984 Code. Because the 1852 Code provided for expiration of all *in rem* actions after a maximum of 20 years, Peru's claims have long been time-barred under Peruvian law.

### 1.     The 1852 Code—not the 1984 Code—would set the applicable limitations period under Peruvian law.

Peru contends that under Peruvian law the 1984 Code—not the Code in place at the time of the underlying alleged acts and breaches—would supply the applicable statute of limitations because Peru waited until after 1984 to bring its claims. In other words, Peru should be rewarded for waiting decades beyond the expiration of its claims under the limitations law then binding in Peru by invoking a much later Code that lacks any limitations period.

Yale has noted that the Peruvian Constitution explicitly prohibits retroactive application of any law, with exceptions for criminal, employment, and tax laws not applicable here. Yale Reply 20; *see also* Ramos Núñez Decl. ¶ 9.1. Peru's expert, Dr. Belaunde, ignores those authorities, and so fails to explain why applying the 1984 Code to resurrect a claim long ago extinguished (no later than 1942) by the 1852 Code's statute of limitations is not unconstitutionally retroactive.

Instead of addressing those Peruvian constitutional authorities, Peru argues by analogy to U.S. law, stating that it is not "unusual or unfair" to apply the 1984 Code retroactively to revive dead claims because American law would do the same. *See* Sur-Reply 3 n.3. This is an odd way to get to Peruvian law, especially for a governmental litigant that asks this Court to defer to its interpretations of Peruvian law on the basis of its supposed neutral expertise. It is also wrong. *See Middleton v. City of Chicago*, 578 F.3d 655, 663 (7th Cir. 2009) (courts "typically presume that a newly extended statute of limitations does *not* revive a previously barred claim") (emphasis added). In 2004, the Second Circuit refused to do exactly what Peru demands here, explaining that "resurrection of previously time-barred claims has an impermissible retroactive

effect" because it "puts defendants back at risk at a point when defendants reasonably believe they are immune from litigation, stripping them of a complete affirmative defense they previously possessed and may have reasonably relied upon." *See In re Enterprise Mortgage Acceptance Co., LLC*, 391 F.3d 401, 410 (2d Cir. 2004) (rejecting requests to apply provision of Sarbanes-Oxley Act that extended limitations period for securities fraud cases to "previously expired securities fraud claims"). None of the cases Peru cites involved what Peru seeks here: applying a new statute of limitations (the 1984 Code) to revive a claim that was already time-barred before the enactment of the new statute.

Unable to rebut the Peruvian constitutional prohibitions on retroactivity, and equally unsupported by U.S. law, Dr. Belaunde reaches for a broadly applicable general principle: the prohibition against "giv[ing] effect to norms that have already been repealed . . . except where specifically authorized by later laws." Belaunde II ¶ 10. Yale does not dispute that repealed norms are generally not applicable—in Peru or elsewhere. But Dr. Belaunde errs in applying that principle to conclude that the 20-year statute of limitations for property actions established by the 1852 Code is no longer applicable. His conclusion is based on the incorrect assumption that "nothing in the 1984 Civil Code authorizes the post hoc application of the laws relating to actions to recover." *Id.* In fact, Article 2122 of the 1984 Civil Code *specifically* authorizes the post hoc application of limitations periods, stating that extinctive prescription periods beginning before enactment of the 1984 Code are governed by the limitations period in place at the time the limitations begins to run. *See id.*; Ramos Núñez Decl. ¶ 9.1.[7] Yale cited Article 2122 in its

---

[7] The period set forth in the 1984 Code governs only if it is shorter than the period set forth in the earlier law. *Id.* That exception does not apply here. The 1936 Code likewise provided that statutes of limitations that started to run before the new Code's enactment would be governed by the prior code. *See* 1936 Code art. 1833 ("[Extinctive] [p]rescription begun prior to the entry

Reply but Dr. Belaunde ignores it.  In sum, even if Peruvian limitations law applied, Article 2122 of the 1984 Code would unequivocally require application of the 1852 Code's maximum 20-year extinctive prescription period.[8]

### 2.   The 1852 Code provided for a maximum 20-year limitations period.

Article 560.4 of Peru's 1852 Civil Code broadly provides that property actions shall expire after twenty years.  *See* Reply 19; 1852 Code art. 560.4.  Peru concedes, as it must, that replevin actions are "not expressly regulated in the 1852 Code."  Belaunde II ¶ 12.  That means that replevin actions, like other property actions, are subject to the maximum 20-year extinctive prescription period.  To avoid that outcome, Peru urges the Court to find that the 1852 Code somehow implicitly incorporated a perpetual limitations period for "acciones reivindicatorias" because, Peru contends, "Civil Law" contains a general principle under which replevin actions are not subject to limitations periods—and the 1852 Code could not have deviated from that principle.  *See* Belaunde II ¶ 14 ("[T]he 1984 Code did not create the 'non-prescription' of *acciones reivindicatorias*, it simply codified an otherwise well-known and pre-existing principle of Civil Law").  Text, history, and expert opinion all refute Peru's contention.

*Text.*  The text of the 1852 Code demonstrates that its drafters knew how to create exceptions to the statute of limitations when required.  *See* 1852 Code art. 568 ("The obligation of the simple guarantor is not extinguished by prescription until the limitations period has run on the principal obligation") (translation of "La obligación del fiador simple no se prescribe, sino

---

into effect of this Code is governed by previous laws . . .," *translation of* "La prescripción iniciada antes de ponerse en vigor este Código, se regirá por las leyes anteriores …").

[8] Dr. Belaunde offers a variation on this theme by invoking the Peruvian legal "theory of completed acts" ("hechos consumados"), under which he says a "legal act must be subject to and governed by the laws in force at the time it is performed or occurs."  Belaunde II at 5 n.21 (quotation marks omitted).  While that is undisputable as a default principle, Article 2122 of Peru's 1984 Code states that the limitations period is governed by the Code in place when the limitations period began, not the Code in place when the lawsuit was filed.

cuando ha prescrito la obligación principal"). They did not create an exception for replevin actions and nothing in the 1852 Code permits the inference that they intended but somehow forgot to do so. *See* Ramos Núñez Decl. ¶ 9.1.

*History.* "Civil Law" does not contain a general principle under which a replevin action/ "acción reivindicatoria" cannot be subject to a statute of limitations. *See* Ramos Núñez Decl. ¶ 9.1. As one of Peru's own authorities points out, Roman law—the origin of Civil Law— provided that the right of a property owner to reclaim his possessions lapsed like any other action under the "praescripto triginta annorum." *See* Georges Ripert & Jean Boulanger, VI Tratado de Derecho Civil 355 (cited by Peru for principles of acquisitive prescription at Belaunde I ¶ 25 n.17) ["Ripert"]; Ramos Núñez Decl. ¶ 9.1. The same was true under the French Code. *See* Ripert 355. That is particularly significant, because Peru's 1852 Civil Code was substantially modeled on the French Code. *See* Aníbal Torres Vásquez, Introducción al Derecho 755 (cited by Peru for structure of Peruvian law at Belaunde II ¶ 6 n.7); *accord* Ramos Núñez Decl. ¶ 9.1.

*Expert opinion.* A Peruvian expert whom Peru itself cites as authoritative directly contradicts Peru's claim. As Max Arias-Schreiber Pezet states, the imprescriptibility of an "accion reivindicatoria" simply "was not contemplated by the superseded (i.e., pre-1984) code." IV *Exegis del Codigo Civil Peruano de 1984* at 228 (cited as authoritative by Peru at Belaunde I ¶ 26 n.20); *accord* Delia Revoredo, V *Exposición de Motivos del Código Civil* 175 ("This rule [Article 927] has no precedent in the prior Code"); Ramos Núñez Decl. ¶ 9.1. As its plain text suggests, therefore, under the 1852 Code Peru's replevin action was subject to the same 20-year limitations period as every other *in rem* action. *See generally* Ramos Núñez Decl. ¶ 9.1.

      **3.**      **Peru's claims would have accrued in 1942 under Peruvian law.**

Dr. Belaunde contends that Peru's claim is not barred even under the 1852 Code's twenty-year limitations period because "the relevant extinctive prescription term could only have begun to expire once Yale actually refused to return the objects and never before" and that Yale did not "refuse" to return the objects until settlement discussions ended in 2007.  *Id.* ¶¶ 15-16. Yet Dr. Belaunde does not cite any Peruvian authority to support his contention. He cites only a treatise on the law of another country—Colombia. *See* Belaunde II ¶¶ 15-16, nn. 24, 26-27 & Exs. 1-14. The source he cites is Fernando Hinestrosa's book *La Prescripción Extintiva* (Universidad Externado de Columbia 2000) ["Hinestrosa"]. Hinestrosa interprets the Civil Code of Colombia, not Peru. But even if Colombian law were relevant, the language quoted by Peru says only that "'the beginning of the prescription period is … the occurrence of the circumstance that damages the real right.'" Belaunde II ¶ 15. That statement provides no information about what constitutes a "circumstance that damages the real right." The full text of the quotation— which Dr. Belaunde truncates—is more enlightening:

> The beginning of the prescription period is the time *ex quo actiones competere de iure coeperunt*—which does not mean the abstract competence of the action, but the occurrence of the circumstance that damages the property right, i.e., the breach of the obligation—which creates an interest in acting to safeguard the right and from which point inactivity implies acquiescence in the state of affairs.

Hinestrosa 107 n.1 (quotation marks omitted). That statement of law comports with Article 559 of Peru's 1852 Code, which provides that where performance of an obligation is required by a certain date, or when a condition is satisfied, then the statute of limitations begins to run on that certain date or when the condition occurred. *See* 1852 Code art. 559 ("En las obligaciones a plazo y en las condicionales, se cuenta el término para la prescripción, desde que el plazo se cumple o la condición se verifica").

In this case, Peru's factual allegations fix the date of the alleged breach of an obligation at January 1, 1922. That is the date by which, according to the Amended Complaint, Peru had

demanded that Yale return all of the objects that it had been permitted to export to Connecticut under the 1912 and 1916 Decrees. *See* Amended Complaint ¶¶ 114, 116, 119. According to Peru, Yale failed to comply with that demand and that deadline. *Id.* ¶¶ 120-122. On the facts as pleaded, therefore, "the circumstance that damages the property right, i.e., the breach of the obligation," Hinestrosa at 107 n.1, occurred in January 1922, when Yale failed to meet Peru's demand.

Peru cannot avoid that conclusion by claiming that it did not know that Yale had not complied with its demand. First, Peru admits that it could have checked whether Yale complied with its demand in 1921 whenever it wanted to. Peru acknowledges that it had a detailed inventory of the contents of the 74 boxes sent to Connecticut in 1916. And it acknowledges that it had an inventory of the 47 boxes returned from Connecticut in September 1921. *See* Pell Declaration and exhibits thereto [docs. ## 75-19, 75-20, 75-21]. Peru had only to compare what left with what came back. Its failure to compare the 1916 inventory with the 1921 inventory does not somehow indefinitely extend the accrual date. As the (Colombian) expert whom Peru cites puts plainly, "inactivity implies acquiescence in the state of affairs." Hinestrosa at 107 n.1. Second, beginning in 1921, Yale publicly and repeatedly announced that it was keeping the objects and had dominion over them—as Yale has shown at length. *See* Mem.13-26; Reply 3.

Peru tries to avoid the consequences of its century of inaction by noting that Yale sometimes described its good "stewardship" of the objects. As Yale has explained, the settlement communications in which Yale used the term "stewardship" are not properly part of the record before this Court, Reply 5 n.5, and good "stewardship" in no way excludes a claim of title, *id.* 7 n.9, particularly where, as here, Yale publicly and repeatedly stated that the objects were part of its permanent collection, *id.* 3. In any event, Peru's effort to use the word "steward"

to cast Yale as a temporary caretaker is irreconcilable with its central contention that Yale had *no* authority to retain the artifacts after January 1922 in any capacity: Peru had demanded that they be returned. Taken as true, Peru's allegations establish that Peru demanded that all artifacts be returned by January 1922 and that Yale only returned some of them, leaving behind other objects contained in the inventory prepared by Peru in 1916. *See* Amended Complaint ¶¶ 114, 116, 119-123; Sur-Reply 2 n.2. Peru does not allege that it agreed to allow Yale to keep objects beyond 1922, and it flatly denies that the 1921 Decree transferred title to Yale. On Peru's allegations, Yale's retention of the objects infringed Peru's alleged ownership rights and triggered Peru's obligation to defend those rights within 20 years. As Peru concedes, "[e]xtinctive prescription does not affect persons not exercising their rights, but persons not defending their rights *when these are infringed.*" Belaunde II ¶ 16 (quotation marks omitted; emphasis in original); *see also* Hinestrosa at 107 n.1 ("inactivity implies acquiescence in the state of affairs."); Ramos Núñez Decl. ¶ 9.

### 4. Yale did not renounce its limitations defense under Peruvian law.

Peru's final attempt to escape from the twenty-year limitations period is to claim that Yale "tacitly renounced" its right to invoke extinctive prescription. Peru has not alleged facts triggering the renunciation doctrine.

The 1852 Code does not recognize "tacit" renunciation of the statute of limitations. To the contrary, it defines renunciation of a limitations defense in only two circumstances: (1) when a defendant recognizes the plaintiff's title or (2) when a defendant admits a debt or pays a substantial portion of it, and does not state that the limitations period has run. *See id.*, art. 528; Ramos Núñez ¶ 9.2. Instead, Peru contends that by referring to itself as a steward of the objects in an October 11, 2002 settlement negotiation letter, Yale implicitly recognized Peru's title. *See*

Belaunde II ¶ 21.[9]  Citation of the settlement negotiation letter is improper, *see* Reply 5 n.5;

moreover, Peru severely mischaracterizes it. *Id.* 7 n.7. In any event, the letter comes nowhere

near a recognition of Peruvian title by Yale. If Yale recognized Peru's title to the objects, there

would have been nothing to negotiate. To be sure, the parties came to a provisional agreement

that contemplated Yale recognizing Peruvian title in the objects at some future date—but that

recognition was contingent on Peru's simultaneous recognition of Yale's rights to study and

display many of the objects for ninety-nine years. *See* Opp. Ex. A-7 at 3 ¶ 3(d). Peru now wants

to have the benefits of the provisional agreement without having to fulfill its obligations, so

argues that the agreement and the communications leading up to it somehow constituted a

recognition of Peruvian title. Yale stood ready to finalize that agreement, but Peru chose instead

to renege on it and sue. Peru cannot have its cake and eat it too.

   Unlike the 1852 Code, the 1984 Code recognizes tacit renunciation of extinctive

prescription. That change in the law can make no difference to Yale's defense because, as

explained above, limitations periods that began to run under a previous code are governed by the

limitations rule announced in that previous code. *See* 1984 Civil Code art. 2122; Ramos Núñez

Decl. ¶¶ 9.1, 9.2. But the 1984 Code would not help Peru even if it applied. Peru maintains that

Yale tacitly renounced the limitations defense "because it could have informed [Peru]

immediately and consistently that [Peru's] right of action was time barred." Belaunde II ¶ 17.

But as Peru recognizes, tacit renunciation can arise only from conduct "manifestly incompatible"

with an intent to invoke the statute of limitations. Belaunde II ¶ 19. As the authority

characterized by Dr. Belaunde as "the seminal treatise on civil law" (Belaunde I ¶ 25) elaborates,

---

[9] Peru did not attach the letter to its complaint, but the First Belaunde Declaration appears to
allege that the letter referred to Yale's "'hope that we are close to a very positive agreement
concerning the Machu Picchu collections under the stewardship of Yale University.'" Belaunde
I ¶ 31 (emphasis omitted).

"judges may not infer that intention lightly, deducing it from ambiguous acts that are susceptible of alternative interpretations." Ripert 359. To the contrary, "renunciation[] is not presumed," *id.*, and evidence of renunciation must be "indubitable." *See* CAS N° 2581-98 AREQUIPA, EL PERUANO 01-12-2000, P.6541; Ramos Núñez Decl. ¶ 9.2. There is no obligation under Peruvian law to remind an adversary that the statute of limitations has run before engaging in settlement discussions. Ramos Núñez Decl. ¶ 9.2. Dr. Belaunde offers no authority suggesting that failure to issue such a reminder can amount to the sort of "indubitable" conduct resulting in tacit renunciation of the limitations defense.[10]

### B. Acquisitive prescription would bar Peru's claims.

Even if Peruvian limitation law applied, and even if Peru's replevin claim were not time-barred under the doctrine of extinctive prescription, it would be barred under the doctrine of acquisitive prescription.

Under the 1852 Code, title passes by acquisitive prescription to one who possesses moveable property for three years with just title and in good faith. *See id.*, arts. 536, 543; Ramos Núñez Decl. ¶ 8. The 1852 Code defines "possession" as "the holding or enjoyment of a thing or a right with the intention to keep it for oneself." *Id.*, art. 536 n.201 (incorporating art. 465). Moreover, one who "possesses" moveable property for forty years obtains title by acquisitive prescription even absent "good faith" and "just title." *See id.* art. 545; Ramos Núñez Decl. ¶ 8.

---

[10] Peru also claims tacit renunciation based on a November 2005 letter in which it claims that Yale asked Peru to "put aside the issue" of title. Belaunde II ¶ 20. Peru indulged in the same mischaracterization in its Opposition. *See* Opp. 8. As Yale explained, suggesting that the question of title be set aside cannot reasonably be interpreted as anything other than a commonplace effort to develop goodwill in negotiations before the most difficult issue is reached. *See* Reply 6 n.7. It certainly cannot be read as an unambiguous acknowledgment of Peru's title, since that would have left nothing to negotiate.

Yale maintains that it had good faith and just title, but the Court need not address those issues because it is undisputed that Yale has had custody of the artifacts for far longer than the forty years required for title under Article 545.  Peru's only argument against acquisitive prescription is that Yale did not really "possess" the objects because it held them not "for itself" but as a "steward" for Peru.  Belaunde II ¶¶ 8-9.  Yet Peru alleges that Yale was legally obliged to return all objects after January 1922 and that its failure to do so was against Peru's will and in breach of Yale's obligations. *See supra* Pt. II.A.3.  Peru cites no authority under which Yale could be described as possessing the objects on Peru's behalf after 1922, when it allegedly kept objects that Peru had demanded be returned.

To be sure, Peruvian law does not usually allow a tenant or caretaker to gain title by acquisitive prescription. *See* Belaunde I ¶ 26.  But as authority cited by Peru notes, a caretaker who stops caring for a property in the name of his employer, and instead openly acts as if he owns the property, becomes a "possessor" who can gain title by acquisitive prescription. *See* V *Código Civil Comentado* 241-42; Ramos Núñez Decl. ¶ 8.  Another authority cited by Peru agrees, explaining that "'the nature of possession can change.  One who possess in the name of another can begin to present himself as a possessor with ownership rights . . .'" Max Arias-Schreiber Pezet, V *Exegis del Código Civil Peruano de 1984* at 16.  The pleadings and matters of which this Court may take judicial notice make it plain that since 1922 Yale "present[ed] [it]self as a possessor with ownership rights," Pezet at 16, excluding Peru from possession, publicly declaring the objects part of its permanent collection, and converting fragmentary objects into new wholes. *See* Mem. 7-26; Reply 3; *cf.* 1852 Code art. 461 (defining the attributes of ownership to include the right to use a thing and enjoy its fruits, to dispose of it in one's discretion, and to exclude others from possessing or using it); Belaunde I ¶ 25 (quoting Peruvian

case law for the proposition that "'one of the requirements to acquire property of an estate by prescription is to have possessed 'as owner,' i.e., to have behaved as such, complying with the obligations and exercising the rights inherent to it'").

### III.   Yale has title under the 1852 Code, the Water Code, and the 1921 Decree.

Yale moved to dismiss this case on the basis of the statute of limitations – which is governed by Connecticut law, not Peruvian law. While Peru recognizes that Connecticut choice of law principles apply, it argues that its claims fit within a narrow exception to *Baxter*, making Peruvian statute of limitations principles applicable. Yale has explained why *Baxter* requires the application of Connecticut statute of limitations principles, *see* Reply 11-16; *see also supra* Pt. I, and why Peru's claims would be time-barred even if Peruvian limitations law applied. *See* Reply 18-20. All those arguments involve limitations law. Yale has not moved to dismiss this case on the basis of initial title, i.e., title at the time of excavation of the objects. Peru nevertheless saw fit to offer a lengthy discourse on the Peruvian law of title.

Its purported excuse for the protracted foray away from limitations issues into title is that "the question of ownership of the artifacts drives the question of limitations because, under Peruvian law, Peru's ownership status is what permit it to bring an action to recover the artifacts and which [sic] establishes that this right is not subject to prescriptive limitation." Peru Surreply 2. That puts the cart before the horse. Naturally Peru claims that it owns the artifacts – that is why it brought the lawsuit. But Yale's motion to dismiss is based on the statute of limitations. The statute of limitations applies the same way to plaintiffs with weak claims and plaintiffs with (otherwise) strong claims. It does not turn on some sort of premature assessment of the merits, as Peru implies. This Court thus need not analyze title at this juncture. Peru's effort to poison the well nevertheless requires a short response.

17

### A.    The 1852 Civil Code and the 1902 Water Code

Under the 1852 Civil Code and the 1902 Water Code, title to "treasure and all buried objects whose owner cannot be ascertained" vested in the person who discovered them. *See* 1852 Civil Code art. 522; 1902 Water Code art. 56. Under the 1852 Code, treasure included any objects "susceptible of being buried or hidden," including "not only gold and silver, but jewels, statues, vases, utensils; in a word, all objects of value." Toribio Pacheco, II Tratado de Derecho Civil 287; Ramos Núñez Decl. ¶ 7.4. By the plain language of these laws, Yale took title to all of the objects as soon as they were discovered.

Contrary to Peru's contention, Supreme Decree 2612 of August 19, 1911 (the "1911 Decree") did not change the rule enshrined in the 1852 and 1902 Codes. The 1911 Decree purported to make all excavated archeological objects the property of the Peruvian State. *See* Peru's Opp. Ex. B-6. In so doing, it came into irreconcilable conflict with the 1852 Civil Code and the 1902 Water Code, both of which stated flatly that all buried objects whose owner could not be determined would belong to the person who found them. *See* 1852 Civil Code art. 522; 1902 Water Code art. 56; Ramos Núñez Decl. ¶ 7.8.

Peru tries to avoid that conflict by arguing that because the 1911 Decree nationalized buried objects, it took them out of the category of "treasure and buried objects whose owner cannot be identified." Belaunde II ¶¶ 5-6. But that circular interpretation only underscores the conflict between the 1911 Decree and the Codes. If the 1911 Decree nationalized all buried objects, then the rules established by the 1852 Civil Code and the 1902 Water Code regulate nothing, and the relevant articles of those codes are superfluous. The conflict between the 1911 Decree and the 1852 and 1902 Codes is therefore unavoidable. Because decrees are purely executive promulgations, they are subordinate under Peruvian law to legislative codes like the

1852 Civil Code and the 1902 Water Code. *See* Ramos Núñez Decl. ¶ 7.8; *accord* authorities cited in Yale's Reply at 17 & n.23. Accordingly, the 1911 Decree could not displace the title conferred on Yale by the 1852 Civil Code and 1902 Water Code.[11]

The fallacy of Peru's contrary view is confirmed by the Peruvian Supreme Court's 1938 holding that due to a constitutional infirmity in a 1930 law purporting to make all archeological objects state property, title to treasure and buried objects would continue to be regulated by the provisions of the 1852 Civil Code and 1902 Water Code. Ramos Núñez Decl. ¶ 7.12. That holding would make no sense if Peru's interpretation of the 1911 Decree were correct.

### B.    The 1921 Decree

Even if Yale had not taken title under the 1852 Civil Code and 1902 Water Code, at a minimum, by the Supreme Resolution of February 19, 1921 ("1921 Decree"), Peru gave Yale title to all "duplicate" objects in the collection. *See* Mem. Ex. B-19 ("It is Resolved: 1st – To cede to Yale University only the duplicates of the antiquities of all kinds which it took for purposes of study and which are to be returned in or before January 1922," *translation of* "Se resuelve: 1. Ceder a la Universidad de Yale, simplemente los duplicados de las antigüedades de toda clase que llevó para estudio su que debe devolver antes o en enero de 1922"); Ramos Núñez Decl. ¶ 7.11.

Peru takes the position that the verb "ceder" does not mean a transfer of title but only "an assignment in the use of the ceded goods, with title remaining in the person who effects the cessation." Belaunde II ¶ 7. Belaunde cites no authority on point. Instead he misleadingly cites the definition of a different phrase, "cesión de bienes," which describes a special assignment of

---

[11] The 1911 Decree was also void because it purported to modify the Supreme Decree of April 27, 1893, but that decree had already been abrogated by Article 282 of the 1902 Water Code. A decree purporting to modify a previously abrogated decree is void from the beginning. *See* Ramos Núñez Decl. ¶¶ 7.6, 7.8.

property from a debtor to a creditor. *See id.*¶ 7 & n.10 (attaching legal encyclopedia entry for

"cesión de bienes" and explaining the limited use of that phrase in that debtor/creditor context).

Yet the Civil Code itself distinguishes between ceding a chattel itself and merely ceding the use

of it. When the Code deals with ceding use without ceding title, it employs the phrase "ceder *el*

*uso de bien*" (cede the *use* of a chattel) not just "ceder" (to cede). *See, e.g.*, 1984 Code art. 1666

("Por el arrendamiento el arrendador se obliga a *ceder* temporalmente al arrendatario *el uso de*

*un bien* por cierta renta convenida," which translates as "By entering into a lease, the landlord

commits itself temporarily to cede use of the property to the renter in exchange for an agreed

rent") (emphasis added); *id.* art. 1734 ("Prohibición de *ceder uso del bien*. El comodatario no

puede *ceder el uso del bien* a un tercero sin autorización escrita del comodante, bajo sanción de

nulidad,"which translates as "A bailee may not cede use of a chattel to a third party without the

bailor's written consent, on penalty of invalidity") (emphasis added).

  If "ceder" meant not "cede" but just "cede the use of," then these Civil Code provisions

would be entirely redundant. The verb "ceder" is not limited in the manner suggested by Peru

and when used alone has its plain meaning of ceding, yielding or relinquishing title. For

example, "ceder" was the verb chosen by the drafters of the 1852 Civil Code to express the

prohibition on uncompensated takings of private property: "[N]o se puede obligar a ninguno *a*

*ceder su propiedad*, sino por utilidad pública, legalmente declarada, y previa indemnización de

su justo valor." 1852 Civil Code art. 462 ("No one shall be obliged to cede his property other

than for public use, legally declared and preceded by indemnification for its fair value").

  Peru also claims that if the 1921 Decree did try to transfer title, it was invalid because the

1920 Constitution required legislative approval for "all contracts involving the property or

general revenues of the State." Belaunde II ¶ 7 & n.11 (quotation marks omitted). Peru cites no

authority to support the claim that the 1921 Decree was a governmental "contract" subject to the

constitutional constraint that Peru invokes. In fact, Peru has abandoned its contract claims in this

case. *See* Opp. 3 n.2; 23 n.13; Reply 2 n.2. Even if the 1921 Decree could somehow be

construed as a contract, that is not the only way to construe it, and as Peru's expert states, "if a

legal provision allows for two different constructions, where one conforms to the Constitution,

and the other contradicts it, the former should prevail and the latter should be rejected."

Belaunde II ¶ 6 n.8 (quotation marks omitted). It follows that the 1921 Decree should not be

construed as a "contract." The imperative for constitutional avoidance is all the greater since, if

the 1921 Decree is an ultra vires executive contract involving state property, then so are the 1912

and 1916 Decrees that form the basis of Peru's own claim. That is because, on Peru's account of

the law of title, those decrees similarly "involved" state property, and the 1867 Constitution then

in effect similarly reserved to the legislature the power "to authorize the Executive to negotiate

loans secured by National Property . . . " *See id.* art. 59.7 ("Autorizar al Poder ejecutivo para que

negocie empréstitos, empeñando la hacienda nacional …").

## IV.    Peru's interpretation of Peruvian law would not be entitled to substantial deference.

Peru claims that this Court should accord its expert's account of Peruvian law

"substantial deference." Sur-Reply 4. The statute of limitations issues relevant to this motion to

dismiss are governed by Connecticut law, not Peruvian law. But even if Peruvian limitations law

applied, the Second Circuit does not have a rule of "substantial deference" to every argument

that a foreign sovereign litigant makes about its law when trying to win. To the contrary, a

foreign sovereign's views regarding its own laws simply "do not command." *Karaha Bodas Co.,*

*LLC v. Perusahan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 92 (2d Cir. 2002)

[hereinafter "*Pertamina*"]. In *Pertamina*, the Second Circuit merely held that, in the limited

21

circumstance "[w]here a choice between two interpretations of ambiguous foreign law" were "finely balanced," then "the support of a foreign sovereign for one interpretation furnishes legitimate assistance in the resolution of interpretive dilemmas." *Id.*

There is no "finely balanced . . . interpretative dilemma[]" under Peruvian law to resolve, so not even "some degree of deference" is due. *Id.* Even if Peruvian limitations law applied, the relevant authorities are as susceptible to this Court's interpretation as the statutes of Louisiana. Peru's counter-textual arguments do not make the Peruvian Code provisions ambiguous.

Even when some ambiguity exists, it is clear that courts may only defer to *reasonable* interpretations of the law. *Cf. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 866 (1984); *In re Oil Spill by Amoco Cadiz Off the Coast of France On March 16, 1978*, 954 F.2d 1279, 1312 (7th Cir. 1992), *cited with approval by Pertamina*, 313 F.3d at 92 (reasoning that a sovereign's reasonable construction of ambiguous law is entitled to some deference by analogy to *Chevron*). Text, history and independent expert commentary all contradict Peru's self-serving arguments about Peruvian law. *See supra* Pts. II & III. And, as Yale has explained, the credibility of Peru's account of title is severely undermined by the fact that its current account contravenes the opinion of the former Chief Justice of the Peruvian Supreme Court, whose testimony Peru offered the last time it litigated issues of title to archeological artifacts in a United States court. *See Gov't of Peru v. Johnson*, 720 F. Supp. 810, 813 (C.D. Cal. 1989); Reply 18. As *Pertamina* itself makes clear, where the foreign sovereign fails to identify credible authority for its position, no deference is due and the foreign sovereign's argument must be rejected. *See Pertamina*, 313 F.3d at 92 (rejecting argument that Indonesia owned disputed funds because plaintiff "ha[d] not identified any Indonesian statute or regulation that grants the Republic of Indonesia ownership rights").

## CONCLUSION

For the foregoing reasons, Peru's claims are time-barred and Yale's motion to dismiss should be granted.

**DEFENDANT YALE UNIVERSITY**

By: ___/s/ Jonathan M. Freiman_____
        Jonathan M. Freiman (ct24248)
        Tahlia Townsend (ct27687)
        WIGGIN AND DANA LLP
        One Century Tower
        P.O. Box 1832
        New Haven, CT 06508-1832
        (203) 498-4400
        (203) 782-2889 fax
        jfreiman@wiggin.com
        ttownsend@wiggin.com

        R. Scott Greathead (*pro hac vice*)
        WIGGIN AND DANA LLP
        450 Lexington Avenue, Suite 3800
        New York, NY 10017
        (212) 490-1700
        (212) 490-0536 fax
        sgreathead@wiggin.com

        *Attorneys for Yale University*

23

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2010, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF system.

/s/ Jonathan M. Freiman
Jonathan M. Freiman