# EXHIBIT A

# MERRILL
# BRINK INTERNATIONAL



Merrill Brink International Corporation

225 Varick Street
New York, NY 10014 • (212) 620-5600

State of New York          )
                           )          ss:
County of New York         )

### Certificate of Accuracy

This is to certify that the attached document:

**Declaration of Professor Carlos Ramos Núñez**

originally written in the Spanish language is, to the best of our knowledge and belief, a true, accurate and complete translation into the English language.

Dated: May 28, 2010

Weikwang Ng (Jason)
Project Manager, Legal Translations
Merrill Brink International

Sworn to and signed before
Me, this _28 TH_ day of
_MAY_ 2010

Notary JACQUELINE THROPE
NOTARY PUBLIC, State of New York
No. 01TH6047313
Qualified in Queens County
Certificate filed in New York County
Commission Expires August 28, 20 _10_

OFFICES IN MAJOR CITIES THROUGHOUT THE WORLD

Civil Action Number 3:09-cv-01332-AWT

Declaration of Professor Carlos Ramos Núñez
I, Carlos Ramos Núñez, hereby declare:

## 1. Personal Qualifications

I am a graduate of Universidad Católica de Santa María de Arequipa (Peru), with specializations in Roman Law and History of Law awarded by University of Rome I and University of Rome II, a Master's Degree in Civil Law and a Doctor of Laws degree granted by the Pontificia Universidad Católica del Perú, a full professor of History of Civil Law and History of Jurisdiction at Pontificia Universidad Católica del Perú, a former visiting professor of Legal History at the University of Seville, a current professor of Legal History for the Doctorate of Law program at the University of Buenos Aires, a guest researcher at the Max Planck Institute of European Legal History in Frankfurt am Main (Germany), a Visiting Scholar at the Robbins Collection of the School of Law, *Boalt Hall* of the University of California (Berkeley) for two periods, and a guest professor at *Cahiers des Ameriques* at the Sorbonne in Paris.

I am the author of numerous books, including the following: *Toribio Pacheco, a Peruvian Jurist of the XIX<sup>th</sup> Century, Ignacia Rudulfo Widow of Canevaro, a Benefactor in the XX<sup>th</sup> Century, The Napoleonic Code and its Reception in Latin America, Codification, Technology and Post-Modernity, The Death of a Paradigm, How to Write a Legal Thesis and Not to Grow Old in the Attempt; Jorge Basadre, a Legal Historian and Comparer.* Through the Judicial Branch Publishing House, I have also published *The Pen and the Law. Lawyers and Judges in Peruvian Narrative, History of the Supreme Court of Peru* and *History of the Court of Justice.* Through the Publishing House of PUCP, I have published *Chronicles of the Classroom: History of the School of Law of PUCP* and a monumental *History of Peruvian Civil Law. XIX<sup>th</sup> and XX<sup>th</sup> Centuries,* of which six volumes have been published, the fifth and the sixth ones consisting of two parts each, obtaining as a result the international Ricardo Zorraquín Becú award for the best work of modern legal history published in Spanish. I have also received the Francisco García Calderón award granted by the Bar Association of Arequipa for the best legal research works in the country, the Francisco Mostajo award for democratic achievements, and the Toribio Pacheco award for academic achievements. I have also been granted the 2006 PUCP research award.

Moreover, I have been General Advisory Director of the National Library of Peru and General Director of the Academy of Judges of Peru, where I am currently a member of its Advisory Board after having organized its Judiciary Research Center. I have also been Director of the Legal Section of the Riva Agüero Institute at Pontificia Universidad Católica del Perú, a founding member and director of the Peruvian Association of Classical Studies, editor of *Chronicles of Legal History* magazine published by the Peruvian Institute of the Legal History, a founder and member of the editorial committee of *Dialogues with Jurisprudence* magazine and the *Legal Gazette,* former director of *Ius et Praxis* magazine of the University of Lima, and currently an Assistant Director of the *Peruvian Magazine of Law and Literature.* I am currently the Director of the Library of the Bar Association of Lima as well as of the *Library of the Bar Association of Lima Review.*

I represent Peru as a member of the digital and printed editorial project at www.modern-constitutions.de (History of Modern Constitutions), headed by Professor Horst Dippel from Kassel University.

I am a full member of the Peruvian Academy of Law and the National Academy of History and, in such a capacity, I am familiar with the legal and historic sides of the case.

It is my opinion that, as a professor of Legal History and History of Peruvian Law, I am perfectly qualified to issue this report and I am an expert in past and present Peruvian law.

## 2.  Summary

The aim is to determine what legislation was applicable at the time of the discovery of archaeological artifacts by Hiram Bingham. I understand that the rules in force at that moment were the *Ius Gentium* of that time, which governed the relationship among States, the Civil Code of 1852 and the rules of the Water Code of 1902, based on the historical legacy of the Roman Law, the ordinary Law of continental Europe, Castilian Law such as the *Ius Propium* of the Kingdom of Castile and the Western Indies, and the Indian Law, which developed both in Spain and in the American continent to govern overseas possessions. I must also stress that ordinary Law rules prevailed over special rules, whether due to their hierarchy, as explained further below, or due to their central position in the law at that time, as codified.

## 3. Background

In 1909, when he visited Choquequirao for the first time, Professor Bingham started to collect human remains and artifacts associated with our Andean history. In 1911, his archaeological collection included objects that can now be found at the Peabody Museum of Natural History at Yale University, New Haven, Connecticut.

By means of a supreme resolution issued by President Guillermo Billinghurst on October 31, 1912, Professor Bingham was granted permission for archaeological exploration and excavation at Cuzco until December 1 of that year. Transport of the materials collected by his team to Yale University was also authorized on the condition that a prior inventory thereof was to be made. This document sets forth that the Peruvian government reserves the right to demand the return of "single or duplicate objects already excavated or to be excavated as per Article 1 of the Supreme Decree of August 19, 1911," as well as any copies of the studies and reports made in regard to the expedition conducted in Peru.

Four years later, in 1916, another Supreme Resolution issued by President José Pardo y Barreda granted him permission to export "seventy-four boxes" found in a warehouse of the Museum of National History. This document establishes that these materials had to be returned to Peru within 18 months starting from the date of the resolution (January 27, 1916). In 1922, the archaeological materials now located at the National Museum of Archaeology, Anthropology and History of Peru based in Lima were surrendered.

It is worth mentioning that, from his arrival in Cuzco in 1908 and until his death in 1956; Hiram Bingham III made important contributions to Peruvian archaeology and gave the discovery international significance.

## 4.  The Past and the Present of the Cultural Patrimony – a Historic Comparison

2

There are at present recent international policies related to the conservation and potential repatriation of cultural objects. The point is, however, that such provisions cannot change the situation prevailing at the time of the excavations.

In this case, the legal and ethical relativism of each time period would apply. I personally agreed with the Memorandum of Understanding (MOU) executed on September 14, 2007 between representatives of the Peruvian government and Yale University with a view to settle Peru's claim to Machu Picchu materials. Although there is no express acknowledgement of ownership in favor of the Peruvian State, the intention can be observed, subject to the principle of good faith, of gradually surrendering the materials to Peru, without any other conditions but a traveling exhibit, the construction of a museum (in Cuzco precisely) and research center, and the creation of a mixed board for a maximum term of 99 years, the duration of the usufructuary rights. Certain non-museum quality pieces could be indefinitely retained by Yale for research purposes for an indefinite time period. Only a "traveling exhibit" should be jointly organized. They would then be surrendered to Peru, obviously on the condition that the aforementioned museum and research center have been completed. Actually, I do not understand why this agreement suitable to both parties has failed; it has probably been due to the sectarianism and misconceived nationalism of one of the parties. Even so, I wish that the parties could reach an understanding and that some pieces could be given to Peru.

## 5. Archaeological Pieces in the Past *Ius Gentium*

In analyzing this case, my personal feelings are of little interest vis-a-vis the prevalence of the law in force at the time of the discoveries. As a legal historian, I could draw a comparison. We reject the slavery existing up to the 19th Century in different countries of the American Continent, but we cannot deny that it existed. We can also reject the servitude and abuse of the rights of aboriginal peoples at the hands of European conquerors, but their existence cannot be denied. Likewise, we cannot deny that there were certain cultural practices agreed by the people, pursuant to the *Ius Gentium* in force at the time, along with other imperialist practices now deemed unsustainable, which authorized the excavation, discovery and removal of objects belonging to other cultures and which found their literary expression in the work of writer Rudyard Kipling (1865 – 1936), an apologist for the domination by the white colonizer and even the winner of the Nobel Prize for Literature granted by the Swedish Academy in 1907, which would now be certainly impossible due to his political incorrectness.

Indeed, museums of the world are full of these objects, regardless of how many controversies there may be, such as the Rosetta Stone and the friezes of the Parthenon in the British Museum of London; the Venus de Milo and the Dendera Zodiac in the Louvre; the Obelisk of Ramses II at Place de la Concordein Paris; the bust of Nefertiti at Neues Museum in Berlin, the discovery of the latter having coincided with that of Machu Picchu in Peru towards 1912. It happens that the notions of justice, ethics and law change throughout history. We cannot judge the past by applying present criteria.

The situation in Peru was not different. According to Indian law, during the colonial times pre-Hispanic monuments were regarded as fields from which treasures could be extracted. It was not a question of protecting them, because they were unappreciated, but of preserving the royal fifth [*quinto real* or tax], as set forth by the regulations of Viceroy Toledo issued in La Plata in 1574. It was

merely a question of finding valuable metals to melt them. Even public deeds were used to implement these practices. [1]

In his *Peruvian Traditions,* Ricardo Palma refers to an excavation at *Huaca Juliana* in Lima which ended up in a multiple murder of the people involved in the search for a precious stone inserted in one of the mummies, which one of them had previously kicked. [2]
After independence, these practices did not stop and were deemed natural and even supported by the government. According to foreign travelers in the mid-19[th] Century, the collection of archaeological pieces had become widespread. [3] In 1862, a partnership was established to exploit the burial grounds of the country in search for treasures. In 1874, the Kenner and Luhrsen collections left Cuzco for Europe. In 1880, Kunne sold his collection to European museums and in 1889; Garcés sold to Swiss-American anthropologist Adolph Bandelier a collection that was sent to the Museum of Natural History of Chicago. [4] Excavations were even undertaken by ordinary citizens as a pastime while others invested in the purchase of pieces. The disdain for pre-Hispanic culture also becomes evident in the use of burial grounds as war parapets. Thus, in 1855 Juliana burial ground served as a battlefield between Castile and Echenique. Even artillery was used. In 1865, the revolutionary forces did their part. [5]

Laying the railway from Lima to Ancón in 1870 and the Chancay works intensified the destruction of the archaeological sites and the massive flight of collections. Two German geologists, Stubel and Reiss, took away with them, and with the approval of the Peruvian State, a huge number of pieces. [6] People even had a favorable opinion of this practice. There is a popular folk song in the north of Peru that says: "I am an old exploiter of burial grounds, taking pieces from the grounds above, from the grounds below. Burial ground exploiter, let's take pieces, from sunset to sunrise."

Von Tschudi, a Peruvian expert and antiquarian, took Peruvian antiques to Switzerland, where they have been preserved up until now.[7] In 1919, Enrique Bruning gathered the collection named after him. Part of it was purchased by the State, but in 1925 he took a set of gold mementos for the Hamburg Ethnographic Museum in Germany. The Ferreyros and Miscenio Espantoso collections left the country. Even Max Uhle, an explorer from the University of Pennsylvania, founder of Peruvian archaeology, took pieces with him to the University of California, Berkeley. In 1881, and probably fearing pilferage in the middle of the war with Chile, physician José Mariano Macedo, a forerunner of Peruvian collectors, sold them through the German dealer Kruger to the Ethnographic Museum of Berlin for two thousand Pounds Sterling. [8] Even a nationalist like Julio C. Tello was accused of taking pieces abroad. [9] In 1937, the National Museum of Anthropology received a donation of 3,000 dollars for the preservation of remains extracted in Paracas by Mr.

[1] SAMANEZ ARGUMEDO, Roberto. «La conservación del patrimonio cultural a través de la historia». *Revista del Museo e Instituto de Arqueología*, No. 23,  pp. 197 – 208, providing a long list during colonial and republican times.
[2] PALMA, Ricardo. «El carbunclo del diablo». *Tradiciones perunas contempletas*. Aguilar, 1961, pp. 114 – 115
[3] SAMANEZ, o., c.
[4] TELLO, Julio C. y Toribio MEJÍA XESSPE.  «Historia de los Museos Nacionales del Perú 1822-1946». *Arqueológicas* No. 10, Instituto de Investigaciones Antropológicas. Lima 1967.
[5] PALMA, Ricardo. *Tradiciones peruanas*, o., c. p.
[6] *El inicio de la arqueología científica en el Perú: Reiss y Stubel en Ancón*. Lima: Museo de Arte, 2000.
[7] RAVINES, Roger. «Johan von Tschudi peruanista y anticuario», *Boletín de* Lima. Vol. XXI, No. 117, Año 21, 1999, pp. 33 – 55.
[8] LUMBRERAS, Luis Guillermo. «Historia de un desbande», *El Comercio*, Lima, agosto de 1977. También TAMAYO HERRERA, José. *Historia del indigenismo cuzqueño. Siglos XVI – XX*. Lima: Instituto Nacional de Cultura, 1980, p. 138.
[9] GUTIÉRREZ DE LA QUINTANA, Emilio. *El Manco Cápac de la Arqueología peruana Julio C. Tello*. Lima, s/n,1922, 157 pp.

4

Nelson A. Rockefeller who received, in exchange, four funerary bundles. At present, there are numerous private museums in Lima, such as the Larco Museum, the Amano Museum and the Gold Museum, whose pieces have been obtained from illegal excavations and purchases. However, were it not for this work, this heritage would have been lost.

In the city of Cuzco itself, the situation was no different. Thus, the collection of María Ana Zenteno was sold to the Ethnographic Museum of Berlin in 1880. Along with Zenteno, Tamayo Herrera names other collectors such as José Miguel Medina, José Lucas Caparó Muñiz, Mariano Macedo, Vidal Olivera and Abel Montes. [10] It is within this framework that the expedition of Professor Bingham took place.

## 6.   Legal Analysis of the Status of a Treasure

### 6.1. Roman Law

In the classical law collected in Digest 41, 1, 31, 1, written by jurist Paulo and following a clear individualistic line, it can be read that the treasure (*thesauros*) is a certain buried quantity the owner of which cannot be recalled and therefore becomes the property of whoever has found it, as it belongs to nobody else. [11]

Justinian Institutions (I. 2, 1, 39), which already reflect post-classical law, established, according to an amendment proposed by Emperor Hadrian (117 – 138 A.D.), which marked the tradition of the Civil Law in this matter and most probably expressed a fiscal interest in doing so, that in line with natural equity any treasures found on an another's property – including the estate of the Caesar—i.e. the State—was to belong one half to the discoverer and the other half to the Roman treasury. [12] Years later, in 474 A.D., Emperors Leon and Zenon enacted an imperial constitution, which can be found in Codex 10, 15, 1, which confirmed the wording of Hadrian by stating that anybody who discovered a treasure in an another's property with the consent of the owner would retain one half of it, and would surrender the other half to the owner of the land, which could be the State. [13]

Pietro Bonfante asserts: "Justinian law provides a solution the origin of which is attributed to Emperor Hadrian, which is that the treasure belongs in halves to the owner of the land and to the discoverer, which rule can be applied even when the site of discovery is a *locus Caesaris.*" He adds: "The State does not acquire its half until the treasure has been discovered, not in a private, but in a public estate." [14] Therefore, the *aerarium* was interested in sharing the profits arising from a discovery and, as a result, in promoting the search for hidden valuable objects. Hadrian's system has been preserved in most contemporary civil codes. It can be observed, on principle, that when more than one person owns rights to a treasure, a community is formed. Hadrian seems to have considered both lines of thought and decided that the owner of the land, which can be the State, should have a share by right of accession and the finder, another share, by virtue of the occupation thereof.

---

[10]  TAMAYO HERRERA, José. O., c. p. 134.
[11]  *El Digesto de Justiniano.* Pamplona: Editorial Aranzadi 1975. Tomo III, p. 292.
[12]  *Instituciones de Justiniano.* Buenos Aires: Editorial Heliasta S.R.L., edición bilingüe, pp. 95 - 96.
[13]  GARCÍA DEL CORRAL, D. Idelfondo. *Cuerpo del derecho civil romano.* Barcelona: Editorial Lex Nova, Tomo V, p.521.
[14]  BONFANTE, Pedro. *Instituciones de Derecho Romano.* Madrid: Instituto Editorial REUS 1965. p. 259.

### 6.2.  The Status of the Treasure in Castilian Law

Within the *Siete Partidas* (Seven Records) of Alphonse the Wise which date from the middle of the 13th Century, record 3, Title 28, Act 45 governs the discovery of treasures. The treasure would be distributed in equal shares if, with the consent of the owner of the land, a third party found the treasure. According to Asso and Manuel's Institutions, the payment of the royal fifth must be guaranteed.[15] An amendment introduced by the New Compilation (book 6, title 13, act 1), enacted in 1640 by Philip II, established that whenever treasures were found on the land or had been purposefully hidden therein, the same would be assigned to the Treasury, with a fourth thereof being reserved for the discoverer, who must inform the judicial authorities, therefore expressly modifying the provisions of the record. [16] This shows a state position favorable for the Spanish Crown, as it reduces the share of the discoverer from one-half to one-fourth.

The Most Recent Compilation of 1805, book 10, title 22, relative to vacant and ownerless property, act 3, also contains regulations about the discovery of treasures, which are entirely assigned to the State. [17] It should be noted that in his draft of the civil code Vidaurre criticized this regulation and proposed that if the State wanted to participate in one half it must also pay for the expenses. [18]

### 6.3. Indian Law

The legal provisions of book 8, title 12 of the Indies Compilation described how treasures, burial grounds, stone beads (chaquiras), jewels and other similar deposits belonging to Peruvian Incas were to be searched for and ordered discoverers, mainly visitors, to surrender them to the Treasury, because they were supposed to belong to the Crown and were therefore the property of the King. Discoverers only deserved some grant for their good service, provided that they reported it. [19]

According to Ots Capdequí in the capitulations or agreements of discovery and population, it was provided that any treasures discovered «in burial grounds or in any other hidden locations» belonged to the Crown «in one half without any deduction, with the other half remaining with the person who had found and discovered the same». [20] Juan de Solórzano, who always supported the point of view that favored *regalism*, held that the Supreme Council of the Indies «has never doubted that these discoveries are lawful even though as a result thereof the corpses of dead Indians lying in said burial grounds are also discovered and unburied, to be then reburied and accommodated just as they were» [21]. In Indian law, unlike in Roman law, the right to receive a prize for the discovery was acknowledged.

---

[15] *Las Siete Partidas del rey don Alfonso El Sabio.* Salamanca: 1555, tercera partida, pp. 163 - 164.
[16] JORDAN DE ASSO, Ignacio y Miguel DE MANUEL Y RODRÍGUEZ. *Instituciones del Derecho Civil de Castilla.* Valladolid: Editorial Lex Nova, edición facsimilar, 1982, p. 100.
[17] *Novísima Recopilación.* París: Librería de Vicente Salvá, 1846, Tomo 4, pp. 336 – 337.
[18] VIDAURRE, Manuel Lorenzo. *Proyecto del Código Civil peruano.* Lima: Imprenta del Constitucional, 1835, tomo II, p. 7, artículo 21.
[19] *Recopilacion de Leyes de los Reynos de Las Indias,* Madrid:  Ivlian de Paredes 1681, p. 64.
[20] OTS CAPDEQUÍ, José María. *Manual de Historia del Derecho Español en las Indias.* Buenos Aires: Editorial Losada S.A. 1945. pp. 447 - 449.
[21] OTS CAPDEQUÍ, José María. *Manual de Historia del Derecho Español en las Indias.* Buenos Aires: Editorial Losada S.A. 1945. pp. 447, 448, 449.

Manuel Lorenzo de Vidaurre, who praises the individual effort in line with the principles of the rationalist natural law which he followed, referred to those laws as unfair. He held that if the government wanted to share the profits, it must also share the expenses. [22]

## 7. Republican Legislation

### 7.1. Supreme Decree N° 89

The decree published on April 3, 1822, executed by Supreme Delegate José Bernardo de Torre Tagle and by Minister Bernardo de Monteagudo, apart from creating the National Museum, sets forth that monuments remaining from Peruvian antiquity belong to the nation. They can freely circulate within the country and change owner, but the government is entitled to ban their exportation. The extraction of mineral stones, ancient handmade utensils, fabrics and other objects found in burial grounds was forbidden unless it was expressly and specifically allowed by the government for public utility purposes, subject to seizure and the application of a fine. [23]

It should be noted that the decree does not prohibit exporting but establishes that "the government is entitled to ban their exportation". On the other hand, the government can decide, for public utility reasons, to issue licenses for exploitation and, therefore, also for export.

### 7.2. Legislative Resolution of the Huancayo Congress

This resolution is key to the controversy because it shows the changing position of the Peruvian State in the field of excavation and exportation of archaeological objects. This rule, enacted on November 28, 1839, within the framework of a congress that approved the conservative constitution of Huancayo, decided, by means of a legislative resolution, which is issued by this parliamentary body vested with constitutional powers, that all Peruvians who wish to work on the discovery of hidden treasures known as *Huacas* can do so freely without discoverers being bound to pay the fees established by ancient laws.[24] Toribio Pacheco explicitly recalls and praises the application of this law as it would no longer be necessary to pay the old fees. [25]

These rights are understood to apply also to foreigners, as there was no reason not to apply them in light of liberal and democratic principle of equality before the law, which was well-known through the liberal ideals of the forerunners of independence such as Simón Bolívar and San Martín, among others. Nor is there an express prohibition, so that rights could not be restricted by means of a *contrariu sensu* interpretation.

### 7.3. Supreme Decree of 1841

Supreme Decree 556 issued by Agustín Gamarra on March 1, 1841, reinstated in its section 14 the validity of the Supreme Decree of 1822, «whereby the extraction of mineral stones, ancient

---

[22] VIDAURRE, Manuel Lorenzo. *Proyecto del Código Civil peruano.* 2ª. Parte. Dominios y Contratos. Lima: Imprenta del Constitucional, 1835, Tomo II, pp. 26 – 27.

[23] *Gaceta del Gobierno.* Lima. Tomo Segundo N° 27. p. 1.

[24] Resolución Legislativa Congreso Huancayo 28 de noviembre de 1839.

[25] PACHECO PACHECO, Toribio. *Tratado de Derecho civil.* Lima: Imprenta del Estado, segunda edición, 1872, tomo II, p. 290, nota 1.

handmade utensils, fabrics and other objects found in burial grounds without the express and specific authorization of the government for public utility purposes is absolutely forbidden». [26]

Three remarks must be made here: 1. The spirit of the rule or *ratio legis* indicates that archaeological objects should not be destroyed; 2. Their exportation was not in fact completely forbidden because the government could issue a license for that purpose, on the condition that it was for public utility purposes; and 3. A legislative resolution with the force of law could not be derogated by a supreme decree of lower rank.

On the other hand, as stated by a critic of Yale's position, among the papers of Professor Bingham which are on file, a translation into English of the Supreme Resolution of June 16, 1887 can be found showing that German subject Augusto R. Berns partnered with the Peruvian State represented by the government of Andrés Andrés Avelino Cáceres to extract «*Incan antiques*» from burial grounds and typical constructions in the province of Cuzco and export them to Germany. [27] One may deduce from this that the Supreme Decree of 1841 would have had no practical application, while the Civil Code of 1852 did.

### 7.4. Civil Code of 1852

Section 522 of this code is key to the controversy because it refers to two elements—on the one hand, treasures, and on the other, "anything buried"—which, if found in a public land or property, belonged to whoever found them. In fact, we are referring to the rule applicable to the case at issue.

The change shown by the code with respect to the Roman and Castilian tradition in force from the times of Emperor Hadrian, which stated the equitable division of the treasure between the discoverer and the State, is surprising. This rule is based on the individualism typical of the 19th century. If the general legal principles adopted by Article IX of the preliminary part of the Civil Code of 1852 are applied, based on the equitable criteria introduced by Emperor Hadrian and the legal tradition of Roman Law and *Ius Commune*, an equitable solution would consist of dividing archaeological items into two equal shares between the Peruvian State and Yale University. There are two types of interests in conflict: those of the owner of the land and those of the discoverer. A compromise must be reached between two opposite interests which are equally respectable.

Francisco García Calderón assures that, if found on public or on an ownerless property, either the treasure or anything buried belongs to whoever found it. [28] In turn, Toribio Pacheco points out that the term "buried or hidden objects" would include «not only gold and silver but jewels, statues, vases, utensils, that is to say, anything of value». Therefore, they not only include precious metals but also «anything buried». [29] Pacheco recalls the principle adopted by the imperial constitution of

---

[26] Decreto Supremo 556 1° de marzo de 1841.

[27] MOULD DE PEASE, MARIANA. «Machupicchu y el Código de ética de la Sociedad americana de Arqueología. Una invitación al diálogo intercultural». PUCP. CONCYTEC, UNSAAC, INC. Lima 2003.

[28] GARCÍA CALDERÓN, Francisco. *Diccionario de la Legislación Peruanas.* París, 1879, p. 1058.

[29] PACHECO, Toribio Pacheco. *Derecho Civil.* . Lima: Imprenta del Estado Calle de la Rifa N° 58, 1872. Tomo II, pp. 287 - 294.

Hadrian: one half of the treasure belongs to its discoverer, by right of occupancy, and the other half, to the owner of the land, by right of accession. This applies as a principle, not as an application of the code of 1852. Pacheco provides the following essential paragraph:

> "If the treasure is found on public or ownerless property, it shall fully belong to the finder (522 C.). Public or ownerless estates actually belong to the State and it could claim half of the treasure, but has waived its right thereto, beyond doubt for reasons of decency". [30]

The solution arising from section 524 of the Civil Code is different and based on equity as it set forth that the treasure found on private property, with the consent of the owner, was to be divided between the owner of the land and the discoverer. [31]

It is also worth mentioning that, because the Civil Code resulted from the promulgation of a statute issued through regular procedures, the Supreme Decree of 1841 was derogated pursuant to three criteria: 1. The time sequence (a later rule revokes an earlier one); 2. The hierarchy—as the Civil Code derived from a regular statute, it derogated a lower rank rule; 3. As an expression of full social life, the code prevailed over previous rules of a special nature which were absorbed by it. [32] In general, legal hierarchy dictates that the Civil Code prevails over any resolution or executive decree that is in conflict therewith.[33]

The Civil Code of 1852 does not provide any special rule hindering the right of occupancy in regard to archaeological pieces. Among Peruvian Codes, the first one which clearly establishes that archaeological objects such as ceramic pieces, fabrics, pre-Inca tools are not regarded as treasures and are deemed to belong to the State is the Civil Code of 1936 in its section 822, subsection 5. [34] This rule was non-existent in the 19th Century because the principles and the line of thought that governed it were different. On the other hand, the Code of 1936 did not define the treasure, as this was supposed to be the task of doctrine, but instead regulated its destiny. Section 887 established that the treasure discovered on private property fully belonged to the discoverer. Section 888 established that nobody could search for treasures in another's property without the consent of the owner. If a treasure was found with the consent of the owner pursuant to Section 889, obviously excluding archaeological objects, it would be divided into equal parts between the finder and the owner of the land, unless otherwise agreed. An equitable solution, typical of Roman Law and *Ius Commune*, which is the traditional one, prevailed in the latter case. This marked a turning point from section 522 of the old code.

The Supreme Decree of July 6, 1950, authorizes in its sections 60 to 66 the search for treasures in lands of the State, provided that the discoverer proves to have made investments for that purpose,

---

[30] PACHECO, Toribio. *Tratado de Derecho civil.* Lima: Librería Hispano-Francesa, 1862, p.247.

[31] *Código Civil de 1852.* Lima: M. A. Fuentes & B. Gil Editores. p. 97.

[32] RAMOS NÚÑEZ, Carlos. *El código napoleónico y su recepción en América Latina* Lima: Fondo Editorial PUCP, 1997. By the same author, *Codificación, tecnología y postmodernidad.* Lima: Fondo Editorial PUCP, varias ediciones, and in reference to the Peruvian case: *Historia del Derecho civil peruano. Siglos XIX y XX.* Tomo II. "La codificación santacrucina y el código civil de 1852«. Lima: Fondo Editorial PUCP, 2001.

[33] Constitución de 1860, artículos 75 y 93; Constitución de 1867, artículos 67 y 85; Constitución de 1920, artículos 109 y 121; Constitución de 1979, artículo 87; y Constitución de 1993, artículo 51.

[34] CASTAÑEDA, JORGE EUGENIO. *Instituciones de Derecho Civil. Los Derechos Reales.* Lima: Fondo Editorial de la Facultad de Derecho de la UNMSM 1965. Tomo I, pp. 247-248.

which authorization shall not be granted to search for treasures in archaeological sites or in buildings declared to be national monuments. [35]

It should be noted that the Civil Code of 1936 does not refer to ownerless property and sets forth that in the event that a treasure is found in a public domain or state-owned land, it must be divided between the discoverer and the State, which cannot keep full ownership thereof.

The aforementioned laws must be construed within the context of archaeologists such as Tello and Uhle, who exported large volumes of archaeological artifacts out of the country. In those times, Peru held that Incan artifacts must be sent to the main museums and universities in Europe and the United States to promote their scientific analysis and foster national pride by spreading the knowledge of Inca civilization. Exporting archaeological artifacts merely for business – as treasures – did not meet these aims and was, therefore, forbidden.

### 7.5. Supreme Decree of 1893

Issued on April 27, 1893 by President Morales Bermúdez. Whereas: explorations in burial grounds and ruins have been conducted without any order and with the sole purpose of satisfying selfish interests, completely overlooking the rights of the Nation, explorations or excavations to look for archaeological objects in burial grounds, old fortresses, temples or other locations situated on public or ownerless places without a special license as set forth in this decree are hereby forbidden. Section 2 assigns national monument status to constructions (not chattel) dating from the times before the conquest and prohibits their mutilation. The license shall be applied for in the capital, before the Conservation Board of Lima and other departments. The license shall be requested in writing, specifying the site, the type of work to be undertaken, the aim, the intended duration and any other details contributing to a clear idea of the project, which shall be performed before the representative or representatives to be appointed by the Government.

Any objects that are found shall belong to the license applicant, who shall also be bound, as stated in the pertinent decree, to provide the State with a duplicate of each object discovered or with a photographic copy of any unique piece, accompanied by a detailed description to give an accurate idea of the object in question. April 27, 1893. Remigio Morales Bermúdez. Félix Cipriano C. Zegarra.

### 7.6. The Water Code of 1902 [36]

Article 56 of the Water Code of 1902, enacted for the purpose of promoting an efficient use of natural resources, established that treasures and any buried items whose owner cannot be identified, whether found in public land or land that does not belong to anyone, would belong entirely to the person who found them. Actually, this rule reproduced and confirmed the Civil Code of 1852 in this regard. The position is corroborated when Article 58 suggests a different formula: should the finding take place on private property, the find shall be divided equally between the owner of the land and the individual making the find, unless special arrangements have been made. On this subject, a contemporary commentator, Enrique Patron, wrote with concern about private capital, which

---

[35] Ibidem, p. 249.
[36] *Código de Aguas. Legislación vigente sobre aguas en el Perú.* Lima: Imprenta del Estado, edición oficial, 1902.

10

promoted the code and infected the spirit of the era «Actually, there is no obstacle preventing what belongs to the State from belonging to a private individual ».[37]

On the other hand, the scope of Article 282 of the same body of laws leaves no doubt about the application ordinary Law to the case *sub iudice*: «All laws, decrees and other provisions that, with regard to the matter which is part of the foregoing, had been enacted prior its promulgation and contravened it, are hereby repealed» [38]  It should be clarified that in the tradition of the Civil Law, as of the 18th Century, during the so-called "codification movement", the codes are the core of the legal system and have a fully regulatory spirit and perpetuity; this means that in the legal spectrum, they have been considered more important from a symbolic and empiric standpoint than special legislation, which has routine and circumstantial characteristics. Another effect is the derogation of the Supreme Decree of 1893, based on the following criteria: 1. Its hierarchy, because it is higher in importance than the repealed rule, and 2. Its timing, because it came later.

### 7.8.   Supreme Decree 2612

This norm passed on August 19, 1911, supposedly modifies Article 11 of the Supreme Decree of April 27, 1893 as it only authorizes the release of duplicates to those who request the license. Regarding unique objects, the interested parties, official scientific organizations, are only authorized to take pictures based on the theory of exclusive ownership by the State. Furthermore, every time a license is issued for excavations or studies, there will be a government representative. While the Lima-based Museum of National History is being built for the purpose of preserving historic objects, the rule strictly forbids their exportation, regardless of their class and condition, except in the case of the abovementioned duplicates. Violators are punished with confiscation.

It should be noted in this instance that the Water Code had already repealed the Supreme Decree of 1893. Peru has never observed the thesis that when a law is repealed, the previous one goes back into effect. In our country, the principle in force is the one where a law repeals another one. Therefore, a rule that no longer existed could not be modified. On the other hand, it should be noted that the exportation prohibition is only temporary: while the Museum of National History is being built. In fact, this is a strange rule because according to official reports, said museum was opened in July 29, 1906, and the German Scholar Max Uhle was hired on November 14.[39]  In other words, the National Museum already existed at the time of issuance of said Supreme Decree. From that standpoint, it could not be enforced. This is so true that it was only in 1930, through Decree Law 6938 of November 15, 1930, that the provisions regarding treasure finds in the Civil Code of 1852 and the Water Code of 1902 were expressly derogated. Had they not been in force in 1911, no repeal would have been necessary. Furthermore, the Supreme Decree could not modify a higher-level law due to hierarchy issues.

It should be noted, on the other hand, that Supreme Decree of 1911 does not forbid excavations but does require obtaining the corresponding license, which Professor Bingham did obtain.

---

[37] *Ibidem.*
[38] *Ibidem.*
[39] TELLO, Julio C. y Toribio MEJÍA XESSPE. "Historia de los Museos Nacionales del Perú, 1822 – 1946", *Arqueológicas* No. 10, Lima, 1967.

In practice and from a legal standpoint, private and foreign collections were not affected by Supreme Decree of 1911. There is no numeric relationship between both supreme decrees, as required by the legislation governing excavations.

On the other hand, and this is essential, Supreme Resolution of October 31, 1912 properly interpreted Supreme Decree of 1911 when it specified that the ban on exportations did not refer to those for scientific purposes but to those for commercial purposes. Therefore, Professor Bingham, of Yale University and the National Geographic Society, should have been granted the corresponding authorization.

### 7.9.   Supreme Resolution N° 17848

This regulation of October 31, 1912 in fact consists of the license issued to Doctor Hiram Bingham, assigned by Yale University and the National Geographic Society of the United States of America, who was applying for a permit or license to carry out explorations and excavations in search of archaeological and osteological items in the national territory and to take, with an exclusive destination, those items obtained as a result of its research. Once the official reports from the History Institute of Peru and the Department of Public Education were received, these activities were authorized.

The whereas section of this regulation clearly stated with regards to Supreme Decree of 1911: «That even though it is true that article 4 of the second of the regulations cited herein forbids the removal of archeological items from the country, it is understood that such regulation is intended to prevent commercial speculation with said items». On the other hand, the rules of international ethics typical of the *Ius Gentium* of the time are mentioned therein. The authorization, obviously, had an exceptional nature and was issued by virtue of the benefit it would provide for the Pre-Hispanic culture of the country, as it happened in fact. The condition was that the items would not be damaged, destroyed or mutilated and neither would materials and constructions. This aspect was complied with, under the scrutiny of government representatives and with preparation of the corresponding inventory.

However, it should be recognized that the Peruvian government reserved itself the right to claim unique or duplicate items that will be or have been extracted, as well as a copy of all studies and reports corresponding to explorations that have been carried out in the national territory to declare them national property; if deemed appropriate, through a prior ruling by the History Institute of Peru. I believe that the MOU was in that sense a good instrument, in accordance with the spirit of the Supreme Resolution. [40]

### 7.10.   Supreme Resolution N° 37

Through this resolution, signed by the Constitutional President of the Republic and Minister of Education Valera, the exportation of 74 cases containing archeological items obtained in the province of Cuzco between 1914 and 1915 requested by Elwood C. Erdis, Assistant Director of the Scientific Expedition presided over by Dr. Hiram Bingham and organized under the sponsorship of Yale University and the National Geographic Society of New York, was duly authorized in January 27, 1916. It should be noted that this order was issued through favorable reports by the Museum of

---

[40] El Peruano – Diario Oficial 31-12-1912. pp. 820-821.

National History. Yale University and the National Geographic Society agreed to return exported items within 18 months, including also the corresponding studies and pictures.[41] The MOU document was also an adequate solution in this instance.

### 7.11.   Supreme Decree of 1921

This norm of June 11, 1921 regarding the prohibition to remove, destroy and export archaeological monuments is strong in protecting archaeological items. It is understood to apply to commercial purposes that have nothing to do with scientific purposes. Article 2 establishes that the government may grant authorization to remove or export items of this nature to national or foreign scientific institutions exclusively, as long as the work is performed under the immediate guidance of professional archaeologists or internationally-known scientists and under the supervision of a government-appointed representative». Article 4 insists on the need to have a record or inventory. However, the rules and regulations were never issued. [42]  This norm would confirm Yale University's right over the archaeological items.

### 7.12.   Decree Law 6938

This norm, issued by a *de facto* government, the result of a coup d'etat on November 15, 1930, stated that any buried treasure and any archaeological item whose owner cannot be determined, whether from public or private lands, will belong exclusively to the State. For the first time in the legal history of the country, articles 522, 523, 524 and 525 of the Civil Code and articles 56, 57 and 59 of the Water Code, which authorized ownership of treasures and other items found, were repealed.

However, as stated by Castañeda, when an attempt was made to enforce it, a legal controversy ensued that was resolved with the ruling issued by the Supreme Court in May 9, 1938. It determined that in the absence of confirmation of said Decree-Law by the Constitutional Congress, ownership of treasures found before the new Civil Code went into effect would be governed by the provisions contained in the repealed Code. [43]

At any rate, this rule would not have a retroactive effect over buried items found before its enactment date.

Fernando de Trazegnies ridicules the public nature of property regarding archaeological items.

«They were automatically considered property of the State. Curiously enough, many of the pots in the country are legally of private ownership, and they never belonged to the State because the laws of the Viceroyalty and the Republic had always allowed, with certain restrictions and conditions, for private individuals to own chattel and treasure found in excavations. Therefore, declaring that all Pre-Hispanic items are property of the State would amount to a confiscation; which contradicts all Constitutions which the Republic has had. Furthermore, it is a fact that a large number of

---

[41] El Peruano – Diario Oficial 17-2-1916. Año 75 – Tomo I. Semestre I – N° 39.
[42] Revista del Museo Nacional – Tomo XL. Antigüedades Peruanas y Protección legal. pp. 398-399.
[43] CASTAÑEDA, Jorge Eugenio. *Instituciones de Derecho Civil. Los Derechos Reales.* Lima: Fondo Editorial de la Facultad de Derecho de la UNMSM. 1965. Tomo I, pp. 249 - 250.

archaeological pieces are in the possession of individuals and private institutions: universities, private museums, collectors and mere individuals ». [44]

Trazegnies recalls that Law 24047 and the Constitution of 1993 provide for private ownership of pre-Hispanic items.

## 8.    Has Yale acquired items through Usucaption?

Similarly, following that same line of reasoning, Jorge Eugenio Castañeda, one of the most authoritative analysts of the Civil Code of 1936, believes that since the treasure is made up of chattel, its discoverer may invoke the two or four-year period of prescription under Article 893 of the Civil Code of 1936, if the claim were brought after reaching said terms, calculated from the day after the discoverer took possession of the treasure.

In the Civil Code of 1852, under Article 464, ownership is acquired through the original methods of occupation, invention and accession, or through the derivatives set forth under this Code. It does not establish exceptions of any kind regarding archeological pieces, in accordance with the mentality of the time, which includes Usucaption.[45]  Usucaption comes from Latin, from the words *usus*, which means use or possession, and *capere* which means obtaining or acquiring, that is, acquiring through use. [46]  This, in fact, is the case with the artifacts in Yale's possession.

Usucaption, which acquires the sanctioning and healing force given by the passage of time, as an additional factor in favor of Yale is consolidated by the provisions contained in the Civil Code of 1852. Articles 536 and 543 establish that the title will be transferred through adverse possession to whoever has in his possession any chattel for three years with legitimate title and good faith; we are dealing with a very long term prescription, applicable to all goods. It was introduced by the Emperor Constantine. There is no requirement of legitimate title or good faith. It definitely cancels all the rights that the owner has failed to assert for forty years. Emperor Theodosius reduced this term to thirty years. [47]  Peruvian Law adopted the Roman tradition.

Under Article 545, whoever possesses an item for forty years will not be obligated to present a title or address matters of good faith. Meanwhile, Article 546 establishes that for the prescription of goods, it is assumed that its holder has legitimate title, unless otherwise demonstrated. Finally, under Article 549, the period of time to prescribe starts from the time the goods are in the holder's possession, that is, from the moment the pieces were discovered and from the moment Yale University took them uninterruptedly, continuously, peacefully and publicly under its care and protection up until the present time and, obviously, with the Peruvian State's full knowledge thereof.

Yale did not act as a dependent holder (Servant) of the Peruvian State. Yale has not been and is not the sort of entity used or hired to carry out services on behalf of another (Master) and, therefore subject to its control in deciding what to do and how to do it. Yale University has acted independently from the Peruvian State and with full autonomy from the moment it took said

---

[44] TRAZEGNIES, Fernando de. «La conservación moderna del patrimonio cultural de la Nación», *Patrimonio Cultural del Perú I*. Lima: Fondo Editorial del Congreso del Perú 2000. Tomo I, pp. 42 - 47.
[45] *Código Civil* de 1852 art. 464.
[46] ARIAS RAMOS, José, *Derecho romano*, Madrid, Editorial Revista de Derecho Privado, 1943, p. 231-236.
[47] RENAUT, Marie-Hélene. *Histoire du droit de la propriété*. París, Ellipses, 2004, p. 59.

14

artifacts in its possession. Throughout this time it has not received any type of order or recommendation. [48] The special nature of the possession required for usucaption should be taken into consideration.

Dr. Belaúnde has indicated that Yale's possession of these artifacts was not the type of possession required by the Civil Code of 1852 because Yale held the items in its possession with the authorization and in the name of the Peruvian Government, and it did not own them for its own benefit.[49] This conjecture is incorrect.

Article 536 of the Civil Code of 1852 incorporates by reference the definition of possession as set forth in Article 465, whereby "possession" means "retention or use of a thing or right with the intention of keeping it for oneself."[50] Retention of these objects by Yale after 1921, its repeated public affirmations that said objects are part of its permanent collections, its conversion of pottery fragments into full objects and its disposal of them without consulting the Peruvian Government are proof that Yale has long held that these items are its property and that its intention to keep them is consistent with said conviction.[51]

The fact that Yale initially had the items in its possession on behalf of the Peruvian Government is irrelevant because, as the well-known commentator Max Arias-Schreiber Pezet has explained, "the nature of the possession may change. Whoever has ownership on behalf of another party may begin presenting himself as possessor with ownership rights."[52] Therefore, "if the guardian of a house has ceased behaving as such, in other words, is not keeping the house in its possession in the name of whoever hired him, but is acting as its owner… the behavior is revealed as opposed to the home owner's, the former guardian would no longer be a holder, but the owner of the house… which would lead to prescription."[53] In this case, the Peruvian Government's claim that Yale's failure to observe instructions to return items after 1921, necessarily implies that Yale was no longer holding the items on behalf of the Peruvian Government, but rather on its own behalf.

## 9.     Can the Peruvian State replevy the archeological assets?

Rather than simply acquiring through adverse possession or usucaption, Yale University has consolidated its control over the archeological pieces by virtue of the passage of time. This is also due to the inactivity of the Peruvian State, which has only shown an interest in recovering these Pre-Hispanic artifacts after ninety years.

It should be noted that Yale's title is through discoveries of buried or hidden objects pursuant to Article 522 of the Civil Code of 1852, which prescribes these types of actions *in rem* after twenty years from the time of gaining possession.[54] Moreover, under Article 2212, paragraph 8 of the same legal body of 1852, the obligations are extinguished by extinctive prescription of ownership.[55] Therefore, if Yale had the obligation to return said artifacts, by virtue of said extinctive prescription,

---

[48] CLAPP, James, *Dictionary of the law*, New York, Random house, 2000, p. 394-395.
[49] Segunda Declaracion del Dr. Belaunde ¶¶ 8-9.
[50] *Código Civil de* 1852 art. 536 n.201 (incorporating by reference Article 465).
[51] *Código Civil de* 1852 art. 461 (which defines that the possession rights include the right to use the thing and to enjoy its fruits, to dispose of it at its own discretion, and exlude other from possessing or using it).
[52] ARIAS-SCHREIBER PEZET, Max, *Exegis del Código Civil Peruano de 1984*, Tomo V p.16 (quotation marks omitted).
[53] *Código Civil Comentado*, Tomo V, pp. 241.
[54] *Código Civil de* 1852, art. 522.
[55] *Código Civil de* 1852, art. 2212.

15

this legal imperative, due to the passage of time, would no longer have been viable or claimable. Regardless of whether the Peruvian State or private individual(s) had ownership rights over said pieces, the passage of time and the care afforded to said artifacts have incorporated them into Yale University's dominion and ownership. The Peruvian State is also responsible for this legal situation by not having taken actions oriented at recovering these pieces during the time it had to do so, to the extent that said period of time has long expired through the obvious delay. The Peruvian State cannot demonstrate otherwise.

### 9.1    The action is not imprescriptible under the laws in effect at that time.

As the claimant has stated, if they apply Article 927 of the Civil Code of 1984, the action would remain untouched because the replevin is imprescriptible. However, the Civil Code of 1984 is not applicable for several reasons.

First, the Civil Code of 1984 marked the first time in the legislative history of Peru that the imprescriptibility of replevin was included. In contrast, the Civil Code of 1852 did not provide for imprescriptibility of replevin. Article 560, Paragraph 4 clearly states that it is applied to all actions *in rem*, including replevin, and there is no other provision under the Civil Code of 1852 from which an exception could be inferred.

The same may be said about the Civil Code of 1936. In fact, Article 1168 establishes the prescription of actions *in rem*, which include the replevin in twenty years. The doctrine has indicated that the replevin is part of an action *in rem*. Thus, Joaquín Escriche, an author of that era, definitely includes such actions among actions *in rem*.[56]

Eleodoro Romero Romaña, the most important author dealing with rights *in rem* commenting on the Civil Code of 1936, states: "At the end of the last century, it was asserted that replevin was not imprescriptible, and that the right to recover property had to expire within the same period of time in which actions *in rem* prescribed. Modern French authors strongly oppose this thesis, especially Planiol, Ripert and Josserand, and they differentiate the rights *in rem* originating from the property, from the right to ownership itself (...). When we study prescription, we will insist on such an important item under No. 130, having to mention now that the Code, under Article 1168, Paragraph 1, establishes that actions *in rem* prescribe after twenty years, without differentiating or creating any exception for replevin...."[57] The law does away with any doubt that there might be in the doctrine. Instead of Planiol and Ripert, the Peruvian law prevails. The law is the source of rights under civil law, transcending any doctrine or theory.

As stated by the contemporary author Max Arias-Schreiber Pezet, when referring to the Code of 1936, when applied to the case *sub iudice,* the imprescriptibility of replevin actions set forth under Article 927 of the Civil Code of 1984 "was not contemplated under the repealed Code."[58] Furthermore, the imprescriptibility of replevin actions is not a general principle of civil law that would have been implicit under the Civil Code of 1852. On the contrary, the Civil Code of 1852 was

---

[56] ESCRICHE, Joaquin, *Diccionario razonado,* Madrid, Imprenta del Colegio Nacional de Sordo-Mudos, tomo 1, p. 82.
[57] ROMERO ROMAÑA, Eleodoro. *Derecho Civil. Los derechos reales.* Lima: Editorial PTCM, 1947, pp. 91 – 92.
[58] ARIAS-SCHREIBER PEZET, Max, *Exegis del Codigo Civil Peruano de 1984,* Tomo IV *p.*228.  REVOREDO, Delia, *Exposicion de Motivos del Codigo Civil,* Tomo V, p.175 ("This norm [Article 927] has no legal precedents in the previous Code.")

based primarily on the French Civil Code,[59] which "declares the owner's replevin to be extinct when the statute of limitations has expired," by stating that "all actions, both *in rem* and personal, will prescribe in thirty years."[60] Thus, "the French law appears to reproduce the old Roman legal rule: *praescriptio triginta annorum*."[61]

Secondly, the application of the Civil Code of 1984 would be a retroactive application of the law, because the applicable rules are the Civil Code of 1852 and the Civil Code of 1936, which actually allowed the expiration of the replevin action, which has indeed automatically occurred in favor of Yale University pursuant to the law applicable at that time, including without any need for a court order recognizing it. The civil laws in Peru do not have and have never had a retroactive effect.[62] In fact, pursuant to Article 560, Item 4 of the Code of 1852, the action *in rem*, including replevin, prescribes after twenty years. There should be no doubt about this, and there is unanimity in the doctrine and interpretation. Neither should an action *in personam* be applied, as this expires after fifteen years pursuant to Item 3.

Thirdly, the doctrine of "completed act" does not mandate the retroactive application of Article 927 of the Civil Code of 1984. The relevant "completed acts" are the actions and events that are the subject of the demand, not the demand itself. As the distinguished commentator Juan Espinoza has explained, "According to the *completed acts theory*, the acts occurring under the old law are governed by that law; those that occurred after the new law was passed will be governed by the new law."[63] In any case, the completed acts theory does not apply to the calculation of the period of time required for the extinctive prescription, because Article 2122 of the Civil Code of 1984 states that "[the prescription initiated prior to this Code becoming effective is governed by the previous laws," unless the period required by the Code of 1984 is shorter.[64]

Fourthly, the Peruvian Government's claim did not accrue after the Code of 1984 was promulgated. On the contrary, if Peru had a claim to recover materials, it accrued in 1921, as soon as Yale allegedly failed to return the materials covered in the Peruvian Government's claims of 1918 and 1920. Therefore, it expired 20 years later, by the end of 1941.

### 9.2    Yale has not waived extinctive prescription.

According to all the foregoing, the rules governing extinctive prescription in this case are provided by the Civil Code of 1852, not the Civil Code of 1984. The Civil Code of 1852 does not recognize tacit renunciation. Instead, according to Article 528, the defendant could only tacitly renounce extinctive prescription by acknowledging the title of the owner against whom the statute of limitations had started to run; or by admitting, without arguing the statute of limitations, that he/she is owed money; or by paying a substantial portion of the remaining debt.[65]

---

[59] VÁSQUEZ, Aníbal Torres, *Introducción al Derecho* 755.

[60] RIPERT Georges y BOULANGER Jean, *Tratado de Derecho Civil*, Tomo VI p.355.

[61] *Ibid.*

[62] *Código Civil de 1984* art. III; *Código Civil de 1852* art. II; Constitución de 1839 art. 154; Constitución de 1860 art. 15; Constitución de 1933 art. 25.

[63] ESPINOZA, Juan, *Los Principos del Título Preliminar del Código Civil de 1984* p. 140 n.24 (2005) (quotation marks omitted) (attached to the second declaration of Dr. Belaunde as Ex. 1-9).

[64] *Código Civil de 1984* art. 2122.

[65] *Código Civil de 1852* art. 528.

17

The facts argued by the Peruvian Government do not meet any of these requirements. Quite the opposite, Yale's agreement to negotiate the issue of the title in the future is a clear rejection of this title claim by the Peruvian Government. Even if the Civil Code of 1984 applies to this issue, the Peruvian Government has not argued enough facts to allow tacit renunciation. Tacit renunciation may be inferred only from conduct that without any consistent mistake with regard to its intention, invokes extinctive prescription.

As was explained by Ripert and Boulanger, "[it is evident that judges must not admit that intention lightly, deducing it from ambiguous facts that were susceptible to receiving a different interpretation; tacit renunciation is not presumed."[66] No obligation in Peruvian law requires warning the adversary[;] that one fails to do so is not inconsistent with the intention of invoking extinctive prescription.

## Conclusions

1.  The legal norms applicable to the issue of title are the Civil Code of 1852 and the Water Code of 1902.

2.  Yale acquired the archaeological artifacts through a finding or discovery with the Peruvian Government's authorization over public land.

3.  The Decree of 1921 consolidated [and] clarified the title to the finding or discovery.

4.  Yale, by acting as the owner of the artifacts for over a century in a public, continued and peaceful fashion, reinforced its ownership through usucapion and the inaction of the Peruvian Government, which was fully aware of Yale's actions.

5.  Current laws, such as Law 28778, may not be applied retroactively. The rules applicable to the issue of prescription are Article 2122 of the Civil Code of 1984 (only in regard to the duration of the laws over time) and the articles regarding the prescription in the Civil Code of 1852 and the Civil Code of 1936.

6.  The attempt retroactively to apply Article 927 of the Civil Code of 1984, which considers the *in rem* replevin action, fails because it creates a legislative and theoretical anachronism.

7.  This report is historical-legal in nature; it is not merely an analysis of the current laws, which are not applicable in this case.

8.  The plaintiff's declarations often use modern Peruvian formulations of positive law; however, what should be used are the laws in force when the discovery occurred, as well as when the acquisitive prescription or usucapion and the extinctive prescription of the *in rem* replevin action occurred.

---

[66] RIPERT Georges y BOULANGER Jean, *Tratado de Derecho Civil*, Tomo VI p. 359.

9. Pursuant to articles 1852 and 1936, the *in rem* replevin action is subject to prescription; therefore, the Peruvian Government may no longer pursue this action.

Lima, May 24, 2010.



Acción Civil N° 3:09-cv-01332-AWT

Declaración del profesor Carlos Ramos Núñez
Yo, Carlos Ramos Núñez, declaro:

**1. Calificaciones personales**

Soy de la Universidad Católica de Santa María de Arequipa (Perú), con especializaciones en Derecho Romano e Historia del Derecho en las Universidades de Roma I y de Roma II, Magíster en Derecho con mención en Derecho Civil y Doctor en Derecho por la Pontificia Universidad Católica del Perú, profesor ordinario de Historia del Derecho civil e Historia de la Jurisdicción en la Pontificia Universidad Católica del Perú, ex profesor visitante de Historia del Derecho de la Universidad de Sevilla, actual profesor de Historia del Derecho en el Doctorado en Derecho de la Universidad de Buenos Aires, investigador invitado en el Instituto Max Planck de Historia del Derecho europeo en Francfort del Meno (Alemania), *Visiting Scholar* de la Robbins Collection de la Facultad de Derecho, *Boalt Hall* de Universidad de California (Berkeley) durante dos períodos, profesor invitado de la *Cahiers des Ameriques* de la Universidad La Sorbona de París.

Soy autor de numerosos libros entre los que destacan *Toribio Pacheco, jurista peruano del siglo XIX*, *Ignacia Rudulfo Vda. de Canevaro. Una benefactora del siglo XX, El código napoleónico y su recepción en América Latina, Codificación, Tecnología y Postmodernidad. La muerte de un paradigma, Cómo hacer una tesis en Derecho y no envejecer en el intento*; *Jorge Basadre, historiador del Derecho y comparatista*. A través del Fondo Editorial del Poder Judicial, ha publicado, así mismo, *La pluma y la ley. Abogados y jueces en la narrativa peruana* y la *Historia de la Corte Suprema del Perú* y una *Historia del Palacio de Justicia*. Por medio del Fondo Editorial de la PUCP ha publicado *Crónicas de claustro: historia de la Facultad de Derecho de la PUCP* y una monumental *Historia del Derecho Civil peruano. Siglos XIX y XX*, de la que se han publicado seis tomos, el quinto y el sexto tomos en dos volúmenes, respectivamente, obteniendo el premio internacional Ricardo Zorraquín Becú, otorgada a la mejor obra de historia del derecho moderno publicada en lengua ibérica. Detenta también el premio Francisco García Calderón que otorga el Colegio de Abogados de Arequipa a las mejores investigaciones jurídicas del país; el premio Francisco Mostajo otorgado en mérito a la trayectoria democrática, y el premio Toribio Pacheco conferido a su derrotero académico. Ostento también el Premio PUCP de Investigación correspondiente al año 2006.

He sido, por otro lado, Director General de Asesoría de la Biblioteca Nacional del Perú y Director General de la Academia de la Magistratura del Perú. Institución de la que soy actualmente Miembro del Comité Consultivo, tras haber organizado su Centro de Investigaciones Judiciales. Ha sido también Director de la sección Derecho del Instituto Riva Agüero de la Pontificia Universidad Católica del Perú, miembro fundador y directivo de la Sociedad Peruana de Estudios Clásicos, editor de la revista *Crónicas de Historia del Derecho*, publicación del Instituto Peruano de Historia del Derecho; fundador y miembro del comité editorial de la revista *Diálogo con la Jurisprudencia* y *Gaceta Jurídica*, ex director de la revista *Ius et Praxis* de la Universidad de Lima, y actual codirector de la *Revista Peruana de Derecho y literatura*. Actualmente soy director de la Biblioteca del Colegio de Abogados de Lima y director de la *Revista de la Biblioteca del Colegio de Abogados de Lima*.

En representación del Perú formo parte del proyecto editorial en soporte digital e impreso, www.modern-constitutions.de (Historia de las Constituciones Modernas) que dirige el profesor Horst Dippel de la Universidad de Kassel.

1

Soy Miembro de Número de la Academia Peruana de Derecho y de la Academia Nacional de Historia y, por mismo, enterado tanto en los aspectos legales como históricos del problema.

Entiendo que como profesor de Historia del Derecho e Historia del Derecho peruano soy perfectamente competente para emitir este informe y un experto en la legislación peruana del pasado y del presente.

## 2. Sumario

Se trata de determinar cuál era la legislación aplicable al momento del hallazgo de los artículos arqueológicos por parte de Hiram Bingham. Considero que las reglas vigentes en ese momento eran las del *Ius Gentium* de la época, que regulaba la relación entre los Estados, el código civil de 1852 y las reglas del código de aguas de 1902, basados en el legado histórico del Derecho romano, el Derecho común continental europeo, el Derecho castellano como *Ius Propium* del reino de Castilla y las Indias occidentales y el Derecho indiano, gestado éste último tanto en España como en América para el gobierno de los reinos de ultramar. Debo indicar también que las normas de Derecho común prevalecían sobre las normas especiales, ya fuera por su jerarquía, como se verá a continuación, ya sea por su centralidad en el Derecho de la época, asentado en la codificación.

## 3. Antecedentes

En 1909, cuando visitó por primera vez Choquequirao, el profesor Bingham empezó a recolectar restos humanos y artefactos asociados a nuestra historia andina. En 1911, su labor de recolección de material arqueológico incluía objetos que ahora se hallan en el Peabody Museum of Natural History de la Universidad de Yale, en New Haven, Connecticut.

A través de una resolución suprema emitida por el presidente Guillermo Billinghurst el 31 de octubre de 1912, se confirió al profesor Bingham permiso para la exploración y excavación arqueológicas en el Cusco hasta el 1.º de diciembre de ese año. Así mismo, se autorizó el transporte a la Universidad de Yale de los materiales que su equipo había recolectado, a condición de ser previamente inventariados. Este documento establece que el Gobierno peruano se reserva el derecho de exigir la devolución de "los objetos únicos y la de los duplicados que se extraigan y hayan extraído, a los que se refiere el artículo 1º del supremo decreto de 19 de agosto de 1911", así como copias de los estudios e informes relativos a la expedición que se hayan conducido en el Perú.

Cuatro años más tarde, en 1916, el presidente José Pardo y Barreda, en virtud a otra resolución suprema, otorga un permiso de exportación de "setenta y cuatro cajones" encontrados en uno de los depósitos del Museo de Historia Nacional. Este documento establece que esos materiales, debían ser devueltos a Perú en un plazo de 18 meses, contados desde la fecha de la resolución (27 de enero de 1916). En 1922, se entregó los materiales arqueológicos que ahora se hallan en el Museo Nacional de Arqueología, Antropología e Historia del Perú con sede en Lima.

Cabe considerar que Hiram Bingham III, que desde su arribo al Cusco en 1908 hasta su fallecimiento en 1956, emprendió contribuciones importantes a la arqueología peruana, destacando la envergadura mundial del descubrimiento.

## 4. El pasado y el presente: del patrimonio cultural: una comparación histórica

2

Existe contemporáneamente, políticas internacionales recientes vinculadas a la conservación y eventual repatriación de objetos culturales. Ocurre, sin embargo, que tales disposiciones no pueden variar la situación existente en la época de las excavaciones.

Aquí se aplicaría el relativismo jurídico y ético de cada época. En lo personal simpatizaba con el Memorándum de Entendimiento (MOU) que suscribieron el 14 de setiembre de 2007, los representantes del Gobierno peruano y de la Universidad de Yale con la intención de resolver el reclamo de Perú sobre los materiales de Machu Picchu. Si bien no hay un reconocimiento expreso de la propiedad a favor del Estado peruano, sí se observa la intención, bajo el principio de buena fe de entregar progresivamente los materiales al Perú, sin otras condiciones que una muestra itinerante, la construcción de un museo (nada menos que en el Cusco) y de un centro de investigaciones y la conformación de directorio mixto por un máximo de 99 años, tiempo límite el usufructo. Algunos artefactos sin calidad de piezas de museo podrían ser retenidos indefinidamente por Yale por razones de investigación por un periodo de tiempo indefinido. Solo habría que organizar una "exhibición viajera" conjunta. Luego serían entregadas al Perú, siempre claro está que se construya el museo y el centro de referencia. En realidad, no puedo entender las razones por las cuales se frustró este acuerdo conveniente para ambas partes, probablemente haya sido el sectarismo y una nacionalismo mal concebido de una de las partes. Aún así, hago votos para que las partes puedan llegar a un entendimiento y algunas piezas puedan entregarse al Perú.

## 5.    Las piezas arqueológicas en el *Ius Gentium* del pasado

En el análisis de este caso, poco interesan mis sentimientos personales, cuanto al imperio de la legislación vigente en la época de los hallazgos. Como historiador del Derecho podría hacer una comparación. Rechazamos la esclavitud imperante hasta el siglo XIX en diferentes países del continente americano, pero no podemos negar que existía. Podemos negar también la servidumbre y abuso de los derechos de los pueblos originarios por parte de los conquistadores europeos, pero no podemos recusar su existencia. Del mismo modo, no podemos negar que existían ciertas prácticas culturales convenidas por los pueblos, conforme al *Ius Gentium* de la época, junto a otras prácticas imperialistas consideradas hoy insostenibles, autorizaban entonces las excavaciones, hallazgo y transporte de objetos de otras culturas que alcanzan su representación literaria en la obra del escritor Rudyard Kipling (1865 – 1936), apologista del dominio del hombre blanco colonizador, incluso premiado en 1907 con el Premio Nóbel de Literatura por la Academia Sueca, seguramente hoy imposible por su incorrección política.

En efecto, los museos del mundo están llenos de tales objetos, por muchas controversias que existan, a saber: la Piedra de Rosetta y los frisos del Partenón en el Museo Británico de Londres; la Venus del Nilo y el Zodiaco de Dendera en el Museo de Louvre; el obelisco de Ramses II en la plaza de la Concordia en París; el busto de Nefertiti en el Neues Museum de Berlín. Hallazgo coincidente éste último, hacia 1912, con Machu Pichu en el Perú. Sucede que las nociones de justicia, moral y Derecho son mudables a lo largo de la historia. No podemos juzgar el pasado con los criterios de hoy.

En el Perú, las cosas no eran diferentes. Conforme al Derecho Indiano, durante la época colonial los monumentos prehispánicos se consideraban como yacimientos de los cuales se podían extraer riquezas. Se trataba no de protegerlos, puesto que hacia ellos se manifestaba desprecio, sino de cautelar el quinto real, como lo exigían las Ordenanzas del Virrey Toledo, dadas en la Plata en 1574.

3

Simplemente se trataba de buscar metales de valor para fundirlas. Hasta se usaba de contratos por escritura pública para estas prácticas. [1]

Ricardo Palma en sus *Tradiciones peruanas* da cuenta de una excavación en la huaca Juliana, en Lima, que acabó en un homicidio múltiple de los involucrados en pos de una piedra preciosa colocada en una de las momias, a la que previamente uno de ellos había pateado. [2]

Después de la independencia estas prácticas no se detuvieron, considerándose natural y contaban hasta con el apoyo del gobierno. Según los viajeros extranjeros a mediados del siglo XIX, la recopilación de objetos arqueológicos se había generalizado. [3] En 1862 se formó una sociedad para explotar las huacas del país buscando tesoros. En 1874 salieron de Cusco con destino a Europa las colecciones de Kenner y Luhrsen. En 1880 Kunne vende su colección a museos europeos y en 1889 Garcés vendió al antropólogo suizo-norteamericano Adolph Bandelier una colección que remitió al Museo de Historia Natural de Chicago. [4] Incluso la excavación la emprendían ciudadanos comunes como pasatiempo y otros invertían para adquirir piezas. El desden por la cultura prehispánica se manifiesta también en el uso de las huacas como parapetos de guerras. Así, en 1855, la huaca Juliana fue escenario de batalla entre Castilla y Echenique. Se usó hasta artillería. En 1865 los revolucionarios hicieron lo propio. [5]

El tendido de ferrocarril de Lima a Ancón en 1870 y las obras en Chancay, intensificaron la destrucción de los sitios arqueológicos y la salida masiva de colecciones. Dos geólogos alemanes, Stubel y Reiss portaron consigo y con la anuencia del Estado peruano una cantidad ingente de piezas. [6] Hasta en la mentalidad popular se observa una imagen complaciente de esa práctica. Existe una popular marinera del norte peruano que dice así: «Yo soy un huaquero viejo, que viene de sacar huacos, de la huaca más arriba, de la huaca más abajo. Huaquero, huaquero, vamos a huaquear, toda la noche hasta el amanecer».

Un peruanista como el anticuario von Tschudi llevó antigüedades peruanas a Suiza donde hasta hoy se conservan.[7] Hacia 1919 Enrique Bruning atesoró la colección que lleva su nombre. Parte ella fue comprada por el Estado, pero en 1925 se llevó de recuerdo a Alemania un lote de objetos de oro para el Museo Etnográfico de Hamburgo. Las colecciones de Ferreyros y Miscenio Espantoso salieron del país. Incluso Max Uhle, expedicionario de la Universidad de Pennsilvania, fundador de la arqueología peruana, llevó consigo piezas a la Universidad de California, Berkeley. El médico José Mariano Macedo, precursor de los coleccionistas peruanos, en medio de la guerra con Chile, quizás por temor al pillaje, hacia 1881, a través del comerciante alemán Kruger, la vendió al Museo Etnográfico de Berlín al precio de dos mil libras esterlinas [8] Hasta un nacionalista como Julio C. Tello fue acusado de portar piezas al extranjero. [9] En 1937 el Museo Nacional de Antropología

---

[1] SAMANEZ ARGUMEDO, Roberto. «La conservación del patrimonio cultural a través de la historia». *Revista del Museo e Instituto de Arqueología*, No. 23, pp. 197 – 208, quien expone una larga lista durante la colonia y la república.

[2] PALMA, Ricardo. «El carbunclo del diablo». *Tradiciones perunas contempletas*. Aguilar, 1961, pp. 114 – 115.

[3] SAMANEZ, o., c.

[4] TELLO, Julio C. y Toribio MEJÍA XESSPE. «Historia de los Museos Nacionales del Perú 1822-1946». *Arqueológicas* No. 10, Instituto de Investigaciones Antropológicas. Lima 1967.

[5] PALMA, Ricardo. *Tradiciones peruanas*, o., c. p.

[6] *El inicio de la arqueología científica en el Perú: Reiss y Stubel en Ancón*. Lima: Museo de Arte, 2000.

[7] RAVINES, Roger. «Johan von Tschudi peruanista y anticuario», *Boletín de Lima*. Vol. XXI, No. 117, Año 21, 1999, pp. 33 – 55.

[8] LUMBRERAS, Luis Guillermo. «Historia de un desbande», *El Comercio*, Lima, agosto de 1977. También TAMAYO HERRERA, José. *Historia del indigenismo cuzqueño. Siglos XVI – XX*. Lima: Instituto Nacional de Cultura, 1980, p. 138.

[9] GUTIÉRREZ DE LA QUINTANA, Emilio. *El Manco Cápac de la Arqueología peruana Julio C. Tello*. Lima, s/n,1922, 157 pp.

recibió una donación de 3,000 dólares destinada a la preservación de los restos extraídos de Paracas, de parte del señor Nelson A. Rockefeller y en reciprocidad se le entregaron cuatro fardos funerarios. En la actualidad, funcionan en Lima numerosos museos privados, como el Museo Larco, el Museo Amano y el Museo de Oro cuyas piezas han sido obtenidas de excavaciones ilegales y compra. Sin embargo, sin esa labor este patrimonio se habría perdido.

En la misma ciudad del Cusco la situación no era diferente. Así la colección de María Ana Zenteno que fue vendida al Museo Etnográfico de Berlín en 1880. Tamayo Herrera enumera a coleccionistas junto a Zenteno, a José Miguel Medina, José Lucas Caparó Muñiz, Mariano Macedo, Vidal Olivera y Abel Montes. [10] En este contexto que tiene lugar la expedición del profesor Bingham.

## 6.   Análisis jurídico de la condición del tesoro

### 6. 1.   Derecho romano

En el Derecho clásico recogido en el Digesto 41, 1, 31, 1, en frase del jurista Paulo, en una clara línea individualista, se lee que el tesoro (thesaurus) es una cierta cantidad depositada de la que no se recuerda quién pudo ser su propietario y se hace de quien lo haya encontrado, pues no es de nadie más. [11]

Las Instituciones de Justiniano (I. 2, 1, 39), que recogen ya el Derecho de la época postclásica, establecieron, conforme a una la modificación propiciada por el emperador Adriano (117 – 138 d.C)), que marcará la tradición del *Civil Law* en la materia, seguramente interesado en razones fiscales, conforme a la equidad natural, que los tesoros encontrados en fundo ajeno, entendiéndose por ella también la propiedad del César –léase Estado-- fuese la mitad del descubrimiento y la mitad del fisco romano. [12]  Años más tarde, el año 474 d.C., los emperadores León y Zenón, hacia el año 474 d.C. dictaron una constitución imperial, que se encuentra en el Códex 10, 15, 1 que confirmaba el texto de Adriano en el sentido que si se hubiera encontrado con la voluntad del dueño un tesoro en propiedad ajena, el descubridor retendrá la mitad y entregará la otra mitad al propietario del terreno, que podía ser el Estado. [13]

Pietro Bonfante asegura: "El Derecho justinianeo da una solución cuyo origen atribuye la Instituta a una disposición del emperador  Adriano, el tesoro pertenece por mitad al dueño del fundo y al descubridor, aplicándose la regla incluso cuando el sitio del descubrimiento es un *locus Caesaris*. » Agrega: "El Fisco no adquiere su mitad sino cuando el tesoro ha sido descubierto, no ya en fundo privado, sino, en público. [14]  Se trataba, pues, del interés del *aerarium* en participar de los beneficios económicos provenientes de un descubrimiento y, consecuentemente, de promover la búsqueda de objetos valiosos escondidos. El sistema de Adriano se ha conservado en la mayoría de los códigos civiles contemporáneos. Se observa, en línea de principio, que cuando más de una persona tiene derechos sobre el tesoro se forma una comunidad. Se ve que Adriano abrazó los dos pareceres, y quiso que el señor del terreno, que puede ser el Estado, tuviese una parte por derecho de accesión, y el que le encontraba, otra, por razón de la ocupación.

[10]  TAMAYO HERRERA, José. O., c. p. 134.

[11]  *El Digesto de Justiniano*. Pamplona: Editorial Aranzadi 1975. Tomo III, p. 292.

[12]  *Instituciones de Justiniano*. Buenos Aires: Editorial Heliasta S.R.L., edición bilingüe, pp. 95 - 96.

[13]  GARCÍA DEL CORRAL, D. Idelfondo. *Cuerpo del derecho civil romano*. Barcelona: Editorial Lex Nova, Tomo V, p.521

[14]  BONFANTE, Pedro. *Instituciones de Derecho Romano*. Madrid: Instituto Editorial REUS 1965. p. 259.

### 6. 2. La condición del tesoro en el Derecho castellano

En las *Siete Partidas* de Alfonso El Sabio que se remontan a mediados del siglo XIII, la partida 3, Título 28, Ley 45 regula el hallazgo de tesoros. El tesoro se repartiría en partes iguales si con el asentimiento del propietario de un fundo, un tercero encuentra el tesoro. Las Instituciones de Asso y de Manuel consideran que se debe garantizar el pago del quinto real.[15]  Una reforma operada por la Nueva Recopilación (libro 6, título 13, ley 1), promulgada en 1640 por Felipe II, determinaba que cuando los tesoros que se encuentran sobre la tierra, ó guardados en ella artificiosamente por alguno, se aplican al Fisco, reservando la cuarta parte al inventor, que debe informar a la justicia, que modifica precisamente la ley de la partida. [16]  Aquí se observa una posición estadual favorable a la corona española que reduce la porción del descubridor de la mitad a la cuarta parte.

En la Novísima Recopilación de 1805, libro 10, título 22, relativa a los bienes vacantes y mostrencos, ley 3 también existe una regulación del hallazgo de tesoros que los atribuye enteramente al Estado. [17] Conviene advertir que Vidaurre en su proyecto de código civil critico a la norma, proponiendo que si el Estado deseaba participar por la mitad debía pagar también los gastos. [18]

### 6.3.  El Derecho indiano

Las leyes del libro 8, título 12 de la Recopilación de Indias detallaban la forma de buscar tesoros, guacas, chaquiras, joyas y otros depósitos semejantes que pertenecían a los Incas del Perú; y ordenaban que los inventores, principalmente los visitadores, debían entregar al fisco, puesto que se consideraba que eran de propiedad de la Corona y por lo tanto aplicables al Rey.   Por su buena diligencia solo correspondía darles a los inventores una merced, siempre que dieran aviso. [19]

Según Ots Capdequí en las capitulaciones o contratos del descubrimiento y población se dispuso que los tesoros que se descubriesen «en enterramientos o cualquiera otros parajes ocultos», pertenecían a la Corona «la mitad sin descuento de cosa alguna, quedando la otra mitad para la persona que así lo hallare y descubriere». [20] Juan de Solórzano, defensor siempre del punto de vista más favorable al *regalismo*, sostuvo que el Supremo Consejo de las Indias, nunca «se ha dudado, que sean lícitos estos descubrimientos aunque en consecuencia suceda que también se descubran, y destierren los cuerpos de los indios muertos, que están en las dichas huacas, como esos se vuelven luego a enterrar, y a acomodar como antes estaban» [21]. En el Derecho Indiano, a diferencia del Derecho romano,  se reconocía el derecho a premio por el hallazgo

---

[15] *Las Siete Partidas del rey don Alfonso El Sabio.* Salamanca: 1555, tercera partida, pp. 163 - 164.

[16] JORDAN DE ASSO, Ignacio y Miguel DE MANUEL Y RODRÍGUEZ. *Instituciones del Derecho Civil de Castilla.* Valladolid: Editorial Lex Nova, edición facsimilar, 1982, p. 100.

[17] *Novísima Recopilación.* París: Librería de Vicente Salvá, 1846, Tomo 4, pp. 336 – 337.

[18] VIDAURRE, Manuel Lorenzo. *Proyecto del Código Civil peruano.* Lima: Imprenta del Constitucional, 1835, tomo II, p. 7, artículo 21.

[19] *Recopilacion de Leyes de los Reynos de Las Indias,* Madrid:  Ivlian de Paredes 1681, p. 64.

[20] OTS CAPDEQUÍ, José María. *Manual de Historia del Derecho Español en las Indias.* Buenos Aires: Editorial Losada S.A. 1945. pp. 447 - 449.

[21] OTS CAPDEQUÍ, José María. *Manual de Historia del Derecho Español en las Indias.* Buenos Aires: Editorial Losada S.A. 1945. pp. 447, 448, 449.

Manuel Lorenzo de Vidaurre, que felicita el esfuerzo individual, conforme a los principios del Derecho natural racionalista que abrazaba, calificaba como "leoninas" estas leyes. Sostiene que si el gobierno quisiera participar de las ganancias, también debe participar de los gastos. [22]

## 7.    Legislación republicana

### 7.1.  Decreto Supremo  N° 89

La norma publicada el 3 de abril de 1822, suscrito por el Supremo Delegado, José Bernardo de Torre Tagle y el ministro Bernardo de Monteagudo, a la par que creaba el Museo Nacional, establece que los monumentos que quedan de la antigüedad del Perú, son propiedad de la nación. Pueden circular libremente en el país y mudar de dominio, pero el gobierno tiene un derecho a prohibir su exportación. Se prohibía la extracción de piedras minerales, obras antiguas de alfarería, tejidos y demás objetos que se encuentren en las huacas, sin expresa y especial licencia del gobierno, dada con alguna mira de utilidad pública. Incautación y multa. [23]

Adviértase que la norma no prohíbe la exportación, sino que establece que "el gobierno tiene derecho a prohibir su exportación». Por otro lado, se deja en manos del gobierno por utilidad pública la expedición de licencias para la explotación y, por ende, para su exportación también.

### 7.2.  Resolución Legislativa Congreso Huancayo

Esta norma es clave en la controversia, pues demuestra la inconstante del Estado peruano en materia de excavación y exportación de objetos arqueológicos. La norma del 28 de noviembre de 1839, dictada en el marco de una Congreso Constituyente que aprobó la Constitución conservadora de Huancayo, resolvió, a través de una resolución legislativa (que es una norma emanada de este parlamento con facultades constitucionales) que todos los peruanos que quieran trabajar en el descubrimiento de tesoros ocultos, conocidos con el nombre de Huacas, puedan hacerlo libremente sin estar obligados a pagar por los que descubrieren los derechos que existen las leyes antiguas. [24] Toribio Pacheco recuerda explícitamente la aplicación de esta ley encomiándolo, pues, ya no habría derecho de pagar las antiguas tasas. [25]

Se entiende que estos derechos se extendían también a los extranjeros, pues, no había óbice para su prohibición atendiendo al principio liberal y democrático de igualdad ante la ley, perfectamente conocido por las ideas ilustradas de los precursores de la Independencia como Simon Bolívar y San Martín, entre otros. Tampoco existe una prohibición expresa, de modo que no podían restringirse derechos a través de una interpretación *contrariu sensu*.

### 7.3.  Decreto Supremo de 1841

El Decreto Supremo 556 dictado por Agustín Gamarra,  de 1 de marzo de 1841 restablecía en el artículo 14 la vigencia del Decreto Supremo de 1822, «por el cual se prohíbe absolutamente la

---

[22] VIDAURRE, Manuel Lorenzo. *Proyecto del Código Civil peruano*. 2ª. Parte. Dominios y Contratos. Lima: Imprenta del Constitucional, 1835, Tomo II, pp. 26 – 27.
[23] *Gaceta del Gobierno*. Lima. Tomo Segundo N° 27. p. 1.
[24] Resolución Legislativa Congreso Huancayo 28 de noviembre de 1839.
[25] PACHECO, Toribio. *Tratado de Derecho civil*. Lima: Imprenta del Estado, segunda edición, 1872, tomo II,  p. 290, nota 1.

extracción al extranjero de piedras minerales, obras antiguas de alfarería, tejidos y demás objetos que se encuentren en las huacas, sin expresa y especial licencia del Gobierno, dada con alguna mira de utilidad pública». [26]

Caben aquí tres comentarios: 1. El espíritu de la norma o *ratio legis* quiere que los objetos arqueológicos no sean destruidos; 2. La exportación al extranjero no estaba, en realidad, absolutamente prohibida, pues el gobierno podía expedir una licencia para ello, siempre que hubiera utilidad pública; y 3. Una resolución legislativa con rango de ley no podía ser derogada por un decreto supremo que lo sigue en jerarquía

Por otro lado, según las propias expresiones de una detractora de la posición de Yale. Entre los papeles del profesor Bingham que se encuentra en archivo, se puede hallar la traducción al inglés de la Resolución Suprema del 16 de junio de 1887 en que el súbdito alemán Augusto R. Berns se asocia con el Estado Peruano representado por el gobierno de Andrés Andrés Avelino Cáceres para extraer «*antigüedades incaicas*» de las huacas y construcciones gentilicias del departamento de Cuzco y exportarlas a Alemania. [27]   De allí se deduce que el Decreto Supremo de 1841 no habría tenido aplicación práctica, pero sí el código civil de 1852.

### 7.4.  Código civil de 1852

El artículo 522 de este código es crucial para la controversia, pues se refiere a dos elementos: por un lado el tesoro y por el otro a "toda cosa enterrada" correspondían si se encontrara un terreno público, correspondían al que las encontró. En realidad, estamos hablando de la norma vigente en el presente litigio.

Sorprende el giro que toma el código respecto de la tradición romanista y castellana vigente desde el emperador Adriano que postulaba, conforme la equidad, la división del tesoro entre el descubridor y el Estado. Se trata de una norma inspirada en el individualismo propio del siglo XIX. Si se aplican los principios generales del Derecho que recoge también el artículo IX del título preliminar del código civil de 1852, siguiendo los criterios de equidad que introdujo en emperador Adriano y conforme tradición jurídica del Derecho Romano y del *Ius Commune,* una solución de equidad consistiría en la división de los bienes arqueológicos por partes iguales entre el Estado peruano y la Universidad de Yale. Hay dos clases de intereses en pugna: los del dueño del suelo y los del descubridor. Debe haber una transacción mixta entre dos intereses opuestos, igualmente respetables los dos.

Francisco García Calderón asegura que el tesoro y toda cosa enterrada, cuyo dueño no puede ser conocido, si se hallan en terreno público o de ninguno, corresponden al que los encontró. [28]   Toribio Pacheco señala, a su vez, que el término "objetos enterrados o ocultados" comprendería «no solamente el oro y la plata, sino las alhajas, las estatuas, los vasos, utensilios, en una palabra todo objeto de valor». De modo tal que no solo se incluyen los metales preciosos, sino «toda cosa enterrada». [29]   Recuerda Pacheco el principio adoptado por la constitución imperial de Adriano: El

---

[26] Decreto Supremo 556 1° de marzo de 1841.

[27] MOULD DE PEASE, MARIANA. «Machupicchu y el Código de ética de la Sociedad americana de Arqueología. Una invitación al diálogo intercultural». PUCP. CONCYTEC, UNSAAC, INC. Lima 2003.

[28] GARCÍA CALDERÓN, Francisco. *Diccionario de la Legislación Peruanas.* París, 1879, p. 1058.

[29] PACHECO, Toribio Pacheco. *Derecho Civil.* . Lima: Imprenta del Estado Calle de la Rifa N° 58, 1872. Tomo II, pp. 287 - 294.

tesoro pertenece por mitad, al que lo descubre, por derecho de ocupación, y al dueño del fundo, por derecho de accesión. Esto a nivel de principio, pero no a nivel de aplicación del código de 1852. Sostiene Pacheco en un párrafo esencial.

> "Si el tesoro se encontrare en terreno público o de ninguno, pertenecerá también íntegramente al inventor (522 C.). Los terrenos públicos o de nadie pertenecen en rigor al Estado, y este podría reclamar la mitad del tesoro; pero ha renunciado a su derecho, sin duda por razones de decoro". [30]

La solución que ofrece el artículo 524 del código civil es diferente y conforme a la equidad, pues, establecía que el tesoro encontrado en propiedad particular, con asentimiento del dueño, se dividía entre el dueño del fundo y el descubridor. [31]

Cabe indicar también que siendo el código civil producto de una ley promulgada por los procedimientos regulares, el decreto supremo de 1841, era derogado por tres criterios: 1. la temporalidad (una norma posterior deroga a la anterior); 2. Por la jerarquía, el código civil, siendo el producto de una ley regular derogaba a la norma inferior; 3. La codificación con un sentido de plenitud de la vida social se imponía sobre las normas anteriores de naturaleza especial a las que absorbía. [32] En general la jerarquía de las leyes dicta que el Código Civil tiene precedencia sobre cualquier resolución o decreto ejecutivo que lo contradiga. [33]

El código civil de 1852 no ha previsto ninguna norma especial que impida el derecho de ocupación de piezas arqueológicas. A nivel de la codificación peruana sería por primera vez el código civil de 1936, cuyo artículo 822, inciso 5 establece con claridad que no se consideran como tesoro los objetos arqueológicos, a saber, ceramios, tejidos, herramientas preincaicas, atribuyéndose la propiedad al Estado. [34] Norma inexistente en el código del siglo XIX por ser sencillamente los principios y la mentalidad que los inspira diferente. El código de 1936, por otro lado, no definía al tesoro, pues estimaba que esa tarea de la doctrina, pero sí legislaba sobre su destino. El artículo 887 estipulaba que el tesoro descubierto en terreno propio pertenecía al descubridor íntegramente. El artículo 888 prescribía que nadie puede buscar tesoros en terreno ajeno sin permiso del dueño. Si se descubría un tesoro con asentimiento del dueño, conforme al artículo 889, excluyendo claro está los objetos arqueológicos, se dividiría en partes iguales entre el que lo halló y el propietario del terreno, salvo pacto diverso. Prevalecía aquí en este último caso, una solución de equidad, propia del Derecho romano y el *Ius Commune* y que es la tradicional. Aquí hay punto de inflexión respecto del artículo 522 del viejo código.

El Decreto Supremo de 6 de julio de 1950, autoriza en los artículos 60 al 66, de la búsqueda de tesoros en terrenos del Estado, siempre que se acredite que el descubridor ha efectuado inversiones

---

[30] PACHECO, Toribio. *Tratado de Derecho civil*. Lima: Librería Hispano-Francesa, 1862, p.247.

[31] *Código Civil de 1852*. Lima: M. A. Fuentes & B. Gil Editores. p. 97.

[32] RAMOS NÚÑEZ, Carlos. *El código napoleónico y su recepción en América Latina* Lima: Fondo Editorial PUCP, 1997. También del mismo autor, *Codificación, tecnología y postmodernidad*. Lima: Fondo Editorial PUCP, varias ediciones y sobre el caso peruano: *Historia del Derecho civil peruano. Siglos XIX y XX*. Tomo II. "La codificación santacrucina y el código civil de 1852a. Lima: Fondo Editorial PUCP, 2001.

[33] Constitución de 1860, artículos 75 y 93; Constitución de 1867, artículos 67 y 85; Constitución de 1920, artículos 109 y 121; Constitución de 1979, artículo 87; y Constitución de 1993, artículo 51.

[34] CASTAÑEDA, JORGE EUGENIO. *Instituciones de Derecho Civil. Los Derechos Reales*. Lima: Fondo Editorial de la Facultad de Derecho de la UNMSM 1965. Tomo I, pp. 247-248.

con tal objeto; y que no se concederá autorización para la búsqueda de tesoros en zonas arqueológicas o en edificios declarados monumentos nacionales. [35]

Es de advertir que en código civil de 1936 no existen bienes de ninguno y si el tesoro es encontrado en terreno del dominio público o privado del Estado deberá dividirlo el descubridor con éste y no apropiárselo íntegramente.

Las leyes anteriormente mencionadas deben ser comprendidas en el contexto de arqueólogos como Tello y Uhle quienes exportaron importantes artefactos arqueológicos fuera del país. En aquel tiempo, Perú sostenía que los artefactos Incaicos debieran ser enviados a los museos y las universidades más importantes en Europa y los Estados Unidos para fomentar su estudio científico e inculcar orgullo nacional por medio de la diseminación del conocimiento de la civilización Incaica. La exportación de los artefactos arqueológicos solo por uso comercial – como uso de tesoro – no avanzaba esos propósitos y por tal era prohibido.

### 7.5. Decreto Supremo de 1893

Emitido el 27 de abril 1893 por el presidente Morales Bermúdez. Considerando: las exploraciones en huacas y ruinas se llevaron sin orden sin orden y sin otro objeto que satisfacer el interés individual, con prescindencia absoluta de los derechos de la Nación, prohibió las exploraciones o excavaciones para buscar objetos arqueológicos, en huacas, antiguas fortalezas, templos u otros parajes situados en terrenos públicos o de ninguno, sin una licencia especial en la forma prescrita en el presente decreto. El artículo 2 declaró monumentos nacionales a las construcciones (ojo no muebles) a las construcciones anteriores a la conquista, prohibiéndose su mutilación. La licencia se solicitará en la Capital, de la Junta Conservadora en Lima y otros departamentos. La licencia se pedirá por escrito, expresándose en la solicitud el sitio, la clase de trabajo que se trate de emprender, su objeto, tiempo que debe durar y demás detalles que contribuyan a dar idea clara del proyecto. El proyecto se realizará en presencia de la persona o personas que se nombren en representación del Gobierno.

Todos los objetos que se encontraren pertenecerán al que solicitó la licencia, pero tendrá éste también la obligación, que se expresará en el decreto respectivo, de entregar al Estado un duplicado de cada uno de los objetos que se descubran, o copia fotográfica de los que no tuvieren similares, acompañada de la descripción detallada que baste para dar idea exacta del objeto a que se refiere. 27 de Abril de 1893. Remigio Morales Bermúdez. Félix Cipriano C. Zegarra.

### 7.6. El Código de Aguas de 1902 [36]

El artículo 56 del Código de Aguas de 1902, dictado con el propósito de auspiciar el uso eficiente de los recursos naturales, establecía que el tesoro y toda cosa enterrada cuyo dueño no puede ser conocido, si se hallan en terreno público o de nadie, correspondían enteramente al que las encontró. En realidad, la norma reproducía y confirmaba al código civil de 1852 en este punto. La posición se corrobora cuando el artículo 58 ofrece otra fórmula: si el hallazgo tenía lugar en propiedad particular se dividirá por iguales partes entre el dueño del terreno y el inventor, salvo, que existieran convenios especiales. A propósito, un comentarista de la época, Enrique Patrón, escribe, preocupado en la

---

[35] Ibidem, p. 249.

[36] *Código de Aguas. Legislación vigente sobre aguas en el Perú.* Lima: Imprenta del Estado, edición oficial, 1902.

inversión privada que alentaba el código e inficionado del espíritu de la época «En realidad, no hay inconveniente para que lo que es de propiedad del Estado, pueda serlo de un particular».[37]

Por otro lado, los alcances del artículo 282 del mismo cuerpo legal no dejan lugar a dudas sobre la aplicación del Derecho común caso *sub iudice*: «Quedan derogadas todas las leyes, decretos y demás disposiciones que, acerca de la materia comprendida en la presente, se hubiesen dictado con anterioridad a su promulgación y estuviesen en contradicción con ella»[38] Conviene aclarar que en la tradición del *Civil Law*, a partir del siglo XVIII, durante la llamada "era de la codificación", los códigos se encuentran en el centro del sistema legal y tienen una vocación de plenitud normativa y de permanencia en el tiempo, esto significa que en el espectro legal se les ha considerado más importantes simbólica y empíricamente que a la legislación especial más bien de carácter rutinario y coyuntural. Otro de los efectos es la derogatoria del Decreto Supremo de 1893, en base a los criterios: 1. La jerarquía, pues es de mayor rango que la norma derogada, y 2. La temporalidad por ser posterior.

### 7.8.   Decreto Supremo 2612

Esta norma dictada el 19 agosto 1911 supuestamente modifica el artículo 11 del decreto supremo del 27 de abril de 1893 en cuanto autoriza solo la entrega de duplicados a quienes soliciten la licencia. De los objetos únicos los interesados, corporaciones científicas de carácter oficial, solo podrían tomar fotografías, sobre la base de la teoría del dominio exclusivo del Estado. Además cada vez que se conceda licencia para excavaciones o estudios habrá un representante del Gobierno. La norma, en tanto se construye el Museo de Historia Nacional con sede en Lima, para la conservación de antigüedades, prohíbe absolutamente la exportación de ellas cualquiera que sea su clase y condición, excepto en el caso de los duplicados ya referidos. Se pena con confiscación a los infractores.

Vale la pena recordar aquí que el Código de Aguas había derogado ya el Decreto Supremo de 1893. El Perú nunca ha seguido la tesis, según la cual si una ley es derogada recobra vigencia la anterior. Entre nosotros rige el principio conforme una ley deroga a otra ley. De modo que mal podía modificarse una norma ya inexistente. Nótese por otro lado que la prohibición de exportación es solo transitoria: mientras se construye el Museo de Historia Nacional. Norma, en verdad, extraña, pues conforme a los reportes oficiales dicho museo fue inaugurado el 29 de julio de 1906, contratándose al estudioso alemán Max Uhle el 14 de noviembre.[39] Vale decir que ya existía el Museo Nacional al momento de la expedición del Decreto Supremo. No podía en ese sentido gozar de vigencia normativa. Tan cierto es ello que solo en el año 1930 mediante el Decreto Ley 6938 del 15 de noviembre de 1930 se derogó expresamente en lo concerniente al hallazgo de tesoros al Código Civil de 1852 y al Código de Aguas de 1902. De no haberse hallado vigentes el año 1911 no habría habido necesidad de la derogatoria. Luego por razón de jerarquía el Decreto Supremo era incapaz de modificar un ley de rango superior.

Adviértase, por otro lado, que el Decreto Supremo de 1911 no prohíbe las excavaciones si solicita la licencia correspondiente. Algo que el profesor Bingham hizo.

---

[37] *Ibidem*.

[38] *Ibidem*.

[39] TELLO, Julio C. y Toribio MEJÍA XESSPE. "Historia de los Museos Nacionales del Perú, 1822 – 1946", *Arqueológicas* No. 10, Lima, 1967.

En la práctica y desde el punto de vista jurídico también las colecciones privadas y extranjeras no se vieron comprometidas con el Decreto Supremo de 1911. Tampoco se observa ilación numérica entre ambos decretos supremos, como exige la técnica legislativa a hacer excavaciones.

Por otro lado y este es punto esencial, la Resolución Suprema del 31 de octubre de 1912 interpretó en forma auténtica al Decreto Supremo de 1911, cuando precisó que la prohibición de exportaciones no se refería a fines científicos, sino comerciales. Razón por la cual procedía otorgar la autorización al profesor Bingham representante de la Universidad de Yale y la Sociedad Geográfica norteamericana.

### 7.9.  Resolución Suprema N° 17848

Esta norma del 31 de Octubre de 1912 precisamente consiste en la licencia otorgada al doctor Hiram Bingham, comisionado de la Universidad de Yale y de la Sociedad Geográfica Nacional de los Estados Unidos de Norte América, quien pedía permiso o licencia para practicar exploraciones y excavaciones en busca de objetos arqueológicos y osteológicos en el territorio nacional y para llevar, con destino exclusivo a aquéllas instituciones, los que obtenga como resultado de sus reconocimientos. Una vez recogidos los informes oficiales del Instituto Histórico del Perú y de la Dirección General de Instrucción Pública, se autorizó estas actividades.

La parte considerativa de la norma señalaba claramente, en alusión al Decreto Supremo de 1911: "Que, si bien es cierto que el artículo 4° de la segunda de las disposiciones citadas, prohíbe sacar fuera del país objetos de valor arqueológico, se entiende que esa disposición tiene en mira evitar que se especule comercialmente con ellos». Se hacía mención por otro lado, a las reglas de ética internacional propias del *Ius Gentium* de la época. La autorización, naturalmente, tenía un carácter excepcional y se hacía en virtud a la utilidad para la historia prehispánica del país, como en efecto sucedió. La condición era que no sufrieran daño ni se destruyen o mutilen ni el material ni las construcciones. Aspecto que se había cumplido, bajo la inspección de representantes del gobierno y con el inventario respectivo.

Debe reconocerse, sin embargo, que el gobierno peruano se reservaba el derecho de devolución de los objetos únicos y la de los duplicados que se extraigan y hayan extraído, así como copia de todos los estudios e informes relativos a las exploraciones que se hayan practicado en el territorio nacional, para declararlos oficiales; si lo creyera oportuno, previo dictamen del Instituto Histórico del Perú. Pienso que el MOE era, en sentido un buen documento, acorde al espíritu de la Resolución Suprema. [40]

### 7.10.  Resolución Suprema N° 37

Mediante esta resolución, rubricada por el propio presidente constitucional de la República y el Ministro de Instrucción Valera,  se autorizó, el 27 de enero de 1916, la exportación, a solicitud de Elwood C. Erdis, Sub-director de la Expedición científica, presidida por el doctor Hiram Bingham y organizada bajo los auspicios de la Universidad de Yale y de la National Geographic Society de Nueva York, de 74 cajones que contienen objetos arqueológicos extraídos del departamento del Cuzco en los años de 1914 y 1915. Conviene advertir que la norma fue dictada, nada menos que con los informes favorables del Museo de Historia Nacional. Se obligaban la  Universidad de Yale y la

---

[40] El Peruano – Diario Oficial 31-12-1912. pp. 820-821.

National Geographic Society a devolver en el plazo de 18 meses los objetos exportados, debiendo remitir también los estudios y fotografías sobre ellos. [41] También aquí el documento MOE resultaba una adecuada solución.

### 7.11.  Decreto Supremo de 1921

Esta norma del 11 junio 1921 sobre prohibición de la extracción, destrucción y exportación de los monumentos arqueológicos es firme en defender los objetos arqueológicos. Se entiende para fines comerciales que nada tiene que ver con fines científicos. El artículo 2 establece que el gobierno podrá conceder autorización para extraer o exportar objetos de esta naturaleza, únicamente a instituciones científicas del país o del extranjero, siempre que los trabajos se ejecuten bajo la dirección inmediata de arqueólogos profesionales o científicos de reputación internacional notoria y bajo la vigilancia del personero que el Gobierno designe». El artículo 4 insiste en la necesidad del registro o inventario. El reglamento, sin embargo, nunca fue expedido. [42] Esta norma confirmaría el título de la Universidad de Yale sobre los objetos arqueológicos.

### 7.12.  Decreto Ley 6938

Esta norma dictada, por un gobierno de facto, resultado de un golpe de Estado, el 15 noviembre 1930 atribuyó que todo tesoro y toda cosa de valor arqueológico enterrados, cuyo dueño no puede ser conocido, así se hallen en terreno público o privado, corresponden al dominio exclusivo Estado. Por primera vez en la historia legislativa del país se derogaron los artículos 522, 523, 524 y 525, del Código Civil y los artículos 56, 57 y 59 del Código de Aguas, que autorizaban la propiedad del tesoro y de otros bienes muebles encontrados.

Sin embargo, según enuncia Castañeda, al pretender ser aplicado se suscitó una controversia judicial que terminó por sentencia de la Corte Suprema de 9 de mayo de 1938 que decidió que no habiendo sido ratificado por el Congreso Constituyente dicho Decreto-Ley, la propiedad de los tesoros hallados antes de la vigencia del nuevo código civil, estaba regida por las disposiciones del código derogado. [43]

En todo caso esta norma no podría tener efecto retroactivo sobre los bienes muebles que se encontraron enterrados antes de la fecha de su promulgación.

Fernando de Trazegnies ironiza sobre la naturaleza pública de los bienes muebles en materia de objetos arqueológicos.

> «Se les considero como propiedad automática del Estado. Curiosamente, muchos de los huacos que existen en el país son legalmente de propiedad privada y nunca fueron del Estado, porque las leyes del Virreinato y de la República habían permitido siempre, dentro de ciertas proporciones y condiciones, que los particulares pudieran ser propietarios de los bienes y tesoros encontrados en excavaciones. En consecuencia, declarar que todos los bienes muebles prehispánicos son propiedad del Estado era proceder a una confiscación; lo que es contrario a todas las Constituciones que ha tenido la República. Además, es un hecho que un número enorme de piezas arqueológicas se

---

[41] El Peruano – Diario Oficial 17-2-1916. Año 75 – Tomo I. Semestre I – N° 39.

[42] Revista del Museo Nacional – Tomo XL. Antigüedades Peruanas y Protección legal. pp. 398-399

[43] CASTAÑEDA, Jorge Eugenio. *Instituciones de Derecho Civil. Los Derechos Reales.* Lima: Fondo Editorial de la Facultad de Derecho de la UNMSM. 1965. Tomo I, pp. 249 - 250.

13

encuentra en poder de personas e instituciones privadas: universidades, museos privados, coleccionistas y simples particulares». [44]

Recuerda Trazegnies que la ley 24047 y la constitución de 1993 admiten la propiedad privada de los bienes muebles prehispánicos.

## 8.    ¿Ha adquirido Yale por usucapión?

Así mismo, en esa misma línea de razonamiento, a juicio de Jorge Eugenio Castañeda, uno de los comentaristas más autorizados del código civil de 1936, como el tesoro está constituido por bienes muebles, puede el descubridor invocar la prescripción de dos o de cuatro años conforme al artículo 893 del código civil de 1936, si la reivindicación se dedujera después de cumplidos dichos plazos computados a partir del día siguiente que entró en posesión del tesoro.

En el código civil de 1852, conforme al artículo 464, se adquiere el dominio por los modos originarios de ocupación, invención y accesión, o por los derivativos prescritos en este código, sin que establezca excepción alguna respecto de las piezas arqueológicas, conforme a la mentalidad de la época, entre los que se halla la usucapión.[45] La usucapión deriva del latín, a partir de las voces *usus*, que significa uso o posesión, y *capere* que signifique obtención o adquisición, vale decir, adquisición a través del uso. [46] Lo que, efectivamente, ha ocurrido con los artefactos poseídos por Yale.

La usucapión, que recoge la fuerza sancionadora y curadora del transcurso del tiempo, como título adicional de dominio a favor de Yale se consolida con las disposiciones del código civil de 1852. Los artículos 536 y 543 juntos proveen que el título pasaría por prescripción adquisitiva a aquel que posee una cosa mueble por tres años con justo título y en buena fe se trata de la prescripción de muy largo tiempo, aplicable a todos los bienes. Fue introducida por el emperador Constantino. No se exige ni justo título ni beuna fe. Suprime definitivamente los derechos que el propietario ha descuidado de hacer valer durante cuarenta años. El emperador Teodosio redujo el plazo a treinta años. [47] El Derecho peruano recogió la figura de la tradición romanista.

Conforme el al artículo 545, el que posea una cosa por cuarenta años no estará obligado a presentar título, ni a responder sobre su buena fe. Mientras que el artículo 546 dispone que para la prescripción de muebles, se presume que el poseedor tiene justo título, si no se prueba lo contrario. Finalmente, conforme al artículo 549, el término para prescribir corre desde que principia la posesión, vale decir desde el momento del descubrimiento de las piezas y desde que la Universidad de Yale tomó el cuidado y la protección de las mismas en forma ininterrumpida, continua, pacífica y pública hasta la actualidad y, claro está, incluso con pleno conocimiento del Estado peruano.

Yale no actuó como poseedor dependiente (Servant) del Estado peruano. Yale no ha sido ni es una suerte de entidad empleada o alquilada para realizar servicios a nombre de otra (Master) y, en consecuencia, sujeta a su control, ya sea para decidir qué hacer y cómo hacerlo. La Universidad de Yale ha actuado, desde que poseer los artefactos en forma independiente al Estado peruano y con

---

[44] TRAZEGNIES, Fernando de. «La conservación moderna del patrimonio cultural de la Nación», *Patrimonio Cultural del Perú I*. Lima: Fondo Editorial del Congreso del Perú 2000. Tomo I, pp. 42 - 47.

[45] *Código Civil* de 1852 art. 464.

[46] ARIAS RAMOS, José, *Derecho romano*, Madrid, Editorial Revista de Derecho Privado, 1943, p. 231-236.

[47] RENAUT, Marie-Hélene. *Histoire du droit de la propriété*. París, Ellipses, 2004, p. 59.

14

total autonomía, sin recibir a lo largo del tiempo ninguna clase de directiva ni recomendación. [48]
Debe destacarse la especial naturaleza de la posesión que se exige para lograr la usucapión.
Dr. Belaúnde indica que la posesión de Yale sobre los artefactos no era el tipo de posesión requerida
por el código civil de 1852 porque Yale poseía los objetos con la autorización y en el nombre del
gobierno peruano, y no los poseía para si mismo.[49]  Tal conjetura no es correcta.

El articulo 536 del código civil de 1852 incorpora por referencia la definición de posesión estipulada
en el Articulo 465, según el cual "posesión" significa "la retención o uso de una cosa o derecho con
intención de quedársela para si mismo."[50]  La retención de los objetos por Yale después de 1921, sus
repetidas afirmaciones públicas que los objetos forman parte de sus colecciones permanentes, su
conversión de los fragmentos de alfarería en objetos enteros, y su disposición de los objetos sin
consultar al gobierno peruano, expresan la convicción que Yale a sostenido por mucho tiempo que
los objetos le pertenecían y su intención de quedarse con aquellos objetos es consistente con tal
convicción.[51]

No tiene importancia que Yale comenzara poseyendo los objetos en el nombre del gobierno
peruano porque, como el respetado comentarista Max Arias-Schreiber Pezet ha explicado, "la
naturaleza de la posesión puede cambiar. El que posee en el nombre de otro puede comenzar a
presentarse como el poseedor con derechos de dominio."[52]  Por tanto, "si el guardián de una casa ya
no se comporta como tal, es decir, que ya no conserva la posesión de la casa en nombre de quien lo
contrató, sino que actúa como propietario de ésta . . . comportamiento es exteriorizado y opuesto al
titular de la casa, el ex guardián ya no sería un tenedor de ella, sino un poseedor de la casa . . . que
surtirá efectos para prescribir."[53]  Aquí, el reclamo del gobierno peruano que Yale no acató sus
instrucciones para el retorno de los objetos después de 1921, necesariamente implica que Yale ya no
poseía los objetos en el nombre del gobierno peruano, si no mas bien en su propio nombre.

## 9. ¿Puede reivindicar los bienes arqueológicos el Estado peruano?

Más que adquirir por su prescripción adquisitiva de dominio o usucapión la Universidad de Yale ha
consolidado su dominio sobre las piezas arqueológicas en virtud al transcurso del tiempo. Ello
debido también a la inactividad del Estado peruano que solo después de más de noventa años se ha
interesado en el retorno de los artefactos prehispánicos.

Debe recordarse que el título de adquisición de Yale es por hallazgo de objetos enterrados u ocultos
conforme al artículo 522 del código civil de 1852, el cual prescribe este tipo de acciones reales
después de veinte años del momento en que comenzó la posesión.[54]  Por otro lado, conforme al
artículo 2212, inciso 8 del mismo cuerpo legal de 1852 se extinguen las obligaciones por prescripción
extintiva de dominio.[55]  De manera que si Yale tuviera la obligación de devolver los artefactos, en
virtud a la prescripción extintiva de dominio tal imperativo jurídico por el transcurso del tiempo se

[48] CLAPP, James, *Dictionary of the law*, New York, Random house, 2000, p. 394-395.
[49] Segunda Declaracion del Dr. Belaunde ¶¶ 8-9.
[50] *Código Civil de 1852* art. 536 n.201 (incorporando por referencia el articulo 465).
[51] *Código Civil de 1852* art. 461 (definiendo que los derechos de posesión incluye el derecho a usar la cosa y gozar sus frutos, para disponer de ella en su propia discreción, y excluir otros de poseerla o usarla).
[52] ARIAS-SCHREIBER PEZET, Max, *Exegis del Código Civil Peruano de 1984*, Tomo V p.16 (comillas omitidas).
[53] *Código Civil Comentado*, Tomo V, pp. 241.
[54] *Código Civil de 1852*, art. 522.
[55] *Código Civil de 1852*, art. 2212.

15

habría hecho inviable e inexigible. Ya fuera que hayan sido el Estado peruano o los particulares los titulares del dominio sobre las piezas, el transcurso del tiempo y las atenciones dedicadas a su cuidado ha incorporado los artefactos en el dominio y titularidad de la Universidad de Yale. El Estado peruano ha colaborado también en la configuración de esta situación jurídica al no haber interpuesto las acciones orientadas a su recuperación en los plazos que tenía para hacerlo, tanto así que dichos plazos han vencido con holgura y notable exceso. El Estado peruano no puede demostrar lo contrario.

### 9.1    La acción no es imprescriptible según las normas vigentes en su momento

Según indica la declaración del demandante, si se usara al artículo 927 del código civil de 1984 la acción seguiría intacta, puesto que la acción reivindicatoria es imprescriptible. Pero el código civil de 1984 no aplica por varias razones.

Primero, en el código civil de 1984 es la primera vez que en la historia legislativa del Perú se incluye la imprescriptibilidad de la reivindicación. Por el contrario, el código civil de 1852 no proveía la imprescriptibilidad de las acciones reivindicatorias. El artículo 560, inciso 4 claramente indica que se aplica a todas las acciones reales, incluyendo acciones reivindicatorias, y no hay otra provisión del código civil de 1852 de la cual una excepción puede ser inferida.

Lo propio puede decirse del código civil de 1936. En efecto, el artículo 1168 fija la prescripción de las acciones reales, que incluye a la reivindicación a los veinte años. La doctrina ha señalado justamente que la acción reivindicatoria forma parte de las acciones reales. Así, Joaquín Escriche, autor de la época, incluye tal figura terminantemente entre las acciones reales. [56]

Eleodoro Romero Romaña, el más importante autor de Derechos reales que comenta el código civil de 1936 señala: «A fines del siglo pasado comenzó a sostenerse que la acción reivindicatoria no era imprescriptible y que el derecho para recuperar la propiedad debía caducar en el mismo lapso de tiempo en que prescriben las acciones reales. Los autores franceses modernos combaten ardorosamente esta tesis, especialmente Planiol, Ripert y Josserand, y distinguen los derechos reales derivados de la propiedad, del derecho mismo de propiedad (…). Al estudiar la prescripción insistiremos sobre tan importante punto en el N° 130, debiendo sólo mencionar ahora que el código, en el artículo 1168 inciso 1°, dispone que la acción real prescribe a los veinte años, sin distinguir ni exceptuar a la acción reivindicatoria...». [57] La ley desbarata entonces cualquier duda que hubiera en la doctrina. En lugar de Planiol y Ripert prevalece la ley peruana. La ley es fuente de Derecho en el Civil Law por encima de cualquier doctrina o teoría.

En las palabras de un autor contemporáneo, Max Arias-Schreiber Pezet, refiriéndose al código de 1936, aplicado al caso *sub iudice*, la imprescriptibilidad de las acciones reivindicatorias establecidas en el artículo 927 del código de 1984 "no fue contemplado por el código derogado."[58] Además, la imprescriptibilidad de las acciones reivindicatorias no es un principio general de la ley civil que hubiese sido implícito en el código civil de 1852. Al contrario, el código civil de 1852 estuvo

---

[56] ESCRICHE, Joaquin, *Diccionario razonado*, Madrid, Imprenta del Colegio Nacional de Sordo-Mudos, tomo 1, p. 82
[57] ROMERO ROMAÑA, Eleodoro. *Derecho Civil. Los derechos reales*. Lima: Editorial PTCM, 1947, pp. 91 – 92.
[58] ARIAS-SCHREIBER PEZET, Max, *Exegis del Codigo Civil Peruano de 1984*, Tomo IV p.228. REVOREDO, Delia, *Exposicion de Motivos del Codigo Civil*, Tomo V, p.175 ("Esta norma [artículo 927] no tiene precedentes en el Código anterior").

16

significativamente basado en el código civil francés,[59] el cual "declara extinguida la acción reivindicatoria del propietario que ha dejado cumplir la prescripción," al proveer que "[t]odas acciones, tanto real como personales, quedan prescriptas en treinta años."[60] De esta manera, "[e]l derecho francés parece reproducir la vieja regla del derecho romano según la cual praescriptio triginta annorum."[61]

Segundo, la aplicación del código civil de 1984 sería una aplicación retroactiva de la ley, dado que las normas aplicables son el código civil de 1852 y el código civil de 1936 que sí permitían la prescripción de la acción reivindicatoria, la cual, en efecto, ya se ha producido a favor de la Universidad de Yale automáticamente por mandato de la legislación de la época, incluso sin necesidad de mandato judicial que lo reconozca. Las leyes civiles en el Perú no tienen ni han tenido efectivo retroactivo.[62] En efecto, conforme al artículo 560, inciso 4 del código civil de 1852 las acciones reales, dentro de las que se encuentra las reivindicatoria prescribe a los veinte años. Sobre eso no puede existir duda alguna y existe unanimidad en la doctrina y la interpretación. Tampoco cabría una acción personal, pues prescribe conforme al inciso 3° a los quince años.

Tercero, la doctrina de "hechos consumados" no manda la aplicación retroactiva del artículo 927 del código civil de 1984. Los relevantes "hechos consumados" son las acciones y eventos que son el sujeto de la demanda, no la demanda si misma. Como el distinguido comentador Juan Espinoza ha explicado, "en virtud de la *teoría de los hechos consumados*, los hechos cumplidos durante la vigencia de la antigua ley se rigen por esta; los cumplidos después de la promulgación de la nueva ley, se regirán por la nueva ley."[63] De todas maneras, la teoría de los hechos consumados no tiene aplicación a la calculación del periodo de tiempo requerido para la prescripción extintiva porque el artículo 2122 del código civil de 1984 provee que "[l]a prescripción iniciada antes de la vigencia de este Código, se rige por las leyes anteriores," a menos que el periodo requerido por el código de 1984 es mas corto.[64]

Cuarto, el reclamo del gobierno peruano no se devengo después de la promulgación del código de 1984. Al contrario, si Perú hubiese tenido una demanda para recuperar los objetos, se devengo en 1921, tan pronto que Yale supuestamente no retorno los objetos cubiertos en las demandas del gobierno peruano en 1918 y 1920. Por consiguiente, expiró 20 años después, al fin de 1941.

### 9.2    Yale no ha renunciado a la prescripción extintiva.

Por todas las razones mencionadas anteriormente, las reglas que gobiernan la prescripción extintiva en este caso son proveídas por el código civil de 1852, no el código civil de 1984. El código civil de 1852 no reconoce renunciaciones tacitas. En vez, de acuerdo al artículo 528, el demandado solo podría renunciar a la prescripción extintiva al reconocer el titulo del dueño contra quien el periodo de limitación ha comenzado a correr o admitiendo, sin alegar prescripción, que se le debe dinero o pagando una porción substancial de la deuda restante.[65]

---

[59] VÁSQUEZ, Aníbal Torres, *Introducción al Derecho* 755.

[60] RIPERT Georges y BOULANGER Jean, *Tratado de Derecho Civil*, Tomo VI p.355.

[61] *Ibid.*

[62] *Código Civil de 1984* art. III; *Código Civil de 1852* art. II; Constitución de 1839 art. 154; Constitución de 1860 art. 15; Constitución de 1933 art. 25.

[63] ESPINOZA, Juan, *Los Principos del Titulo Preliminar del Código Civil de 1984* p. 140 n.24 (2005) (comillas omitidas) (adjunto a la segunda declaración del Dr. Belaunde as Ex. 1-9).

[64] *Código Civil de 1984* art. 2122.

[65] *Código Civil de 1852* art. 528.

17

Los hechos alegados por el gobierno peruano no satisfacen ninguna de esas condiciones. Al contrario, el acuerdo de Yale de negociar sobre la pregunta del título en el futuro es claramente un rechazo del presente reclamo de título del gobierno peruano. Aunque el código civil de 1984 aplique a esta cuestión, el gobierno peruano no ha alegado hechos suficientes para permitir un encuentro de renuncia tacita. La renuncia tacita puede ser inferida solo de la conducta que sin equívoco consistente de cualquier intención que invoque la prescripción extintiva.

Como explican Ripert y Boulanger, "[e]s evidente que los jueces no deben admitir a la ligera esa intención, deduciéndola de actos equívocos, que fueran susceptibles de recibir otra interpretación; las renuncias no se presumen."[66]  No hay obligación en la ley peruana que requiera advertir a un adversario que sus dejar de hacerlo no es inconsistente con la intención de invocar la prescripción extintiva.

## Conclusiones

1. Las normas aplicables a la cuestión del título son el código civil de 1852 y el código de aguas de 1902.

2. Yale adquirió los objetos arqueológicos por invención o descubrimiento con la anuencia del Estado peruano sobre tierras públicas

3. El decreto de 1921 consolidó saneó el título de la invención o descubrimiento.

4. Al actuar como el propietario de los objetos por más de un siglo de manera pública, continua y pacífica, Yale consolidó su dominio con la usucapión y la inacción del Estado peruano, el que estaba perfectamente enterado de las acciones de Yale.

5. Las leyes actuales como la Ley 28778 no son aplicables retroactivamente. Las normas aplicables a la pregunta de prescripción son artículo 2122 del código civil de 1984 solo en cuanto a la vigencia de las leyes en el tiempo, y los artículos sobre la prescripción en el código civil de 1852 y en el código civil de 1936.

6. La pretensión para que se aplique retroactivamente el artículo 927 del código civil de 1984, que considera que la acción real de reivindicación, es insostenible, pues incurre en anacronismo legislativo y teórico.

7. El presente informe es de naturaleza histórico-jurídico y no simplemente un examen de las normas actuales, no aplicables al presente caso.

8. Es muy frecuente en las declaraciones del demandante el empleo de fórmulas de la legislación positiva peruana actual, no obstante que deben utilizarse las normas de la época en que se produjo el hallazgo y en la época que se cumplieron tanto la prescripción adquisitiva de dominio o usucapio como la prescripción extintiva de la acción real reinvindicatoria.

---

[66] RIPERT Georges y BOULANGER Jean, *Tratado de Derecho Civil*, Tomo VI p. 359.

18

9. La acción reinvindicatoria como una real, conforme a los códigos de 1852 y 1936, es prescriptible, en consecuencia, el Estado peruano ya no puede intentar esta acción.

Lima, 24 de Mayo de 2010.



19

## INDIVIDUAL ACKNOWLEDGEMENT CERTIFICATE

Republic of Peru        )
Province and City of Lima  )   ss:
Embassy of the          )
United States of America  )

I, **T'Errance Favors**, Vice Consul of the United States of America at Lima, Peru, duly commissioned and qualified, do hereby certify that on this day the individual(s) named below appeared before me and acknowledged to me that the attached instrument was executed freely and voluntarily:

CARLOS RAMOS NUNEZ

This Embassy assumes no responsibility for the contents of the document.

T'Errance Favors
Vice Consul
U.S. Embassy, Lima-Peru

My commission expires:
INDEFINITELY

May 25, 2010
(Date)