# EXHIBIT B-5

Case 3:09-cv-01332-AWT   Document 78-5   Filed 06/01/10   Page 2 of 22

INSTITUCIONES DE DERECHO CIVIL

# Los Derechos Reales

TOMO I

CUARTA EDICION

POR

JORGE EUGENIO CASTAÑEDA

LIMA — PERU

1 9 7 3

Case 3:09-cv-01332-AWT   Document 78-5   Filed 06/01/10   Page 3 of 22

# LOS DERECHOS REALES

TOMO I

(3ra. edición)

Por

## JORGE EUGENIO CASTAÑEDA

Universidad N. M. de San Marcos.
BIBLIOTECA CENTRAL

Lima - Perú
1965



UNIVERSIDAD NACIONAL
MAYOR DE SAN MARCOS

OFICINA GENERAL DE EDITORIAL,
IMPRENTA, BIBLIOTECA CENTRAL,
LIBRERIA Y ARCHIVO

Biblioteca de **BIBLIOTECA CENTRAL**

INGRESO
603064

CLASIFICACION:
KD
35
.C29
1965
t. I

227.—*Régimen legal de los tesoros.*—Previamente deberá determinarse qué se entiende por tesoro. Constituyen tesoro el objeto o los objetos cuyo dueño no es conocido y que están enterrados u ocultos en un bien inmueble o mueble.

La cuestión de la antigüedad de los bienes muebles que constituyen el tesoro carece de importancia, porque puede tratarse de bienes muebles de creación reciente.

No se consideran como tesoro los objetos arqueológicos, ya que uno de los requisitos es el de que el dueño no sea conocido y dichos objetos (ceramios, tejidos, herramientas preincaicas o incaicas) tienen un propietario que es el Estado (art. 822 inc. 5º cód. civ.).

Es obvio que el tesoro debe ser susceptible de valor económico y que haya sido ocultado; debe comprender sólo bienes muebles.

No sólo deberá ignorarse o no tenerse memoria del propietario, sino que nadie podrá acreditar su derecho de tal (70).

GARCÍA CALDERÓN (71), con respecto al tesoro decía: "......Depósito antiguo de dinero o alhajas, escondido, y cuyo dueño se ignora; o bien el dinero u otra cosa preciosa oculta o escondida, sobre quien nadie puede justificar derecho do dominio, y que se descubre por puro efecto de la casualidad......". "Sólo se debe tener por tesoro los antiguos depósitos de monedas o alhajas, de barras o tejos, y otras piezas fundidas por los hombres y soterradas por ladrones, o de cualquier otra manera, de tiempo inmemorial, de suerte que se ignore su dueño (art. 21, Tít. 16, Ord Mín.). Los depósitos o entierros que no pertenezcan a este número, son minas denunciables con arreglo a la ordenanza del ramo". Estas ideas son casi en su totalidad exactas, salvo en cuanto requieren la antigüedad de los bienes muebles que forman el tesoro.

Nuestro cód., sin definir el tesoro, legisla sobre su propiedad. Veamos los dispositivos pertinentes:

Art. 887.—"El tesoro descubierto en terreno propio pertenece al descubridor íntegramente".

La claridad de la regla reproducida no exige comentario alguno.

Art. 888.—"Nadie puede buscar tesoro en terreno ajeno sin permiso del dueño".

(70) Véase SALVAT, Derechos Reales, I, Nº 746 ss, p. 400 ss., LAFAILLE, III, 1 Nº 598 ss, p. 466 s.
(71) Diccionario, palabra tesoro.

---

"río o por un arroyo", o sea que este fenómeno era considerado como accesión natural.

Para el cód. civ. español las crías son frutos naturales; así, el art. 355 declara: "Son frutos naturales .......... las crías y demás productos naturales". Y en este punto debe decirse que los frutos del bien no le corresponden al propietario de éste por accesión, sino por extensión del dominio.

Como accesión también lo considera el cód. francés en el § III del art. 547.

## CAPÍTULO IV

## EL TESORO Y EL HALLAZGO

228.—*Naturaleza jurídica del tesoro.*—Es un modo de adquirir la propiedad de bienes muebles *nullius*.

Considera LAFAILLE (68), que si el descubridor es el dueño del suelo y se dispone legalmente que el tesoro le pertenece en su totalidad, es porque la mitad le pertenece *iure inventione* y la otra *iure dominii*. Agrega que el tesoro no es sólo una apropiación, porque si el descubridor fuera un extraño el tesoro le correspondería a él integramente y nada al dueño del bien; y que tampoco es sólo una extensión del dominio, porque en la distribución habría que prescindir del descubridor y todo sería para el propietario del inmueble.

El descubrimiento de un tesoro tiene importancia social incuestionable, porque hace posible que regresen al comercio jurídico una serie de valores que estuvieron apartados o segregados del mismo.

Para Clovis BEVILAQUA (69) la mejor doctrina es la que considera como una accesión este modo de adquirir, desde que el tesoro es adquirido por el propietario del inmueble donde se hallaba oculto. Desestima la invención y la ocupación. Y teniendo en cuenta que la ocupación no se requiere en el tesoro, para adquirir el dominio no es indispensable la aprehensión; basta el simple descubrimiento.

(68) III, I, Nº 599, p. 466.
(69) III, 5ª ed., p. 151.

Art. 889.—"El tesoro encontrado fuera del caso del art. 887, se dividirá por iguales partes entre el que lo halló y el propietario del terreno, salvo pacto diverso".

La división del tesoro sólo procede en el supuesto que se le hubiere buscado por un extraño con permiso del dueño; pero si la búsqueda se lleva acabo sin requerir su consentimiento o contra su consentimiento, es incuestionable que el tesoro pertenecerá íntegramente al propietario del terreno (Véase art. 2561 *in fi*e cód. civ. argentino). También se procederá a la división entre el descubridor y el dueño del suelo si el primero lo encuentra en forma casual, al realizar trabajos en predio ajeno, siendo indiferente que cuente o no con el consentimiento del propietario.

Cuando la ley ordena que el tesoro se divide por iguales partes entre el descubridor y el propietario establece una solución de equidad, que es la tradicional. En esta materia entran en conflicto dos intereses: de un lado, el del descubridor que encuentra bienes *nullius*, que le corresponden por ser el primer ocupante; debiendo atenderse también a la circunstancia de que con el descubrimiento se incorpora dicha riqueza a la colectividad. Pero de otro lado está el interés del dueño del terreno que, conforme al art. 834 del cód. civ, tiene derecho a todo lo que está dentro de su predio, con mayor razón lo que se encuentra bajo del mismo, no siendo ni las minas ni las aguas.

Deberá tenerse por descubridor al que primero hace visible el tesoro, sea totalmente o en parte; no al que lo aprehende. No es descubridor el obrero alguien el dueño del terreno o un extraño, con permiso del dueño, le encarga hacer excavaciones para la búsqueda de un tesoro; pero sí será considerado el obrero como descubridor si las excavaciones u otros trabajos de demolición no tienen la finalidad de buscar tesoro sino otra distinta.

No existe en nuestro cód. ninguna fórmula que resuelva el supuesto del tesoro hallado en un inmueble sujeto a la hipoteca o anticresis. El art. 2566 cód. civ. argentino dispone que el tesoro no está comprendido en el gravamen. Tampoco se resuelve el caso del tesoro hallado por un condómino (art. 2557 cód. civ. argentino), o por un usufructuario, usuario o habitador (art. 2558 cód. civ. argentino). Como es lo razonable el tesoro se divide por partes iguales entre el descubridor y los dueños o el dueño del terreno.

Nuestro cód. no prevé la hipótesis de que el tesoro se encontrará oculto dentro de un bien mueble; empero, tendrían que aplicarse analógicamente las reglas anteriormente reproducidas.

248

El Decreto Supremo de 6 de julio de 1950, que establece nuevas disposiciones para controlar el patrimonio fiscal, se ocupa en los arts. 60 al 66, de la búsqueda de tesoros en terrenos del Estado. Dispone que se requiere que la autorización conste en resolución ministerial, dictada por intermedio de la Dirección de Bienes Nacionales; que se deposite el valor de las obras de reparación cuando la búsqueda se efectúe en fincas, terrenos urbanos o rústicos dedicados a la agricultura, pero no cuando se trate de terrenos eriazos; que toda autorización es por el término de un año, el cual ni puede prorrogarse, si se trata de búsqueda de tesoros en fincas, y sí es en terrenos el plazo es de dos años prorrogable por período igual siempre que se acredite que el descubridor ha efectuado inversiones con tal objeto; y que no se le concederá autorización para la búsqueda de tesoros en zonas arqueológicas o en edificios declarados monumentos nacionales.

228.—El tesoro encontrado por uno de los cónyuges.—Establece el inc. 8° del art. 184 cód. civ. que son bienes comunes: "El tesoro descubierto, aunque se hallare en predio de alguno de los cónyuges".

Si uno de los cónyuges descubre el tesoro en un bien común, en un bien propio o en bien de propiedad ajena acrecerá su valor la masa de los bienes comunes.

No parece que deberá observarse esta disposición, si el tesoro es descubierto por un extraño en bien propio de uno de los cónyuges. En tal supuesto, juegan los principales generales que hemos visto anteriormente. Nos referimos, naturalmente, a la participación que corresponda a uno de los cónyuges, la que no podrá reputarse como bien común.

La fórmula se explica porque el hallazgo de un tesoro es obra de la casualidad, siendo justificado que el beneficio se comparta por igual entre ambos cónyuges; ambos participan por igual de la ventura o de la desventura. El mismo principio está invívito en el inc. 7° del art. 184, cuando previene que son bienes comunes las ganancias obtenidas por el marido o la mujer en las loterías.

229.—Legislación anterior sobre tesoros.—En el cód. civ. de 1852 se legislaba sobre tesoros en los arts. 522 a 525. Se declaraba en el primero que el tesoro encontrado en terreno público o de ninguno correspondía al que lo encontró. Es de advertir que en la nueva legislación no existen bienes del dominio público o privado del Estado deberá dividirlo el descubridor con éste y no apropiárselo íntegramente.

249

Con fecha 15 de noviembre de 1930 se promulgó el Decreto-ley Nº6938, que con respecto a los tesoros que se encontraran por los particulares, disponía lo que sigue: Que el tesoro, así se encontrare en terreno eriazo, labrado o edificado, a no ser el Estado, que el Estado podía conceder un premio prudencial a los descubridores y a los propietarios del terreno o edificio donde se encontrara el tesoro, que no podría exceder del 10 por ciento del valor del tesoro; y que el mismo premio se concedería a quienes denunciaren la extracción clandestina de tesoros.

Sin embargo, al pretender ser aplicado se suscitó una controversia judicial que terminó por sentencia de la Corte Suprema de 9 de mayo de 1938 (72), que decidió que no habiendo sido ratificado por el Congreso Constituyente dicho Decreto-ley, la propiedad de los tesoros hallados antes de la vigencia del nuevo cod, civ, estaba regida por las disposiciones del cód. derogado.

230.—*Reivindicación del tesoro.*—Si alguien se presentara reclamando la propiedad del tesoro, es evidente que la reivindicación prosperará si demuestra su dominio en forma indubitable. Por más antiguo que hubiere sido el ocultamiento y por más remoto que fuere el antecesor del reivindicante que lo ocultó, no cabe invocar la excepción de prescripción de la acción reivindicatoria. Tratándose de bienes muebles, esta acción no prescribe jamás, porque el derecho mobiliario de propiedad no se extingue por el no uso, por el abandono. En cambio, tratándose de bienes inmuebles el abandono si hace perder la propiedad a favor del Estado. Tampoco cabría invocar que ha funcionado la prescripción adquisitiva, porque nadie poseyó el tesoro hasta su descubrimiento; y para prescribir es necesario poseer.

Como el tesoro está constituido por bienes muebles, puede el descubridor invocar la prescripción de 2 o de 4 años conforme al art. 893 cód. civ., si la reivindicación se dedujera después de cumplidos dichos plazos computados a partir del día siguiente que entró en posesión del tesoro.

231.—*Tesoros sumergidos en los cursos de agua.*—No obstante que ahora todas las corrientes de agua, como los cauces por donde

(72) En A. J., 1938, p. 36.

ellas discurren, y los lagos y sus álveos son del Estado (inc. 4º art. 822 cód. civ.), los objetos sumergidos en ellas continúan perteneciendo al dueño primitivo, siendo aplicable en este supuesto el art. 62 del cód. de aguas:

"Los objetos sumergidos en los cauces públicos siguen perteneciendo a sus dueños; pero si en el término de un año no los extrajesen serán de las personas que efectúen la extracción, previo el permiso del juez del lugar. Si los objetos sumergidos ofreciesen obstáculo a las corrientes o a la viabilidad se concederá por la autoridad un término prudente a los dueños, transcurrido el cual sin que hagan uso de un derecho, se procederá a la extracción como de cosa abandonada.

"El dueño de objetos sumergidos en aguas de propiedad particular, solicitará del dueño de éstas el permiso para extraerlos, y en el caso de que éste lo negase, concederá el permiso el juez del lugar, previa fianza de daños y perjuicios".

A tenor de este texto y de la doctrina general, sólo será tesoro sumergido en cauce público cuando se trate de dueño desconocido. Empero, no obstante ser el dueño conocido, si éste no procede a la extracción de los objetos sumergidos en el plazo de un año, dichos objetos pertenecerán a quienes hagan su extracción. Distingue entre cauces públicos y privados, los que ya no existen, porque todos son del Estado.

Contiene también esta fórmula la manera de determinar cuándo se reputan abandonadas ciertas cosas muebles.

232.—*Tesoros sumergidos en el océano.*—Si se encuentra dentro del mar territorial y siendo éste bien del Estado, le pertenece el 50 por ciento del mismo, además de haber dado su consentimiento para la búsqueda. En el mar libre, el tesoro sumergido es integramente del descubridor. Véase, asimismo, el Reglamento de Capitanías de 1952.

233.—*Régimen legal sobre las cosas perdidas o extraviadas.*— Las cosas que se han extraviado no son susceptibles de apropiación. Existe la obligación legal de dar aviso al dueño, si fuere conocido, si esto no consta deberá avisarse al juez y, a su falta, a la autoridad local (art. 884 cód. civ.) (73).

(73) Debe consultarse lo que al respecto exponen SALVAT, Derechos reales, I, Nº 785 ss, p. 407 ss; y LAFAILLE, III, I, Nº 612 ss., p. 475 ss.

# EXHIBIT B-6

# DICCIONARIO

### DE LA

# LEGISLACION PERUANA

POR

## FRANCISCO GARCÍA CALDERON

EX-DECANO DEL ILUSTRE COLEGIO DE ABOGADOS DE LIMA

MIEMBRO CORRESPONDIENTE DE LA REAL ACADEMIA ESPAÑOLA

---

## SEGUNDA  EDICION

Corregida y aumentada con las leyes y decretos dictados hasta 1877



<table>
<tr><td>LIMA</td><td></td><td>PARIS</td></tr>
<tr><td>EN LOS DEPÓSITOS Y AGENCIAS</td><td></td><td>LIBRERÍA DE LAROQUE Jeune</td></tr>
<tr><td>DEL AUTOR</td><td></td><td>1, QUAI VOLTAIRE.</td></tr>
</table>

1879

de las denominaciones *hacienda pública*, *hacienda nacional*, y con ellas, ó con sólo la palabra hacienda se denota el tesoro ó los bienes que posee el Estado.

Como la hacienda nacional debe gastarse en beneficio público, todos tienen interes en que se conserve. Por esto todo ciudadano tiene derecho á velar sobre la hacienda nacional; y puede denunciar á los defraudadores, que son considerados como enemigos capitales. (Dec. 18 Mzo. 1824.) V. ADMINISTRACION, BIENES NACIONALES, CAUSAS DE HACIENDA, ESTADO, DIRECCION DE HACIENDA, EMPLEADO, FISCAL, GASTOS, y ESCUELA DE AGRICULTURA.

HALLAZGO. Segun el Código civil el *hallazgo ó invencion* es un modo originario de adquirir. Por él se adquiere, conforme á las disposiciones que vamos á insertar en este artículo, el dominio de una cosa ocultada ó perdida, cuyo dueño no puede ser conocido. (404 y 514. C.) En este artículo se usa indistintamente de las palabras hallazgo ó invencion. Es cierto que esta última, en una de sus acepciones, significa lo mismo que hallazgo; pero tambien denota el descubrimiento de algun principio científico; y como éste es un asunto enteramente distinto del que vamos á tratar, nos ocuparemos de él en el artículo INVENCION.

El hallazgo se diferencia de la ocupacion, en que por ésta adquirimos las cosas que no tienen dueño; y por el hallazgo, las que han pertenecido á una persona que las ha perdido ó echado, con ánimo de desprenderse de ellas.

Miéntras el dueño de una cosa no haya hecho el ánimo de quedarse sin ella, se puede decir que se conserva su dominio, y que nadie puede hacerse dueño de la cosa que él perdió. Por esta razon el hallazgo no confiere la propiedad inmediatamente, sino despues que por el trascurso del tiempo, y á mérito de las diligencias que se han hecho, se puede presumir que la cosa hallada no tiene dueño conocido, ó se lo tuvo, ha sido abandonada por él.

Se puede hallar una cosa mueble que ha sido perdida ó abandonada, las especies que se han salvado de un naufragio ó echazon, y el tesoro y demas cosas enterradas. En cada uno de estos casos se siguen distintas reglas.

1º El que se halla una cosa, está obligado: 1º á poner carteles en los lugares de costumbre, avisando que la ha hallado; 2º á publicarlo por los periódicos, donde los haya; 3º á dar parte al juez del lugar. (515. C.) Si el dueño parece y prueba que la cosa es suya, dando sus señales, le será devuelta. El inventor tendrá derecho á que se le paguen los gastos hechos en conservar la cosa, y en averiguar quien es su dueño. (516 y 517. C.) Pero si en el término de seis meses, contados desde que se fijaron los carteles, y se hicieron las demas publicaciones dichas, no parece el dueño de las cosas halladas, corresponderán al que las halló. (521. C.)

2º El que halle cosas arrojadas por el mar, que se presume hayan sido de la propiedad de alguno, estará obligado á avisarlo al juez del lugar. Este las hará depositar, y dará cuenta inmediatamente á la autoridad política del departamento, para que se publique en los periódicos la relacion de ellas. (518. C.) Las cosas encontradas en la playa, por resultado de naufragio ó de echazon, se entregarán al dueño, tan luego que parezca y acredite que le pertenecen. El dueño pagará al inventor los gastos de conservacion de las cosas, y

además, por vía de premio, un quince por ciento sobre el valor de ellas. (519 y 520. C.) Si en el término de seis meses contados desde que el inventor dió aviso al juez del lugar, y se publicó la relacion de las cosas halladas, no pareciere el dueño de ellas, se devolverán al que las halló. (521. C.)

3º El tesoro y toda cosa enterrada, cuyo dueño no puede ser conocido, si se hallan en terreno público ó de ninguno, corresponden al que los encontró. (522. C.)

Ninguno puede buscar tesoro en terreno labrado ó edificado, sin consentimiento del dueño de éste. (523. C.) En todo caso el tesoro encontrado en propiedad particular se dividirá por iguales partes entre el dueño del terreno y el inventor, salvo los convenios especiales. (524. C.)

El que ha buscado tesoro en fundo ajeno, debe dejar el fundo en estado que no cause perjuicio al propietario. (525. C.) Véase además DENUNCIA DE MINAS, BIENES MOSTRENCOS, DESCUBRIMIENTO y NAUFRAGIO.

Por el decreto de 11 de Noviembre de 1839 se mandó establecer en Lima una casa de hallazgo, que no ha llegado á plantificarse.

HALLAZGO. El que halla una cosa está obligado, segun las leyes civiles, á presentarla para que sea restituida al dueño. Si no se cumple esta obligacion, hay mala fé porque el inventor, no pudiendo mirar la cosa como suya, la oculta maliciosamente. Hay, pues, en este caso una verdadera defraudacion. Los que se nieguen á restituir la cosa ajena que hubiesen encontrado perdida, deben ser castigados con la pena de los defraudadores, en proporcion al valor de la cosa. (346. § 9º. Pen.) V. DEFRAUDACION.

La misma obligacion que con las cosas, se tiene con respecto á los menores perdidos. El que encuentre perdido ó desamparado á un menor de siete años, está obligado á recogerlo ó depositarlo en lugar seguro, dando cuenta á los padres ó guardadores del menor, ó á la autoridad. Si no lo hace, se le mira como reo de sustraccion; y como tal debe ser castigado con multa de veinticinco á doscientos pesos. (314. Pen.) Esta disposicion tiene por objeto favorecer á los menores, haciendo forzoso por la pena los deberes que la humanidad y la religion prescriben para con ellos. V. AUTORIDAD.

HARAGAN. El que huye del trabajo, y pasa la vida en ocio. V. VAGO.

HARINA. El grano molido y reducido á polvo.

El Sub-prefecto del Callao debe hacer reconocer las harinas y trigos que se introduzcan por ese puerto, por medio de una comision y bajo las formalidades debidas, que aseguren el acierto y responsabilidad del resultado; y debe dar parte del resultado.

Cuando haya motivo de duda ó discordia en la comision, el intendente debe remitir con las precauciones de estilo las muestras de trigos y harinas á Lima, para que allí se haga nuevo reconocimiento; y nunca debe disimular el mas pequeño fraude que se intente hacer con el objeto de introducir trigos ó harinas nocivas á la salubridad pública; y dar cuenta de todo oportunamente. (Dec. 21 May. 1839.)

Al que vende trigos ó harinas corrompidas se le aplica, en favor del denunciante, la multa de 500 pesos por cada saco ó barril. Para la imposicion de esta pena no debe preceder otra formalidad que la simple averigua-

cion del hecho, y la declaracion jurada de tres peritos nombrados para el reconocimiento. Estas diligencias las practica un juez, y están sujetos tambien á la pena los abastecedores que amacen estas harinas. (Dec. 2 Jun. 1839.)

Los vendedores de harinas y trigos pueden libertarse de la multa, denunciando en tiempo el mal estado de ellas. Entónces pueden obtener permiso de venderlas para cebar puercos, ú otros objetos en que se consulte la salubridad pública, con intervencion de la policía. Esta disposicion no tiene lugar cuando son sorprendidos ántes de hacer la denuncia, pues entónces se les impone la multa. (Dec. 24 Jul. 1839.)

Para el reconocimiento se nombran dos peritos, uno por el interesado y otro por la prefectura.

En caso de discordia se nombra un tercer perito por los otros dos. Todos deben jurar que desempeñarán bien y fielmente el cargo; y practicar la operacion en el menor tiempo posible, para evitar los perjuicios que ocasionaría la demora. Si del reconocimiento resulta que los trigos ó harinas son nocivos á la salubridad pública, se arrojan al agua, y se impone la multa. (Dec. 24 Jul. 1839.)

Estas disposiciones se han dado solamente para el Callao; y desde el restablecimiento de las municipalidades, á quienes corresponde el cuidado de la salubridad pública, debe entenderse con ellas lo dicho con respecto al Sub-prefecto.

En todas las Aduanas de la República los administradores tienen facultad de mandar arrojar al agua, con conocimiento de los interesados, todo artículo corrompido, sea de los de expedita entrega en el muelle, ó de los depositados en almacenes. (187. R. Com.)

Como estas medidas no son bastantes para impedir que se vendan artículos nocivos, porque no todos pasan por las aduanas, ni todos los que pasan se depositan en ellas, la municipalidad de cada lugar tiene facultad para destruir los comestibles nocivos y las bebidas dañosas, comprobada que sea su mala calidad. V. COMESTIBLES, GRANOS y CONCEJO.

HEBDOMADARIO. En los cabildos eclesiásticos y comunidades regulares, se llama así la persona que se destina cada semana para oficiar en el coro ó en el altar.

HECHO. Con esta palabra se designan en general todas las acciones ú obras que pueden practicar los hombres; pero en el foro llamamos *hecho* á toda accion de la cual puede resultar una obligacion al que la practica; así es que en cierto sentido hay cuatro clases de hechos, que son los contratos y los cuasi-contratos, los delitos y los cuasi-delitos. (1219. C.) Todos estos hechos están sujetos á las reglas que se han insertado en los artículos que se refieren á ellos.

Los hechos de los hombres pueden no solamente ser el orígen, sino tambien el objeto de las obligaciones. Por ejemplo, si un individuo ofrece donar sus bienes, con la condicion de que el donatario le preste su servicio, este servicio ó hecho es el objeto de la obligacion. En este sentido la palabra hecho equivale á *condicion* ó *causa*; las cuales pueden verse en los lugares respectivos.

En los juicios se llama *hecho* el caso, suceso ó accion que dá motivo al litigio. Por ejemplo, en un juicio de intestado hay dos

# EXHIBIT B-7



# RANDOM HOUSE WEBSTER'S

# DICTIONARY

## OF THE

# Law

JAMES E. CLAPP
Member of the New York and
District of Columbia Bars

Random House
New York

**separate maintenance** to **servant**

males could pass constitutional muster; but by laying heavy emphasis on the requirement that any such scheme have an "exceedingly persuasive justification" (a phrase used nine times in the opinion), the Court made it clear that sex segregation in public education can no longer be justified simply by invoking the concept of "separate but equal."

**separate maintenance** *n.* See under MAINTENANCE.

**separate opinion** *n.* See under OPINION.

**separate property** *n.* **1.** property owned by one spouse separately from the other.
**2.** property that is not considered as MARITAL PROPERTY or COMMUNITY PROPERTY; for example, property that belonged to one of the spouses before they got married, property received by one spouse during the marriage as a gift or from a decedent by will or intestate succession, or property that the spouses have agreed to treat as separate property under a MARITAL PROPERTY AGREEMENT.
Also called **individual property.**

**separate property state** *n.* Same as COMMON LAW STATE.

**separate return** *n.* See under RETURN.

**separate trial** *n.* See under TRIAL.

**separation** *n.* **1.** the termination of cohabitation of a husband and wife, or the status of a husband and wife who are living apart, either preliminary to a divorce or instead of divorcing.
**2. legal separation** separation of spouses pursuant to a court order or, sometimes, pursuant to a SEPARATION AGREEMENT.

**separation agreement** *n.* a formal agreement between spouses stating that they will live apart and setting forth the terms of their separation.

**separation of church and state** *n.* the principle that government should not meddle in or involve itself with religion, as by dictating, discriminating among, or subsidizing religious beliefs or practices. The principle is embodied in the *Establishment Clause* and *Free Exercise Clause* of the First Amendment to the Constitution. See also sion at ESTABLISHMENT OF and FREE EXERCISE OF RELIGION; also FREEDOM OF RELIGION; SEPARATION BETWEEN CHURCH STATE.

**separation of powers** *n.* the that government should have separate branches: a legislature to make laws, an executive branch to minister them, and a judicial interpret them and resolve arising under them. For the government of the United States first three articles of the Constitution define the powers of each of three branches in turn. In practice is much overlap and interplay the three branches.

**separation settlement** *n.* **1.** a RATION AGREEMENT, especially provides for transfer or property.
**2.** property to which one pursuant to such an agreement. Cf. MARRIAGE SETTLEMENT.

**sequester** *v.* to segregate, isolate apart, especially by court order quester property is to hold it pending a decision on its disposition; sequester witnesses is to keep from talking to each other or to testimony during a trial; to a jury is to keep it in isolation trial or during deliberations and shield it from outside influence. —**sequestrable** *adj.*
—**sequestration** *n.*

**sequestrate** *v.*, **sequestrated**, **trating.** Same as SEQUESTER.

**sequestrator** *n.* **1.** the person nated by a court to hold sequestered property.
**2.** an official who executes a tion order.

**servant** *n.* an employee; a person to perform services for another (a MASTER) and subject to the other's control both as to what work is and how it is done (in contrast to an INDEPENDENT CONTRACTOR, who

axonomy).  See also BORROWED SERV-
ANT; FELLOW SERVANT; and see note at
MASTER AND SERVANT.

**serve** *v.*, **served, serving.** to effect SERV-
ICE of papers or process. See also PROC-
ESS SERVER.
— **server** *n.*
—— **Usage.** One can speak of serving ei-
ther the person or the papers: *The mar-
shal served the defendant with the sum-
mons. The marshal served the summons
on (or upon) the defendant.*

**service** *n.* **1.** Also called **service of
process.** the giving of formal notice of
judicial proceedings or a judicial act to
a person involved, by delivering a copy
of the PROCESS to the person or follow-
ing some other procedure prescribed by
law.
**2.** the act of providing a copy of any
paper filed with the court, such as a
motion or affidavit, to the other parties
or attorneys in the case. Normally a
court will reject the paper if this has
not been done. Cf. EX PARTE.
**3. personal service**  hand delivery of a
copy of the process directly to the in-
tended recipient or to an agent author-
ized to accept process.
**4. service by publication**  the printing
of notice of an action in a newspaper in
the hope that the person affected by it
will see it. This is the least effective
method of service, allowed only in cer-
tain situations and only as a last resort.
**5. sewer service**  purported service of
process by a process server who files a
return falsely stating that he has ef-
fected service. The term derives from
the idea of a process server throwing
the papers down a sewer to save the
trouble of locating and serving the indi-
vidual who was to receive them. To
make it difficult to file false affidavits of
service, some statutes require that proof
of service include a physical description
of the individual to whom the papers
were given.
**6. substituted service**  any of several
methods of service permitted in place
of personal service under certain
circumstances, such as service by mail.
Also called **constructive service.**

See also *affidavit of service* (under AFFI-
DAVIT); NAIL AND MAIL; PROOF OF SERV-
ICE; RETURN OF SERVICE.

**service mark** *n.* **1.** a name, symbol, or
other MARK used by a company to iden-
tify its services and distinguish them
from the services of others. For exam-
ple, the distinctive logo of a bank or a
restaurant chain would be a service
mark.
**2. registered service mark**  a service
mark that is a *registered mark* (see un-
der MARK). See also ®; SM.

**service redlining** *n.* the practice of a
business in refusing or failing to pro-
vice services to specific neighborhoods
either out of safety concerns (as in the
case of PIZZA REDLINING or taxi redlin-
ing) or because of economic considera-
tions.

**services** *n.pl.* in older law, the labor of
a wife or child contributing to the eco-
nomic welfare of a man's household.
The common law recognized a man's
right to recover damages for the loss of
such services from anyone who injured
or enticed away his wife or child. Since
the husband owed no services to his
wife, she had no corresponding right of
action. To the extent that loss of eco-
nomic services of a family member is
recognized as giving rise to a tort claim
today, it applies without regard to the
sex of the spouse or the parent.  See
also CONSORTIUM.  Cf.  THEFT  OF
SERVICES.

**servient estate** *n.* See under ESTATE³.

**servient tenement** *n.* See under ES-
TATE³.

**servitude** *n.* **1.** Also called **involuntary
servitude.** forced labor; working for
another against one's will, whether for
pay or not. This includes not only SLAV-
ERY but also such schemes as requiring
a person to work for one to whom he is
indebted in order to work off the debt.
It is outlawed by the Thirteenth
Amendment (see Appendix), except as
punishment for a crime. Public respon-
sibilities such as jury duty and military
service for draftees are not barred by
the Thirteenth Amendment.
**2.** a right to use another's land for a

# EXHIBIT B-8

# DICCIONARIO RAZONADO

DE

# EGISLACION Y JURISPRUDENCIA,

POR

# DON JOAQUIN ESCRICHE,

ABOGADO DE LOS TRIBUNALES DEL REINO.

La ciencia de las leyes es como fuente de justicia , et aprovéchase della
el mundo mas que de las otras ciencias ; *ley* 8 , *tit.* 31, *Part.* 2.

## Segunda edicion, corregida y aumentada.

## TOMO PRIMERO.

**MADRID:**

IMPRENTA DEL COLEGIO NACIONAL DE SORDO-MUDOS.

el que tiene ambas acciones obrará con mas cordura valiéndose primero de la posesoria, pues una vez constituido en la posesion echa sobre su adversario la carga de probar el derecho que pretendiere á la propiedad. Tal es el consejo que da Cayo en la ley 24, ff. de *rei vind: Is qui destinavit rem petere, animadvertere debet an aliquo interdicto possit nancisci possessionem, quia longe commodius est ipsum possidere, et adversarium ad onera petitoris compellere, quàm, alio possidente, petere.*

Las acciones posesorias se llaman *interdictos,* que pueden verse en su lugar. Véase tambien *Juicio petitorio y posesorio.*

ACCION PIGNORATICIA. La que dimana de prenda, que en latin es *pignus.* Hay dos acciones pignoraticias, una llamada directa y otra contraria La *directa* corresponde al deudor para reclamar la alhaja empeñada luego que el acreedor está satisfecho de su crédito, en cuyo caso debe este restituirla; *ley* 23, *tít.* 13, *Part.* 5.

La *contraria* compete al acreedor contra el deudor para la indemnizacion de los gastos que hubiere hecho en la prenda, y de los perjuicios que en razon de ella se le hubieren seguido por no ser equivalente al débito, ó no ser propia del deudor, ó por otra causa semejante.

El acreedor no puede de su propia autoridad prendar ó tomar los bienes del deudor; y si lo hiciere deberá ser condenado á volverlos á su dueño, y pagar al rey otro tanto como importa la deuda, perdiendo ademas por el mismo hecho la accion que contra el deudor tenia; *leyes* 11, *tít.* 13, *Part.* 5; y 1, 5 y 6, *tít.* 34, *lib.* 11, *Nov. Recop.* Véase *Acreedor pignoraticio.*

ACCION PUBLICA Ó POPULAR. La que se concede por la ley á cualquiera vecino en los asuntos que interesan al pueblo, como v. gr., usurpaciones de caudales y fondos públicos; y asimismo en los delitos que se llaman públicos y causan daño al cuerpo social. Véase *Acusacion* y *Acusador.*

ACCION PUBLICIANA. La que compete al que perdió una cosa que poseia con buena fé, sin haberla usucapido ó prescrito todavía, contra cualquiera que la detuviese, á no ser que fuese su verdadero dueño; *ley* 13, *tít.* 11, *Part.* 3, y ley 50 *al fin, tít.* 5, *Part.* 5.

La introdujo un pretor llamado Publicio, fundado en la equidad, revistiendo de la calidad de dueño al que todavía no lo era, pero que tenia mas derecho á la cosa que el tercero que la detentaba.

Esta accion pertenece á la clase de las acciones reales.

ACCION REAL. La que nace de alguno de los derechos llamados reales, esto es, del dominio pleno ó menos pleno, de la sucesion hereditaria, de la servidumbre, ó de la prenda é hipoteca. Llámanse *reales* estos derechos, porque no afectan á la persona sino á la misma cosa, fijándose y encarnándose, por decirlo así, en ella.

Todas las acciones reales nos competen ó se nos dan contra cualquiera poseedor, séanos conocido ó desconocido, hayamos ó no tratado con él: lo que no sucede en las acciones personales, las cuales se nos dan contra las personas con quienes hemos contratado y no contra terceros.

Se tiene por poseedor contra quien podamos ejercer nuestras acciones reales, no solo el que posee actualmente la cosa sino tambien el que dolosamente ha dejado de poseerla. De aqui es que si el demandado destruye maliciosamente ó pierde por su culpa la cosa que es objeto del litigio, debe pagar el valor de ella con los daños y perjuicios, segun juramento del actor y prévia tasacion del juez; *ley* 19, *tít.* 2, *Part.* 3. Mas si la cosa se perdiere ó destruyere por algun accidente sin malicia ni culpa del demandado, deberá este ser absuelto en el caso de ser poseedor de buena fé; pero en el caso de serlo de mala, estará obligado á pagar su valor y los perjuicios en los términos indicados; *ley* 20, *tít.* 2, *Part.* 3, y *ley* 6, *tít.* 14, *Part.* 6.

Como son cuatro las especies de derechos reales, deben ser tambien cuatro las clases de acciones que de ellos dimanan.

La primera clase, que es la que nace del dominio, abraza tres acciones reales, que son la accion reivindicatoria, la accion publiciana, y la accion rescisoria conocida con el nombre de restitucion *in integrum.*

La segunda clase de acciones reales, que es la que nace del derecho hereditario, comprende dos acciones que son la peticion de herencia y la querella de inoficioso testamento: bien que esta querella no es otra cosa que una especie de peticion de herencia.

La tercera clase, que es la de aquellas acciones que se dan con motivo de las servidumbres, contiene la accion confesoria y la accion

# EXHIBIT B-9

# LOS PRINCIPIOS CONTENIDOS EN EL TÍTULO PRELIMINAR DEL CÓDIGO CIVIL PERUANO DE 1984

## Análisis doctrinario, legislativo y jurisprudencial

Juan Espinoza Espinoza



Pontificia Universidad Católica del Perú
Fondo Editorial 2005

140    LOS PRINCIPIOS DEL TÍTULO PRELIMINAR DEL CÓDIGO CIVIL DE 1984

expresa que la razón de diferencia entre derecho y «derecho adquirido con fuerza de supervivencia [que él propone] estriba en la finalidad misma del segundo, que es la de evitar los trastornos que produciría toda ley nueva al chocar con los intereses creados y, por su importancia social, respetables y no burlar así las más robustas esperanzas de los titulares de derechos».[20]

Como se ha advertido, «si aplicamos esta teoría hasta las últimas consecuencias, se llegaría a un inmovilismo jurídico que iría en contra de la perfección del ordenamiento jurídico».[21] Por eso, la teoría del derecho adquirido «se ve obligada a ir exceptuando poco a poco de la irretroactividad una serie de consecuencias que se derivan del derecho adquirido».[22]

*b) Teoría de los hechos cumplidos* (factum praeteritum)

Esta teoría ha sido defendida por Dernburg Windscheid en Alemania y seguida por Vareilles-Sommiers y, en parte, por Planiol en Francia, así como por Chironi y Coviello en Italia.[23] Según ella, cada hecho jurídico debe quedar sometido y ser regulado por la ley vigente en el momento en que dicho hecho se produce o acontece (*tempus regit factum*).[24] Se ha observado que esta teoría «consiste en sostener que la ley no debe afectar la calificación ni las consecuencias jurídicas del hecho ya cumplido, es decir, en que están integradas todas las circunstancias que lo constituyen en antecedente de imputación jurídica; pero debe ser aplicada a los nuevos hechos».[25] Con ello se le da a la nueva ley efectos *en nunc*, es decir, para el futuro.

Se sostiene, con razón, que «el principio expuesto no suscita mayores discrepancias. Pero las dudas aparecen cuando a uno no se trata de apreciar el

mente rechazada, porque no tiene sentido» (cit. por BORDA, Guillermo. *Retroactividad de la ley y derechos adquiridos*. Buenos Aires: Perrot, 1951, p. 12).

[20] NOGUERA, Rodrigo. *Op. cit.*, p. 49.

[21] DÍEZ-PICAZO, Luis y Antonio GULLÓN. *Op. cit.*, p. 135.

[22] *Ibíd.*, p. 136.

[23] Los datos han sido tomados de ARAUZ CÁSTEX, Manuel. *Derecho Civil: parte general*. Tomo I. Buenos Aires: Cooperadora de Derecho y Ciencias Sociales, 1974, p. 147.

[24] Esta teoría también es denominada de los «hechos consumados» y se afirma sobre ella que «priorizando el carácter innovador del derecho, prefiere optar por la aplicación inmediata de la nueva norma en vez de una soslayada aplicación ultractiva de la norma antigua. En síntesis, en virtud de la *teoría de los hechos consumados*, los hechos cumplidos durante la vigencia de la antigua ley se rigen por esta; los cumplidos después de la promulgación de la nueva ley, se regirán por la nueva ley» (TUESTA SILVA, Wílder. *Código Civil comentado*. 2.ª ed. Lima: Grijley, 2001, p. 14).

[25] ARAUZ CÁSTEX, Manuel. *Op. cit.*, p. 147.

---

hecho en sí, sino sus consecuencias».[26] Por ello, hay que diferenciar el hecho de sus efectos y dentro de estos últimos debemos distinguir:[27]

- efectos agotados (cumplidos),
- efectos pendientes (derivados sin haberse cumplido) y
- efectos futuros (que ni siquiera se han producido).

Sin embargo, se ha advertido que «aun partiendo de la máxima *tempus regit factum*, la extensión que se da a esta teoría es muy diversa según los autores. Y así, mientras según algunos significa que la ley nueva no puede modificar los efectos agotados de los hechos pretéritos y sí afectar a los derechos futuros de tales hechos, otros autores sostienen que deben quedar excluidos del imperio de la nueva ley incluso las consecuencias jurídicas de los hechos pasados que se realicen bajo su vigencia».[28]

Se alinea dentro de esta teoría el artículo segundo del Título Preliminar del Código Civil francés de 1802 cuando establece lo siguiente: «La ley no dispone sino para el porvenir: esta no tiene efecto retroactivo». Sigue textualmente este modelo legislativo el art. 11 de las Disposiciones Preliminares del Código Civil italiano de 1942. Interpretando este dispositivo, se sostiene que la nueva ley «no puede contemplar sino hechos o situaciones que hayan de acaecer a partir del momento en que entra en vigor, sin modificar la relevancia (originaria) de aquellos que, por el contrario, tuvieron lugar con anterioridad y que fueron, por tanto, regulados por una ley distinta».[29] Asimismo, este mismo modelo circula en el art. 9 del Código Civil chileno.[30]

Propondré un ejemplo para entender la teoría de los hechos cumplidos. Pedro le presta a Pablo 1,000 y convienen en que mensualmente se pagará el interés legal (que en la fecha de celebración del mutuo acuerdo era el 5%). El contrato se inicia el 14 de julio de 2000 y en este se estipula un pago 100, más los intereses legales, el 14 de cada mes. Hasta la fecha Pablo no ha

[26] LLAMBÍAS, Joaquín. *Op. cit.*, p. 140.

[27] DÍEZ-PICAZO, Luis y Antonio GULLÓN. *Op. cit.*, p. 137.

[28] *Ibíd.*, loc. cit.

[29] BRECCIA, Umberto; Lina BIGLIAZZI GERI, Ugo NATOLI y Francesco BUSNELLI. *Op. cit.*, p. 65.

[30] Este establece que «la ley puede solo disponer para el futuro y no tendrá jamás efecto retroactivo. Sin embargo, las leyes que se limiten a declarar el sentido de otras leyes se entenderán incorporadas en estas, pero no afectarán en manera alguna los efectos de las sentencias judiciales ejecutoriadas en el tiempo intermedio».

# EXHIBIT B-10

# CUERPO

DEL

# DERECHO CIVIL ROMANO

A DOBLE TEXTO, TRADUCIDO AL CASTELLANO DEL LATINO

PUBLICADO POR LOS HERMANOS

## KRIEGEL, HERMANN Y OSENBRÜGGEN

CON LAS VARIANTES DE LAS PRINCIPALES EDICIONES ANTIGUAS Y MODERNAS Y CON NOTAS DE REFERENCIAS

POR

## D. ILDEFONSO L. GARCÍA DEL CORRAL

Licenciado en Derecho Civil y Canónico y en Filosofía y Letras
y Abogado de los Ilustres Colegios de Barcelona y Madrid

PRIMERA PARTE

# DIGESTO

TOMO II

BARCELONA

JAIME MOLINAS, EDITOR - VALENCIA, NÚMERO 378

**1892**

filio meo et herede, dari praestarique iubebo» (1);
deinde subiecit in praeceptione relinquenda filiae
suae haec verba: «Paulinae, filiae meae dulcissi-
mae, si quid me vivo dedi, comparavi, sibi habere
iubeo; cuius rei quaestionem fieri veto; et peto a
te, filia carissima, ne velis irasci, quod ampliorem
substantiam fratri tuo reliquerim, quem scis ma-
gna onera sustentaturum (2), et legata, quae su-
pra feci, praestituturum». Quaero, an ex his extre-
mis verbis, quibus cum filia sua in testamento
pater locutus est, effectum videatur, ut heredita-
riis actionibus, id est omnibus, filium suum onera-
verit, an vero iam solum propter onus legatorum
locutus esse videatur, petitiones autem heredita-
riae in utrumque heredem creditoribus dari de-
beant? Modestinus respondit, ut actiones credito-
rum filius solus excipiat, iussisse testatorem, non
proponi.


§ 7.—Titia, quum nuberet Caio Seio, dedit in
dotem praedia, et quasdam alias res; postea dece-
dens codicillis ita cavit: Γάϊον Σἢον τὸν ἄνδρα μου
παρακατατίθεμαί σοι, ὦ θύγατερ· ᾧ βούλομαι δοθῆναι
εἰς βίου χρῆσιν καὶ ἐπικαρπίαν μετοχὴν (3) κώμης Να-
κλήνων, ἣν ἔφθασα δεδωκυῖα εἰς προῖκα σὺν σώμασι τοῖς
ἐμφερομένοις τῇ προικί· καὶ κατὰ μηδὲν ἐνοχληθῆναι αὐ-
τόν περὶ τῆς προικός, ἔσται γὰρ μετὰ τὴν τελευτὴν αὐτοῦ
σὰ καὶ τῶν τέκνων σου· [Caium Seium virum meum
commendo tibi, o filia; cui volo dari ad vitae usum
et fructum participationem Castelli Nacleorum,
quam praeveni dedisse in dotem cum corporibus,
quae inferuntur doti; et in nihilum molestari eum
de dote, erunt enim post mortem tua, et filiorum
tuorum; (4)] praeterea alia multa huic eidem ma-
rito legavit, ut, quamdiu viveret, haberet; quaero,
an propter (5) haec, quae codicillis ei extra dotem
relicta sunt, possit post mortem Caii Seii ex causa
fideicommissi petitio filiae et heredi Titiae compe-
tere, et earum rerum nomine, quas in dotem Caius
Seius accepit? Modestinus respondit: licet non ea
verba proponuntur, ex quibus filia testatricis fi-
deicommissum a Caio Seio, postquam praestiterit,
quae testamento legata sunt, petere possit, tamen
nihil prohibet, propter voluntatem testatricis post
mortem Caii Seii fideicommissum peti.


**35.** [36.] IDEM *libro* XVI. (6) *Responsorum
respondit.*—Legatis uxori, quae usus eius causa
parata sunt, cos servos ad eam non pertinere, qui
non proprii ipsius, sed communis usus causa parti
sunt.


**36.** [37.] IDEM *libro* III. *Pandectarum.*—Le-
gatum est donatio testamento relicta.


**37.** [38.] IAVOLENUS (7) *libro* I. *ex Cassio.*—
Qui testamento inutiliter manumissus est, legari
eodem testamento potest, quia toties efficacior est
libertas legato, quoties utiliter data est.


**38.** [39.] IDEM *libro* II. *ex Cassio.*—Quod ser-
vus legatus ante aditam hereditatem acquisiit, he-
reditati acquirit.

(1) iubeo, *Hal. Vulg.*
(2) sustenturum, *Hal. Vulg.*
(3) κατοχήν, *Hal.*
(4) *Versión Vulgar.*

gados, ó que mandé que se diese, se dé y se entre-
gue por Atciano, mi hijo y heredero;» después, al
dejar un prelegado á su hija, añadió estas palabras:
«si viviendo yo le dí ó le compré alguna cosa á
Paulina, mi cariñosísima hija, mando que la tenga
para ella, sobre lo que prohibo que se promueva
cuestión; y te pido, queridísima hija, que no quieras
llevar á mal que yo haya dejado más bienes á tu
hermano, que sabes ha de soportar grandes cargas,
y ha de pagar los legados que antes he hecho.» Pre-
gunto, en virtud de estas últimas palabras, con que
el padre habló con su hija en el testamento, ¿se con-
siderará haberse efectuado que haya gravado á su
hijo con las acciones de la herencia, esto es, con
todas ellas, ó se considerará que habló ya solamen-
te respecto al gravamen de los legados, pero que
las peticiones de la herencia deban darse contra
ambos herederos á los acreedores? Modestino res-
pondió, que nada se exponía por lo que el testador
hubiese mandado que solo su hijo contestase las
acciones de los acreedores.

§ 7.—Ticia, al casarse con Cayo Seyo, dió en do-
te predios y algunas otras cosas; al fallecer des-
pués dispuso así en los codicilos: «te recomiendo,
hija, á Cayo Seyo mi marido, á quien quiero que
se le dé para usufruto durante su vida la partici-
pación de la aldea de Nacléos, que antes dije le dí
en dote con las cosas que se agregan á la dote; y
que por nada se le moleste respecto á la dote, por-
que después de su muerte estas cosas serán tuyas
y de tus hijos;» además le legó otras muchas cosas
á este mismo marido, para que las tuviera mien-
tras viviese; pregunto, ¿por razón de lo que además
de la dote se le dejó en los codicilos, podrá compe-
terles á la hija y al heredero de Ticia acción para
pedir después de la muerte de Cayo Seyo por
causa del fideicomiso, y por razón de las cosas que
Cayo Seyo recibió en dote? Modestino respondió:
aunque no se alegan palabras por las cuales pue-
da pedir la hija de la testadora el fideicomiso á
Cayo Seyo después que hubiere pagado lo que se
legó en el testamento, sin embargo, nada impide
que conforme á la voluntad de la testadora se pi-
da el fideicomiso después de la muerte de Cayo Seyo.


**35.** [36.] EL MISMO *respondió en el libro* XVI.
*de las Respuestas.*—Habiéndose legado á la mujer
las cosas que se destinaron para su uso, no le per-
tenecen los esclavos que no se adquirieron por cau-
sa de uso de ella misma, sino de uso común.


**36.** [37.] EL MISMO; *Pandectas, libro* III.—El
legado es una donación dejada por testamento.


**37.** [38.] JAVOLENO; *Doctrina de Cassio, libro*
I.—El que inútilmente fué manumitido en un testa-
mento, puede ser legado en el mismo testamento,
porque siempre y cuando ha sido dada útilmente,
es más eficaz la libertad que el legado.


**38.** [39.] EL MISMO; *Doctrina de Cassio, libro*
II.—Lo que un esclavo legado adquirió antes de
adida la herencia, lo adquiere para la herencia.

(5) praeter, *otros en Hal.*
(6) XVII., *Hal.*
(7) Papinianus, *Hal.*