# EXHIBIT B-12

FERNANDO
HINESTROSA

# LA PRESCRIPCIÓN

# EXTINTIVA

UNIVERSIDAD EXTERNADO DE COLOMBIA

Case 3:09-cv-01332-AWT Document 75-15 Filed 03/01/10 Page 3 of 16

CAPÍTULO NOVENO
*Iniciación del cómputo del tiempo*

¿Cuándo comienza la cuenta del término de prescripción? ¿Cuál es ese *dies a quo*? [1]. Es de sentido común, a la vez que de equidad elemental, que la cuenta del término de prescripción no se inicie antes de que la acción nazca [2], o dicho en términos negativos: *actioni nondum natae non praescribitur* [4]. Otra cosa es cuándo se considera la *actio nata* [4]. ¿Acaso el derecho es ejercitable desde el momento mismo en que surge? [5]. La doctrina ha oscilado al respecto entre la tesis de que aquella nace sólo cuando el derecho es violado [6], dentro de la conocida tendencia a considerar que el derecho no se da o no se manifiesta sino con su violación [7], y la tendencia a considerar que el interesado asume la

---

1   "El comienzo de la cuenta de la prescripción coincide con el momento *ex quo actiones competere de iure coeperunt* –que no quiere decir la competencia abstracta de la acción, sino la ocurrencia de la circunstancia lesión del derecho real, incumplimiento de la obligación– que genera un interés de obrar para la reintegración del derecho y a partir de la cual la inercia implica aquiescencia al estado de hecho": Amelotti. *Prescrizione, diritto romano, cit.*, p. 44.

2   Así cas. del 4 de noviembre de 1930, XXXVIII, p. 424, con cita de Baudry-Lacantinerie y Tissier.

3   El § 198 del BGB dispone: "La prescripción comienza con el nacimiento (*Entstehung*) de la pretensión", lo cual exige la presencia de la plenitud del *factum* normativo correspondiente: Lange. *BGB Allgemeiner Teil, cit.*, p. 107.

4   Savigny. *Sistema del diritto romano attuale*, 5, *cit.*, § 239 ss.

5   Cfr. A. Thon. *Rechtsnorm und subjectives Recht* (trad. A. Levi, *Norma giuridica e diritto soggettivo*), Padova, 1951, pp. 16 ss. "La acción es el derecho en pie de guerra": F. Laurent. *Principes de droit civil français*, T. XXXII, N° 16. En pro del significado objetivo de la inercia, aun cuando no se esté en presencia de una falta de reacción ante la violación del derecho: Grasso. "Prescrizione, diritto privato", *cit.*, p. 63. "Con la lesión del interés surge el interés de reaccionar, que si no se hace valer dentro del término prescriptivo produce la pérdida del derecho", con argumento contrario: Panza. *Contributo allo studio della prescrizione, cit.*, pp. 19 ss. y 23.

6   "Toda acción tiene dos requisitos (§ 205): primero, un derecho efectivo, actual, perseguible, y donde este falte no es posible prescripción alguna. Segundo, una lesión del derecho, una turbación que mueva a obrar al derechohabiente. Todo consiste en hacerse a una idea exacta de esta lesión del derecho, que es condición de la acción": Savigny. *Sistema del diritto romano attuale*, 5, *cit.*, § 239, pp. 234 s.

7   "La prescripción no golpea ya a quien no ejercita el derecho, sino a quien no lo defiende cuando es violado": Carnelutti. "Appunti sulla prescrizione", en *Riv. dir. proc.*, 1933, p. 47, citado por Bigliazzi-Geri *et al. Diritto civile*, I, 1, *cit.*, N° 77, nota 269.

carga de ejercicio de su derecho desde el momento mismo en que está en posibilidad de hacerlo valer, o en otras palabras, que no se le considera incurso en negligencia o abandono sino desde cuando pudo obrar o, más propiamente, desde cuando le fue "exigible" proceder, con la necesidad de poner de presente que en este punto no hay precisión plena, por lo mismo que a veces se juega indistintamente con las sentencias de: "desde el momento en que tiene interés en obrar" y "desde el momento en que puede (¿o debe?) ejercitar el derecho"[8], cual si fueran equivalentes[9]. En fin, valga añadir al conjunto de consideraciones y de hipótesis con relevancia a propósito del tema que, de la misma manera que para los derechos sujetos a plazo (inicial), no puede pensarse en comienzo del término de prescripción sino a partir de la expiración de aquel, cuando el derecho en cuestión está sometido a condición suspensiva, dado que el titular no lo puede hacer valer durante la pendencia[10], el cómputo sólo se inicia una vez cumplida la condición[11]. Un caso especial de esta es el constituido por las obligaciones pagaderas en contados sucesivos, en cuya fuente contractual se estipula la facultad del acreedor de dar por vencido el plazo y poder demandar el pago del saldo, en razón de mora del deudor del número de cuotas allá establecido ("cláusula de aceleración"). Se trata, a no dudarlo, de una exigibilidad pendiente de la ocurrencia de una condición meramente potestativa (art. 1535 C. C.) del acreedor: suya es la decisión de exigir el remanente ante la mora del deudor del correspondiente número de cuotas, o sea que la obligación de pagarlo no es exigible sino en cuanto él haga uso de aquella facultad –facultad y no deber suyo– y, por lo mismo, el término

de prescripción extintiva del saldo, resultante de la acumulación de las cuotas, no comenzará a contarse sino desde el día en que el acreedor la hace efectiva.

Esto permite afirmar que, en cuanto a los derechos sujetos a término o a condición[12], el término de prescripción no comenzará a contarse, en su orden, sino al vencimiento de aquel o al acaecimiento de esta[13], o cuando la obligación se haya vuelto pura y simple por otra circunstancia. En las obligaciones periódicas o de ejecución sucesiva[14] o escalonada, o distribuidas en cuotas o fracciones, cada una de estas es autónoma, corre su propia suerte (art. 1651 C. C.)[15], por lo mismo que su exigibilidad es independiente y es el punto de partida de la cuenta[16].

---

8   Cfr. al respecto Messineo. *Manuale di diritto civile e commerciale, cit.,* II, § 13, 7, p. 67.
9   "Si la ley no dispone de otra forma, comienza el plazo de una acción judicial para el cumplimiento de una obligación de dar o de hacer con el inicio del día siguiente a aquel en que pueda ser demandado el cumplimiento inmediato": art. 313 C. C. neerlandés. Otra cosa es cuando queda al arbitrio del derechohabiente el nacimiento de la acción: *toties praescribitur actioni nondum nate, quties nativitas est in potestate creditoris.* Cfr. Savigny. *Sistema del diritto romano attuale,* 5, *cit.,* § 239, p. 325.
10  Esto sin perjuicio de las medidas cautelares y de aseguramiento que la propia ley prevé: art. 1549, inc. 3° C. C.
11  Cfr. Trabucchi. *Istituzioni di diritto privato, cit.,* p. 124.

---

12  "[T]ratándose de un asignatario bajo condición suspensiva, por cuanto la delación de la herencia se le hace al cumplirse la condición y no al momento de fallecer el causante, menester es concluir que, en este evento, el término prescriptivo de la acción de petición de herencia no puede empezar a contarse antes de que la respectiva condición se cumpla": cas. del 7 de noviembre de 1977, CLV, p. 347.
13  Así Domat. *Les lois civile dans leur ordre naturel, cit.,* p. 308: "La prescription de las demandas por deudas u otras cosas que se deben bajo alguna condición, y que no se pueden demandar sino luego de que adviene la condición, no comienza a correr sino desde el día del advenimiento de la condición". Sin embargo, aun en la hipótesis de obligaciones sujetas a condición suspensiva, "puede hablarse de inercia cuando el titular, teniendo los poderes procesales y extraprocesales de reacción, no reacciona frente a una lesión": Grasso. "Prescrizione, diritto privato", *cit.,* p. 66.
14  "[T]ratándose de obligaciones sucesivas que se extinguen por el transcurso del tiempo, y contándose este tiempo desde que ellas se hacen exigibles de acuerdo con el inciso del artículo 2535 del C. C., debe entenderse que, como sucesivas que son, el tiempo de prescripción debe contarse desde que pudo demandarse el cumplimiento de tales obligaciones; y como por obra de la sucesión hay tantos créditos cuantas obligaciones nacen, su extinción debe apreciarse refiriéndola a los distintos momentos de su exigibilidad; habiendo, por consiguiente, distintas y particulares prescripciones, con puntos de partida diferentes": sent. SNG, 4 de noviembre de 1930, XXXVIII, p. 423.
15  Malaurie y Aynes. *Cours de droit civil, cit.,* N° 1087, pp. 629 s. Cfr. SNG, 4 de noviembre de 1930, XXXVIII, p. 423.
16  Con imprecisión conceptual expresó la Corte al respecto, cas. del 12 de julio de 1951, LXX, pp. 40 s.: "Cuando se trate de prestaciones sucesivas, como en el caso de los que ejercen cualquiera profesión liberal [...] el crédito por concepto de honorarios comprende todos los servicios prestados en desarrollo de una misma actividad [...] El criterio de

110   *La prescripción extintiva*

Punto complementario es el relativo a la identificación del día a partir del cual comienza el cómputo y de aquel hasta donde éste llega, en lo que atañe a la interrogación de si se cuenta o no el día en que la obligación es o se hace exigible y a la de qué hacer cuando el día final es festivo o inhábil. La lógica indica que el día en que el interesado puede ejercer su derecho ha de contarse, es decir, que la cuenta se principiará ese mismo día, y que se extenderá hasta el primer día hábil siguiente al día festivo en que ocurrió el vencimiento. Ahora bien, al no contener ni el Código Civil ni el de Comercio Terrestre previsión alguna sobre manejo de los términos o plazos, se acudió a lo dispuesto por el Código de Régimen Político y Municipal (Ley 4ª/913)[17], hasta la vigencia del Código de Comercio de 1971, que se aplica directamente a las obligaciones mercantiles, y por *analogia legis* a las civiles[18], y que al respecto estatuyó, por cierto con poca perspicuidad: "Artículo 829. En los plazos de horas, días, meses y años, se seguirán las reglas que a continuación se expresan [...] 2ª Cuando el plazo sea de días, se excluirá el día en que el negocio jurídico se haya celebrado, salvo que de la intención de las partes se desprenda otra cosa, y 3ª Cuando el plazo sea de meses o de años, su vencimiento tendrá lugar el mismo día del correspondiente mes o año. El plazo que venza en día feriado se prorroga hasta el día siguiente. El día de vencimiento será hábil hasta las seis de la tarde" (!)[19].

---

unidad aplicado al conjunto de obras no opera sino en el contrato de empresa, donde se fija un precio único por la integridad de la ejecución de las obras", cual si el precio único, como también los trabajos, no pudieran estar escalonados, que es lo que de ordinario sucede, y, por tanto, su exigibilidad ser sucesiva.

17 Cuyo artículo 61 disponía que "Cuando se dice que una cosa debe observarse *desde* tal día, se entiende que ha de observarse desde el momento siguiente a la media noche del día anterior; y cuando se dice que debe observarse *hasta* tal día, se entiende que debe observarse hasta la media noche de dicho día"; y cuyo artículo 62 agregaba: "... Los [plazos] de meses y años se computan según el calendario; pero si el último día fuere feriado o de vacante, se extenderá el plazo hasta el primer día hábil".

18 Cual lo prevé y dispone el artículo 8º de la Ley 153 de 1887.

19 El modelo italiano prevé: "Artículo 1187. *Cómputo del término*. El término fijado para el cumplimiento de las obligaciones se computa según las disposiciones del artículo 2963 ["*Cómputo de los términos de prescripción*. Los términos de prescripción contemplados en

---

*Iniciación del cómputo del tiempo*   111

El artículo 2535 del C. C. es definitivo en lo que respecta a los créditos: "Se cuenta este tiempo desde que la obligación se haya hecho exigible"[20]. Sin embargo, en oportunidades la misma ley fija otro momento determinado para el comienzo del término; p. ej. en el contrato de transporte: "la prescripción comenzará a correr desde la fecha en que el pasajero emprende el viaje o desde que el remitente entrega la carga al transportador", y en últimas, "desde la fecha del contrato" (art. 993 C. Co.); en el seguro de responsabilidad, el término de prescripción de la obligación del asegurador para con la víctima se cuenta desde el acaecimiento "del hecho externo imputable al asegurado", y de su obligación para con el asegurado, "desde cuando la víctima le formula la petición judicial o extrajudicial" (art. 1131 C. Co: [84 Ley 45/990]); en caso de fuerza vicio de la voluntad, "desde el día en que esta haya cesado"; y para la nulidad relativa por incapacidad, "desde el día en que esta haya cesado" (art. 1750 2 C. C.; el artículo 900 (1) C. Co. nada dice al respecto). En los demás casos, tanto el de las obligaciones no exigibles (piénsese, p. ej., en la de resarcimiento de daños, o en la de reintegro de la cuota de expensas comunes en condominio o propiedad horizontal) como el de derechos distintos del de crédito, subsiste la dificultad, o por lo menos la inquietud, de determinar a ciencia cierta ese punto de partida de la cuenta[21]. Y otro tanto hay que decir

---

el presente Código y en las demás leyes se computan según el calendario común. No se computa el día en que cae el momento inicial del término y la prescripción tiene lugar con la expiración del último instante del día final. Si el término en día festivo, se prorroga de derecho hasta el día siguiente no festivo...]".

20 Cfr. cas. del 4 de noviembre de 1930, XXXVIII, p. 424.

21 El § 852 del BGB previene la prescripción de la pretensión indemnizatoria por acto ilícito "a los tres años contados a partir del momento en que el perjudicado tuvo conocimiento del daño". En el Código neerlandés, artículo 310.1, se prevé el comienzo del término: "después del inicio del día siguiente a aquel en que el perjudicado haya conocido el daño [...] y en todo caso por el transcurso de veinte años desde el acontecimiento [...] 2. Cuando el daño sea una consecuencia de contaminación del aire, agua o suelo, prescribe la acción judicial en todo caso por el transcurso de treinta años desde el acontecimiento...". El artículo 3980 del C. C. argentino dispone, muy confusamente: "La prescripción de las acciones personales, lleven o no intereses, comienza a correr desde la fecha del título de la obligación".

a propósito de las obligaciones de hacer[22] y de las negativas, en donde la "falta de ejercicio" o la "inercia" no se pueden predicar del acreedor, sino a partir del incumplimiento del deudor[23].

De por medio están los presupuestos básicos de la prescripción: la inercia del titular del derecho y la ausencia de reconocimiento de su contraparte. La idea de tomar la "posibilidad" de ejercer el derecho (*potestas experiundi*), que de plano despierta la idea de inercia de su titular, contrasta con la consideración de que a él no le es "exigible" obrar si la otra parte le está reconociendo ese derecho. En otras palabras, ¿cómo exigirle a alguien que obre, o mejor, cómo censurarle el no haber obrado, si esa actitud habría sido improcedente?, ¿a qué demandar a quien está sirviendo el crédito o lo reconoce de otra manera?[24]. Esto impone resaltar la incompatibilidad entre los fundamentos de la prescripción y los hechos concretos, y hace pensar en la figura de la interrupción natural. Planteamiento tenido en cuenta por la jurisprudencia en el caso de la de simulación: la prescripción no se cuenta allí sino desde cuando el "fiduciario" se alza[25]. Posición que se acerca a la de la violación, atrás mencionada, que se presenta incuestionable en algunas oportunidades, como es la hipótesis de las obligaciones negativas. En fin, por descontado se da que la idea de iniciar el cómputo a partir del momento de la "posibilidad" pone de presente la relevancia de la "imposibilidad" de hacer valer el derecho

*Iniciación del cómputo del tiempo*   113

como fenómeno que determina el aplazamiento del principio de la cuenta, hasta cuando subsista[26].

Esto quiere decir, en primer término, que en materia de obligaciones, como lo previene el inciso 2° del artículo 2535 C. C., "Se cuenta este tiempo desde que la obligación se haya hecho exigible"; y más ampliamente, que el tiempo de prescripción, por así decirlo, se detiene en favor de quien no puede hacer valer el derecho respectivo. Aun cuando esta reflexión pudiera proyectarse a los eventos de suspensión (*infra* cap. décimo) en favor de personas a las que, por su incapacidad, su ausencia, su cargo u oficio, u otras condiciones especiales determinadas, no les es "exigible" el ejercicio idóneo de una pretensión[27], el caso es que el fenómeno ahora examinado es el relativo a lo que puede denominarse "carga" de obrar (formular demanda), que no la asume el interesado sino ante la amenaza o la violación de su derecho por parte del contendor, por lo cual, mientras tanto, su inactividad no es censurable o, mejor, es justificable. Al respecto se suele invocar el brocárdico latino *contra non valentem agere non currit praescriptio*, tomable tanto por la positiva como por la negativa: bien porque no hay rebeldía alguna del contendor, actitud próxima al reconocimiento generador de interrupción (art. 2539 inc. 2° C. C.)[28]; o

---

22 "Cuando se trata de una obligación de hacer, el plazo de la prescripción no comienza a contarse sino desde que el obligado ha dejado de cumplir la obligación": cas. del 26 de agosto de 1911, XX, p. 214; igual cas. del 1° de junio de 1912, XXI, p. 125.

23 Así Bigliazzi-Geri *et al. Derecho civil*, 1, 1, *cit.*, §77, p. 498. "Si la pretensión corresponde a una abstención, la prescripción comienza a contarse desde la contravención": § 198 BGB.

24 "Si quien ha contraído una obligación la está cumpliendo estrictamente, sería un disparate que quien ha adquirido el correspondiente derecho estableciera un pleito enderezado a que la persona obligada haga lo que está haciendo y cumpla lo que está cumpliendo": cas. del 26 de agosto de 1911, XX, p. 214.

25 "El lapso de la prescripción de la acción de simulación, debe comenzar a contarse no desde el día en que fue celebrado el contrato, pues así carecería de finalidad la simulación, sino desde cuando el 'comprador' desconoce el pacto oculto [...] sino desde cuando aquel contradiga o desconozca el derecho del dueño real [...] sólo a partir del agravio": cas. del

25 de julio de 1956, LXXXII, p. 284, y en el mismo sentido, SNG, 12 de diciembre de 1956, LXXXIII, p. 247; 14 de abril de 1959, con diferenciación del pacto comisorio y la acción pauliana: XC, pp. 318 s.; y cas. del 13 de agosto de 1959, XCI, p. 782.

26 "Es importante anotar que en todo caso debe tratarse de impedimentos de orden jurídico y no de mero hecho", señalan Azzariti y Scarpello. *Della prescrizione e della decadenza*, *cit.*, p. 221, con cita de bibliografía multinacional y jurisprudencia italiana (nota 1). Pero, al mismo tiempo, se han de tener en cuenta hipótesis en que la propia ley es la que pospone la iniciación de la cuenta por razones de hecho, v. gr. en la acción de nulidad relativa por fuerza vicio de la voluntad, hasta cuando ella cesa (art. 1750 [2] C. C.).

27 Cfr. *supra* capítulo primero, nota 17, y art. 2251 C. C. francés.

28 Es el caso, por ejemplo, de la acción de simulación, cuyo término de prescripción no se inicia sino desde cuando el "fiduciario" se rebela, y el interesado ha menester de hacer efectivo lo pactado con él. Cfr. 28 de febrero de 1955, LXXXIX, pp. 518 ss.: "Para el ejercicio de la acción de simulación es requisito indispensable la existencia de un interés jurídico en el actor [...] Sólo entonces se hacen exigibles [!] las obligaciones nacidas del acto oculto"; 26 de julio de 1956, LXXXII, pp. 278 ss.: "El momento [desde el cual se contaría el término

bien porque el titular no puede instaurar la acción en cuestión sino luego de haber terminado otro proceso, cuya decisión está aún pendiente[29].

Hace bien la norma en identificar el momento inicial del cómputo como el de la exigibilidad de la obligación, para que no se confunda —como es frecuente— con el de la colocación del deudor en mora. En muchas oportunidades, las más, exigibilidad y mora coinciden en el tiempo, pero las dos son figuras autónomas y no se pueden asimilar. La ejecución coactiva o forzosa de la obligación presupone, conforme al Código de Procedimiento Civil (art. 488), que la obligación sea "exigible"[30]; y exigible es aquella obligación para cuya satisfacción y, por ende, para cuyo cobro, no es menester el advenimiento de hecho alguno

cierto o incierto, determinado o indeterminado, esto es, que surgió pura y simple, o que, de otra manera, tiene el todo allanado su camino. El Código Civil se refiere en diversas ocasiones y sedes a la mora: para indicar cuándo el deudor entra en mora (art. 1608) y cuáles son las consecuencias de esta, según la clase de obligación (arts. 1610, 1731 ss., 1613 y 1615). El caso es que —por lo general— el acreedor puede proceder ejecutivamente contra el deudor desde el momento en que la obligación es exigible, y, en proceso de conocimiento, contra el deudor eventual, a partir del momento en que ocurrió el hecho con virtualidad obligacional (*u. gr.* el daño resarcible) que pudiera invocar en procura de una sentencia de condena[31]. Empero, casos hay, como por ejemplo sucede con la cláusula penal, tanto la compensatoria como la moratoria, y con el resarcimiento, en que la obligación respectiva no es exigible sino en razón de la mora del deudor (arts. 1594, 1595 y 1615 C. C.). En cuanto a las acciones derivadas de los contratos, encaminadas a impugnarlos o a demandar su rectificación, la regla general es la de que el término de prescripción se cuenta desde la fecha de su celebración, salvo que la ley, por razones especiales, disponga otra cosa; así, p. ej., para la acción *quanti minoris* en materia de inmuebles el plazo se cuenta "desde la entrega" (art. 1890 C. C.). El término de prescripción de la acción revocatoria por fraude a los acreedores se cuenta desde la fecha del acto o contrato (art. 2491 [3º] C. C.). Y el de la acción de reforma de testamento, "desde el día en que [los legitimarios] tuvieron conocimiento del testamento y de su calidad de legitimarios" (art. 1274 [1] C. C.). En materia de daño ocurrido en encuentro social ocasional, la tendencia de la normatividad es a regular específicamente la hipótesis, y a establecer, entre otras particularidades, que el término de prescripción no comienza a contarse sino desde el momento en que la víctima se percató de su quebranto[32].

---

de prescripción), en ausencia de toda estipulación al respecto, no puede ser sino aquel en que el "adquirente" contradiga el contrato secreto contradiciendo el derecho del dueño"; 14 de abril de 1959, XC, p. 311: la cuenta se inicia "con la aparición del interés".

29   Es el caso del hijo extramatrimonial, a quien, habiendo intentado acción de filiación en vida del padre, no se le podría oponer prescripción de la acción petitoria de herencia que intentó luego de obtenida la definición de su estado, siendo así que la de filiación, a la que mal pudiera haberla acumulado, sólo vino a ser decidida luego de transcurrido el término prescriptivo de la acción patrimonial: cas. del 7 de noviembre de 1977, CLV, p. 346: "La acción de petición de herencia [...] sólo puede ser eficazmente ejercida por quien ostente el título de heredero de igual o mejor derecho que el del que lo ocupa diciéndose también heredero; síguese que el término de prescripción de esta acción no puede siempre contarse desde la defunción del *de cuius*, sino desde cuando al demandante se reconoció su vocación hereditaria, pues mientras no puede probar su calidad de heredero de igual o mejor derecho, por carecer de interés jurídico [...] Lo cual es conforme con lo que dispone el segundo inciso del artículo 2536 del C. C., que al establecer que la prescripción que extingue las acciones y derechos ajenos exige solamente cierto lapso durante el que no se hayan ejercido dichas acciones, precisa que se cuenta este tiempo desde que la obligación se hizo exigible, es decir, que con en el caso de que la obligación haya nacido a la vida del derecho, mientras no sea exigible, mientras no se pueda demandar su cumplimiento, no empieza a contar el término prescriptivo. Y con más razón, tratándose ya de la facultad de demandar con eficacia el reconocimiento de un determinado derecho, el plazo de prescripción no puede empezar a contarse antes de que ese derecho no haya nacido".

30   El artículo 982 del C. J. decía "actualmente exigible", con adverbio que la norma nueva suprimió con la consideración de que el adjetivo "exigible" implica exigibilidad actual. Por lo demás, el Código Civil, a propósito de la compensación, emplea el adverbio "actualmente" referido a la exigibilidad de las obligaciones (art. 1715 3º).

31   Con todo, casos se dan en los que la obligación no es exigible sino con el requerimiento del acreedor, como p. ej. ocurre con la obligación alternativa (arts. 1558 C. C. y 496 C. P. C.): *actioni nondum natae totius praescribitur, quotiens natiuitas eius est in potestate creditoris*, y también en los que la obligación es exigible sino con posterioridad al requerimiento: piénsese en obligación de hacer para la que no se acordó término, que vendrá a determinar posteriormente el juez (con arg. *ex* arts. 1610 C. C. y 500 C. P. C.).

32   Panza. *Contributo allo studio della prescrizione*, cit., p. 50. § 852 BGB. Cfr. *infra* capítulo

**TRANSLATION**

FERNANDO
HINESTROSA

# EXTINCTIVE PRESCRIPTION

UNIVERSIDAD EXTERNADO DE COLOMBIA

ISBN 958-616-480-2

© FERNANDO HINESTROSA, 2000
© UNIVERSIDAD EXTERNADO DE COLOMBIA, 2000
EXCLUSIVE PUBLISHING AND DISTRIBUTION RIGHTS
CALLE 12 № 1-17 ESTE, BOGOTÁ – COLOMBIA. FAX 284 3769
HTTP://WWW.UEXTERNADO.EDU.CO

FIRST EDITION: AUGUST 2000

COVER DESIGN: PUBLISHING DEPARTMENT
TYPESETTING: PUBLISHING DEPARTMENT
PHOTOMECHANICS, PRINTING AND BINDING: PANAMERICANA, FORMS AND PRINTINGS, WITH A PRINT RUN OF
1,000 COPIES

PRINTED IN COLOMBIA

TRANSLATION

## CHAPTER NINE

### *Beginning the time calculation*

When does the extinctive prescription period begin to run? What is the *dies a quo*?[1]  It is both common sense and essentially fair that the time period should not start before the cause of action accrues,[2] or, to put it in negative terms: *actioni nondum natae non praescribitur.*[3]  Another question refers to the moment from which the *actio nata*[4] should be considered.  May the right be exercised from the very moment the cause of action accrues?[5]  Some legal scholars hold that it only accrues when the right is infringed,[6] thus following the well-known approach that the right arises only when it is infringed,[7] while others claim that the interested party assumes the burden of exercising his right from the moment it is possible for him to do so, that is to say, that he will be deemed negligent or neglectful only from the time he is able to act or, strictly speaking, from the time he is "required" to act. It should be noted that this approach is not perfectly accurate because sometimes the following statements are used interchangeably: "From the time he is interested in acting" and "from the time he is able to (or should?) exercise his right",[8] as if they were equivalent.[9] Anyway, it should be added to these remarks and hypotheses in relation to this topic that, just as in the case of

---

[1] "The beginning of the prescription period is the time *ex quo actiones competere de iure coeperunt* (which does not mean the abstract competence of the action, but the occurrence of the circumstance that damages the real, i.e. the breach of the obligation) which creates an interest in acting to safeguard the right and from which the inactivity implies acquiescence in the state of affairs": Amelotti. *Prescrizione, diritto romano, aforementioned*, p.44.

[2] So stated in the case of November 4, 1930, XXXVIII, p. 424, with quotations from Baudry-Lacantinerie and Tissier.

[3] §198 of the BGB provides that: "The extinctive prescription period commences when the cause of action accrues (*Entstehung*)", which requires the relevant rules to be in full force: Lange. *BGB Allgemeiner Teil, aforementioned*, p.107.

[4] Savigny. *Sistema del diritto romano attuale*, 5, *aforementioned*, §239 et seq.

[5] See A. Thon. *Rechtsnorm und subjectives Recht* (translated by A. Levi, *Norma Guiridica e diritto soggetivo*), Padova, 1951, pp. 16 et seq. "The action is the right ready for war": F. Laurent. *Principes de droit civil français*, volume XXXII, No. 16. In favor of the objective meaning of the inactivity, even if there is a reaction to the infringement of a right: Grasso. "Prescrizione, diritto privato", *aforementioned*, p. 63. "The interest in reacting arises when the right is infringed and if it is not enforced within the limitation period, the right is forfeited", with an opposite argument: Panza. *Contributo allo studio della prescrizione, aforementioned*, pp. 19 et seq. and 23.

[6] "Any action has two requirements (§205): first, a right that is actual and existing and may be claimed; in its absence, no extinctive prescription is possible. Second, a right infringement or violation that leads its holder to act. It all comes down to forming an exact idea of this right infringement, which is a condition of the action": Savigny. *Sistema del diritto romano attuale, 5, aforementioned,* § 239, pp. 234 et seq.

[7] "Extinctive prescription does not affect persons not exercising their rights, but persons not defending their rights when these are infringed": Carnelutti. "Appunti sulla prescrizione", in *Riv. Dir. Proc.*, 1933, p.47, quoted by Bigliazzi-Geri *et al. Diritto Civile*, I, 1, *aforementioned*, No. 77, note 269.

[8] In this regard, see Messineo. *Manuale di diritto civile e commerciale, aforementioned*, II, §13, 7, p. 67.

[9] "Unless otherwise provided by law, the period within which an action may be brought to enforce obligations to act or to deliver property commences at the beginning of the day following that on which immediate performance may be demanded": Section 313 of the Dutch Civil Code. The situation is different when the accrual of the cause of action is at the right holder's discretion: *toties praescribitur actioni nondum ntae, uoties nativitas est in potestate creditoris.* See Savigny. *Sistema del diritto romano attuale*, 5, *aforementioned*, §239, p.325.

rights enforceable after a fixed term the prescription period commences only upon the expiration of such term, in the case of rights subject to a condition precedent, since the holder is unable to enforce it while the condition is pending,[10] the prescription period starts running only when the condition is met.[11] A special case is that of agreements providing for obligations payable in installments where the creditor is entitled to deem the term expired and demand the full payment of the balance due to the debtor's default on the number of installments set forth in the agreement ("acceleration clause"). Certainly, the enforceability of the right depends on a condition whose occurrence is merely at the creditor's discretion (Section 1535 of the Civil Code): He may decide to demand the payment of the remaining balance upon the debtor's default on the agreed number of installments, i.e., the obligation to pay the remaining balance will be enforceable only upon the exercise of such right (a right rather than a duty) by the creditor and, for the same reason, the prescription period on the balance, resulting from the accumulation of installments, will start running on the day the creditor enforces it.

It follows from the above that the prescription period for rights enforceable after a fixed term starts running upon the expiration of such term and the prescription period for rights subject to a condition[12] begins running when such condition is met,[13] or, otherwise, whenever the obligation is no longer subject to any condition for another reason. In the case of obligations to be performed periodically[14] or payable in installments or parts, each of them is autonomous (Section 1651 of the Civil Code) and, thus, the enforceability of each installment is independent[15] and sets the time upon which the respective prescription period starts running.[16]

---

[10] Nevertheless, there are preliminary and protective measures provided by law: Section 1549 (3) of the Colombian Civil Code.

[11] See Trabucchi. *Instituzioni di diritto privato, aforementioned*, p.124.

[12] "In the event of a beneficiary on a suspensive condition, since the right to inherit is acquired when the condition is satisfied and not when the decedent passes away, the period within which the inheritance claim may be filed cannot commence before the satisfaction of the respective condition": case of November 7, 1977, CLV, p.347.

[13] So stated by Domat. *Les lois civile dans leur ordre naturel, aforementioned*, p. 308: "The limitation period for actions on obligations subject to conditions that may be brought only upon the satisfaction of such conditions commences on the date when the condition is satisfied". However, even in the event of obligations subject to suspensive conditions "inactivity occurs when, although the right holder may react to the infringement both in court and out of court, he fails to do so": Grasso. "Prescrizione, diritto privato", *aforementioned*, p.46.

[14] "If the obligations are discharged by the passage of a time period and this period commences when they become enforceable pursuant to Section 2535 of the Colombian Civil Code, it must be understood that, since they are payable over a period of time, the limitation period must be computed from the time when the performance of those obligations can be demanded. Since, as a result of the number of installments, there are many credits as obligations, their discharge must be computed according to their specific times of enforceability. As a consequence, there are several limitation periods that commence at different times": judgment SNG, November 4, 1930, XXXVIII, p. 423.

[15] Malaurie and Aynes. *Cours de droit civil, aforementioned*, No. 1087, pp. 629 et seq. See SNG, November 4, 1930, XXXVIII, p.423.

[16] With respect to this issue and with conceptual inaccuracy, the Supreme Court, in the case of July 12, 1951 LXX, pp. 40 et seq, stated: "When the obligation is performed on different occasions over a period of time, like the case of practitioners [...] the credit for professional fees covers all services rendered in the course of the same activity [...] The unit criterion applied to

Some additional issues include specifying the day when the time period commences and ends, determining whether or not the day on which the obligation becomes enforceable should be counted, and how to proceed if the last day is a public holiday or a non-business day. If logic is applied, the day when the right may be exercised should be counted and, consequently, the period should commence on that day and end on the first business day following the due date. However, since neither the Colombian Civil Code nor the Colombian Land Trade Code contain any provision on time periods, the Colombian Municipal and Political System Code (Colombian Law 4°/913)[17] was applied until the Colombian Commercial Code [Código de Comercio] came into effect in 1971 which applies to commercial obligations and by *analogia legis* to civil ones[18] and which with little clarity establishes: "Section 829. In terms consisting of hours, days, months, and years, the following rules shall be observed [...] (2) In the case of day term, the day when the legal transaction is closed shall be excluded, unless the parties agree otherwise, and (3) in the case of a month or year term, the due date shall be on the same day of the relevant month or year. Periods ending on a holiday shall be extended to the following day. The due date shall be a business day up to 6 pm." (!).[19]

Section 2535 of the Colombian Civil Code is conclusive as regards credits: "This period shall commence when the obligation becomes enforceable".[20] However, in other cases, the law sets a different time for the commencement of the period; for instance, in the case of the transportation contract: "The term for the filing of an action commences on the day the passenger takes the trip or the sender delivers the load to the carrier" and ultimately "on the effective date of the agreement" (Section 993 of the Colombian Commercial Code). As regards liability insurance, the term of the insurer's obligation to the victim commences on the occurrence of "the external event attributable to the insured," whereas the term of the insurer's obligation to the insured "begins on the day the victim files a court or out-of-court claim" (Section 1131 of the Colombian Commercial Code [84 Colombian Law No. 45/990]); in the event of duress, "on the day duress ceases"; and in the event of relative nullity due to incapacity, "on the day incapacity is overcome" (Section 1750 2 of the Colombian Civil Code; Section 900 (1) of the Colombian Commercial Code states nothing in this regard). In all other cases concerning both unenforceable obligations (take, for example, the obligation to redress

---

the entirety of the works is used in companies contracts, in which one price is set for the entirety of the works" as if the price, as well as the works, could not be divided, which is usually the case, and, consequently, their enforceability may be divided as well.

[17] Section 61 of such law set forth: "If something shall be done *from* certain day, it shall be understood that such thing shall be done from the moment following the midnight of the previous day; and if something shall be done *until* certain day, it shall be understood that such thing shall be done until the midnight of said day". In turn, Section 62 added: "...Terms of months and years are computed according to the calendar; however, if the last day thereof is a public holiday or a non-business day, the term shall be extended up to the first business day".

[18] As set forth in Section 8 of Colombian Law No. 153 enacted in 1887.

[19] The Italian model provides: "Section 1187. *Term computation.* The term set for the fulfillment of obligations shall be computed as set forth in Section 2693 ["*Limitation periods computation.* Limitation periods provided for in this Code and in any other laws shall be computed according to the ordinary calendar. The period commencement day shall not be included and the extinctive prescription period runs up to the last moment of the final day. If such final day is a public holiday, the period shall be extended up to the following business day by operation of law...")."

[20] See case of November 4, 1930, XXXVIII, p. 424.

the damage caused, or the obligation to reimburse the share of common co-owners fees in condominiums) and rights other than credit rights, there is still difficulty or at least an interest in determining the commencement of the above-mentioned term for certain.[21] The same holds true for obligations to perform an act[22] and to refrain from performing an act, where the creditor can only be considered to have "failed to act" upon the debtor's breach.[23]

The basic assumptions on which extinctive prescription relies are the right holder's inactivity and the debtor's lack of acknowledgment. The idea of considering the "possibility" of exercising the right (*potestas experiundi*), which immediately conveys the idea of its holder's inactivity, contrasts with the fact that he is not "required" to act if the other party acknowledges that right. In other words, how can someone be required to act, or rather, how can someone be blamed for not acting when acting would have been inadmissible? What can be demanded of someone who is fulfilling an obligation or otherwise acknowledging it?[24] This leads us to stress the incompatibility between the foundations of extinctive prescription and specific facts and makes us think of the concept of natural bolting. This approach has been taken into account by the courts in simulation cases: the prescription period commences when the "fiduciary" changes his mind.[25] This position is similar to the abovementioned one on breach, which is unquestionable in some cases, as is the case with obligations to refrain from performing an act. Anyway, it is taken for granted that the fact that the term is considered to commence upon the "possibility" emphasizes the importance of the "impossibility" of enforcing the right as a phenomenon that defers the commencement of the limitation period for as long as it exists.[26]

---

[21] §852 of the BGB bars actions to claim damages for torts "after 3 years from the time the aggrieved party became aware of the damage". Section 310.1 of the Dutch Code provides that the period commences: "after the beginning of the day following that on which the aggrieved party noticed the damage [...] and, in any case, the period shall end 20 years after the occurrence [...] 2. In the event of damage arising out of air, water, or soil pollution, the action may be brought in any event within 30 years of the occurrence..." Section 3980 of the Argentine Civil Code, very confusingly, states: "The prescription period for personal actions, whether with interest or not, commences on the date of the document evidencing the obligation."

[22] "When the obligation is to act, the limitation period commences when the obligor stops fulfilling the obligation": case of August 26, 1911, XX, p. 214; like case of June 1, 1912, XXI, p. 125.

[23] So stated by Bigliazzi-Geri *et al. Derecho Civil*, 1, I, *aforementioned*, §77, p. 498. "If the cause of action is related to an obligation to refrain from acting, the limitation period commences at the time of the violation": §198 BGB.

[24] "If an obligor is meeting his obligations strictly, it would be absurd for the obligee to bring an action aimed at making the obligor do what he is doing and fulfill what he is fulfilling": case of August 26, 1911, XX, p. 214.

[25] "The limitation period for simulation actions should not commence when the agreement is entered into because the simulation would have no purpose, but when the 'purchaser' breaches the hidden agreement [...] but when he infringes or ignores the actual owner's rights [...] only when the injury is caused": case of July 25, 1956, LXXXIII, p. 284, and likewise, SNG, December 12, 1956, LXXXIII, p. 247, April 14, 1959, with the differences between the right to rescind and the action brought by creditors to void the debtor's fraudulent acts: XC, pp. 318 et seq.; and case of August 13, 1959, XCI, p. 782.

[26] "It should be pointed out that, in any event, the impediments have to be legally relevant and not merely factual", state Azzariti and Scarpello. *Della prescrizione e della decadenza,*

First, this means that, as regards obligations, as stated by Section 2535 (2) of the Colombian Civil Code, "This period shall commence when the obligation becomes enforceable"; and more broadly, that the limitation period, so to speak, stops running in favor of persons unable to enforce their respective rights. Although this conclusion could also be applied to cases of suspension (chapter ten *infra*) in favor of persons that, on account of their incapacity, absence, office, trade, or other special conditions, may not be "required" to seek relief properly,[27] the matter under discussion is related to what may be called the "duty" to act (to file suit), which is assumed by the interested party only when his rights are threatened or actually infringed by the other party. Hence, in the meantime, his inactivity is not censurable, or rather, is justifiable. In this respect, the following Latin brocard is often used: *contra non valentem agere non currit praescriptio*, which may be interpreted both in a positive and in a negative way: either because the other party does not object, which is similar to the acknowledgment that would toll extinctive prescription (Section 2539 (2) of the Colombian Civil Code),[28] or because the right holder is unable to bring the action in question until another pending proceeding comes to an end.[29]

The rule correctly states that the period for extinctive prescription commences when the obligation becomes enforceable to avoid confusion (as is frequently the case) with

---

*aforementioned*, p. 221, with quotes of multinational bibliography and Italian caselaw (note 1). Nonetheless, at the same time, there are some situations where it is the law itself that defers the commencement of the period on factual grounds, e.g., in the action for relative nullity due to duress, up to the time when it ceases (Section 1750 [2] of the Colombian Civil Code).

[27] See *supra* chapter one, note 17, and Section 2251 of the French Civil Code.

[28] For instance, it is the case of the simulation action, whose limitation period commences when the "fiduciary" changes his mind and the interested party needs to enforce the agreement entered into by them. See February 28, 1995, LXXXIX, pp. 518 et seq.: "An essential requirement to bring a simulation action is for the plaintiff to have a legally relevant interest [...] Only then do the obligations arising out of the hidden agreement become enforceable [!]; July 26, 1956, LXXXIII, pp.278 et seq.: "The time [when the limitation period is supposed to commence], absent any provision in that regard, must be the time when the 'purchaser' breaches the hidden agreement, thus infringing the owner's rights"; April 14, 1959, XC, p. 311: the period commences "when the interest arises".

[29] An example is the child out of wedlock who brings a paternity action while his father is alive and, once this action has been decided, files an inheritance claim. Extinctive prescription may not be raised against him in this claim if the paternity action was decided after the expiration of the prescription period for the inheritance claim because, besides, both actions cannot be processed together: case of November 7, 1977, CLV, p. 346: "Inheritance claims [...] can be won only by persons who can prove their capacity as heirs and that their rights are the same as or better than the rights of the current presumptive heirs; hence, the limitation period for this action cannot always commence on the death of the *de cuius*, but when the petitioner's capacity as heir has been acknowledged, because, in the meantime, he is unable to prove his capacity as heir with the same or better rights due to his lack of legal interest [...] Which is in agreement with the Colombian Civil Code, Section 2536, subsection 2. This rule sets forth that the extinctive prescription that bars actions and rights requires only a certain period within which such actions have not been brought and that said period commences when the obligation becomes enforceable. This means that, even if the obligation has arisen, as long as it is not enforceable and as long as its performance cannot be demanded, the limitation period cannot commence, and more rightly so, since this is the power to successfully claim the acknowledgement of certain right, the limitation period cannot commence before such right has been acquired."

the time when the debtor is held to be in default. In most cases, enforceability and default occur simultaneously, but they are two independent concepts that cannot be equated. In accordance with the Colombian Code of Civil Procedure [Código de Procedimiento Civil] (Section 488), the specific performance of an obligation presupposes that there is an "enforceable" obligation.[30] An enforceable obligation is any obligation for whose fulfillment and payment no fact, whether certain or uncertain, defined or undefined, is necessary. This means that the obligation is a simple one, subject to no condition and the way is paved for its fulfillment. The Colombian Civil Code mentions default on several occasions: to state when the debtor is in default (Section 1608) and what the consequences of default are, according to the type of obligation (Sections 1610, 1731 *et seq.*, 1613, and 1615). In general, the creditor can file an enforcement action against the debtor from the moment the obligation is enforceable. He can also bring an ordinary proceeding against the possible debtor since the occurrence of the event giving rise to obligations (*i.e.*, the damage to be redressed) which the creditor may invoke in order to obtain judgment in his favor.[31] Nevertheless, there are cases, as is the case with liquidated damages, both compensatory and punitive, and with compensation, where the obligation is enforceable only upon the debtor's default (Sections 1594, 1595, and 1615 of the Colombian Civil Code). As regards actions under contracts, the general rule is that the extinctive prescription period starts running on the execution date, unless the law, for special reasons, provides otherwise; e.g. in the *quanti minoris* action, related to real property, such period commences upon "delivery" (Section 1890 of the Colombian Civil Code). The term for actions to annul the debtor's fraudulent acts commences on the date of the act or agreement (Section 2491 [3°] of the Colombian Civil Code). The term for the action to amend a will commences on "the day when [the forced heirs] became aware of the will and of their capacity as such" (Section 1274 [1] of the Colombian Civil Code). In the case of the damage caused in a casual social meeting, rules generally contemplate that particular hypothesis and provide, among other things, that the prescription period runs from the time the victim becomes aware of his loss[32].

---

[30] Section 892 of the Colombian Judicial Code [Código Judicial] stated "currently enforceable" and the amended rule has deleted the adverb on the grounds that the adjective "enforceable" implies current enforceability. Apart from that, the Colombian Civil Code, regarding setoff, uses the adverb "currently" in reference to the enforceability of obligations (Section 1715 3°).

[31] Even so, at times, the obligation becomes enforceable only at the creditor's request, e.g. alternative obligations (Section 1558 of the Colombian Civil Code and Section 496 of the Colombian Code of Civil Procedure): *actioni nondum natae toties praescribitur, quoties nativitas eius est in potestate creditoris*, and some obligations are enforceable only after the request: e.g. obligations to act where no term has been agreed upon and, therefore, such term will be set by court subsequently (with arguments *ex* Sections 1610 of the Colombian Civil Code and 500 of the Colombian Code of Civil Procedure).

[32] Panza. *Contributo allo studio della prescrizione, aforementioned*, p. 50, §852 BGB. See *infra* chapter [...]

# EXHIBIT B-13

# TRATADO

## DE

# DERECHO CIVIL

POR

## T. PACHECO.

( Segunda edicion. )

## II

## LIMA

**IMPRENTA DEL ESTADO CALLE DE LA RIFA N. 58.**

## 1872.

Digitized by Google

zar en fundo ajeno, debiendo, por lo mismo, aplicar-
se, por analogía, á la pesca, los principios que rigen
en materia de caza, cuando se hace en fundo ajeno
(cf. 484 f., 487 C.) (1).

### c.—Del tesoro.

Tambien se adquiere inmediatamente por ocupa-
cion el tesoro. Llámase tesoro cualquiera cosa ocul-
ta ó enterrada, cuyo dueño es desconocido y que es
descubierta por casualidad. Pueden, pues, consti-
tuir el tesoro cualesquiera objetos, susceptibles de ser
enterrados ú ocultados, y se consideran tales, no so-
lamente el oro y la plata, sino las alhajas, las está-
tuas, los vasos, utensilios, &ª; en una palabra, todo
objeto de valor. Sin embargo, parece que la ley hi-
ciera alguna distincion, pues habla del *tesoro y de to-
da cosa enterrada* (cf. 522, 1097 C.), limitando sin
duda el sentido de la palabra tesoro á los metales pre-
ciosos, que es la acepcion en que vulgarmente se la
toma. Esto proviene seguramente de la definicion
del derecho romano: *thesaurus est vetus quædam de-
positio pecuniæ* (Fr. 31, § 1º D. *de acq. rer. dom.* 41
l); entendiéndose por *pecunia* únicamente el dinero;
pero es bien sabido que esa palabra significa todo lo
que se halla en nuestro patrimonio (cf. Fr. 5 pr. D.
*de verb. sign.*, 50, 16).
Segun la definicion que hemos dado, tres condi-

_____

[1] Segun el Código chileno, si alguno pescare en fundo
ajeno, sin permiso del dueño, cuando por ley estaba obliga-
do á obtenerlo, lo que pescare será para el dueño, á quien
ademas indemnizará de todo perjuicio.

Digitized by Google

DERECHO CIVIL.

ciones se requieren para que una cosa sea considerada como tesoro:—1ª Que la cosa esté oculta ó enterrada, pues de lo contrario se consideraría como cosa perdida que debe restituirse á su dueño.   Por lo demas, importa poco que la cosa se halle oculta en el suelo, en la pared ó en algun mueble, pues de todos modos se verifica la condicion:—2ª Que el dueño sea desconocido; de manera que si hay siquiera indicios acerca de la persona á quien pueda pertenecer la cosa, entrará como en el caso anterior, en la clase de las perdidas (arg: de las palabras *no puede ser conocido* del art. 522 C.).   Servirá, por ejemplo, de indicio poderoso, la fecha de la moneda ó la que puedan tener algunos objetos preciosos, pues siendo reciente, fácilmente se calculará quién fué el poseedor del fundo en esa época.   Pero ¿hasta qué tiempo será permitido hacer este cálculo retrospéctivo?   La doctrina ha establecido generalmente la época en que vivía el dueño anterior del fundo, declarando expedito el derecho de sus herederos para reclamar el tesoro: —3ª Que el descubrimiento se haga casualmente, condicion que excluye la premeditacion.   Esto no impide que el propietario haga practicar deliberadamente excavaciones en un fundo, con el objeto de buscar un tesoro, cuya existencia presume ó sospecha, ya que cada uno es libre para hacer en su propiedad las obras que mas le acomoden: el principio se ha establecido únicamente para determinar los derechos del inventor, cuando no es el mismo propietario.   Por eso y tambien porque nadie tiene derecho de usar de la propiedad ajena, se ha establecido que no se pueda buscar tesoro en terreno labrado ó edificado, sin

Digitized by Google

consentimiento del dueño de este (523 C.) (1).

En cuanto á la propiedad del tesoro, hay que te-
ner cuenta de dos principios. El tesoro, considera-
do en su verdadero 'punto de vista, no pertenece á
nadie, y puede adquirirse por ocupacion, pertenecien-
do en su totalidad al descubridor, pero, de otro lado,
puede tambien decirse que el tesoro no es una *res nu-
llius* en la extension de la palabra, puesto que forma
parte del fundo ó de la cosa en que se encuentra, y
que por consiguiente debe pertenecer, por derecho de
accesion, al dueño de la cosa (arg. de las palabras *se
les une* del art. 490 C.). En vez de adoptar cual-
quiera de estos dos principios, las legislaciones mo-
dernas han adoptado ambos, combinándolos, así co-
mo lo hizo la legislacion romana, en atencion á la
equidad natural: "*thesauros............divus Hadria-
nus, naturalen equitatem secutus, ei concessit, qui in-
venerit;.........at si quis in alieno loco invenerit di-
midium inventori, dimidium domino soli concessit*
(§ 39 I. *de rer. div.* 2 1):" El tesoro pertenece, pues
por mitad, al que lo descubre, por derecho de ocupa-
cion, y al dueño del fundo, por derecho de accesion.
Este es el principio general; veamos las aplicaciones.

_____

(1) La ley dice que no se podrá buscar tesoro en terreno
labrado ó edificado, sin consentimiento del dueño de este.
¿Se seguirá de aquí que, no siendo el terreno labrado ó edi-
ficado, aunque pertenezca á un particular, se podrá buscar
tesoro sin consentimiento del dueño? A pesar del argumen-
to, en apoyo de la afirmativa, que podría sacarse de los tér-
minos al parecer limitativos de la disposicion legal á que
nos referimos, debe concluirse negativamente, puesto que
el derecho de propiedad, cualquiera que sea el objeto ó cosa
sobre que se ejerza, envuelve la idea de exclusion absoluta,
que el propietario puede ejercer respecto de las demás. [cf.
461. 1º 4º, C.).

Digitized by Google

Desde luego, si el mismo dueño del fundo es quien descubre el tesoro, le pertenecerá en totalidad (cf. 461, 1º, 490 C.), puesto que en él se reunen las dos cualidades de propietario é inventor.   Si el tesoro se encontrare en terreno público ó de ninguno, pertenecerá tambien íntegramente al inventor (522 C.). Los terrenos públicos ó de nadie pertenecen en rigor al Estado, y este podría reclamar la mitad del tesoro; pero ha renunciado á su derecho, sin duda por razones de decoro (1). Si el tesoro se hallare en propiedad particular, por otro que no sea el dueño, se dividirá entre este y el inventor, por iguales partes, salvo los convenios especiales (524 C.). El inventor tendrá siempre derecho á la mitad, aun cuando estuviese trabajando en el fundo por cuenta del dueño, siempre que el trabajo no haya tenido por especial objeto la indagacion del tesoro. Aun los criados se hallan en el mismo caso que los trabajadores. Tampoco es necesario que la persona que descubre el tesoro se apodere de él inmediatamente; basta que lo haya descubierto, esto es, que lo haya hecho visible, para que sea

(1) Las leyes romanas y españolas conferían al fisco la mitad del tesoro hallado en terreno público (cf. § 39 I. de rer. div. 2, 1; ley 45, tit. 28, Part. 3ª; ley 3, tít. 22, lib. 10 Nov. Rec.\.—Las leyes de Indias (1. 1ª, tít. 12, lib. 8) introdujeron otras innovaciones. Vidaurre hace de estas leyes y de las de la Recopilacion una fuerte y merecida censura, con ese estilo apasionado que le es propio.—La ley peruana solo habla de terrenos públicos ó de nadie: no se hallan, pues, comprendidos en la disposicion los que pertenecen á una comunidad, como por ejemplo al municipio. Una resolucion legislativa de 28 de Noviembre de 1839 concedía á *todos los peruanos*, que quisiesen trabajar en el descubrimiento de tesoros ocultos, conocidos con el nombre de Huacas, la facultad de haerlo libremente, sin estar obligados á pagar los derechos que exigían las leyes antiguas.

Digitized by Google

Case 3:09-cv-01332-AWT   Document 78-10   Filed 06/01/10   Page 23 of 42

incuestionable su derecho á la mitad, aun cuando el
dueño se haya encontrado presente al tiempo de ve-
rificarse el descubrimiento.   Se ha suscitado tambien
en cuanto al tesoro una cuestion: si un propietario
vende los materiales de que está hecha una casa y al
demolerla se halla dentro de ellos un tesoro, corres-
pondiendo la mitad al inventor, ¿pertenecerá la otra
mitad al dueño de los materiales ó al del terreno?
Nuestro Código no permite resolver la cuestion, por-
que habla, en general, de propiedad particular, y tan-
to el terreno como los materiales tienen ese carácter.
Sin embargo, se ha convenido en adjudicar esa mitad
del tesoro al dueño del terreno y nó al de los mate-
riales, porque se considera que el tesoro es accesorio
de aquel y no de estos (1).   Si el tesoro se encontra-
re en un fundo sujeto á usufructo, no tendrá derecho á
él el usufructuario, sino el propietario del fundo
(1097 f. C.); porque el tesoro no entra en la catego-
ría de los frutos; mas si el usufructuario fuese el que
lo hallare, le corresponderá la mitad por su derecho
de invencion (524 C.].   En cuanto al derecho del en-
fiteuta sobre el tesoro encontrado en el fundo enfitéu-
tico, hay divergencias de opiniones.   Algunos le con-
fieren los mismos derechos que al propietario, por
cuanto posee el dominio útil, que se extiende á todo
lo que se encuentre encima y debajo del fundo; pero
otros hacen una distincion, que parece muy racional:
si la enfiteusis se concede por dos ó mas vidas, el
enfiteuta tendrá derecho al tesoro; pero nó, si solo se
halla establecida por años ó por una vida; porque en

_____

(1). La doctrina y la jurisprudencia han establecido este
principio de una manera incontrovertible, en todos los pai-
ses que han adoptado la legislacion francesa.

Digitized by Google

este último caso la enfiteusis presenta una gran ana-
logía y casi semejanza con el usufructo, deduciéndose
por paridad de razon, que no teniendo derecho el usu-
fructuario, tampoco debe tenerlo el enfiteuta.   Si du-
rante la sociedad conyugal se encontrare un tesoro en
el fundo de uno de los cónyuges, ¿tendrá derecho ex-
clusivo á la mitad el cónyuge propietario del fundo,
ó se la considerará como bienes gananciales, parti-
bles en esta calidad entre ambos cónyuges?   Desde
luego, puede decirse que la mitad del tesoro adjudi-
cada al propietario, no es mas que dinero ú objetos
muebles, semejantes á los que componen la otra mi-
tad que se adjudica al inventor; y siendo muebles, no
están comprendidos en las disposiciones de la ley que
determinan cuales bienes son los que deben conside-
rarse como propios de cada cónyuge (cf. 957, 960,
961, 963 C.); y ademas podría invocarse en apoyo de
esta opinion otro precepto legal, que declara bienes
comunes los productos de los bienes propios de cada
cónyuge [964, 1º C.].   Sin embargo, es menester
considerar que, cuando la ley determina la naturaleza
jurídica del tesoro, determina al mismo tiempo la
manera de resolver las cuestiones que se promuevan
sobre esta materia.   Hemos visto que la ley, adop-
tando un partido medio, dá á la mitad del tesoro el
carácter de mueble, y á la otra el de inmueble, pues-
to que confiere la mitad al que lo descubre, por dere-
cho de invencion, *jure inventionis*, dejando la segun-
da mitad al propietario del fundo, por derecho de ac-
cesion *jure accessionis.*   Y si el tesoro es meramente
un accesorio del fundo, es claro que debe seguirse á
lo principal, y corresponder exclusivamente al pro-
pietario de este, ya que es indudable que le corres-
ponde, por derecho de accesion, todo lo que se une al

Case 3:09-cv-01332-AWT Document 78-10 Filed 06/01/10 Page 25 of 42

fundo [cf. 461, 1º, 490 C. |. Poco importa que despues la mitad del tesoro se convierta en mueble, pues lo mismo sucede con otras cosas, muebles por su naturaleza, y que la ley considera, sin embargo, en ciertos casos, como inmuebles. La disposicion relativa á los productos tampoco es aplicable, pues bien se deja entender que la ley, en esa parte, ha querido hablar de frutos, en cuyo número no entra el tesoro (cf. 1097 f. C.). Segun esta doctrina, la mitad del tesoro pertenecerá exclusivamente al cónyuge en cuyo fundo se haya encontrado, como bienes adquiridos por un título gratuito, segun el tenor y el espíritu de la ley (arg. de las palabras *título gratuito* de los art. 960, 1º y 961, 4º, y arg. *á contrario* de las palabras *título oneroso* del art. 964, 3º C.). Mas si el inventor fuere uno de los cónyuges, la mitad que le corresponde, por derecho de invencion, pertenecerá á la sociedad, porque ha sido adquirida por medio del trabajo ó la industria (arg. del art. 964, 3º C.).

La ley, como hemos visto, al adjudicar el tesoro por mitad al inventor y al dueño del fundo exceptúa el caso en que haya convenio especial (524 f. C.). Es indudable, en efecto, que cada uno está facultado para renunciar á los derechos que le correspondan, cuando no interesen al órden público ni á las buenas costumbres [cf. VII tít. prel. C.], y ni estas ni aquel sufren el mas leve daño en qualquier convenio que celebren el inventor y el propietario sobre la reparticion del tesoro. Así tambien, un propietario podría convenir con el usufructuario en ceder á este la mitad ó una parte del tesoro que se encontrare en el fundo, y este convenio surtiría todo sus efectos. Al caso de convenio se refiere así mismo aquella disposicion de la ley que no permite buscar tesoro en terreno ajeno ó edificado,

sin consentimiento del dueño de este [523 C.]. Si falta
el consentimiento y se busca el tesoro, este pertenece-
rá en su totalidad al dueño del fundo, incurriendo ade-
más el inventor en una pena por su temeridad. Habi-
endo consentimiento, sin ningun otro pacto acerca de la
reparticion del tesoro, se dividirá por mitad [arg. de
las palabras *en todo caso* del art. 524 C.], pues el con-
sentimiento del dueño es ya un título suficiente que
acredita el derecho del inventor, y aunque su parti-
cipacion no fuera de rigorosa justicia, sería por lo me-
nos de equidad (cf. 1257 C). En el caso en cuestion,
la ley se limita á imponer al que ha buscado tesoro en
fundo ajeno, la obligacion de dejar el fundo en estado
que no cause perjuicio al propietario (525 C.). Y de
esta misma disposicion y de la que exige el consenti-
miento del dueño para buscar tesoro en fundo ajeno,
se deduce la consecuencia de que la indagacion del te-
soro puede hacerse deliberadamente; lo cual es, en cier-
to modo una derogacion del principio que quiere que el
descubrimiento del tesoro sea casual; derogacion que
se justifica por sí misma, porque puede suceder que
un individuo posea indicios poderosos acerca de la
existencia de un tesoro, y no sería racional dejarlo per-
derse, únicamente por no haber intervenido la ca-
sualidad, ó por la mala voluntad del dueño del fundo,
si se presume que el tesoro existe en él. Que si el due-
ño se resistiere á prestar su consentimiento, y apro-
vechando del aviso hiciere la excavacion y encontra-
re el tesoro la mitad pertenecerá siempre al que dió
el aviso puesto que sin él no se hubiera encontrado,
equivaliendo entónces el aviso á un verdadero descu-
brimiento.

# EXHIBIT B-14

Pág. 10  El Perú y el Mundo - Comentarios                         LIMA, JUEVES 18 DE AGOSTO DE 1977                         El Comercio

Pedro de la Barra

# Muerte de un maestro

> ## Hizo teatro no para nosotros sino para la sociedad
>
> Por Domingo PIGA

El rol de José Toribio Polo

## Historia de un "desbande"

Por Luis Guillermo LUMBRERAS

1877

*María Mérida*, la anti-Fallaci

## Nuevas fuentes de iluminación histórica sobre España

Un análisis del libro "Tráfico de Francia", establece íntimo de una dictadura.

por R. XIMÉNEZ

El ejército h...

Cuba emiten comuni... hundimiento de b...

Programa de lo... del Perú y Ecua...

# EXHIBIT B-15

JOSÉ MARÍA OTS CAPDEQUÍ

# MANUAL DE HISTORIA

DEL

# DERECHO ESPAÑOL EN LAS INDIAS

Y DEL DERECHO PROPIAMENTE INDIANO

PRÓLOGO DE
RICARDO LEVENE



EDITORIAL LOSADA, S. A.
BUENOS AIRES

sro si ésta fuese inmemorial, pusomo anteriormente hemos dicho,
da la naturaleza de esta institucí se entendía que el hijo sucesor
nentraba en la posesión de la enmienda a título de heredero de
susausante, sino por llamamiento Bl, y, por tanto, no podían perju-
dirle los actos de su autecesor,

Hasta aquí los preceptos jurídis más interesantes del Derecho
iano, sobre la sucesión en las enmiendas. Ya hemos dicho que
fra de lo relacionado con esta insтitución, los principios de Derecho
-esorio que-se-contienen-en-la-llanda-legislación-de-Indias,-presen-
tª un interés doctrinal muy escaso.

Sólo algunas disposiciones Realesencaminadas a corregir los abu-
srcometidos por algunas autoridad coloniales en la sucesión de los
cácazgos y contra libertad de tesr de los indíos; otras sobre el
cyplimiento de las restituciones dconciencia que al tiempo de su
mrte hicieren a los indios sus encomenderos; algunas Reales Cédulas
crectoras de las extralimitacionessometidas por los Prelados ecle-
lias en punto a la libertad testamentaria de sus clérigos y preben-
dos, así como de los fraudes comedos por algunos confesores para
ceseguir que sus fieles otorgaran tratamento en favor de sus deudos,
Iesia o Religión y por último, ciert Bulas o Brebes pontificios, con-
sr correspondientes leyes aclaratorn, puntualizando las facultades,
diraniales de los Obispos sobre subienes patrimoniales y sobre los
aauiridos en razón de su dignidad eclesiástica.

Es, en cambio, extraordinariamen nutrido, el grupo de leyes que-
sdictaron para conseguir la buenadministración y la remisión a
Bafia de los bienes de los difuntos Indias cuyos herederos estu-
vian radicados en la Metrópoli. Sllegaron a crear juzgados espe-
ceis de bienes de difuntos en tod las ciudades importantes y se-
divuso que en todos los Concejos bíera un area de tres llaves —
q debían estar en poder del juez, l Fiscal y dl Escribano— don-
des había de depositar, con las oídas garantias, el producto de
es bienes, hasta que por los Oficies Reales se realizase su envío a-
lдesa de la Contratación de Sevilli. Pero el conjunto de estas dispo-
siones sobre bienes de difuntos este de interés específico desde el
pío de vista jurídico y sirve sólo pa poner de relieve la importan-
cidel problema en el orden social administrativo, debido principal-
mte a la enormidad de las distcias y a la dificultad de las,
cunicaciones.

4. EL DERECHO PROPIEDAD 49).

Por tratarse c'territorios de nuevo descubrimiento y nueva pobla-
ción se observa estas fuentes del Derecho indiano reguladoras de esta
materia, una frente interferencia entre el interés público y el inte-
rés privado. Dª la amplitud que presenta el cuerpo general de las
regalías de la Cona de Castilla en estos territorios según la doctrina
articulada por los juristas más destacados de la épo, ya hemos dicho
que no es aventudo afirmar que todo derecho de propiedad privada,
de los colonizados en las Indias, derivada originariamente, de la gra-
cia o merced Rea

La enumeran y alcance de estas regalías a como el proceso
histórico seguidos orden a la apropiación privada las tierras de
realengo y el pode aprovechamiento por los partidares de los yaci-
mientos mineros,a quedado sumariamente expues al tratar de las
instituciones economicas,

Veamos ahoratros aspectos importantes del Derho de propiedad
indiano, que en una parte rebasan, como ya hemos dicho, la esfera,
del interés puramente privado.

a) Hidalgo de toros.

En las Capitaciones de nuevo descubrimiento población se dis-
puso con respecta los tesoros que se descubriesen 'n enterramientos
o cualquiera otr parajes ocultos'', que pertenecía a la Corona ''la,
mitad sin descuto de cosa alguna, quedando la ra mitad para la
persona que así hallare y descnbriere''.

Esta misma ctrina se sanciona con caracterese general aplica-
ción, en la Real revisión de 4 de septiembre de 15 y en la Recopi-
lación de las ley de las Indias de 1680. Se previ también en esta,
Recopilación, quom motivo de supuestos descubrimentos de resoros,
no habían de ser defraudados los indios de lo quraviesen por suyo,
por tenerlo guando o esconido por temor, o portra justa causa'';
que para poder rovecharse de un enterramiento scobierto era ne-
cesario registrarª previamente y que en punto a ess descubrimiatos
habían de ser ezparados los indios con los español.

Los requisitoque se habían de observar para jentar el descubri-
miento de tesor se puntualizan minuciosamente . la ley 1, tit. 12,

447

lhVIII de la propia Recopilación: que si alguno... intentare descubrir tesoros en las Indias, capitulantes con Nos, o los Virreyes, Pridentes o Gobernadores, la partque se le ha de dar de lo que sare, y obligándose por su personay bienes, con fianças bastantes dque satisfará y pagará los daños menoscabos, que de buscar el tero se siguieren en las casas, heredes o posesiones a los dueños dde presumieren que está, como fre passado por personas de intetencia y experiencia, nombradas pa ello, y hará el descubrimientotoor su cuenta y pagará de su bienda todas las costas y gastos nesarios (hecha esta prevención).1 Virrey, Presidente o Gobernor elija otra de confiança, rectid y satisfacción, que vaya, y asta con el descubridor, y tongeventa, y razón de lo que se hare, con orden de que lo haga aluar y tassar, y acuda al descubior con la parte que le pertene conforme a lo resuelto o por ocierto, o capitulación se le hubie concedido, menos los derechos yuintos, que a Nos pertenecen, yraiga la restante cantidad a la pié que se le señalare, dándonos risso de todo, y remitiéndolo a ess Reynos. Y assimismo ordenam, que para el cumplimiento de lecferido, y allanar las casas, heredas y posesiones, que el descubbior señalare, el Virrey, Presidente Gobernador dé comisión, encargdo a la persona, que ha de assir, que use della con limitación, y las Audiencias y Justicias"... se le presten el favor neccesario.

Según el testimonio de los tratadas del Derecho indiano de tanta anidad como Solórzano y Matienz a pesar de la doctrina legal exrsta en punto a los derechos de lCorona sobre los tesoros desenbros en los enterramientos de Indi, "lo más ordinario" era "pagar se el quinto de lo que se saca a SMajestad, como se haze de los itales, y otros Tesoros".

Parece interesante hacer constar se las Iglesias de las Indias pretdieron "ser suyo lo que se ha hado en adoratorios y santuarios, e descubridor, y assi mesmo las tras, ganados, charquizas, joyas yttas cosas que eran de los Yngas, del Rayo y Sol, y estaban dedidas al servicio de los ídolos". ElRey, en Cédula de 1575 salió al po de tales pretensiones, reivindicado sobre estos bienes los derechos dla Corona.

Se disentió entre los teólogos laicitud de las explotaciones para conbrir supuestos tesoros en los enterramientos de los indios, dado caráoter sagrado de estos enterrmientos. El Concilio II de Lima

celebrado en 1567,e pronunció en contra, ordenan bajo pena de excomunión "que se desbaraten las sepulturas de l indios aunque sean infieles". El mismo criterio prohibitivo hab sido sostenido antes por el P. LaCasas y otros tratadistas. Juan Solórzano, defensor siempre defunto de las Indias, nunca "sea dudado, que que en el SupremConsejo de las Indias, nunca "sea dudado, que sean lícitos estos conbrimientos aunqte en consecucia de ellos suceda que también descubran, y desenierren los cueos de los indios muertos, que están las dichas Huacas, como esoes buelban luego a enterrar, y a amudar como antes estaban".

b) *Sobre la propiad privada de los oficios públicos en las Indias.*

Ya hemos vistque, según la doctrina de la épo, la institución y provisión de ofis públicos fué considerada como u de las regalías vinculadas en la Cona de Castilla, de la cual hicier uso los Monarcas recompensardcon estos oficios a sus vasallos eméritos, unas veces con merceddе carácter vitalicio o por un núaro determinado de años, otras poros o tres vidas y otras a perpetuad.

Ya hemos vistambién que en tiempos de Felipe. se acordó, para subvenir a las necidades del Tesoro público "que sevediessen todos los oficios que no viesen jurisdicción. Y por que restaban vendidos algunos de plumase executasse en los demás, y seriasen los que conviniesse para mismo efecto" (Arvonno de Las Pineda, *Trdado... de las Confutaciones Reales*).

Estos antecedes históricos explican que en tor a la propiedad privada de estos otios públicos se desarrollase todo o cuerpo de doctrina jurídica pafijar las facultades dominicales sus poseedores.

Se hizo consta estos efectos: que de los oficivendibles no se pudiera pedir resión por lesión en el precio y q no se pudieran gravar con censos otras cargas porque "aunque lopoceedores de los oficios vendibles renunciables tengan el dominio d, con las limitaciones que precen las leyes, no se hallan autorizos para disponer de ellos a su arño, como de cualquiera otra finde su patrimonio, por conservar sigre mi Corona el dominio dired con un derecho espectativo de resión a ella, por causas diferent que puedan sobrevenir".

Al admitirse e los tenedores de estos oficios pieran renunciar-

449

8

# EXHIBIT B-16

# TRATADO

## DE

# DERECHO CIVIL

### POR

### T. PACHECO.

(Segunda edicion.)

## II

## LIMA

IMPRENTA DEL ESTADO CALLE DE LA RIFA N. 58.

1872.

DERECHO CIVIL.          287.

zar en fundo ajeno, debiendo, por lo mismo, aplicar-
se, por analogía, á la pesca, los principios que rigen
en materia de caza, cuando se hace en fundo ajeno
(cf. 484 f., 487 C.) (1).


C.—*Del tesoro.*


` Tambien se adquiere inmediatamente por ocupa-
cion el tesoro.    Llámase tesoro cualquiera cosa ocul-
ta ó enterrada, cuyo dueño es desconocido y que es
descubierta por casualidad.    Pueden, pues, consti-
tuir el tesoro cualesquiera objetos, susceptibles de ser
enterrados ú ocultados, y se consideran tales, no so-
lamente el oro y la plata, sino las alhajas, las está-
tuas, los vasos, utensilios, &ª; en una palabra, todo
objeto de valor.    Sin embargo, parece que la ley hi-
ciera alguna distincion, pues habla del *tesoro y de to-
da cosa enterrada* (cf. 522, 1097 C.), limitando sin
duda el sentido de la palabra tesoro á los metales pre-
ciosos, que es la acepcion en que vulgarmente se la
toma.    Esto proviene seguramente de la definicion
del derecho romano: *thesaurus est vetus quædam de-
positiq pecuniæ* (Fr. 31, § 1º D. *de acq. rer. dom.* 41
l); entendiéndose por *pecunia* únicamente el dinero;
pero es bien sabido que esa palabra significa todo lo
que se halla en nuestro patrimonio (cf. Fr. 5 pr. D.
*de verb. sign.*, 50, 16).
    Segun la definicion que hemos dado, tres condi-

---

[1] Segun el Código chileno, si alguno pescare en fundo
ajeno, sin permiso del dueño, cuando por ley estaba obliga-
do á obtenerlo, lo que pescare será para el dueño, á quien
ade mas indemnizará de todo perjuicio.

Digitized by Google

ciones se requieren para que una cosa sea considera-
da como tesoro:—1ª Que la cosa esté oculta ó enter-
rada, pues de lo contrario se consideraría como cosa
perdida que debe restituirse á su dueño.  Por lo de-
mas, importa poco que la cosa se halle oculta en el
suelo, en la pared ó en algun mueble, pues de todos
modos se verifica la condicion:—2ª Que el dueño sea
desconocido; de manera que si hay siquiera indicios
acerca de la persona á quien pueda pertenecer la co-
sa, entrará como en el caso anterior, en la clase de
las perdidas (arg: de las palabras *no puede ser conoci-
do* del art. 522 C.).  Servirá, por ejemplo, de indi-
cio poderoso, la fecha de la moneda ó la que puedan
tener algunos objetos preciosos, pues siendo reciente,
fácilmente se calculará quién fué el poseedor del fun-
do en esa época.  Pero ¿hasta qué tiempo será per-
mitido hacer este cálculo retrospectivo?  La doctri-
na ha establecido generalmente la época en que vi-
vía el dueño anterior del fundo, declarando expedito
el derecho de sus herederos para reclamar el tesoro:
—3ª Que el descubrimiento se haga casualmente,
condicion que excluye la premeditacion.  Esto no im-
pide que el propietario haga practicar deliberada-
mente excavaciones en un fundo, con el objeto de bus-
car un tesoro, cuya existencia presume ó sospecha,
ya que cada uno es libre para hacer en su propiedad
las obras que mas le acomoden: el principio se ha es-
tablecido únicamente para determinar los derechos
del inventor, cuando no es el mismo propietario. Por
eso y tambien porque nadie tiene derecho de usar de
la propiedad ajena, se ha establecido que no se pue-
da buscar tesoro en terreno labrado ó edificado, sin

consentimiento del dueño de este (523 C.) (1).

En cuanto á la propiedad del tesoro, hay que te-
ner cuenta de dos principios. El tesoro, considera-
do en su verdadero 'punto de vista, no pertenece á
nadie, y puede adquirirse por ocupacion, pertenecien-
do en su totalidad al descubridor, pero, de otro lado,
puede tambien decirse que el tesoro no es una *res nu-
llius* en la extension de la palabra, puesto que forma
parte del fundo ó de la cosa en que se encuentra, y
que por consiguiente debe pertenecer, por derecho de
accesion, al dueño de la cosa (arg. de las palabras *se
les une* del art. 490 C.). En vez de adoptar cual-
quiera dé estos dos principios, las legislaciones mo-
dernas han adoptado ambos, combinándolos, así co-
mo lo hizo la legislacion romana, en atencion á la
equidad natural: "*thesauros............divus Hadria-
nus, naturalen equitatem secutus, ei concessit, qui in-
venerit;.........at si quis in alieno loco invenerit di-
midium inventori, dimidium domino soli concessit*
(§ 39 I. *de rer. div.* 2 1):" El tesoro pertenece, pues
por mitad, al que lo descubre, por derecho de ocupa-
cion, y al dueño del fundo, por derecho de accesion.
Este es el principio general; veamos las aplicaciones.

_____        _____

(1) La ley dice que no se podrá buscar tesoro en terreno
labrado ó edificado, sin consentimiento del dueño de este.
¿Se seguirá de aquí que, no siendo el terreno labrado ó edi-
ficado, aunque pertenezca á un particular, se podrá buscar
tesoro sin consentimiento del dueño? A pesar del argumen-
to, en apoyo de la afirmativa, que podría sacarse de los tér-
minos al parecer limitativos de la disposicion legal á que
nos referimos, debe concluirse negativamente, puesto que
el derecho de propiedad, cualquiera que sea el objeto ó cosa
sobre que se ejerza, envuelve la idea de exclusion absoluta,
que el propietario puede ejercer respecto de las demás. [cf.
461. 1º 4º, C.).

Digitized by Google

290                    DERECHO CIVIL.

Desde luego, si el mismo dueño del fundo es quien
descubre el tesoro, le pertenecerá en totalidad (cf.
461, 1?, 490 C.), puesto que en él se reunen las dos
cualidades de propietario é inventor.   Si el tesoro se
encontrare en terreno público ó de ninguno, pertene-
cerá tambien íntegramente al inventor (522 C.).  Los
terrenos públicos ó de nadie pertenecen en rigor al
Estado, y este podría reclamar la mitad del tesoro;
pero ha renunciado á su derecho, sin duda por razones
de decoro (1).  Si el tesoro se hallare en propiedad
particular, por otro que no sea el dueño, se dividirá
entre este y el inventor, por iguales partes, salvo los
convenios especiales  (524 C.).  El inventor tendrá
siempre derecho á la mitad, aun cuando estuviese tra-
bajando en el fundo por cuenta del dueño, siempre
que el trabajo no haya tenido por especial objeto la
indagacion del tesoro.   Aun los criados se hallan en
el mismo caso que los trabajadores.   Tampoco es ne-
cesario que la persona que descubre el tesoro se apo-
dere de él inmediatamente; basta que lo haya descu-
bierto, esto es, que lo haya hecho visible, para que sea

_____                                          ___ ___

(1) Las leyes romanas y españolas conferían al fisco la mi-
tad del tesoro hallado en terreno público  (cf. § 39 I. de rer.
div. 2, 1; ley 45, tit. 28, Part. 3º; ley 3, tít. 22, lib. 10 Nov.
Rec.\.—Las leyes de Indias (1. 1ᵃ, tít. 12, lib. 8) introduje-
ron otras innovaciones. Vidaurre hace de estas leyes y de las
de la Recopilacion una fuerte y merecida censura, con ese
estilo apasionado que le es propio.-La ley peruana solo habla
de terrenos públicos ó de nadie: no se hallan, pues, compren-
didos en la disposicion los que pertenecen á una comunidad,
como por ejemplo al municipio. Una resolucion legislativa
de 28 de Noviembre de 1839 concedía á *todos los peruanos*,
que quisiesen trabajar en el descubrimiento de tesoros ocul-
tos, conocidos con el nombre de Huacas, la facultad de ha-
cerlo libremente, sin estar obligados á pagar los derechos
que exigían las leyes antiguas.

Digitized by Google

incuestionable su derecho á la mitad, aun cuando el dueño se haya encontrado presente al tiempo de verificarse el descubrimiento.  Se ha suscitado tambien en cuanto al tesoro una cuestion: si un propietario vende los materiales de que está hecha una casa y al demolerla se halla dentro de ellos un tesoro, correspondiendo la mitad al inventor, ¿pertenecerá la otra mitad al dueño de los materiales ó al del terreno? Nuestro Código no permite resolver la cuestion, porqué habla, en general, de propiedad particular, y tanto el terreno como los materiales tienen ese carácter. Sin embargo, se ha convenido en adjudicar esa mitad del tesoro al dueño del terreno y nó al de los materiales, porque se considera que el tesoro es accesorio de aquel y no de estos (1).  Si el tesoro se encontrare en un fundo sujeto á usufructo, no tendrá derecho á él el usufructuario, sino el propietario del fundo (1097 f. C.); porque el tesoro no entra en la categoría de los frutos; mas si el usufructuario fuese el que lo hallare, le corresponderá la mitad por su derecho de invencion (524 C.].  En cuanto al derecho del enfiteuta sobre el tesoro encontrado en el fundo enfitéutico, hay divergencias de opiniones.  Algunos le confieren los mismos derechos que al propietario, por cuanto posee el dominio útil, que se extiende á todo lo que se encuentre encima y debajo del fundo; pero otros hacen una distincion, que parece muy racional: si la enfiteusis se concede por dos ó mas vidas, el enfiteuta tendrá derecho al tesoro; pero nó, si solo se halla establecida por años ó por una vida; porque en

(1). La doctrina y la jurisprudencia han establecido este principio de una manera incontrovertible, en todos los paises que han adoptado la legislacion francesa.

este último caso  la enfiteusis presenta una gran ana-
logía y casi semejanza con el usufructo, deduciéndose
por paridad de razon, que no teniendo derecho el usu-
fructuario, tampoco debe tenerlo el enfiteuta.   Si du-
rante la sociedad conyugal se encontrare un tesoro en
el fundo de uno de los cónyuges, ¿tendrá derecho ex-
clusivo á la mitad el cónyuge propietario del fundo,
ó se la considerará como bienes gananciales, parti-
bles en esta calidad entre ambos cónyuges?   Desde
luego, puede decirse que la mitad del tesoro adjudi-
cada al propietario, no es mas que  dinero ú objetos
muebles, semejantes á los que  componen la otra mi-
tad que se adjudica al inventor; y siendo muebles, no
están comprendidos en las disposiciones de la ley que
determinan cuales bienes son los que deben conside-
rarse como propios de cada cónyuge (cf. 957, 960,
961, 963 C.); y ademas podría invocarse en apoyo de
esta opinion otro precepto legal,  que declara bienes
comunes los productos de los bienes propios de cada
cónyuge [964, 1º C.].  Sin embargo, es menester
considerar que, cuando la ley determina la naturaleza
jurídica del tesoro, determina al mismo tiempo la
manera de resolver las cuestiones que se  promuevan
sobre esta materia.   Hemos  visto que la ley, adop-
tando un partido medio, dá á la mitad del tesoro el
carácter de mueble, y á la otra el de inmueble, pues-
to que confiere la mitad al que lo descubre, por dere-
cho de invencion, *jure inventionis*, dejando la segun-
da mitad al propietario del fundo, por derecho de ac-
cesion *jure accessionis.*  Y si el tesoro es meramente
un accesorio del fundo, es claro  que debe seguirse á
lo principal, y corresponder exclusivamente al pro-
pietario de este, ya que es indudable que le corres-
ponde, por derecho de accesion, todo lo que se une al

Digitized by Google

fundo [cf. 461, 1º, 490 C. |.   Poco importa que des-
pues la mitad del tesoro se convierta en mueble, pues
lo mismo sucede con otras cosas, muebles por su na-
turaleza, y que la ley considera, sin embargo, en
ciertos casos, como inmuebles.   La disposicion rela-
tiva á los productos tampoco es aplicable, pues bien
se deja entender. que la ley, en esa parte, ha querido
hablar de frutos, en cuyo número no entra el tesoro
(cf. 1097 f. C.).   Segun esta doctrina, la mitad del
tesoro pertenecerá exclusivamente al cónyuge en cu-
yo fundo se haya encontrado, como bienes adquiridos
por un título gratuito, segun el tenor y el espíritu de
la ley (arg. de las palabras *título gratuito* de los art.
960, 1º y 961, 4º, y arg. *á contrario* de las palabras
*título oneroso* del art. 964, 3º C.).   Mas si el inven-
tor fuere uno de los cónyuges, la mitad que le cor-
responde, por derecho de invencion, pertenecerá á la
sociedad, porque ha sido adquirida por medio del tra-
bajo ó la industria (arg. del art. 964, 3° C.).

La ley, como hemos visto, al adjudicar el tesoro por
mitad al inventor y al dueño del fundo exceptúa el
caso en que haya convenio especial (524 f. C.). Es in-
dudable, en efecto, que cada uno está facultado para
renunciar á los derechos que le correspondan, cuando
no interesen al órden público ni á las buenas costum-
bres. [cf. VII tít. prel. C. ], y ni estas ni aquel sufren
el mas leve daño en qualquier convenio que celebren
el inventor y el propietario sobre la reparticion del
tesoro. Así tambien, un propietario podría conve-
nir con el usufructuario en ceder á este la mitad ó una
parte del tesoro que se encontrare en el fundo, y este
convenio surtiría todo sus efectos. Al caso de convenio
se refiere así mismo aquella disposicion de la ley que
no permite buscar tesoro en terreno ajeno ó edificado,

sin consentimiento del dueño de este [523 C.]. Si falta
el consentimiento y se busca el tesoro, este pertenece-
rá en su totalidad al dueño del fundo, incurriendo ade-
más el inventor en una pena por su temeridad. Habi-
endo consentimiento, sin ningun otro pacto acerca de la
reparticion del tesoro, se dividirá por mitad [arg. de
las palabras *en todo caso* del art. 524 C.], pues el con-
sentimiento del dueño es ya un título suficiente que
acredita el derecho del inventor, y aunque su parti-
cipacion no fuera de rigorosa justicia, sería por lo me-
nos de equidad (cf. 1257 C). En el caso en cuestion,
la ley se limita á imponer al que ha buscado tesoro en
fundo ajeno, la obligacion de dejar el fundo en estado
que no cause perjuicio al propietario (525 C.). Y de
esta misma disposicion y de la que exige el consenti-
miento del dueño para buscar tesoro en fundo ajeno,
se deduce la consecuencia de que la indagacion del te-
soro puede hacerse deliberadamente; lo cual es, en cier-
to modo una derogacion del principio que quiere que el
descubrimiento del tesoro sea casual; derogacion que
se justifica por sí misma, porque puede suceder que
un individuo posea indicios poderosos acerca de la
existencia de un tesoro, y no sería racional dejarlo per-
derse, únicamente por no haber intervenido la ca-
sualidad, ó por la mala voluntad del dueño del fundo,
si se presume que el tesoro existe en él. Que si el due-
ño se resistiere á prestar su consentimiento, y apro-
vechando del aviso hiciere la excavacion y encontra-
re el tesoro la mitad pertenecerá siempre al que dió
el aviso puesto que sin él no se hubiera encontrado,
equivaliendo entónces el aviso á un verdadero descu-
brimiento.

Digitized by Google