# EXHIBIT B-17

RICARDO PALMA

# TRADICIONES PERUANAS
## COMPLETAS

EDICION Y PROLOGO
DE
EDITH PALMA
NIETA DEL AUTOR

CON SIETE EXTENSOS APENDICES
Y UNA SELECCION DE CARTAS
DEL AUTOR

AGUILAR
MADRID - 1964



*Esta edición de las*
TRADICIONES PERUANAS COMPLETAS
*que fué autorizada por las hijas del autor*

CONTIENE:

A DON RICARDO PALMA.

PRÓLOGO

TRADICIONES PERUANAS

ANALES DE LA INQUISICIÓN DE LIMA.
LA SEGUNDA INQUISICIÓN.
LA BOHEMIA DE MI TIEMPO.
RECUERDOS DE ESPAÑA.
ARTÍCULOS DIVERSOS.
PARRAFADAS DE CRÍTICA.
MISCELÁNEA EPISTOLAR.

APÉNDICES

I: CRONOLOGÍA DE LA HISTORIA DEL PERÚ.
II: LEXICOGRAFÍA, PAREMIOLOGÍA Y MUSA FESTIVA.
III: GEOGRAFÍA DE LAS «TRADICIONES».
IV: DRAMATIS PERSONÆ.
V: BIBLIOGRAFÍA.
VI: ÍNDICE ALFABÉTICO DE TÍTULOS DE LAS «TRADICIONES».
VII: ÍNDICE POR SERIES DE LAS «TRADICIONES».

QUINTA EDICIÓN, 1964

INSTITUTO RIVA AGÜERO
BIBLIOTECA
19 DIC. 1969
025232

NÚM. RGTRO.: 2762-53.
DEPÓSITO LEGAL. M. 4800.—1964

© AGUILAR, S. A. DE EDICIONES
*Reservados todos los derechos.*

Printed in Spain. Impreso en España por Talleres Gráficos Montaña - Amor Hermoso, 89 - Madrid

RICARDO PALMA

# TRADICIONES PERUANAS
## COMPLETAS

Case 3:09-cv-01332-AWT Document 78-11 Filed 06/01/10 Page 4 of 19

Diego de Mora. Hallábase éste todavía en campaña cuando fué notificado, y contestó que mal podría ir a la cárcel quien, como él, aparte de ser hidalgo de solar conocido, era también el capitán más antiguo entre todos los del reino, razones que pesaron en el ánimo del pesquisidor para no insistir en lo de ponerlo entre rejas. ¡Buen peine de escardar lana fué el tal don Diego! No hubo revolución en la que no figurara entre los más comprometidos; pero siempre, a la hora de apretar, decía: «Ya vuelvo», «Hasta aquí llegaron las amistades», y desertaba para presentarse en el campo realista. Fué un politiquero de sutilísimo olfato.

El proceso, que existe en el Archivo Nacional, y que he hojeado y ojeado, consta de más de 500 folios, y duraría hasta hoy día de la fecha si a Diego de Mora no se le hubiera llevado al otro mundo la *Tiñosa* en 1556.

La pobre andaluza, después de ocho años de litigio, en el que, según tasación de costas, gastó 610 pesos de oro y 6 tomines, ganó el apodo de la *Nariz de Camello*, mote con que ella misma se bautizara en su primer recurso.

## EL MOTIN CONTRA GASCA

(1547)

Dueño ya don Pedro de La Gasca de los veintidós buques que bajo el mando del general Hinojosa componían la escuadra de Gonzalo Pizarro, resolvió principiar la campaña contra el rebelde, desentendiéndose de las observaciones que, en oposición a su propósito, formularon don Diego García de Paredes y demás capitanes.

El 10 de abril de 1547, y con propicio viento, abandonaron las naves el fondeadero de Panamá, embarcándose Gasca en la capitana, acompañado del arzobispo Loayza, que había poco antes conseguido huir de Lima. No llegaban a la cifra de quinientos los soldados y tripulantes que iban a acometer la ardua empresa.

Dos días de navegación llevaba la flota, cuando sobrevinieron calmas tan completas que varios de los barcos, arrastrados por las corrientes, retrocedieron a Taboga.

Disperso el convoy, convocó Gasca una junta, en la que los marinos opinaron que la estación era adversa para navegar con rumbo a las costas del Perú, pues hallándose mal carenadas algunas de las naves se corría el peligro de verlas hundirse, y por ende, convenía regresar a Panamá y esperar a septiembre, en que corrientes y brisas son favorables. Los hombres de guerra, por su parte, añadían que en cinco o seis meses más, con los leales que acudieran de Nicaragua y México, habría una base de mil soldados, por lo menos, para lanzarse a la aventura con seguridad del éxito.

Gasca consideró que aplazar por medio año las operaciones era dar tiempo para que los rebeldes cobrasen bríos, y apartándose de la opinión general, dijo:

—No se hable, señores, de volver atrás, que de animosos es el peligro. Señor Juan Alonso de Palomino, en nombre del emperador, ordeno que las naos hagan rumbo a la Gorgona.

Y no hubo más que proseguir navegando con los buques que estuvieron en condición de hacerlo.

Tres días más tarde, y casi al anochecer, desatóse un atroz temporal del Norte. Juan Cristóbal Calvete lo describe así:

«El viento era tan recio y la mar tan brava, que el riesgo de zozobrar se hizo inminente; y eran las olas tan furiosas y continuas, que no había marinero que parase, por el agua que de la mar entraba y por la que del cielo caía; y eran tantos los truenos, relámpagos y rayos, que la nao parecía arder en vivas llamas.»

La gente de mar, casi amotinada, manifestó a Gasca la conveniencia de amainar velas, conservando sólo la del trinquete, y correr el temporal hasta volver a dar fondo en Taboga o Panamá.

El clérigo Gasca, que, breviario en mano, no se separaba de la cubierta, despreciando el peligro de ser arrebatado por una ola, le contestó con energía:

—A la Gorgona he dicho, y pena de la vida al que toque un trapo.

A las tres de la mañana bajó el licenciado a la cámara, y la marinería se echó a aflojar escotas para arriar la mayor y la mesana.

Un par de minutos llevaban en la faena cuando volvió a presentarse Gasca sobre cubierta.

—¡Por la Virgen del Pilar!—gritó furioso—. ¡Alto esa maniobra!

—Señor licenciado—contestó un contramaestre—, saber leer en el breviario no es saber en cosas de mar.

El motín no podía ser más declarado.

Y hasta los oficiales, sin tomar parte activa, simpatizaban con la marinería, pues ninguno puso a raya al insolente.

Por fortuna, las cuerdas y velas estaban tan duras y tiesas, que la maniobra se hacía difícil.

Gasca cruzó los brazos sobre el pecho, alzó los ojos al cielo, pidió a Dios un milagro, y Dios lo oyó.

De pronto brillaron luces sobre los masteleros y gavia.

Eran las luces o fuegos de San Telmo, anunciadores de que la tempestad iba a cesar.

La amotinada marinería cayó de rodillas delante de don Pedro de La Gasca, como los sublevados compañeros de Colón cuando el serviola gritó desde la cofa: «¡Tierra!»

## EL CARBUNCLO DEL DIABLO

(1547)

La *huaca* Juliana, cuya celebridad data desde la batalla de la Palma, el 5 de enero de 1855, por haber sido ella la posición más disputada, tiene su leyenda popular, que hoy se me antoja referir a mis lectores.

Cuando el conquistador Juan de la Torre, el *Madrileño*, sacó en los tiempos de la rebelión de Gonzalo Pizarro grandes tesoros de una de las huacas vecinas a la ciudad, despertóse entre los soldados la fiebre de escarbar en las fortalezas y cementerios de los indios.

Tres ballesteros de la compañía del capitán Diego Gumiel asociáronse para buscar fortuna en las huacas de Miraflores, y llevaban ya semanas y semanas de hacer excavaciones sin conseguir cosa de provecho.

El Viernes Santo del año 1547, y sin respeto a la santidad del día, que la codicia humana no respeta santidades, los tres ballesteros, después de haber sudado el quilo y echado los bofes trabajando todo el día, no habiendo sacado más que una momia, y ni siquiera un dije o pieza de alfarería que vallese tres pesetas, estaban dados al diablo y maldiciendo

Case 3:09-cv-01332-AWT Document 78-11 Filed 06/01/10 Page 5 of 19

de la corte celestial. Aquello era de taparse los oídos con algodones.

Habíase ya puesto el sol, y los aventureros se disponían para regresar a Lima, renegando de los indios cicateros que tuvieron la tontuna de no hacerse enterrar sobre un lecho de oro y plata, cuando uno de los españoles dando un puntapié a la momia la hizo rodar gran trecho. Una piedrecita luminosa se desprendió del esqueleto.

—¡Canario!—exclamó uno de los soldados—. ¿Qué candelita es ésa? ¡Por Santa María que es carbunclo, y gordo!

Y disponíase a mover la planta tras la piedrecilla, cuando el del puntapié, que era todo un matón, le detuvo deciéndole:

—¡Alto, camarada! No me salve si no es mío el carbunclo, que fuí yo quien sacó la momia.

—¡Un demonio que te lleve! Yo lo vi brillar primero, y antes mueras que poseerlo.

—¡Cepos quedos!—arguyó el tercero, desenvainando una espada de las llamadas *de perrillo*—. ¿Y yo soy don Nadie?

—¡A mí no me tose ni la mujer del diablo, caracolines!—contestó el matón sacando a lucir su daga.

Y entre los tres camaradas armóse la tremenda.

Y el carbunclo, lanzando vivísimos destellos, alumbraba aquel siniestro duelo. No parecía sino que la maldita piedra azuzaba con su fatídico brillo la codicia y la rabia de los combatientes.

Al día siguiente, los *mitayos* de una huerta vecina encontraron el cadáver de uno de los guapos, y los otros dos con el pellejo hecho una criba y pidiendo a gritos confesión.

El alférez don Francisco Carrasco, propietario del terreno sobre el que hoy se han edificado las espléndidas casas de Chorrillos, hizo en 1663 donación de esas tierras a varias familias indígenas de Huacho y Surco que vivían consagradas a la pesca. ¿Quién habría dicho al alférez Carrasco que la miserable pesquería que él fundó habría, antes de dos siglos, de convertirse en la más opulenta villa del Perú? (1).

Era fama que anualmente, en la noche del Viernes Santo, los viajeros que pasaban por el camino de Chorrillos veían brillar, sobre la *huaca* Juliana, el carbunclo del diablo.

Parece que el silbido de la locomotora ha bastado después para espantar al maligno.

## EL HIJO DE LA DICHA

(1547)

Con este mote fué bautizado en 1547 el capitán Lope Martín, y por mi fe que el mote no tuvo nada de antojadizo.

Cuando llegaron a Trujillo los primeros rumores de haberse defeccionado en Panamá la escuadra de Gonzalo Pizarro, el capitán Diego de Mora, que era el gobernador de la ciudad, se puso en viaje para Lima, a fin de comunicar la importante noticia a su caudillo. En la primera jornada saliósele la espada de la vaina

(1) Ocupada Chorrillos, en la noche del 13 de enero de 1881, fué incendiada por el ejército chileno. Se estima en muchos millones de pesos el valor de lo destruído en Chorrillos, Barranco y Miraflores.

En la actualidad; ya reconstruídas, son poblaciones florecientes.

hiriendo al caballo que montaba. Túvolo el de Mora por malísimo agüero, y regresando a Trujillo alzó bandera por el rey.

Noticioso Pizarro de que el mal ejemplo de Mora había encontrado imitadores en otros de sus tenientes en el Norte, despachó contra ellos al capitán Juan de Acosta con veinte arcabuceros y cien jinetes. Encomendó éste el mando de la descubierta o fuerza de exploración al alférez Jerónimo de Soria, quien, aprovechando una ocasión propicia, se pasó con su gente al enemigo.

Francisco de Carbajal, que a la sazón estaba en Lima, juró y rejuró que daría garrote a cuantos hubiesen aconsejado a Soria que desertase del bando de Gonzalo, y echóse en consecuencia a hacer averiguaciones. De ellas resultó que el capitán Lope Martín había regalado a Soria su caballo, lo que para el *Demónio de los Andes* constituía prueba plena de criminalidad. Púsole preso, y dióle una horita de plazo para que ajustara cuentas con Dios.

Don Antonio de Ribera, deudo de los Pizarro y personaje de muchos respetos y campanillas, tuvo noticia del conflicto en que se hallaba Lope Martín, que era muy amigo, y calculando que empeñarse con Carbajal era perder tiempo y gastar saliva, se fué directamente a Gonzalo, y tanto le rogó, que a la postre se avino a perdonar. Pero como la cosa urgía y no daba tiempo para escribir y firmar, obtuvo don Antonio que Gonzalo le diese sus guantes de gamuza, que ya en otra oportunidad habían servido de cédula de perdón para con el sanguinario don Francisco.

Entre tanto, habían transcurido cincuenta minutos, y del palacio de Gonzalo a la cárcel había casi dos cuadras de camino. Don Antonio corrió, y echando casi los bofes llegó a la prisión, y sin fuerzas para articular palabra presentó los guantes a Carbajal.

—Paréceme, y me alegro—dijo don Francisco—, que vuesa merced ha llegado tarde con la bula. Ya ese bellaco de Lope Martín debe estar en el infierno dando cuenta al diablo de sus perrerías en este mundo. Pero en fin, véngase vuesa merced conmigo y llévese el cuerpo del traidor y tenga el consuelo de darle la sepultura que no merece.

Y entraron en el calabozo a tiempo que el verdugo, después de dar una vuelta de garrotillo, que no bastó para matar al preso, se preparaba a dar la segunda, que infaliblemente habría sido la de apaga y vámonos.

Lope Martín, medio estrangulado, cayó sin sentido en brazos de su amigo.

Mientras le hacían aspirar algunas sales, Carbajal le examinaba el amoratado cuello y murmuraba:

—¡Vaya un pescuezo para duro! Bien puede este pícaro desbautizarse desde hoy y llamarse *el hijo de la dicha*.

Y salió del calabozo canturreando una de sus coplas favoritas:

¡Ay amor!, tirano amor,
más que tirano, traidor;
pues traidor me fuiste, amor,
todo te sea traidor.

## LOS QUE ESTAN A LA MIRA

(1548)

Fué el licenciado Polo de Ondegardo, autor de una interesante crónica historial del Perú, que, según Prescott, se conserva aún inédita, hombre de agudo ingenio y muy amigo de jugar con los vocablos. Pruébalo el que habiéndose

# EXHIBIT B-18

Carlos Ramos Núñez



# Codificación, Tecnología y Postmodernidad

## La muerte de un paradigma



PONTIFICIA UNIVERSIDAD CATÓLICA DEL PERÚ    FONDO EDITORIAL 2005

ración de sujetar a cálculo la dinámica social. Los códigos, por tanto, debían disponer de estructuras fijas y durables. Por todo ello, estaban destinados a convertirse en los paradigmas jurídicos de la sociedad moderna.

# CAPÍTULO 2

## El código en entredicho: crisis del paradigma y descodificación

La bella arquitectura de los códigos, inmutable durante el siglo XIX, empezó a temblar con la rápida expansión de las ideas que cuestionaban la vigencia irrestricta del individualismo (Ripert 1955; Ripert 1963; Savatier 1964). La impugnación del derecho burgués era al mismo tiempo una requisitoria contra los códigos. La prédica socialista se abría paso en los propios occidentales y la convulsión social surgía por todos lados. Quedaban entonces dos alternativas: oponer una resistencia cerrada a cualquier tipo de influencia colectivista; o formular ideologías de reforma que introdujesen ciertos cambios en el sistema económico imperante, atenuasen el individualismo y promovieran un régimen de protección social al trabajador. Era evidente que los códigos no traían disposiciones que garantizasen este proceso de reforma. En forma paralela, un pujante desarrollo industrial, que superaba largamente a la pequeña escala de la producción manufacturera, dejaba sentir sus efectos a lo largo y ancho de la vida social. El bucólico paisaje rural que los códigos decimonónicos encontraron ya había desaparecido. Los mismo códigos contribuyeron a modernizar la economia y renovar las mentalidades, pero el desfase entre el orden codificador y la realidad era ya inocultable. El firmamento clásico en el que los códigos operaban ya no existía más. Era necesario que el Derecho se adecuase al doble reto que constituía, de una parte, la amenaza de la explosión social que ponía en riesgo la subsistencia misma de la formación económica capitalista y, de otra, al vertiginoso cambio industrial con un mundo de necesidades y problemas nuevos.

Los cambios tecnológicos y las transformaciones industriales a los que asistía la sociedad occidental de la primera postguerra aparentemente constituían el marco histórico del fin de *l'età delle codificazioni* (Paradisi 1973: 461-502) y el inicio de un nuevo género de producción jurídica. Asomó entonces la legislación especial que erosionaba la estructura de los grandes códigos. La paulatina e irrefrenable dación de leyes especiales haría pensar en la inauguración de una nueva era: *l'età della decodificazione* (Irti 1979). Una herida se abría en los códigos y el paradigma empezaba a agrietarse. Desde ese momento, las leyes especiales acompañarían a los códigos. No tenía importancia si se dictaba otros que sustituyesen a los antiguos, o que (como un pírrico homenaje) se postergase su derogación, porque definitivamente ya no serían los mismos. Se consideraba que los grandes asuntos, los temas verdaderamente importantes, como la persona, el matrimonio, la herencia, la propiedad, las obligaciones y los contratos, así como los principios generales que inspiraban al ordenamiento jurídico en su conjunto, se contemplaban en los códigos, mientras que los problemas pequeños, particulares, muy específicos o reglamentarios, se ceñían a la normatividad de ese conjunto cada vez más impresionante e inmanejable de la legislación especial. La muerte de los códigos, sin embargo, con toda la dificultad que para su vigencia entrañaban las leyes especiales, se hallaba lejana todavía. El paradigma, aun cuando débil y anegado de fisuras, se mantenía vivo. Serían necesarias otras variables, ajenas al universo normativo y más conectadas a los cambios políticos y a la innovación tecnológica, para que cayese el tiro de gracia sobre los códigos.

En la construcción teórica de Thomas S. Kuhn, la *ciencia normal*, es decir, la idea corriente de ciencia que predomina en una determinada época o coyuntura, se desarrolla dentro de un paradigma, inconscientemente adoptado por cierta comunidad científica. Al cabo de un tiempo surgen anomalías que apenas se presentan nos llevan a descartar el modelo. En este estado los conceptos y las teorías tradicionales se reajustan, pero el paradigma se mantiene; sin

embargo, cuando las anomalías son excesivas y arraigadas, se empieza a poner en duda la misma validez del paradigma (Barnes 1986). Tiene lugar entonces una renovación científica radical, que consiste en un cambio o sustitución del paradigma (Kuhn 1975: 165).

Cuanto se ha reseñado en el párrafo anterior puede aplicarse a la codificación y a sus productos técnicos, los códigos. Bajo este esquema el paradigma formal que la comunidad de juristas comparte y postula como modelo inequívoco sufre los embates de las leyes especiales que, en la terminología de Kuhn, vendrían a ser las *anomalías* o *perplejidades* contra las que tiene que enfrentarse el paradigma.[11] Se admitirá entonces que la codificación tendrá que convivir con esa *anómala* legislación especial, pero de ello no se deducirá que la segunda desterrará a la primera. Estaríamos, más bien, en una etapa de tránsito de un paradigma a otro. Solo después de una revolución tecnológica radical, como la informática y la telemática, por ejemplo, surgirán problemas tan graves que terminarán por romper el paradigma hasta entonces establecido, allanando el camino para el asentamiento de uno nuevo. Las *perplejidades*, sin embargo, habrán contribuido a poner en tela de juicio el paradigma. Su fin no se producirá, pues, de la noche a la mañana, sino tras un largo proceso que de la simple anomalía pasa a una crisis aguda y de allí a su fenecimiento y a su sustitución.

## 2.1. Inflación legislativa y microsistemas

La explosión demográfica, otro signo de la modernidad, inusitada en sus proporciones, dio lugar al establecimiento de una socie-

[11] Para Kuhn, «los paradigmas están dirigidos no solo hacia la naturaleza, sino también hacia la ciencia que los produjo. Son la fuente de los métodos, problemas, normas de resolución aceptados por cualquier comunidad científica madura, en cualquier momento dado. Como resultado de ello, la recepción de un nuevo paradigma frecuentemente hace necesaria una redefinición de la ciencia correspondiente» (1975: 165).

dad de masas. La misma civilización contemporánea ya no es, conforme al ideal liberal del ochocientos, una sociedad de individuos sino de masas, donde el hombre se integra como un ser anónimo y despersonalizado (Ortega y Gasset 1930). Junto a la producción industrial en gran escala coexiste también una cultura uniforme (*mass media*) que impone modas y disuelve predilecciones; es el reino de la uniformidad más allá de cualquier diferencia económica, social o étnica. No es que de pronto la aspiración socialista se haya consumado; sucede que, en realidad, estamos ante una igualación externa, cuyo rasgo esencial consiste en la despersonalización de las relaciones humanas. El Derecho, como no podía ser de otro modo, ha sufrido también el impacto de la cultura de masas; dentro de esta tendencia se han masificado los instrumentos y utillajes jurídicos. Vivimos envueltos en masas de leyes y de sentencias (Diez Picazo 1979: 77-85). Se legisla cada vez más y los repertorios jurisprudenciales (en los países donde se publican las sentencias de los tribunales, que no es el caso del Perú) crecen de año en año. Las cifras son verdaderamente astronómicas si contamos los decretos que emanan del Poder Ejecutivo, de los gobiernos locales y de los organismos públicos autónomos. El papel legiferante del Poder Legislativo es hoy en día una parodia del pasado. El jurista no puede dejar de sentir ante esta situación, en palabras de Diez Picazo, «una sensación de ahogo e impotencia» (1978: 78).

La vasta extensión de las leyes especiales, expresión típica de la cultura de masas, a pesar de que desde hace casi una centuria mina los cimientos de los grandes códigos, no deja de ser sorprendente. El ideal jacobino de una legislación clara, corta y reducida, frente a la espesa selva de textos legales que inundan los anaqueles de las librerías, ha sido virtualmente deshecho.

Los viejos adagios medievales, que se filtraron en los códigos y las constituciones como principios generales del Derecho, de *ignorantia iuris non excusat* y *nemo ius ignorare censetur*, resultan imposibles de acatar y, por lo mismo, demandan su revisión. Ahora ni siquiera los juristas más avezados pueden conocer todo el ordenamiento jurídico de un país,[12] mucho menos podrá reclamarse al hombre de la calle que tenga un conocimiento solvente de aquel.[13] Basta contemplar los problemas que padecen los agentes tributarios y hasta los especialistas para determinar la aplicación de un régimen fiscal o para dar cuanta de la vigencia de una norma.

Sin la ayuda de una computadora, el sistema legislativo de nuestros días es absolutamente inabarcable. Se ha producido la quiebra del ideal humanista de proporción que acompañó el diseño de los códigos. Los medios mecánicos se revelan insuficientes para sistematizar toda esa vasta e hipertrófica legislación. El buen deseo de que la Constitución y los códigos basten para ilustrar jurídicamente al pueblo ya es un tema histórico, pues en la actualidad solo existe un Derecho, formulado por los especialistas para que otros especialistas lo lean y comprendan. En el conocimiento y el ejercicio legal se han instalado pequeñas parcelas compartimentadas, cada vez más pequeñas, y entre los juristas reina una ignorancia mutua de cuánto hacen e incluso hasta de quiénes son. Dentro de cada rama han surgido especialidades infinitesimales que, si bien dan

---

12 Diez Picazo formula una pregunta terrible: «¿Cuál es la proporción del ordenamiento que se conoce?». El mismo autor, probablemente el civilista vivo más talentoso de habla hispana, sostenía que, después de 30 años de estudio, solo llegó a conocer el 11% del sistema legal español.

13 Francesco Galgano trae una historia que ilustra cómicamente la incongruencia del brocárdico *ignorantia iuris non excusat*. Cuenta que cierta vez un abogado reclamaba al juez por haber condenado a su patrocinado. El letrado sostenía que su cliente no sabía que el hecho constituyese delito. El juez entonces le recuerda que la ignorancia de la ley no le eximía de su cumplimiento. Con astucia el abogado insiste: «Oiga, señor juez, mi defendido es tan ignorante que ni siquiera sabe que *ignorantia iuris non excusat*» (1991: 91). En un país pluricultural como el nuestro, la aplicación de semejante axioma legal (que fue incluido en el artículo 6 del Código Penal de 1862 y en el artículo 87 del Código Penal de 1924) trajo consecuencias desastrosas en las comunidades indígenas de la sierra y de la Amazonía. Tal vez el caso más patético se refería al delito de violación presunta, esto es, la relación sexual con menores de 16 años (hasta que la reforma redujo la edad a 14 años), que era una práctica habitual y consentida en esos pueblos, pero severamente reprimida por la legislación. Mucha gente purgó condena por un delito que en su horizonte cultural no era tal.

trabajo a cáfilas de abogados, provocan que el compañero del costado no sepa un ápice de lo que el vecino, en su pequeñísimo compartimento, domina a la perfección. El Derecho lo fabrican ahora funcionarios especializados para funcionarios especializados. Piénsese, por ejemplo, en las normas que regulan una serie de actividades económicas, como la minería, la pesca, los carbohidratos, la agroindustria, el comercio, la exportación, etc. Seguramente en el trazado legislativo de estas esferas ni siquiera participan abogados y, si lo hacen, tienen un papel secundario. Los mismos políticos que otrora desempeñaban una función central en la promulgación de normas, auspiciando proyectos y discutiendo en el seno de las comisiones y las plenarias, se rodean de pléyades de asesores que (no siempre) imprimen un carácter técnico a sus iniciativas; pero, en todo caso, su actuación legislativa es mínima, comparada con la capacidad legislativa de los órganos de gobierno. La masificación trae también consigo la burocratización del Derecho.

El caos legal es, pues, un fenómeno extendido. Si únicamente en el plano de la producción normativa se produce una clara desconexión entre las diferentes partes del sistema legislativo, el desconcierto aumentará en el momento de la aplicación. Y es que las normas no solo se formulan sino que también se interpretan y aplican. Cada una de esas circunstancias considerada en sí mismas, como el proceso integral que las engloba (*legal process*), padece las consecuencias de la maraña legal. El cálculo del futuro, la previsión de los efectos de una decisión, la relación entre el poder de elección de un individuo y su consecuente responsabilidad, elementos todos ellos del liberalismo decimonónico, a raíz de la inflación legislativa, fueron alterados.

La aparición y el desarrollo de pequeños ámbitos[14] de organización legislativa conllevan la generación de verdaderos microsistemas legislativos (Irti 1979) que mal se prestarían a insertarse en el armónico sistema de los códigos. Se percibe al instante el en-

[14] Pequeños en sus linderos pero vastos en el número de normas.

frentamiento y la falta de armonía entre la masificación del ordenamiento legal y la regulación tradicional y paradigmática de los códigos, estos y las leyes especiales casan mal; las segundas representan una brecha abierta en el sistema de las fuentes formales. Si los códigos supusieron el esfuerzo de poner orden en medio de la dispersión normativa, las leyes especiales hacen precisamente todo lo contrario, dado que originan un ordenamiento falto de coherencia y conexión. Con ellas el principio de unidad y la exigencia de una lógica interna, plasmada (por lo menos idealmente) en los códigos, se pierde. Aunque se siga hablando del ordenamiento jurídico o del sistema legislativo de un país como si fuera de algo unitario, la urdimbre está lejos de ser real; en la práctica, el mentado ordenamiento se halla formado por piezas desconectadas entre sí (Diez Picazo 1992: 474, 1993: 11-18), sin otra unidad que la pertenencia a un determinado Estado.

Por otro lado, se echa de menos la perfección técnica de los códigos. En este aspecto, las leyes especiales exhiben una pobreza a menudo exasperante para el jurista que denuncia el declive del estilo literario (Trazegnies 1993: 38-39); a contrapelo de los códigos, no presentan cánones generales y abstractos, sino respuestas a problemas específicos y acuciantes. Irrumpe en el lenguaje legislativo la jerigonza de los expertos sin formación jurídica, que desarrollan modalidades expresivas y sintácticas ignoradas por el codificador, conexas con el léxico particular de la materia regulada. Este novísimo lenguaje no tiene ninguna deuda con la tradición jurídica romanista ni se aproxima al vocabulario de la dogmática, tanto así que el significado que quiere atribuirse a una norma debe buscarse en la terminología especializada (Irti 1979: 16-17).

La difusión de las leyes especiales ha dado nacimiento a un nuevo sistema de normas jurídicas. Antes el código ocupaba un puesto de honor dentro del Derecho, se encontraba en la cúspide de las fuentes formales. Nadie puede negar que esta situación ha cambiado en las últimas décadas. Ello puede constatarse con una simple ojeada a la infinidad de leyes que regulan espacios de la vida social

hasta hace poco de exclusiva competencia de los códigos, a saber, la propiedad agrícola y urbana; la posesión de predios (Trazegnies 1978: 75-104); el arrendamiento de inmuebles destinados a casa-habitación, por solo nombrar algunos ejemplos de una lista francamente larguísima de materias que han sido sustraídas de la regulación de los códigos. Áreas importantísimas han sido expropiadas del Código civil, al punto que este cumple un papel residual en el complejo normativo, ya no es más el cuerpo legal exclusivo y unitario de la vida privada.

Conforme a la tendencia microsistémica, el Código civil ha pasado de ser el centro del sistema a la condición de un conjunto de preceptos subsidiarios que se destinan a llenar las lagunas de las otras ramas del Derecho. Dejó de ser el núcleo del Derecho civil para dar lugar a pequeños mundos de normas que están constituidas por leyes especiales, con lógicas autónomas y propias, que han derogado diversos preceptos del Código civil, aunque este todavía concibe la regulación de algunas instituciones. Como contrapartida, la legislación especial ocupa ya un lugar preponderante en el ámbito del Derecho y es esa la tendencia que se manifiesta en todas las ramas del Derecho y en todo el mundo, cualquiera sea el sistema jurídico al que se aluda. El monosistema ha sido superado por el plurisistema; desconocer esto no es sino profesar una inútil y melancólica nostalgia por los códigos. Se precisa por ello romper la fascinación que aquellos ejercen sobre los juristas y reconocer que las leyes especiales constituyen actualmente el Derecho predominante (Irti 1979: 26). Por lo demás, la descodificación, ese proceso de decadencia de los códigos, debe ser percibida con claridad, admitiendo la insuficiencia de estos para regular la vida contemporánea. Tampoco conviene al espectador atento que es el jurista representarse el fenómeno de la legislación especial como un episodio transitorio, como un mero paréntesis provisional en la historia triunfal de los códigos, puesto que aquella ha adquirido carta de ciudadanía plena en el universo legislativo.

Por lo demás, si se ha operado un masivo éxodo normativo e institucional del Código civil y se ha instalado en el espectro legal un sinfín de disposiciones especiales, debe considerarse que estas últimas afrontan hábilmente los problemas tecnológicos, económicos y sociales más apremiantes del mundo moderno; en tanto que aquel, no obstante sus virtudes técnicas, contiene preceptos notoriamente incompatibles con las exigencias de la vida moderna e, incluso, constituyen un pesado lastre que frena el progreso social (Novoa Monreal 1975: 11-13) y el desenvolvimiento económico.

El proceso que conduce al predominio de las leyes especiales se inicia cuando salen a luz las normas sociales (Nicolau: 43-44). Así, por ejemplo, las leyes laborales, de locación urbana y rústica, las normas que protegen los derechos intelectuales, aquellas que se refieren a la adquisición de propiedad inmobiliaria a crédito, la propiedad horizontal, el contrato de trabajo, los seguros, la adopción, etc., se han desprendido del catálogo de instituciones que trae el Código civil, orgullo y baluarte del liberalismo.

Detrás de esa suerte de fuga institucional que castigó los códigos durante el siglo XX, reposaba una concepción ideológica asistencialista y socializante. Bajo esa perspectiva, el Estado no podía permanecer inerte frente al mercado como un simple garante de las reglas de juego que los códigos patrocinaban; por el contrario, debía intervenir directamente en la economía limitando los poderes para negociar de los individuos, sustituyéndolos a su voluntad y actuando como un verdadero empresario. Si antes el Código civil suministraba los medios y el marco legal que los individuos requerían para la consumación de fines previamente elegidos por su iniciativa y bajo su responsabilidad, confiados en un cálculo de utilidad que podía conducirlos al éxito económico o al fracaso más estrepitoso, la legislación especial nacida bajo el auspicio de las corrientes socialistas determinaba ella misma las metas. La selección de los fines pasaba de manos de los individuos a manos del legislador. Ya no serían aquellos sino este quien valorase lo que fuese conveniente o inconveniente. La ley entonces reemplazaba o restringía la libertad indivi-

dual, como atenuaba las posibilidades de éxito o el riesgo de fracaso, indisociables de la elección personal. El propio orden económico no nacería más de la iniciativa privada, sino que sería proyectado y preconstituido por ley (Irti 1979: 16). En el giro de unos años, la legislación no se reconocería más en la tabla de valores de la burguesía liberal del ochocientos; un Estado interventor lo invadía y penetraba todo. Finalmente se coronaba un cisma entre los códigos, genuinos representantes del liberalismo, y la legislación especial, cristalización jurídica del Estado benefactor.[15]

La expansión ilimitada de los microsistemas legislativos no tiene por cierto como única causa consideraciones ideológicas. Si así fuera, ahora que se asiste al rápido deterioro del socialismo (y de las ideas afines) y cuando el discurso liberal e individualista recupera el terreno perdido, la legislación especial cesaría de ser un fenómeno rutinario y tal vez adquiriría un carácter excepcional, mientras que los códigos asumirían el protagonismo de antaño. Sin embargo, como lo saben todos, esa modalidad legislativa persiste aún con mayor intensidad que antes. Ocurre que a la base de ese mar infinito de disposiciones legales se halla la creciente complejidad de la vida económica y social, la vertiginosa rapidez de los cambios que demandan al Derecho una adecuación rápida. Materias esenciales para la actividad económica, como las sociedades, los títulos-valores, las operaciones de crédito, los seguros y las fianzas, el comercio marítimo, el control y registro de la transferencia de tecnología, el uso de patentes y marcas, la protección al consumidor y al medio ambiente, la promoción de inversiones, el mercado de valores, aun cuando carezcan como antes de una clara orientación hacia el Dere-

[15] Es muy interesante la diferencia que encuentra Hayek entre los dos tipos de producción legislativa, la cual sería la misma que existiría entre el formular las normas de viabilidad, como en un Código de Tránsito, y el ordenar dónde la gente debe estar; o, mejor todavía, entre el organizar un sistema de carteles indicadores de caminos, y prescribir a cada uno qué ruta debe seguir (Irti 1979: 16-17). Aunque el pensador austriaco no alude al código ni a la legislación especial, es obvia la correspondencia que existe.

cho público, no podrían hallarse reguladas por un cuerpo legal con vocación de estabilidad como el Código civil, por ejemplo.

El forado que la legislación especial ha abierto en los códigos, ya sea a causa de los postulados socializantes, hoy venidos a menos, a raíz de la acelerada dinámica de la actividad económica, puede rastrearse a partir de un examen de los textos de reenvío o remisión legislativa en nuestros códigos civiles. Mientras que el Código civil peruano de 1852 registra tan solo dos normas de remisión;[16] el Código de 1936 trae, en su versión original, quince disposiciones de reenvío.[17] Naturalmente, con el paso del tiempo este número iría incrementándose. En materia de remisiones, la faz que revela el có-

[16] Son los artículos 1195 y 1636. El primero se refiere a la autorización concedida a los poseedores de capellanías de familia para disponer de ellas y enajenar los capitales a que se hallaban gravados, sin perjuicio de continuar cumpliendo con el pago de las pensiones a que estuviesen afectas. Por un lado, la norma pretende facilitar el proceso de emancipación de la propiedad de los vínculos que evitan su ingreso en el mercado, pero por el otro, cumplía una función tuitiva, ya que obligaba a responder con el pago a favor de los beneficiarios instituidos a la fundación de la capellanía. Para quien no es historiador del Derecho no es superfluo señalar que la capellanía consistía en la fundación de una renta que debía gozar una persona con la obligación de celebrar o hacer misas, o por el desempeño de ciertos cargos generalmente asociados a la profesión religiosa. La leyes especiales a las que se remite la disposición en cuestión no son otras que las dictadas por Agustín Gamarra el 11 de enero de 1830 y por Ramón Castilla el 5 de setiembre de 1849, disposiciones que insistían en la paulatina desaparición de ese instituto colonial. La segunda norma, referida a la locación de servicios de domésticos, tiene conexión con las leyes y reglamentos de policía, los mismos que regulaban el desplazamiento de criados y obreros, de modo que se pudiera disponer libremente de su fuerza de trabajo. Vid. Trazegnies (1994) a propósito de los trabajadores chinos sujetos a contrata.

[17] Los artículos aludidos son el 29, que remite a la Ley de Registro Civil; el 38, que atribuye a los reglamentos de la Corte Suprema la organización y el funcionamiento de los registros de estado civil; el 41, sobre enajenación de bienes de corporaciones oficiales; el 70, relativo a comunidades indígenas; el 110, de oposición al matrimonio; el 495, sobre impugnación de tutor; el 854, sobre minas y aguas; el 890, sobre venta a plazos de ciertos bienes muebles; el 1037, sobre el registro de prenda agrícola; el 1043, que reenvía los actos inscribibles al Reglamento de los Registros Públicos; el 1773, que remite a las disposiciones especiales del juego prohibido y a las loterías de la Sociedad de Beneficencia; el 1814, sobre bonos nominativos de Banco Central Hipotecario; y, por último, el artículo 1823, sobre derogación necesariamente expresa de las leyes especiales.

digo actual de 1984 es realmente dramática, pues consigna nada menos que 41 normas de reenvío. Dadas las variaciones producidas en las mismas normas a las que el código se remite, mencionaremos únicamente el numeral respectivo.[18] De allí resulta que el libro de personas trae ocho remisiones; el libro dedicado al acto jurídico no consigna ninguna; el libro de familia solamente una, mientras que el libro de los Derechos reales cita once normas de reenvío; el libro VI de las obligaciones menciona seis remisiones, mientras que el libro VII sobre fuentes de las obligaciones se refiere a diez disposiciones de reenvío. El libro VIII de prescripción y caducidad no consigna ninguna, en tanto que el libro IX de registros públicos incluye cuatro artículos de remisión. Por su propia naturaleza resulta irrelevante pronunciarse sobre el numeral de reenvíos en el libro X de Derecho internacional privado. Como podrá colegirse, son muy pocas las áreas del Código Civil que no aluden a normas de reenvío. Otros segmentos, especialmente en el libro V de los Derechos reales, tienen solo una existencia retórica. Dada la profusión de normas que remiten a leyes especiales, lo mismo da que se incluyan en el código o no. Los bienes rústicos, las propiedades incorporales, la expropiación, el patrimonio cultural de la Nación, la propiedad horizontal, la hipoteca popular y la prenda de títulos-valores se hallan a la sombra de los microsistemas. El libro de los Derechos reales constituye una situación límite. Empero, otros libros, como los de personas, de obligaciones y de fuentes de las obligaciones (esenciales en la estructura codigocéntrica), tampoco se encuentran en grado de resistir los embates de la legislación especial.[19] Poco queda al Código civil, salvo una angosta franja que por oposición termina bajo su débil y tal vez transitorio amparo. El nuevo sistema normativo determina que el código se haya convertido en una más de las leyes civiles. Si se emprendiera una revisión de nuestro Código civil que no partiera de la perfección técnica a que han llegado otras naciones,[20] sino de la operatividad funcional de los textos normativos y de las instituciones, muy poco quedaría por regular en los códigos.

Lo cierto es que los códigos sufren un proceso de desmembración progresiva. Esta es una realidad tangible.[21] Su paulatina descomposición no consiste en una idea teórica ni un postulado quimérico.

### 2.2. Quiebra del Estado-nación y de sus códigos

En el campo político del mundo moderno, junto al protagonismo de la clase burguesa, quedó definida la construcción de los Estados nacionales, desarrollándose como presupuesto jurídico de legitimación el concepto de soberanía nacional. De ese modo, el Estado se convirtió en árbitro y gendarme de los destinos individuales. La idea de Estado moderno, como un sujeto abstracto ajeno a las personas que lo encarnaban, postulaba una entidad unitaria que superase definitivamente la fragmentación medieval. Como en el plano del control político se marchaba hacia una descentralización de los órganos de gobierno que dejaba atrás los medios de coerción feudales, simultáneamente se atacaba sus esferas de formulación legal y de administración de justicia (Van Caenegem 1987). El programa de desmoronamiento del poder señorial involucraba un enérgico

[18] Se trata de los artículos 3, 6, 13, 17, 18, 21, 37, 76, 137, 379, 881, 882, 883, 884, 926, 928, 936, 957, 958, 972, 1087, 1230, 1237, 1243, 1244, 1252, 1324, 1357, 1409, 1677, 1712, 1714, 1719, 1853, 1944, 1988, 2009, 2026, 2031 y 2044.

[19] Las condiciones que regulan la donación de órganos, la contratación, el ejercicio de la propiedad, la protección de los menores incapaces o de la víctima de la responsabilidad extracontractual, por citar algunos casos al azar, ya no son las mismas que afrontaba el Código civil. En la actualidad se hallan sometidas a las leyes nuevas. En la mayoría de casos, su regulación y funcionamiento se resuelven administrativamente, a despecho de cuanto consagren las normas del Código.

[20] No deja de ser curiosa la sustentación de las soluciones que el código propone a partir de experiencias legislativas tan distantes de la nuestra. La mención, por ejemplo, de numerosos códigos, entre los que se incluyen el egipcio y el etíope, revela una erudición estéril y marcha a la par con un desconocimiento completo del impacto social de la normatividad en dichos países.

[21] Para el proceso legislativo reciente en otros países, como México. Véase Acosta (1989).

# EXHIBIT B-19

Carlos Ramos Núñez

# El Código napoleónico y su recepción en América latina

PONTIFICIA UNIVERSIDAD CATÓLICA DEL PERÚ
Maestría en Derecho con mención en Derecho Civil

FONDO EDITORIAL 1997

Case 3:09-cv-01332-AWT Document 78-11 Filed 06/01/10 Page 17 of 19

un nivel muy profundo [...]»[100], hallándose firmemente afincado en el Derecho romano, el Derecho común y en las elaboraciones doctrinales que sobre ellos reposaban.

Un jurista peruano del ochocientos, que al parecer deseaba una aproximación más nítida con el *Code* napoleónico, espetaba lapidario: «Su fondo fue la antigua legislación española y su forma la del Código de Napoleón.»[101]. Dos verdades a medias las suyas, puesto que las notas originales de que está dotado el Código peruano no debían hacerle olvidar que el *Code* napoleónico fue el modelo fundamental del que aquél tomó mucho de su contenido. Asimismo, en cuanto a sistemática, si bien se dividía como el arquetipo galo en tres libros, la distribución de las materias era harto distinta. En el libro segundo del peruano se incluye lo atinente a la herencia y al régimen de bienes en el matrimonio, lo que en el francés se ubica en el libro tercero. Este último libro, en el Código de 1804, trata de los diferentes modos de adquirir la propiedad, mientras que en el Código peruano se concreta a las obligaciones y los contratos[102]. No es cierto que la forma sea exactamente igual al Código francés.

Se encuentran semejanzas saltantes en casi todo el articulado del Título Preliminar. Es fácil colegir que el legislador peruano copia *ad litteram* el Código galo. Por ejemplo: el artículo primero, que estipula que «las leyes obligan en todo el territorio de la República»; el artículo segundo, que establece que «la ley no dispone sino para lo venidero y que no tiene carácter retroactivo»; el artícu-

[100] Schipani, Sandro, «Dal Diritto romano alle codificazioni latinoamericane: l'opera di A. Teixeira de Freitas», en *Diritto romano, codificazioni e unità del sistema giuridico latinoamericano*, Studi Sassaresi 5, Giuffrè, 1981, p. 605.

[101] *José Antonio Barrenechea. Su vida y su obra (1829-1889)*, editada por sus hijos y nietos, Imprenta Torres Aguirre, Lima, 1929, p. 446.

[102] José León Barandiarán, «Estudio comparativo del Código Civil de 1852 y el Código napoleónico», *op. cit.*, p. 258. León Barandiarán se detiene a examinar las virtudes y los defectos que trae la diversa sistemática en ambos códigos.

lo cuarto, que prescribe que «las leyes de policía y de seguridad obligan a todos los habitantes del Perú», son exactamente iguales a los numerales 1, 2 y 3 del *Code* Napoleón, respectivamente. El Código peruano supera al francés en un punto esencial de la teoría del Derecho, puesto que mientras el Código francés en el artículo cuarto se limita a expresar que «el juez que se rehusara a juzgar, bajo pretexto de silencio, oscuridad o de insuficiencia de la ley, podrá ser perseguido como culpable de denegación de justicia», sin mencionar los medios a los que debe recurrir el juzgador, el Código peruano, con gran acierto, ofrece ciertas pautas:

> «Los jueces no pueden suspender ni denegar la administración de justicia, por falta, oscuridad o insuficiencia de las leyes; *en tales casos, resolverán atendiendo: 1.º al espíritu de la ley; 2.º a otras disposiciones sobre casos análogos, y 3.º a los principios generales del Derecho* [...].»

El Código nacional, en este aspecto, sigue (y perfecciona) parcialmente al Código Civil austriaco de 1811, que consignaba:

> «Si la ley no es aplicable enteramente a un hecho, el juez tomará en consideración los casos análogos, los motivos y, en defecto de éstos, *los principios de Derecho natural y las circunstancias.*» (Art. 7 T. P.)

Esta norma sobre integración de las lagunas jurídicas es quizá una de las más destacadas de nuestro antiguo ordenamiento civil[103]. Su influencia en los códigos latinoamericanos posteriores es

[103] No se ha reparado suficientemente en la transcendencia de este dispositivo, que se anticipaba en décadas al desarrollo teórico. El hecho de que se refiriese al «espíritu de la ley», antes que al «espíritu del legislador», como querían entender los exégetas, anunciaba ya una de las conquistas de la llamada «es-

inocultable. Debe tenerse en cuenta que el Código peruano es el primero en América latina en recurrir a este mecanismo de heterointegración.

La ascendencia del iluminismo en el Código peruano es más categórica que en el francés al incluir una norma que no figura en el texto galo: «Las leyes no se derogan por la costumbre ni por el desuso» (art. VI del T. P.). Nuestro código, así, en este punto, como anota León Barandiarán, «se confesó más racionalista, dogmático y adscrito al *ius scriptum*, que el napoleónico»[104]. Ello suponía la primacía de la ley sobre la costumbre. Paradójica decisión en un país marcado por la tradición indígena.

Después del Título Preliminar la influencia del *Code* decae. El libro de las personas prácticamente tiene una factura adscrita al Derecho romano, canónico y castellano. Así, el Código nacional se ocupa largamente de las personas, del inicio de la personalidad y de su fin[105]. En este aspecto es también precursor en América latina[106]. Los rasgos conservadores del código nativo se traslucen en muchos de los dispositivos del libro primero: dedica un título completo a los clérigos; regula la esclavitud (servidumbre) y la manu-

cuela científica del Derecho», que a fines del siglo pasado y comienzos del actual se orientaba en la misma dirección. Se adelanta también a las corrientes positivistas más modernas que prefieren remitir a los «principios generales del Derecho», tal como lo hacía el Código peruano, más que a los «principios de Derecho natural», a los que alude el Código austriaco. No está de más recordar que el legislador nacional consignaba esta norma en 1852, época en la que aún no asomaban estos aportes teóricos.

[104] León Barandiarán, *op. cit.*, p. 259.

[105] Es elocuente que el epígrafe del Código francés, que encabeza el libro primero, se denomina lacónicamente «De las personas», en tanto que el peruano usa una formula más comprensiva: «De las personas y sus derechos».

[106] La identidad del *nasciturus* como «el hombre que está por nacer», el hombre como categoría jurídica no abstracta, la teoría de la viabilidad, propias del Derecho romano, son reguladas por primera vez en un Código moderno, sea latinoamericano o europeo.

misión; otorga efectos jurídicos únicamente al matrimonio canónico; prohíbe el divorcio vincular y distingue entre los hijos naturales y los incestuosos, adulterinos y sacrílegos, que no podían ser reconocidos por el padre; aspectos en los que se distancia del Código francés, más revolucionario sobre el particular. Se muestra, sin embargo, más avanzado que éste cuando proscribe esa *capitis diminutio* terrible de la muerte civil, y cuando autoriza, aunque tímidamente, la indagación de la paternidad a los hijos ilegítimos nacidos de rapto y estupro.

En el libro segundo del Código peruano («De las cosas: del modo de adquirirlas y de los derechos que las personas tienen sobre ellas»), se acusan también respecto al *Code* una serie de diferencias. La factura ultraindividualista de éste al definir la propiedad como «el derecho de gozar y disponer de las cosas de la manera más absoluta», sin otra limitación que la impuesta por las leyes y los reglamentos (art. 544), es reemplazada en el código nativo por una fórmula menos declamatoria: «Propiedad o dominio es el derecho de gozar y disponer de las cosas». Se suprime la expresión «de la manera más absoluta», pero se prescinde también de la limitación de las leyes y los reglamentos.

El Código peruano reproduce literalmente, en el artículo 462, la norma francesa (art. 545) conforme a la cual no se puede obligar a nadie a ceder su propiedad, sino por utilidad pública legalmente declarada y previa indemnización de su justo valor. Pueden encontrarse aquí una serie de normas bastante afines. Un punto importante en el que disienten es en la transferencia del dominio, pues mientras para el *Code* basta el simple consentimiento, el artículo 574 de aquél precisa que la enajenación se completa con la tradición de la cosa. Era impensable además que el Código francés, renuente a toda forma de propiedad vinculada, regulase las capellanías y el patronato como lo hacía el nuestro (arts. 1189 a 1218).

Finalmente, en materia de obligaciones y contratos se detecta

una marcada similitud[107]. La definición de contrato contenida en el artículo 1101 del *Code*, como el convenio celebrado entre dos o más personas, por el que se obligan a dar, hacer o no hacer alguna cosa, es la misma que fluye del artículo 1226 del Código peruano. Los requisitos de validez de los contratos contemplados en el artículo 1235 de este último, no hacen más que repetir el numeral 1109 del *Code français*. Asimismo, el artículo 1236 del Código peruano sanciona con nulidad el contrato practicado por error sobre la sustancia de la cosa, exactamente igual al artículo 1119 del modelo galo. El artículo peruano 1245, que establece la capacidad para contratar, es una copia del artículo 1123 del Código francés. Lo es también el artículo 1255, que sanciona como ilícita la causa contraria a las leyes, idéntico al artículo 1133 del *Code*. Igualmente, el 1257 del código nativo, que establece el principio de obligatoriedad de los contratos, reproduce literalmente el artículo 1135 del ordenamiento galo. En el área contractual se observan, sin embargo, una serie de rasgos distintivos que evidencian con nitidez el esfuerzo de los legisladores por adecuar el orden legal a la realidad existente. Se halla, por ejemplo, el rubro dedicado a los domésticos (arts. 1633 a 1636) al regular la locación de servicios. Vale la pena transcribir, para conocimiento del lector, el contenido de estos artículos, pues trasuntan y consagran sin eufemismos una inmensa desigualdad social, exhibiendo descarnadamente en paños menores al Derecho civil de la época. Recitan los artículos aludidos:

*Art. 1633.*– En cuanto a la tasa, pago y buenas cuentas de los jornales ó salarios de criados, merece entera fe el señor de ellos, miéntras no se pruebe lo contrario.

[107] Un trabajo comparativo en materia contractual entre ambos ordenamientos es el de Miguel Torres Méndez, «L'influence du systeme contractel français dans la codification civile peruvienne», en *Journèes franco-italiennes*, Association Henri Capitant des amis de la culture juridique française, *op. cit.*

*Art. 1634.*– Los criados de cualquiera clase que sean, pueden ser despedidos en todo tiempo, aunque no se exprese la causa, pagándoles su jornal ó salario devengado.

*Art. 1635.*– Pueden los criados despedirse cuando quieran, sino han recibido anticipaciones de vestido ó de dinero. En caso de haberlas recibido, se les obligará a servir por el tiempo y precio convenido, salvo que hubiese alguna causa grave para su salida.

*Art. 1636.*– Se observará además lo dispuesto en las leyes y reglamentos de policía sobre criados y obreros.

No puede dejar de omitirse, asimismo, la filosofía liberal prestada, en parte, del *Code*, y en parte, del discurso ideológico de la Emancipación, presente en el Código peruano. No exageremos, sin embargo, la real vigencia de esta ideología[108]; puede decirse, más bien, que sus postulados fueron atenuados adaptándolos a los intereses y valoraciones de la clase dirigente, de la cual los codificadores formaban parte. Este cuerpo legal constituye, en ese sentido, una expresión legislativa de *modernismo tradicionalista*[109].

Raoul de la Grasserie, comparatista francés al que debe tanto la América latina, refiriéndose al Código Civil peruano de 1852, sentenciaba:

«En muchos puntos puede servir de modelo; hay en él lugar para que el legislador de todo país medite sobre las inno-

[108] Por ejemplo, César Luna-Victoria León, «Código Civil de 1852: lo nacional y lo importado», en *Derecho*, n.º 42, PUCP, Lima, diciembre de 1988, pp. 73-100.

[109] Fernando de Trazegnies, *La idea del Derecho en el Perú republicano del siglo XIX*, Fondo Editorial de la Pontificia Universidad Católica del Perú, Lima, 1980. Reimpreso en 1992.