# EXHIBIT B-29

# Patrimonio cultural del Perú I

FONDO EDITORIAL DEL CONGRESO DEL PERÚ

Biblioteca del Congreso del Perú
306.0985
P
Patrimonio Cultural del Perú. / Wálter Alva, Fernando de Trazegnies, Luis Lumbreras... [et. al.]; presentación de Martha Hildebrandt. – Lima: Congreso del Perú, 2000.
2 t.

ISBN : 9972-755-33-9
1er. tomo : 9972-755-50-9

CULTURA / PATRIMONIO CULTURAL / INSTITUCIONES / TURISMO / POLÍTICA CULTURAL / LEGISLACIÓN / PERÚ

INSTITUTO RIVA AGÜERO
BIBLIOTECA
17 OCT. 2000
40963

Alva, de Trazegnies, Lumbreras y otros
PATRIMONIO CULTURAL DEL PERÚ

*Portada:* Maqueta de escenas rituales hecha en madera con incrustaciones de nácar. Fue descubierta en Trujillo (1995), en una tumba chimú, en la plataforma I de *La Huaca de la Luna*, por el doctor Santiago Uceda. Esta maqueta es propiedad del Proyecto arqueológico *Huaca del Sol y de la Luna*, de la Universidad Nacional de Trujillo. Fotografía: Mylene d'Ariol.

*Corrección:* Jorge Díaz Herrera

© Fondo Editorial del Congreso del Perú
Teléfono: 426-0769 Telefax : 427-1144
Correo electrónico: webmaster@congreso.gob.pe
http://www.congreso.gob.pe
Impreso en el Perú
2000

Hecho el depósito legal Nº 1501032000-3135
Fondo Editorial del Congreso del Perú
Av. Abancay 251, Lima

# ÍNDICE
## TOMO I

PESENTACIÓN
*Martha Hildebrandt*
11

PRÓLOGO
*Ricardo Marcenaro Frers*
15

**PRIMERA PARTE**
**ESTADO Y CULTURA: CONSERVACIÓN DEL PATRIMONIO CULTURAL DEL PERÚ**
19

La conservación moderna del Patrimonio Cultural
*Fernando de Trazegnies Granda*
21

Patrimonio Cultural. Historia del debate
*Pablo Macera*
61

*Comentarios de Luis Lumbreras, Santiago Agurto y Luis Millones*
79

Case 3:09-cv-01332-AWT Document 78-15 Filed 06/01/10 Page 4 of 19

contrario, los bienes culturales virreinales y republicanos fueron siempre considerados como que podían ser de propiedad del Estado o de los particulares. Sin embargo, durante algunas décadas se atribuyó en forma exclusiva al Estado la propiedad de todo bien cultural precolombino, sin advertir que había una contradicción en ello: si tanto el bien cultural prehispánico como el virreinal merecerían ser protegidos, ¿por qué hacer esta diferencia? En realidad, la diferencia obedecía a la insostenibilidad de la posición estatista hasta sus últimas consecuencias: la posibilidad de propiedad privada en materia de bienes virreinales era una concesión a la realidad, como veremos a continuación.

### 2. CRISIS CONCEPTUAL Y LEGAL DE LA PROPIEDAD

Atribuir la propiedad de todo bien cultural al Estado —o, cuando menos, de todo bien cultural prehispánico— implicaba situaciones terriblemente complicadas, porque construía el sistema sobre una base de irrealidad; lo que daba lugar a lagunas de protección por la dificultad de mantener la coherencia.

Es así como, si bien se consideró que los inmuebles prehispánicos eran propiedad del Estado, más tarde se comprobó que ello traía muchas dificultades porque, aquellos que se encontraban en el campo, estaban ubicados dentro de predios privados que tenían dueño conocido; y muchos de aquellos que se encontraban en la ciudad, como en el caso del Cuzco, habían recibido construcciones virreinales encima de ellos y ahora eran viviendas privadas,

conventos de propiedad de órdenes religiosas, comercios y otros locales particulares. ¿Qué hacer en esas circunstancias? La ley 6634 de 1929 optó por considerar que sólo las construcciones prehispánicas propiamente dichas eran de propiedad del Estado, mientras que el terreno superficial en las que se encontraban era propiedad de particulares; por lo cual autorizaba la expropiación de ese terreno para consolidar la propiedad del Estado sobre el inmueble. Sin embargo, no se expropió un solo terreno. Por otra parte, esa solución no servía en absoluto para los inmuebles urbanos, porque hubiera sido necesario expropiar todo Cuzco, despojar a la Iglesia de sus propiedades y adoptar otras medidas similarmente absurdas. La conclusión de todo ello es que simplemente no se hizo nada: la sobreprotección que se había ideado para el Patrimonio cultural inmueble dio lugar en la práctica a una falta de protección. Es por ello que todavía hoy existen reclamaciones privadas sobre Machu Picchu, por cuanto se encuentra en terrenos de una hacienda inscrita en los Registros Públicos. Y es posible encontrar muchos casos similares. Por otra parte, nadie entiende la situación jurídica de las casas cuzqueñas; porque no cabe duda de que son propiedad de quienes viven en ellas y tienen sus títulos inscritos a su nombre pero, al mismo tiempo, la ley actual insiste en que la construcción incaica que forma parte inseparable de ellas es propiedad del Estado.

En el caso de los bienes muebles, la ley 6634 los consideró simplemente como propiedad automática del Estado. Sin embargo, es una realidad que muchos de los huacos

Case 3:09-cv-01332-AWT Document 78-15 Filed 06/01/10 Page 5 of 19

que existen en el país son legalmente de propiedad privada y nunca fueron del Estado, porque las leyes del Virreinato y de la República habían permitido siempre, dentro de ciertas proporciones y condiciones, que los particulares pudieran ser propietarios de los bienes y tesoros encontrados en excavaciones. En consecuencia, declarar que todos los bienes muebles prehispánicos son propiedad del Estado era proceder a una confiscación; lo que es contrario a todas las Constituciones que ha tenido la República. Además, es un hecho que un número enorme de piezas arqueológicas se encuentra en poder de personas e instituciones privadas: universidades, museos privados, coleccionistas y simples particulares que quieren adornar su casa o su oficina profesional con estas hermosas obras de arte de nuestros antepasados.

¿Qué hacer entonces? Si todos los huacos y demás objetos arqueológicos son propiedad del Estado, habría que quitárselos a todos los tenedores privados porque estarían reteniendo un bien ajeno. Sin embargo, era una verdadera locura realizar esta confiscación generalizada porque, posiblemente, no se sabría dónde poner esta inmensa cantidad de objetos en los museos nacionales. Por otra parte, los particulares considerarían este acto como una arbitrariedad abusiva y posiblemente intentarían ocultar sus piezas; con lo cual la protección del Patrimonio cultural se encontraría afectada por cuanto gran parte de la riqueza arqueológica sería escondida y quizá extraída ilegalmente fuera del país.

Entonces, se hizo un uso perverso de una distinción jurídica válida para crear una situación inválida e irreal. Es así como se dijo que era necesario diferenciar propiedad y posesión; de manera que aun cuando la propiedad correspondía al Estado, los huacos se encontraban en posesión por los particulares; este derecho es legal pero se limita sólo a la posesión. De esta manera se pretendió encubrir la realidad real del dominio de los huacos por los particulares con una suerte de concesión otorgada por el Estado, que les permitía a los particulares mantener la posesión indefinidamente. Pero un derecho de posesión total y sin límites temporales es, en realidad, un derecho de propiedad. La división esquizoide preconizada por esta peregrina tesis llevaba a que el propietario teórico —es decir, el Estado— no podía ejercer ninguno de los atributos de la propiedad porque no le correspondía disponer de esas piezas que estaban en manos de particulares ni usar de ellas ni aprovecharlas en forma alguna; por su parte, los particulares, que teóricamente eran meros poseedores, ejercían en la práctica la mayor parte de los atributos de la propiedad.

Esta situación nos hace recordar la vieja polémica que se produjo en la Edad Media entre los franciscanos y la Iglesia. Como se sabe, los franciscanos habían hecho voto de pobreza, al extremo de que no podían tener propiedad alguna. Sin embargo, gracias a las donaciones recibidas, tenían grandes conventos, con hermosas iglesias colmadas de obras de arte. Para salvar la contradicción con el

Case 3:09-cv-01332-AWT Document 78-15 Filed 06/01/10 Page 6 of 19

principio de pobreza incorporado en la Regla de la Orden, sostuvieron que ellos no eran propietarios sino meros poseedores de todos esos bienes materiales; y que la propiedad correspondía al Papa. La ficción era evidente; al punto que en la Edad Media se hacía la broma de que los franciscanos poseían todo sin poseer nada. Pero llegó al trono de San Pedro un Papa jurista, Juan XXII; y éste inmediatamente puso las cosas en orden: el Papa no podía ser propietario, aunque se le llamase así, porque no ejercía ninguno de los atributos de la propiedad; y, en cambio, los franciscanos, aunque pretendieran ser meros poseedores, eran en realidad propietarios porque usaban de los bienes como tales.

En consecuencia, la tesis de que el Estado es propietario de los bienes culturales muebles prehispánicos y que los particulares que tienen realmente las piezas, que las heredan y que las gozan son meros poseedores, había sido ya refutada hace 700 años. Por eso, para eliminar esta situación alucinante y organizar las cosas dentro del marco de la realidad, la ley 24047 y la Constitución Política de 1993 reconocieron la existencia de propiedad privada de los bienes muebles prehispánicos.

### 3. HACIA UNA NUEVA CONCEPTUALIZACIÓN JURÍDICA DE LA PROTECCIÓN DEL PATRIMONIO CULTURAL

El problema fundamental consiste en dejar de lado el fetichismo de la propiedad que lleva a esa división maniquea entre la propiedad estatal y la propiedad privada, y reconocer finalmente que los bienes culturales reúnen diferentes intereses, distintas perspectivas, cada una de las cuales da lugar a derechos para diferentes sujetos. Entre esos derechos, la propiedad tiene un papel; pero ese papel no debe exceder el alcance clásico de esta institución y no debe tampoco desconocer la existencia de otros derechos coincidentes sobre el mismo bien. Recordemos que Ihering afirmaba que el derecho es un interés jurídicamente protegido; por consiguiente, cuando hay varios intereses sobre un mismo objeto que merecen protección, nos encontramos que hay varios derechos sobre ese objeto y que estos derechos tienen a su vez diferentes titulares, entre los que se encuentra tanto el Estado como los particulares.

Frente a la perspectiva ingenua de la propiedad clásica que consideraba que cada cosa era un solo bien y atribuía un propietario por cada cosa, ahora encontramos que cada cosa física constituye muchos bienes superpuestos y que cada bien es gozado y tutelado por diferentes personas. De acuerdo a lo antes dicho, la cosa está conformada por distintos componentes; y cada uno de estos componentes da origen a un derecho distinto y se refiere a un sujeto diferente; de manera que aquello que llamamos "bien cultural" es, en realidad, la organización de un conjunto de derechos diferentes que involucra a varias personas —públicas y privadas— distintas.

Regresemos por un momento al ejemplo del libro. Ahora sabemos que frente a cada libro en particular no sólo se

# EXHIBIT B-30

ANÍBAL TORRES VÁSQUEZ

# INTRODUCCIÓN AL DERECHO

## TEORÍA GENERAL DEL DERECHO

*Tercera edición*
REIMPRESIÓN

IDEMSA

Lima - Perú

Case 3:09-cv-01332-AWT Document 78-15 Filed 06/01/10 Page 9 of 19

Meses después se produjo el cambio de gobierno, y ocupó la presidencia el general José Rufino Echenique. El Congreso, por ley del 7 de junio de 1851, suspendió los efectos del decreto de Castilla, y mediante otra ley de la misma fecha dispuso el nombramiento de una tercera comisión con miembros de ambas cámaras para que procediesen al examen y reforma de los proyectos de códigos; el 12 de junio de ese mismo año, ambas cámaras nombraron la comisión, que quedó integrada por los senadores Andrés Martínez y José Luis Gómez Sánchez, y por los diputados Pedro Gálvez, Manuel Toribio Ureta, Teodoro la Rosa, Juan Celestino Cavero y Pedro José Flores. Presidió la comisión Andrés Martínez, que impuso en ella una orientación conservadora. Se cambió el título de los clérigos, acomodándolo a la ortodoxia; los liberales perdieron la batalla sobre el matrimonio, el cual quedó sometido a la ley eclesiástica; se suprimieron las disposiciones relativas a los gremios, profesiones y letras de cambio, entre otras cosas; hubo modificaciones en materia de herencia, derecho de cosas y contratos. El proyecto así modificado fue aprobado sin más debate por ley del Congreso del 23 de diciembre de 1851, que ordenó su promulgación el 28 de julio de 1852, para que entrara en vigencia al día siguiente.

b) *Sistema del Código Civil de 1852.* El Plan del Código de 1852 era el mismo del Código Civil francés de 1804, que a su vez se inspiró en el Plan de GAYO.

El Código se divide en un Título preliminar (De las leyes en general) y tres libros: 1°. De las personas y sus derechos; 2°. De las cosas: del modo de adquirirlas; y de los derechos que las personas tienen sobre ellas; 3°. De las obligaciones y contratos.

Los codificadores del 52 se inspiraron fundamentalmente en el Código Civil francés, pero también en el Derecho español, sobre todo en el Derecho castellano, el Derecho de Indias y en el Derecho canónico.

El antiguo Derecho español nace de la confluencia del Derecho romano con el germano; lo mismo sucedió con el antiguo derecho consuetudinario francés y de otros países europeos.

Consecuencias del iusnaturalismo y del romanticismo en el Derecho son la exaltación de la libertad, la propiedad privada y la responsabilidad por culpa. El artículo 462 del Código Civil de 1852, que es copia del artículo 545 del Código francés, decía que a nadie se le puede obligar a ceder su propiedad, sino por utilidad pública, legalmente declarada y previa indemnización de su justo valor.

A partir del siglo VIII los romanistas alemanes, llamados pandectistas: HUGO, SAVIGNY, PUCHTA, IHERING, ARNDTS, BRINZ, WINDSCHEID NIEBUHR, STAHL y otros, dieron origen a la *Escuela Histórica*, que otorga importancia decisiva a la tradición jurídica, y adaptaron el Derecho romano a los nuevos tiempos; completaron los conceptos jurídicos y elaboraron una teoría general del Derecho con base en la abstracción y generalización de principios que solo en germen concibieron los romanos.

# EXHIBIT B-31

# PROYECTO

DEL

## CODIGO CIVIL PERUANO

DIVIDIDO EN TRES PARTES

## 2.a PARTE

## DOMINIO Y CONTRATOS

ESCRITO POR EL CIUDADANO

**M. L. VIDAURRE.**

Si la naturaleza dicta las leyes,
ellas necesariamente serán santas.

LIMA

IMPRENTA DEL CONSTITUCIONAL POR JUSTO LEON.

1835.

Art. 10. Al dueño lejítimo le corresponde el aumento natural de la cosa—el industrial, si ha provenido de su trabajo—el misto, si una persona estraña no ha concurrido á ello.

Art. 11. El poseedor de buena fé hace suyos los frutos—El de mala, los ha de entregar sacando los gastos—El usurpador pierde lo gastado en castigo de su crimen.

Art. 12. Se adquiere por la tradicion—La tradicion ó es voluntaria ò judicial. Voluntaria, por contratos y testamentos: judicial por sentencia del juez ò salud de la patria.

Art. 13. Si en una materia vil, ó de una materia vil se forma una especie de valor, pertenece al que la trabajó pagando el precio de la materia; pero si distan poco los valores, quedará la eleccion al propietario.

Art. 14. Si dos cantidades de la misma especie, pertenecientes à diferentes personas, se confunden, divídase el precio en proporcion al peso que correspondia á cada uno.

Art. 15. Todos los ganados mayores ò menores, sean signados ó errados. El propietario que lo omitiese, no pueda vindicar lo que hubiese perdido.

Art. 16. Si de metales ó maderas ajenas, se hiciesen alhajas ó muebles sin consentimiento del dueño, la accesion declárese á este: será el castigo del hurto.

Art. 17. El que quiera trabajar en suelo ajeno, cuyo dueño se ignora, plantando ó edificando, denúncielo por desamparado. Si despues de edificado apareciese el dueño no se le restituirá, reconociendo su valor, por el que no podrá ser reconvenido en cuatro años. Pero si edificó sin licencia, ó sabiendo quien era el dueño, quede la fabrica á beneficio de este, pagando la mitad del precio. No siendo conveniente al dueño la fabrica, se destruirá á costa del que edificó, el que restituirá las cosas al estado en que las halló.

Art. 18. El que trabaje en fundo propio con materiales ajenos, pagará el valor de los materiales, los daños y perjuicios que resultasen de haberse apoderado de ellos y el interes del dinero.

Art. 19. Toda cosa, que se halla en un lugar público, y que se conoce, no fué jamas poseida por otro, pertenece en pleno dominio al que la halla.

Ar. 20. Los creadores de perlas y oro, las minas, los montes, los terrenos de salitre, serán del que los descubra,

pagando una corta contribucion de lo mismo que se estraiga; sacandose titulo, y dandose fianza de poner alli labores. Si se abandonan, quedan de libre adquisicion con las mismas calidades.

Art. 21. Tesoro es el valor oculto cuyo dueño es desconocido—Si se descubre por el dueño del fundo corresponde á él—Ninguno puede buscarlo en fundo ajeno contra la voluntad de su dueño—El dueño del fundo que lo halle por noticia de otro, pártalo con él—El que se presuma estar en lugar pùblico, denunciese—Si el estado se conviniese en hacer la mitad de los gastos, tenga la mitad de lo que se hallase; sino se conviniese, sea todo del descubridor, dando fianzas de restituir el terreno al estado en que se hallaba—Si alguno reclamase tesoro que le corresponde y está en fundo ajeno, si diese de ello pruebas, accedase á su solicitud, afianzando à satisfaccion del propietario, pagar todos los menoscabos que sufra, y los frutos que deje de percibir—El tesoro hallado en las iglesias, corresponde á ellas—Ninguna comunidad religiosa, ni cuerpo eclesiàstico tiene derecho á los tesoros que se hallan en los lugares pùblicos, ó de propiedad individual.

Art. 22. El que se hallare cosas mostrencas las hará suyas; previas las siguientes dilijencias.

Las hará manifiestas al juez.

Se constituirà por un año depositario de ellas.

Se pregonarán una vez cada semana.

Se pondrán carteles pùblicos.

Se anunciarán en los papeles ministeriales.

Pasado el año, se declarará el dominio al que las halló, con fianza de devolverlas, si entre dos años mas apareciese el dueño, y probare ignorancia ó justo impedimento para no haber reclamado en tiempo.

Concluidos los tres años, se chancelará la fianza, y no será oido el dueño.

Art. 23. El que se apropie la cosa mostrenca sin estos requisitos, restituyala como si fuese hurtada. Sino parece el dueño, corresponderà la accion al fisco nacional.

Art. 24. Los ganados menores se pregonaràn por sesenta dias—Se pondrán carteles y se dará el aviso en papeles públicos, lo que verificado y cumplido el plazo, se declararán en favor del que los halló—para el ganado mayor serán tres meses—para las bestias de estimacion un

nece, conforme á lo resuelto, ó por concierto ò capitulacion se le hubiese concedido, menos los derechos y quintos, que á nos pertenecen, y traiga la restante cantidad á la parte que se le señalare, dandosenos aviso de todo y remitiendolo á estos reinos (1); y asi mismo ordenamos, que para el cumplimiento de lo referido y allanar la casas, heredades y posesiones, quel descubridor señalare, el virey, presidente ò gobernador dé comision, encargando á la persona que ha de asistir, que use de ella con limitacion"—las demas son prevenciones jenerales.

De estas leyes ninguna es enteramente justa. Las he puesto á la letra, para que se conozca la necesidad de un nuevo código, y lo difícil que era que entre tantos preceptos contradictorios, se hallase abogado, ó juez perfectamente instruido en la legislacion. El dueño de una heredad, de un predio urbano, es dueño por lo bajo hasta el centro de la tierra, por lo alto hasta los cielos; espresion que he tomado á la letra de Blackstone. [2] El gobierno no puede tocar en las propiedades particulares, sino en el caso de exijirlo la salvacion del estado. Felizmente esto se halla decidido por la Carta. [3] Es inviolable el derecho de propiedad. Esta sentencia nos ayudará á resolver muchas cuestiones en lo político y civil. Si el dueño del fundo halla el tesoro, todo es de él, hálleselo por casualidad, ò buscandolo; del mismo modo que el puquio de agua que allí brotase, que los frutos de sus árboles y mieses de sus campos. Si un estraño quiere descubrir el tesoro, pedirá la vénia al amo, pactará con él, y si se negare, la riqueza quedará en el centro de la tierra: bien que si con la noticia, el dueño hiciere por si el descubrimiento, dividirá el tesoro con el verdadero descubridor. Esta viene á ser una tácita compañía, en la que el dueño pone su fundo, y el descubridor su conocimiento. No es justo que ninguno enriquezca á costa de otro.

Si el descubrimiento es en un lugar público, se ocurrirá al gobierno, solicitando la licencia para hacer las escavaciones. Dará fianzas de reponer el terreno á su estado

(1) Siempre á enriquecer la España.
(2) *Lib. 2 cap. 2 al fin.*
(3) *Art.* 161.

antíguo, hallese ó no se halle el tesoro. Si el gobierno quiere hacer por mitad los gastos, le corresponderá la mitad de lo que se descubra; si se negase á ello, todo será del descubridor.

El caso de la ley de partida es muy raro, pero posible. ¿Qué se hará si uno reclama y dice, en el fundo de Ticio, mis padres dejaron sepultado un tesoro que me corresponde? Desoirlo seria una injusticia. Ticio es dueño del fundo, pero no del tesoro, conocida la persona á quien corresponde. Allanar la casa ó heredad ajena, por su simple palabra, tambien seria injusticia. Si dá tales, cuales pruebas y fianzas completas á satisfaccion del poseedor del fundo, de reparar todos los daños que se causen por la investigacion, y pagar el valor de los frutos que la tierra debia producir, se le permitirá. El que tiene derecho á un dinero, no lo pierde porque esté en las arcas de otro: el dueño no debe enriquecer con lo ajeno. *Nemo cum alterius damno, fieri debet locupletior.* Este es un dogma de derecho natural. Y en comprobacion de mi doctrina, debo referir que se hizo cuestionable, si se podian sacar los tesoros de la tierra, contra la espresa voluntad de los que allì los depositaron, y fué la decision, que no habiendo herederos conocidos de ellos, podian estraerse. [1] Aunque segun nuestros principios no habia duda, que podian sacarse, porque es concedido el uso de las cosas, y no el abuso, no pudiendo ser mayor, que impedir para siempre el círculo de una cantidad, sin embargo traigo el ejemplo para que se vea que siempre se reconoció el dominio del tesoro oculto en el descendiente del que allí lo depositó.

De todos los tesoros hallados en sepulturas, oques (2) templos, adoratorios y heredades de los indios, tomaba la mitad el rey para si, sacados los derechos y quintos. [3] Es decir, se llevaba la mayor parte, siempre con la clausula espresa de remision á los reinos de España. D. Juan Solorzano, tratando espresamente esta materia [4] distingue si los tesoros se buscaban de propósito, pertenecian al rey, si por casualidad eran descubiertos, la mitad era del des-

[1] *Herrera dec 5 lib. 5 cap. 8.*
[2] *Solorzano dice que se lea huacas.*
[3] *Ley 2a. tit. cit.*
[4] *Lib. 6 cap. 5.*

# EXHIBIT B-32



Case 3:09-cv-01332-AWT Document 78-15 Filed 06/01/10 Page 15 of 19

# CÓDIGO CIVIL comentado

COMENTAN 209 ESPECIALISTAS EN LAS DIVERSAS MATERIAS DEL DERECHO CIVIL

**COMITE DIRECTIVO**

Walter Gutierrez Camacho
Director General

Manuel Muro Rojo
Director del Tomo V

**COMITE CONSULTIVO**

Max Arias-Schreiber †
Fernando Vidal Ramírez
Jorge Avendaño Valdez
Jorge Santistevan de Noriega
Javier de Belaunde
Augusto Ferrero Costa
José León Barandiarán Hart †

## TOMO V

Derechos Reales

GACETA

GACETA JURÍDICA

CÓDIGO CIVIL COMENTADO
TOMO V

SEGUNDA EDICIÓN
MAYO 2007
2000 Ejemplares

PROHIBIDA SU REPRODUCCIÓN
TOTAL O PARCIAL
DERECHOS RESERVADOS
D.LEG. Nº 822

© *Gaceta Jurídica S.A.*

HECHO EL DEPÓSITO LEGAL EN LA
BIBLIOTECA NACIONAL DEL PERÚ
2007-04320

LEY Nº 26905 / D.S. Nº 017-98-ED

ISBN OBRA COMPLETA: 978-9972-208-89-8
ISBN TOMO V: 978-9972-208-94-2

REGISTRO DE PROYECTO EDITORIAL
31501220700346

DISEÑO DE TAPA
Armando Ochoa Gamboa

DISEÑO DE INTERIORES
Carlos Abanto León

# Autores de este Tomo

(por orden de aparición)

1. FERNANDO VIDAL RAMÍREZ
2. ALFREDO BULLARD GONZÁLEZ
3. FRANCISCO AVENDAÑO ARANA
4. FREDY SILVA VILLAJUÁN
5. JAVIER PAZOS HAYASHIDA
6. PEDRO ÁLAMO HIDALGO
7. JORGE AVENDAÑO VALDEZ
8. MARTÍN MEJORADA CHAUCA
9. GLORIA SALVATIERRA VALDIVIA
10. ANA PATRICIA LAU DEZA
11. LUIS GARCÍA GARCÍA
12. SAMUEL GÁLVEZ TRONCOS
13. FRANK ALMANZA ALTAMIRANO
14. XIMENA BENAVIDES REVERDITTO
15. MANUEL MURO ROJO
16. JAVIER ÍSMODES TALAVERA
17. WILBERT SÁNCHEZ VERA
18. WALTER GUTIÉRREZ CAMACHO
19. CÉSAR GODENZI PANDO
20. ALFONSO REBAZA GONZÁLEZ
21. TEÓFILO ALARCÓN RANGEL
22. FEDERICO MESINAS MONTERO
23. CARLOS GRANDA BOULLÓN
24. SILVIA GODENZI MONTAÑÉZ
25. MAX ARIAS-SCHREIBER PEZET
26. ENRIQUE VARSI ROSPIGLIOSI
27. CLAUDIO BERASTAIN QUEVEDO

## 3. Prohibición y restricción

Mientras el artículo 882 del Código Civil de modo taxativo impide pactar convencionalmente la prohibición al ejercicio de los atributos del derecho de propiedad, el artículo 926 del mismo cuerpo legal sí permite establecer restricciones al ejercicio de tales atributos. Siendo entonces que se trata de dos normas vinculadas entre sí, referidas ambas al ejercicio de los atributos del derecho de propiedad, resulta indispensable precisar la diferencia entre los vocablos "prohibición" y "restricción" a efectos de establecer los alcances que tiene cada una de las precitadas disposiciones.

Prohibir, conforme al diccionario de la Real Academia Española de la Lengua Española, significa *vedar* o *impedir el uso o ejecución de algo*. Restringir, en cambio, significa *circunscribir, reducir a menores límites*. Se trata pues de dos vocablos diferentes, con alcances y significado distintos. Mientras en el primer caso –prohibir– el impedimento es absoluto, en la restricción, el impedimento es relativo; no podrá significar la prohibición de ejercer el atributo.

Así, resultará entonces que no podremos **impedir** (limitación absoluta), sin apartarnos del orden establecido, el ejercicio de los atributos del derecho de propiedad, salvo, por supuesto, autorización legal expresa en sentido distinto. Situación distinta ocurrirá con las restricciones convencionales ya que las mismas sí están permitidas por el artículo 926, lo que significa que es jurídicamente posible **circunscribir o reducir los límites** (limitación relativa) del ejercicio de los atributos ya mencionados. Por lo tanto, si bien no podemos prohibir, sí es posible restringir el ejercicio de los atributos del derecho de propiedad.

## 4. El contenido de la restricción

El tema central en cuanto al contenido de la restricción radica en que esta no debe ser contraria a ley, ni generar efectos que esta no permite.

Respecto de esto último, debe tenerse en cuenta que la restricción no puede suponer una prohibición de ejercer los atributos del derecho de propiedad, ni directa ni indirectamente. La restricción, para ser válida, solo puede significar el establecimiento de límites (como por ejemplo, la aplicación de un ómnibus entregado en usufructo al transporte de escolares y no a transporte público) o del cumplimiento de determinadas condiciones como requisito previo al ejercicio del derecho de propiedad. Esto supone que la restricción no puede consistir –en ningún caso– en hechos cuya ejecución dependa de la exclusiva voluntad de una de las partes o de un tercero, ya que si así fuera, estaríamos expuestos a la negativa y, por ende, se estaría en una situación que importe la prohibición (limitación absoluta) del ejercicio de los atributos del derecho de propiedad, la cual está absolutamente vedada.

La doctora Lucrecia Maisch Von Humboldt señalaba que las partes, mientras no vulneren normas imperativas de la ley, pueden acordar restricciones al derecho de propiedad o a su ejercicio.

En nuestra opinión, son tres los parámetros que deben respetarse al pactar una restricción al derecho de propiedad: (i) que no constituya un impedimento (limitación absoluta) al ejercicio de los atributos del derecho de propiedad, (ii) que no atente contra las normas imperativas de la ley, y (iii) que el pacto no constituya un caso de abuso del derecho.

Una reflexión final consiste en determinar si las restricciones a las que alude el artículo 926 son de carácter personal o de carácter real. Usualmente, las restricciones están asociadas a la figura de la servidumbre.

Sin embargo, el escenario de las restricciones es más amplio que el de las servidumbres. Así, una diferencia importante entre las servidumbres y las restricciones es que las primeras solo se pueden constituir a partir del atributo dispositivo, en tanto que una restricción se puede pactar también respecto al disfrute o aprovechamiento económico del bien.

## 5. La eficacia del pacto ante terceros

La eficacia material de esta norma se resuelve fundamentalmente por el tema de la oponibilidad frente a terceros de aquellas restricciones al ejercicio de los atributos del derecho de propiedad que se hubiesen pactado. La razón estriba en que al permitirse a las partes imponer restricciones al ejercicio del derecho de propiedad, será necesario exigir la inscripción de las mismas en el Registro respectivo a fin de informar a terceros ante quienes podrán oponerse dichas restricciones. De otra manera, la oponibilidad no surtiría efecto y el acuerdo restrictivo quedaría limitado a las partes que han convenido.

La información que se brinda al tercero mediante la publicidad registral implica también una protección para las partes, ya que estando inscrita la restricción, un tercero no podrá alegar que no tenía conocimiento de las restricciones impuestas al ejercicio del derecho de propiedad, toda vez que aquello que se encuentra inscrito en el Registro se presume conocido por todos (principio de cognoscibilidad, artículo 2012 del C.C.), sin admitirse prueba en contrario.

En suma, la inscripción de la restricción convencional en el registro fortalece el acuerdo de las partes en la medida en que no solo ellas, sino principalmente los terceros, estarán obligados a respetarla.

## DOCTRINA

*MAISCH VON HUMBOLDT, Lucrecia, En: REVOREDO DE DEBAKEY, Delia (compiladora) Código Civil. Exposición de Motivos y Comentarios, tomo V, Lima 1985; MAISCH VON HUMBOLDT, Lucrecia. Los Derechos Reales, 3ª edición. Lima, Librería Studium, 1984.*

# ACCIÓN REIVINDICATORIA

**ARTÍCULO 927**

***La acción reivindicatoria es imprescriptible. No procede contra aquel que adquirió el bien por prescripción.***

**CONCORDANCIAS:**

*C. art. 70; C.C. arts. 665, 923, 950, 953, 1989; C.P.C. art. 486, incs. 2), 5); LEY 27287 art. 15*

## *Comentario*

***César Godenzi Pando***

Antes de iniciar el comentario del presente artículo, es necesario señalar que la doctrina tradicional divide en dos grupos las acciones que protegen el dominio: las acciones reales y las acciones personales, cuyos antecedentes más remotos los encontramos en el Derecho Romano, en donde se conoció esta división como la *actio in rem* en contraposición a la

Case 3:09-cv-01332-AWT Document 78-15 Filed 06/01/10 Page 17 of 19

Case 3:09-cv-01332-AWT Document 78-15 Filed 06/01/10 Page 18 of 19

*actio in personam*, de las que se derivaron los derechos *in rem* y los derechos *in personam*, respectivamente (MAISCH VON HUMBOLDT).

De lo anotado anteriormente se desprende que existen, pues, diferencias fundamentales entre los derechos reales y los derechos personales, entre las que podemos mencionar a las siguientes:

a) En cuanto al número de elementos: el derecho real presenta únicamente dos elementos, el sujeto (titular del derecho), y el bien, por lo que se afirma que el derecho real es el poder directo e inmediato que ejerce una persona sobre un bien, originando así una relación directa entre dicha persona y dicho bien.

   El derecho personal, en cambio, se compone de tres elementos: el sujeto activo, el sujeto pasivo y el objeto o la prestación, estableciéndose una vinculación entre ellas y quedando el sujeto pasivo obligado a efectuar una prestación específica.

b) En cuanto a la oponibilidad: el derecho real es un derecho absoluto, es decir, oponible *erga omnes*, por ejemplo todos tienen la obligación de respetar mi propiedad, en cambio, el derecho personal es un derecho relativo, ya que solo es exigible al sujeto pasivo.

c) En cuanto al modo de ejercicio: en el derecho real, el objeto se obtiene directamente, sin ningún intermediario; en cambio, en el derecho personal el objeto se alcanza por medio de otra persona.

d) En cuanto al número: los derechos reales tienen un número limitado *(numerus clausus)*, ya que solo pueden ser creados taxativamente por la ley, así lo señala nuestra norma sustantiva civil en el artículo 881; en cambio, los derechos personales pueden crearse ilimitadamente *(numerus apertus)*. De lo anterior se desprende que en los primeros se trata de normas de orden público, mientras que en los segundos, prima el principio de la libre autonomía de la voluntad (BORDA).

e) En cuanto a la determinación del bien: los derechos reales se refieren a bienes corporales e individualmente determinados, la propiedad "A", el usufructo "B", la hipoteca "C", en cambio, los derechos personales están referidos a objetos inmateriales.

f) En cuanto al *ius preferendi*: el derecho real confiere a su titular un derecho de preferencia frente al que tiene un derecho crediticio, y además establece la primacía ante otro derecho similar, según su antigüedad. Los derechos crediticios no poseen esta característica, pues todos están en igualdad de condiciones.

g) En cuanto al *ius persequendi:* el derecho real otorga a su titular el derecho de persecución sobre el bien, por lo tanto es oponible a cualquier tercero que lo posea (excepto en los bienes muebles poseídos de buena fe que son irreivindicables), en cambio, los derechos personales no tienen esa naturaleza "reipersecutoria".

Como consecuencia de lo anteriormente anotado se desprende, pues, que los derechos reales dejan expedito a su titular para invocar una acción real que le hará reivindicar el bien contra aquella persona que lo tenga en su poder; en cambio, los derechos personales solo se dirigen contra el obligado, quien deberá cancelar su obligación.

En ese mismo sentido, coincidimos con Valverde, quien señala que: "en el derecho obligacional la acción nace con el derecho mismo, en el real la acción nace de la violación de él".

Ahora bien, el artículo en comentario consagra, como una característica propia de los derechos reales, la potestad inherente del propietario para restituir a su dominio un bien de su propiedad a través de la llamada acción reivindicatoria.

En principio, la palabra "reivindicación" tiene su origen en las voces latinas *res*, que

significa "cosa" y *vindicare*, que significa "reclamar todo aquello que se ha desposeído", vale decir que, etimológicamente, esta acción persigue la restitución de un bien.

Nuestro Código Civil no define qué es la acción reivindicatoria, sin embargo, podemos anotar algunas definiciones doctrinarias.

Guillermo Cabanellas en su Diccionario de Derecho Usual, señala que la reivindicación es: "la recuperación de lo propio, luego del despojo o de la indebida posesión o tenencia por quien carecía de derecho de propiedad sobre la cosa".

Por su parte Lucrecia Maisch Von Humboldt agrega que "la acción reivindicatoria es la acción real por excelencia, ya que protege el derecho real más completo y perfecto que es el dominio".

Además, Planiol-Ripert-Picard afirman que "la reivindicación es la acción que ejercita una persona para reclamar la restitución de un bien (cosa) del que pretende ser propietario. Se basa, por tanto, en la existencia del derecho de propiedad y tiene como finalidad la obtención de la posesión".

También Guillermo Borda sostiene que "es la acción que puede ejercer el que tiene derecho a poseer una cosa (bien) para reclamarla de quien efectivamente la posee". Es preciso mencionar que Guillermo Borda se refiere acertadamente a "el que tiene derecho a poseer un bien", al que lo posee.

De esta manera, podemos señalar que la acción reivindicatoria reclama con justo derecho la restitución del bien indebidamente poseído por una tercera persona que carece de título legítimo y/o aparente y/o incompleto para poseerlo o para tener justo derecho sobre él. Consecuentemente, por esta acción se pretende restituir la posesión de un bien.

En ese mismo sentido, Arturo Alessandri Rodríguez, Manuel Somarriva y Antonio Vodanovic, indican que "la reivindicación es la acción dirigida al reconocimiento del dominio y la restitución de la cosa a su dueño por el tercero que la posee".

Esta definición es pues ratificada por el Código Civil chileno, en cuyo artículo pertinente estipula que: "La reivindicación o acción de dominio es la que tiene el dueño de una cosa singular, de que no está en posesión, para que el poseedor de ella sea condenado a restituírsela" (artículo 889 C.C. chileno).

De lo anotado anteriormente se colige que existen requisitos necesarios para la procedencia de esta acción, entre los que podemos mencionar:

a) Que el demandante o titular del derecho tenga legítimo derecho de propiedad sobre el bien que pretende reivindicar.

b) Que el legítimo propietario o titular esté privado de la posesión del bien.

c) Que se trate de un bien inmueble determinado, preciso e identificable.

Estos requisitos nos llevan a determinar que el fundamento de la acción reivindicatoria no es otro que el poder de persecución y la inherencia del derecho a la cosa, propios de todo derecho real y muy en particular del derecho de propiedad (ALESSANDRI R.).

Debemos agregar además que no es rigurosamente exacto que la acción reivindicatoria nazca cuando el propietario ha perdido la posesión del bien, puesto que también detenta el derecho a ejercitarla, en los casos en los que el propietario nunca tuvo dicha posesión (BORDA).

De lo anotado, creemos que a los requisitos anteriormente señalados se debería añadir como requisito *sine qua non* para ejercitar esta acción, la presentación del título que

(útil) vale para prescribir, siempre que se cumplan los plazos previstos en los artículos en comentario. A continuación paso a comentar cada uno de estos requisitos:

i) **Posesión continua.-** Para que se cumpla este requisito no es necesario que el poseedor tenga un ejercicio permanente de posesión sobre el bien, basta que se comporte como cualquier propietario lo haría. Para determinar si una persona tiene la posesión de un bien, debemos preguntarnos ¿cómo usualmente se posee ese bien?, por ejemplo, si una persona que vive sola en un departamento, lo usual es que cuando salga a trabajar, a estudiar, hacer deporte o se vaya de viaje, cierre la puerta con llave, y cuando llegue volverá a realizar los diversos actos de goce sobre ese bien. Ese comportamiento demuestra cuidado, diligencia, como lo tendría cualquier dueño de un departamento, y expresa que este bien se encuentra dentro de su esfera jurídica, por lo que conserva la posesión del inmueble a pesar de no tener un contacto permanente sobre él.

El artículo 904 del C.C. va más allá, establece que se conserva la posesión aunque su ejercicio esté impedido por hechos de naturaleza pasajera, un caso común de nuestra realidad geográfica es que por las fuertes y constantes lluvias que azotan nuestro territorio (sierra y selva), las carreteras se vean bloqueadas por la caída de huaicos, lo que genera que muchas veces los campesinos no puedan llegar a sus chacras. Sin embargo, a pesar de la imposibilidad de ejercer la posesión de las chacras por parte de los campesinos, no significa que ellos pierdan la posesión.

Ahora bien, Hernández Gil ha señalado que "la continuidad de la posesión no necesita ser mantenida por el mismo sujeto. Desde el Derecho romano se conoce la llamada 'accesión de posesiones', es decir, la unión de dos posesiones cuya finalidad es conceder al poseedor actual la facultad de aprovecharse de la posesión del anterior titular a efectos de facilitar el cumplimiento del término legal de la usucapión" (cit. por GONZALES BARRÓN, p. 525). En nuestra doctrina, esta figura se conoce preferentemente con el nombre de "suma de plazos posesorios", y está reconocida en el artículo 898 del C.C. La accesión de posesiones requiere una transmisión válida del bien y la tradición entre el poseedor anterior y el poseedor actual. La "transmisión válida" alude a la existencia de un negocio jurídico transmisivo entre las partes, el cual debe ser un negocio estructuralmente perfecto (artículo140 del C.C.), aunque sea ineficaz por faltarle al transmitente la titularidad del derecho. La importancia fundamental de esta figura se encuentra en facilitar el cumplimiento del término legal de la usucapión, y por ello, las posesiones que se unen deben ser homogéneas, en este caso, *"ad usucapionem"* (GONZALES BARRÓN, pp. 525-526).

La posesión debe ser continua (sin interrupciones de carácter natural o civil, me referiré a estas al comentar el artículo 953 del C.C.), lo cual no significa que sea en todo instante, pero ¿cómo se prueba? El artículo 915 del C.C. libera a la persona que pretenda ser declarada propietario de un bien en virtud a la prescripción adquisitiva de probar a cada instante que ha estado en posesión del bien, estableciendo una presunción *iuris tantum* de continuidad. Efectivamente, el poseedor deberá probar su posesión actual y haber poseído anteriormente, presumiéndose que poseyó en el tiempo intermedio. Considero que una de las pruebas que se pueden usar para acreditar la posesión actual y anterior son los recibos de las empresas prestadoras de los servicios públicos o una constancia de posesión expedida por la municipalidad respectiva.

ii) **Posesión pacífica.-** La posesión debe ser exenta de violencia física y moral. "Ser pacífica significa que el poder de hecho sobre la cosa no se mantenga por la fuerza. Por tanto, aun obtenida violentamente, pasa a haber posesión pacífica una vez que cesa la violencia que instauró el nuevo estado de cosas" (ALBALADEJO, p. 184). La

doctrina coincide con lo señalado por Albaladejo, en el sentido de que una vez que hayan terminado los actos de violencia, recién en ese momento se puede considerar que existe posesión pacífica que vale para prescribir.

El referido autor señala "como de lo que se trata es de que la situación mantenida violentamente no tenga valor (mientras la violencia dura) para quien ataca la posesión de otro, hay que afirmar que sí hay posesión pacífica para el que defiende por la fuerza la posesión que otro trata de arrebatarle" (ALBALADEJO, p. 185). El artículo 920 del C.C. trata al respecto, permite la autocomposición unilateral del conflicto, que no afecta a la posesión pacífica, por el cual el poseedor puede ejercitar la defensa posesoria repeliendo los actos violentos que se empleen contra él y recuperar el bien, siempre que dicha defensa cumpla con el requisito de inmediatez y racionalidad.

Asimismo, la existencia de procesos judiciales previos entre las partes o con terceros no afecta a la posesión pacífica (podrá ser causal de interrupción del plazo para prescribir), pero existe jurisprudencia en contra, criticable por cierto, ya que los procesos son la forma más pacífica de resolver los conflictos.

iii) **Posesión pública.-** Es decir, que exista una exteriorización de los actos posesorios, que actúe conforme lo hace el titular de un derecho. "El usucapiente es un contradictor del propietario o del poseedor anterior. Por eso, es necesario que la posesión sea ejercida de manera que pueda ser conocida por estos, para que puedan oponerse a ella si esa es su voluntad. Si ellos pudieron conocer esa posesión durante todo el tiempo que duró, y no lo hicieron, la ley presume en ellos el abandono, y la posesión del usucapiente se consolida" (PAPAÑO, KIPER, DILLON y CAUSSE, pp. 43-44).

Lo contrario a la posesión pública es la posesión clandestina, que carece de eficacia posesoria, por ejemplo, una persona que ingresa por las noches a un inmueble por un pequeño hueco en la pared del lindero del fondo, y que antes que amanezca se retira del inmueble. Este individuo no podrá adquirir la propiedad por prescripción, ya que su posesión ha sido clandestina. La prueba de la publicidad de la posesión se da a través de las testimoniales de los vecinos, que son las personas idóneas para atestiguar si la persona que invoca la prescripción ha ejercido una posesión de público conocimiento.

iv) **Como propietario.-** Se entiende que el poseedor debe actuar con *animus domini* sobre el bien, pero no se trata creerse propietario, sino comportarse como tal. El poseedor pleno[1] y el mediato[2] pueden prescribir un bien. Sin embargo, el poseedor inmediato[3] (artículo 905 del C.C.), y el servidor de la posesión[4] (artículo 897 del C.C.), no lo pueden hacer. "No cabe usucapir, por mucho que sea el tiempo que transcurra, si posee en concepto distinto del de dueño..." (PEÑA BERNALDO DE QUIRÓS, p. 127).

Pero qué sucede si el guardián de una casa ya no se comporta como tal, es decir, que ya no conserva la posesión de la casa en nombre de quien lo contrató, sino que actúa como propietario de esta. Considero que si dicho comportamiento es exteriorizado y opuesto al titular de la casa, el ex guardián ya no sería un tenedor de ella, sino un poseedor de la casa (claro está que hablamos de una posesión ilegítima de mala fe) que surtirá efectos para prescribir (extraordinaria).

(1) Por ejemplo, el invasor de un terreno.
(2) Por ejemplo, el arrendador no propietario.
(3) Por ejemplo, el arrendatario.
(4) Por ejemplo, el guardián de una casa.